## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| In re: | § § | Case No. 09-02140 (HB) |
| BI-LO, LLC *et al.*, | § § | Chapter 11 |
| Debtors.[1] | § § § | (Joint Administration) |

## MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO SELL AND TRANSFER CERTAIN PHARMACY INVENTORY AND RECORDS AND TO DISBURSE THE NET PROCEEDS THEREOF TO THE DEBTORS' DIP LENDERS

_____

BI-LO, LLC and its affiliates ("BI-LO" or the "Debtors"), the above-captioned debtors in possession, hereby file this motion (the "Motion") seeking entry of an order, in substantially the form attached hereto as **Exhibit A**, authorizing the Debtors to sell and transfer certain pharmacy inventory and records, as described in further detail herein, and to disburse the net proceeds thereof to the Debtors' DIP Lenders (as defined below). In support of this Motion, the Debtors respectfully submit the following:

### JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and Local Civil Rule 83.IX.01, D.S.C. This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1]     The Debtors and the last four digits of their respective tax identification numbers are: BI-LO, LLC (0130); BI-LO Holding, LLC (5011); BG Cards, LLC (4159); ARP Ballentine LLC (6936); ARP James Island LLC (9163); ARP Moonville LLC (0930); ARP Chickamauga LLC (9515); ARP Morganton LLC (4010); ARP Hartsville LLC (7906); and ARP Winston Salem LLC (2540).

3.      The statutory bases for the relief requested herein are §§ 105 and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## PROCEDURAL HISTORY

4.      On March 23, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned bankruptcy cases (the "Chapter 11 Cases").

5.      The Debtors are operating their business and managing their properties as debtors in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.  On March 30, 2009, the Office of the United States Trustee for the District of South Carolina (the "U.S. Trustee") appointed the official committee of unsecured creditors (the "Committee").  No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases.

6.      On March 23, 2009, the Court entered an order designating the Chapter 11 Cases as Complex Chapter 11 Cases pursuant to Rule 2081-2 of the Local Rules for the United States Bankruptcy Court for the District of South Carolina (the "Local Rules").  On March 24, 2009, the Chapter 11 Cases were administratively consolidated under Case No. 09-02140.

7.      BI-LO operates as a regional retail supermarket chain under the "BI-LO" and "Super BI-LO" banners.  As of the Petition Date, BI-LO was one of the largest food retailers in the Southeast United States, operating more than 200 stores in South Carolina, North Carolina, Georgia and Tennessee, with the majority of stores located in South Carolina.  BI-LO's corporate headquarters are located in Greenville, South Carolina and it employs more than 15,000 employees.

## FACTUAL BACKGROUND

8.      BI-LO currently operates a pharmacy business (the "Pharmacy") at a retail store located at 2226 Park Road, Charlotte, North Carolina 28203 (the "BI-LO Store").  The Debtors' property lease on the BI-LO Store expires in May 2009 and BI-LO is required to remove all inventory and equipment located on the premises of the BI-LO Store on or before May 25, 2009. The Pharmacy will close for business at the end of the day on Friday, April 24, 2009 and the remainder of the BI-LO Store will close on April 25, 2009.  The Debtors are filing the *Motion of the Debtors for Entry of an Order Authorizing the Debtors (A) to Employ and Retain Grafe Auction Company as a Liquidator to Conduct Public Auction Sale; (B) to Sell Certain Equipment Assets Free and Clear of All Liens, Claims, Interests and Encumbrances; and (C) to Disburse the Net Proceeds to the Term Lenders For Credit Upon Their Claims*  in connection with the sale of other non-Pharmacy related assets at the BI-LO Store.

9.      On April 9, 2009, BI-LO solicited bids from selected viable purchasers for the sale of certain of the Pharmacy's inventory and related records (the "Pharmacy Assets").  Bids were to be submitted by the end of business on Tuesday, April 14, 2009.  CVS/pharmacy submitted the highest bid with an offered purchase price of $150,000 (plus the cost of inventory pursuant to a formula set forth in the Purchase Agreement (defined below)).  CVS/pharmacy's bid averages approximately $10.66 per annualized prescription.  Recent sales of similar prescriptions researched by the Debtors averaged $7.00 per annualized prescription.

10.      For competitive reasons, BI-LO did not solicit bids prior to April 9, 2009.  An announcement of the sale of a pharmacy's prescriptions may cause existing customers to transfer prescriptions in anticipation of the pharmacy's close.  This would result in a dwindling asset base and would impair the maximum value that a seller could recover for the proposed sale of its

assets.  BI-LO, therefore, only solicited bids shortly before the Pharmacy's close in order to preserve the value of its Pharmacy Assets.  Consequently, a sale of the Pharmacy Assets is required to be made on an expedited basis in order to both vacate the BI-LO Store premises in a timely manner and, more importantly, provide a seamless transition for customers.  BI-LO anticipates a closing of the sale of Pharmacy Assets on April 25, 2009, the day following the Pharmacy's closing.

11.    CVS/pharmacy (the "Purchaser") and BI-LO have negotiated, at arm's-length, a Purchase and Sale Agreement for the sale of the Pharmacy Assets (the "Sale") in substantially the form attached hereto as **Exhibit B** (the "Purchase Agreement").  The Purchase Agreement provides, among other things:

(a)    The Sale will be consummated on the Closing Date, defined in the Purchase Agreement as April 25, 2009 (the "Closing);

(b)    BI-LO will sell, transfer, convey, assign and deliver to the Purchaser, its right, title and interest in and to the "Purchased Assets", defined in the Purchase Agreement as (i) the prescription drug inventory located at the Pharmacy as of the Closing Date and (ii) any over-the-counter medications considered to be inventory of the Pharmacy and located at the Pharmacy as of the Closing Date;

(c)    BI-LO will transfer custody and all of its right, title and interest in and to the "Pharmacy Records", defined in the Purchase Agreement as prescription files, customer prescription lists, and related records of the Pharmacy, whether stored electronically or on paper, related to prescriptions issued by the Pharmacy during the two year period prior to

the date of the Purchase Agreement that are in the possession of BI-LO as

of the Closing Date; provided, however, that Pharmacy Records shall not

include any accountings of disclosures retained by BI-LO in order to allow

BI-LO to fulfill its obligations under the Health Insurance Portability and

Accountability Act of 1996;

(d)    Purchased Assets will not include (i) cash, real estate, fixtures, furniture,

and/or equipment of BI-LO, (ii) BI-LO's accounts receivable, or (iii) any

computer hardware or software owned or licensed by BI-LO and used in

connection with the operation of the Pharmacy;

(e)    The purchase price for the Pharmacy Records will be $150,000 and

payment thereof by the Purchaser is a condition precedent to BI-LO's

obligations under the Purchase Agreement;

(f)    The purchase price for the inventory will be calculated pursuant to § 5 of

the Purchase Agreement and is payable no later than three (3) days

following the Closing Date;

(g)    BI-LO will indemnify, defend and hold harmless the Purchaser from and

against any loss, liability or damage suffered or incurred by the Purchaser

arising out of or related to:  (i) any breach of any covenant, warranty, or

representation made by BI-LO in the Purchase Agreement; (ii) any and all

liabilities and obligations arising from BI-LO's possession or use of the

Pharmacy Records or Purchased Assets, or (iii) any other liabilities or

obligations arising from the operation of the Pharmacy up to and including

the Closing, including, but not limited to, Losses (as defined in the

Purchase Agreement) suffered or incurred by the Purchaser by reason of or in connection with BI-LO's failure to discharge any liabilities or obligations of BI-LO, whether to its creditors or otherwise; and

(h)    The Purchaser will indemnify, defend and hold BI-LO harmless from and against any Losses (as defined in the Purchase Agreement) suffered or incurred by BI-LO arising out of or related to:  (i) any breach of any covenant, warranty, or representation made by the Purchaser in the Purchase Agreement; or (ii) any and all liabilities and obligations arising from the Purchaser's possession or use of the Pharmacy Records or Purchased Assets following the Closing.

12.    As of the date hereof, to the Debtors' knowledge and information, the only parties with a lien on the Pharmacy Assets are:

(a)    the Debtors' post-petition lenders pursuant to that certain *Senior Secured Superpriority Debtor-in-Possession Credit Agreement*, dated April 16, 2009 (the "DIP Facility"), among BI-LO Holding, LLC ("BI-LO Holding"), BI-LO, GE Electric Capital Corporation, as Administrative Agent and Swingline Lender (the "DIP Agent"), Wachovia Bank, National Association, as Issuing Lender, GE Capital Markets, Inc, as sole lead arranger and sole bookrunner, and the lenders that are parties thereto from time to time (collectively, together with the DIP Agent, the "DIP Lenders");

(b)    to the extent not discharged in full by the application of the proceeds from the DIP Facility, the Debtors' pre-petition ABL lenders pursuant to that

certain *Credit Agreement*, dated as of March 26, 2007, among BI-LO Holding, BI-LO, GE Business Financial Services, Inc. (f/k/a Merrill Lynch Capital, a division of Merrill Lynch Business Financial Services, Inc.), as Administrative Agent, sole lead arranger and sole bookrunner (the "Prepetition ABL Agent"), and the lenders that are parties thereto from time to time (collectively, together with the Prepetition ABL Agent, the "Prepetition ABL Lenders"); and

(c)     the Debtors' pre-petition term lenders pursuant to that certain *Credit Agreement*, dated as of March 26, 2007, among BI-LO Holdings, BI-LO, Merrill Lynch Capital Corporation, as the original Administrative Agent (the "Prepetition Term Agent"), Merrill Lynch, Pierce, Fenner & Smith Incorporated, as sole lead arranger and sole bookrunner, The Bank of New York Mellon, as successor Administrative Agent, and the lenders that are parties thereto from time to time (collectively, together with the Prepetition Term Agent, the "Prepetition Term Lenders"; and with the DIP Lenders and Prepetition ABL Lenders, the "Lenders").

13.     Pursuant to the terms of the DIP Facility, the Debtors will pay the net proceeds from the Sale directly to the DIP Agent, for the benefit of the DIP Lenders.

## RELIEF REQUESTED

14.     The Debtors seek entry of an order (a) approving the terms and conditions of the Purchase Agreement between the Purchaser and BI-LO and authorizing the execution and delivery thereof, (b) authorizing the Sale of the Pharmacy Assets to the Purchaser free and clear of all liens, claims and encumbrances, (c) authorizing the Debtors to pay the net proceeds of the Sale

to the Debtors' DIP Lenders and (d) granting such other and further relief to which the Debtors may be justly entitled.

## BASIS FOR RELIEF REQUESTED

**A.      Sale of the Pharmacy Assets Pursuant to the Purchase Agreement is an Appropriate Exercise of Sound Business Judgment and Should Be Approved.**

15.      Section 363(b)(l) of the Bankruptcy Code governs the sale of assets of a debtor outside the ordinary course of business.  Specifically, that section provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  In determining whether to authorize the sale of property outside the ordinary course of business, courts require a debtor "to show that a sound business purpose justifies such actions."  *See, e.g., In re Cont'l Airlines, Inc.,* 780 F.2d 1223, 1226 (5th Cir. 1986), *In re Del. & Hudson Ry. Co.,* 124 B.R. 169, 178 (D. Del. 1991) (affirming decision permitting debtor to sell assets where sound business reasons supported the sale).  Judicial review of sound business judgment requires a "balanced approach that does not grant debtors unfettered discretion, but permits the Court to analyze factors, based on the facts and circumstances of each case, that guide the Court in assessing a debtor's proposed [disposal of property]."  *In re Georgetown Steel Co.*, 306 B.R. 549, 556 (Bankr. D.S.C. 2004).  "As long as [the sale] appears to enhance a debtor's estate, court approval of a [Trustee's] decision to[sell] should only be withheld if the [Trustee's] judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code. . ." *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1309 (5th Cir. 1985) *(quoting Allied Tech., Inc. v. R.B. Brunemann & Sons*, 25 B.R. 484, 495 (Bankr. S.D. Ohio 1982)).

16.      In the instant case, the Debtors submit that sound business justification exists, which merits judicial approval of the Sale of the Pharmacy Assets pursuant to the Purchase

Agreement.  First, the Debtors are required to remove the inventory and other assets located at the BI-LO Store, including at the Pharmacy, prior to the expiration of their lease.  Customers of retail pharmacies typically select a pharmacy within a specified geographic area convenient to the customer.  Prescriptions and pharmacy inventory, therefore, is unlike other inventory which may be re-deployed in another of the Debtors' retail stores.  To realize value for the prescriptions and related inventory, the Debtors are required to sell the prescriptions to potential purchasers located within a limited geographic area of the Pharmacy.  This sale of prescriptions will also permit the Debtors to immediately realize additional funds for their estates, thereby increasing the pool of assets available for creditor distribution.

17.     Second, the Pharmacy Assets have been marketed and the Purchaser's offer is the highest, best and only offer available for the Pharmacy Assets after good-faith negotiations between BI-LO and the Purchaser. As noted, the pool of potential purchasers for the Pharmacy Assets is limited.  The Debtors solicited potentially viable purchasers and requested submission of bids.  The Purchaser submitted the highest bid, averaging approximately $10.66 per prescription. This bid exceeds the purchase price researched by the Debtors for recent similar sales. The Debtors submit there is ample authority for approval of the Sale under § 363 of the Bankruptcy Code.  The Debtors further submit that the terms of the Purchase Agreement were negotiated at arm's-length, reflect customary market terms and are reasonable.

18.     Pursuant to Bankruptcy Rule 6004(f)(1), a private auction is one method by which a debtor-in-possession may conduct an asset sale.  A debtor has broad discretion in determining the manner in which its assets are sold.  *Berg v. Scanlon (In re Alisa P'ship),* 15 B.R. 802, 802 (Bankr. D. Del. 1981) ("[T]he manner of [a] sale is within the discretion of the trustee . . ."); *In re Bakalis,* 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998) (noting that a trustee has "ample

discretion to administer the estate, including authority to conduct public or private sales of estate property.") (internal quotations and citations omitted). As long as a debtor maximizes the return to its estate, a court should defer to a debtor's business judgment. *Id.* at 532 (recognizing that although a trustee's business judgment enjoys great judicial deference, a duty is imposed on the trustee to maximize the value obtained from a sale); *In re Nepsco, Inc.,* 36 B.R. 25, 26 (Bankr. D. Me. 1983) ("Clearly, the thrust of the statutory scheme [governing 363 sales] is to provide maximum flexibility to the trustee, subject to the oversight of those for whose benefit he acts, i.e., the creditors of the estate."). Accordingly, if a debtor concludes that conducting a private sale, as opposed to a public auction, is in the best interest of the estate, the debtor should be permitted to do so. *Penn Mut. Life Ins. Co. v. Woodscape Ltd. P'ship (In re Woodscape Ltd. P'ship),* 134 B.R. 165, 174 (Bankr. D. Md. 1991) (noting that, with respect sales of estate property, "[t]here is no prohibition against a private sale... and there is no requirement that the sale be by public auction.").

19.     Given the specialized nature of the Pharmacy Assets, the number of potential buyers is limited to pharmacy businesses within a narrow geographical area surrounding the BI-LO Store.  To extract the maximum value for the Pharmacy Assets, the Debtors were required to target the most likely purchasers in the vicinity.  The Debtors therefore submit that a private auction was the best way to maximize the value of the Pharmacy Assets.

**B.     Sale of the Pharmacy Assets Free and Clear of Liens, Claims and Encumbrances Is Appropriate**

20.     The Debtors further submit that it is appropriate that the Pharmacy Assets be sold free and clear of liens, claims and encumbrances pursuant to § 363(f) of the Bankruptcy Code, with any such liens, claims, encumbrances, or interests to attach to the sale proceeds thereof. Section 363(f) of the Bankruptcy Code provides:

> The trustee may sell property under subsection (b) or (c) of this section free
> and clear of any interest in such property of an entity other than the estate,
> only if—
>
> (1) applicable nonbankruptcy law permits sale of such property free and
> clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold
> is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5)     such entity could be compelled, in a legal or equitable
> proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 365(f).

21.     To facilitate the Sale, the Debtors seek authorization to sell such Pharmacy Assets free and clear of any and all liens, claims and encumbrances, with such liens, claims. Because § 363(f) is stated in the disjunctive, when selling property of the estate it is only necessary to meet one of the five conditions of that section. 11 U.S.C. § 363(f). *See Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot),* 94 B.R. 343, 345 (E.D. Pa. 1988) ("[Section 363(f)] is written in the disjunctive, not the conjunctive. Therefore, if any of the five conditions of § 363(f) are met, the Trustee has the authority to conduct the sale free and clear of all liens.").

22.     The Debtors submit that the requirements of one of the subsections of § 363(f) are met to permit a sale of the assets free and clear of such Liens.  As part of the relief requested herein, the Debtors seek to pay to the DIP Agent, for the benefit of the DIP Lenders, the net proceeds of the Sale of the Pharmacy Assets to reduce the principal amounts under the DIP Facility.  On information and belief, the Debtors submit that the DIP Lenders have consented to the sale of the Pharmacy Assets as proposed herein.  The Sale of the Pharmacy Assets and payment of the net proceeds to the DIP Agent, for the benefit of the DIP Lenders, is in accordance

**MOTION TO SELL CERTAIN PHARMACY ASSETS**

Dallas 1553945v.5

with the DIP Facility.  Thus, the Debtors submit that they have met the requirements of § 363(f)

of the Bankruptcy Code and are, therefore, entitled to sell or otherwise dispose of the Pharmacy

Assets free and clear of liens, claims, interests and other encumbrances.

**C.    The Purchasers Should be Deemed Good Faith Purchasers**

23.    Section 363(m) of the Bankruptcy Code protects the sale of a debtor's property to

a good faith purchaser.  Section 363(m) provides

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property does not
> affect the validity of a sale or lease under such authorization to an entity
> that purchased or leased such property in good faith, whether or not such
> entity knew of the pendency of the appeal, unless such authorization and
> such sale or lease were stayed pending appeal.

11 U.S.C. §363(m).

24.    Although the Bankruptcy Code does not define "good faith purchaser," the United

States Court of Appeals for the Fourth Circuit has recognized that the phrase encompasses one

who purchases in "good faith," "for value," and "without notice of adverse claims." *In re Tudor*

*Assocs., Ltd., II,* 20 F.3d 115, 119 (4th Cir. 1994); *Willemain v. Kivitz*, 764 F.2d 1019, 1023-24

(4th Cir. 1985).  The bidding process by the Debtors and the subsequent negotiation of the

Purchase Agreement with the Purchase was undertaken at arm's-length.  The Purchaser has not

exerted control or undue influence over the Debtors.  The Purchaser does not, and will not, share

any common incorporators, officers, directors or stockholders with the Debtors, and the Purchaser

is not an insider of the Debtors.  *See* 11 U.S.C. § 101(31).

25.    "This subsection creates a rule of statutory mootness. Where a sale of a bankrupt's

assets has not been stayed, an appeal challenging the sale's validity is moot because the court has

no remedy that it can fashion even if it would have determined the issues differently... [s]ection

363(m) codifies Congress's strong preference for finality and efficiency in the bankruptcy

context, particularly where third parties are involved. Without the protection of § 363(m), purchasers of bankruptcy estate assets could be dragged into endless rounds of litigation to determine who has what rights in the property. This would not only impose unfair hardship on good faith purchasers, but would also substantially reduce the value of the estate.  An asset that provides a near-certain guarantee of litigation and no guarantee of ownership is likely to have a low sale price; by removing these risks, § 363(m) allows bidders to offer fair value for estate property.  This in turn, of course, greatly benefits both the debtor and its creditors." *In re Rare Earth Minerals*, 445 F.3d 359, 363 (4th Cir. 2006) (internal quotations and citations omitted).

26.    Accordingly, the Debtors request that the Court determine that the Purchaser acquiring the Pharmacy Assets pursuant to the Purchase Agreement set forth above has acted in good faith and is entitled to the protections afforded to good faith purchasers under section 363(m) of the Bankruptcy Code.

27.    Bankruptcy Code section 105(a) authorizes the Court to "issue any order... that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Allowing asset sales that are in compliance with section 363 is a recognized and valid use of the power granted by 105. *See, e.g., In re Rare Earth Minerals*, 445 F.3d at 365 (affirming the dismissal of a challenge to such a sale).

<u>**REQUEST FOR WAIVER OF STAY**</u>

28.    The Debtors further seek a waiver of any stay of the effectiveness of the order approving this Motion. Pursuant to Rule 6004(h) of the Bankruptcy Rules, "[a]n order authorizing the use, sale or lease of property other than cash collateral is stayed until the expiration of ten days after entry of the order, unless the court orders otherwise."  As set forth above, in order to preserve the value of the Pharmacy Assets, the Debtors utilized a narrow

window of time to solicit and negotiate a sale.   Consequently, the Debtors are required to

consummate the Sale on April 25, 2009 in order to vacate the BI-LO Store premises in a timely

manner, and more importantly, provide a seamless transition for its customers after the

Pharmacy's close on April 24, 2009.   Accordingly, the Debtors submit that ample cause exists

to justify a waiver of the ten-day stay imposed by Rule 6004(h) of the Bankruptcy Rules, to the

extent it applies.

## **NOTICE**

29.    Notice of this Motion has been provided by electronic mail, facsimile or overnight

delivery to: (a) the Office of the United States Trustee for the District of South Carolina;

(b) counsel to the Committee; (c) counsel to General Electric Capital Corporation, as agent for the

Debtors' postpetition lenders; (d) counsel to The Bank of New York Mellon, as agent for the

Debtors' prepetition secured term lenders; (e) counsel to GE Business Financial Services, Inc., as

agent for the Debtors' prepetition secured ABL lenders; (f) those persons who have formally

appeared in the Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002; (g) all

applicable government agencies to the extent required by the Bankruptcy Rules and the SC LBR;

and (h) any party holding or asserting a lien on the Pharmacy Assets.   A copy of the Motion has

been made available on the website of the Debtors' claims and noticing agent, Kurtzman Carson

Consultants LLC, at www.kccllc.net/BI-LO.   In light of the nature of the relief requested herein,

the Debtors submit that no other or further notice is required.

WHEREFORE, the Debtors respectfully request that the Court enter an order, in substantially the form attached hereto as **Exhibit A**, (a) approving the terms and conditions of the Purchase Agreement between the Purchaser and BI-LO and authorizing the execution and delivery thereof, (b) authorizing the Sale of the Pharmacy Assets to the Purchaser free and clear of all liens, claims and encumbrances, (c) authorizing the Debtors to pay the net proceeds of the Sale to the Debtors' DIP Lenders and (d) granting such other and further relief to which the Debtors may be justly entitled.

Dated April 19, 2009
Columbia, South Carolina

Respectfully submitted,


By:     /s/ Jody A. Bedenbaugh
           George B. Cauthen, Federal Bar No. 81
           Frank B. B. Knowlton, Federal Bar No. 2379
           Linda K. Barr, Federal Bar No. 6284
           Betsy Johnson Burn, Federal Bar No. 7574
           Jody A. Bedenbaugh, Federal Bar No. 9210
           **NELSON MULLINS RILEY &**
           **SCARBOROUGH, LLP**
           1320 Main Street, 17th Floor
           Post Office Box 11070 (29211)
           Columbia, SC 29201
           Tel: 803-799-2000
           Fax: 803-256-7500
           Email:  george.cauthen@nelsonmullins.com
           Email:  frank.knowlton@nelsonmullins.com
           Email:  linda.barr@nelsonmullins.com
           Email:  betsy.burn@nelsonmullins.com
           Email:  jody.bedenbaugh@nelsonmullins.com

Josiah M. Daniel, III, SBTX # 05358500
Katherine D. Grissel, SBTX # 24059865
**VINSON & ELKINS L.L.P.**
3700 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas 75201-2975
Tel:  214-220-7700
Fax: 214-220-7718
E-mail: jdaniel@velaw.com
E-mail: kgrissel@velaw.com

Dov Kleiner, SBNY# DK4600
Alexandra S. Kelly, SBNY # AK2021; SBNJ
# 001302005; SBCA # 228141
**VINSON & ELKINS L.L.P.**
666 Fifth Avenue, 26th Floor
New York, New York 10103-0040
Tel: 212-237-0110
Fax: 917-849-5361
E-mail: dkleiner@velaw.com
E-mail: akelly@velaw.com

**PROPOSED ATTORNEYS FOR THE DEBTORS**

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on April 19, 2009, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the District of South Carolina and by U.S. Mail to those parties on the attached service list who do not receive notice by CM/ECF.

_____/s/ Jody A. Bedenbaugh_____
One of Counsel

# EXHIBIT A

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

Case No. 09-02140 (HB) (Joint Administration)

## MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO SELL AND TRANSFER CERTAIN PHARMACY INVENTORY AND RECORDS AND TO DISBURSE THE NET PROCEEDS THEREOF TO THE DEBTORS' DIP LENDERS

The relief set forth on the following pages, for a total of _____ pages including this page, is

hereby **ORDERED**.

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| In re: | § | **Case No. 09-02140 (HB)** |
| | § | |
| **BI-LO, LLC** *et al.*, | § | **Chapter 11** |
| | § | |
| Debtors.[1] | § | **(Joint Administration)** |
| | § | |

### ORDER AUTHORIZING THE DEBTORS TO SELL AND TRANSFER CERTAIN PHARMACY INVENTORY AND RECORDS AND TO DISBURSE THE NET PROCEEDS THEREOF TO THE DEBTORS' DIP LENDERS

Upon the motion (the "Motion")[2] of BI-LO, LLC and its affiliates ("BI-LO" or the "Debtors"), the above-captioned debtors in possession, for entry of an order authorizing auction sales of certain of the Debtors' Pharmacy Assets located in a retail location of the Debtors that will cease operations (the "Order"); it appearing that the relief requested herein is in the best interests of the Debtors' estates, their creditors and other parties in interest; and it appearing that the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and it appearing that this proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and it appearing that venue of this proceeding is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that notice of the Motion and opportunity for a hearing on the Motion was appropriate under the circumstances and that no other or further notice with respect to the Motion need be given; and after due deliberation and sufficient cause appearing therefore, it is HEREBY ORDERED:

---

[1]    The Debtors and the last four digits of their respective tax identification numbers are: BI-LO, LLC (0130); BI-LO Holding, LLC (5011); BG Cards, LLC (4159); ARP Ballentine LLC (6936); ARP James Island LLC (9163); ARP Moonville LLC (0930); ARP Chickamauga LLC (9515); ARP Morganton LLC (4010); ARP Hartsville LLC (7906); and ARP Winston Salem LLC (2540).

[2]    Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Motion.

Dallas 1553945v.5

1.      The Motion is granted.

2.      The Purchase Agreement, all other ancillary documents, and all of the terms and conditions thereof, are hereby approved.

3.      The Debtors have provided sufficient evidence that the Purchase Agreement constitutes the highest and best offer for the Pharmacy Assets and will provide a greater recovery for the Debtors' estate than would be provided by any other available alternative.

4.      The Debtors' determination that the Purchase Agreement constitutes the highest and best offer for the Pharmacy Assets constitutes a valid and sound exercise of the Debtors' business judgment.

5.      The Debtors are authorized and empowered to take any and all action necessary or appropriate to consummate the Sale pursuant to and in accordance with the Purchase Agreement, including the execution and delivery of the Purchase Agreement and any documents ancillary thereto.

6.      The Sale of Pharmacy Assets made in accordance with this Order shall be free and clear of any and all liens, claims and encumbrances, with such liens, claims and encumbrances.

7.      The Debtors are authorized to disburse net proceeds of the Sale to the Debtors' DIP Agent, for the benefit of the DIP Lenders.

8.      Except as expressly permitted or otherwise specifically provided by the Purchase Agreement or this Order, all persons and entities holding liens or interests in the Pharmacy Assets arising under or out of, in connection with, or in any way relating to the Pharmacy Assets hereby are forever barred, estopped and permanently enjoined from asserting against the Purchaser or its successors or assigns, their property or the Pharmacy Assets, or such person's or entities' interests in and to the Pharmacy Assets.

**MOTION TO SELL CERTAIN PHARMACY ASSETS**

Dallas 1553945v.5

9.      All persons and entities are hereby forever prohibited and joined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and transfer the Pharmacy Assets to the Purchaser in accordance with the terms of the Purchase Agreement and this Order.

10.     A copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel liens and other encumbrances on the Pharmacy Assets, except as may be set forth in this Order and the Purchase Agreement.

11.     The Purchaser is purchasing the Pharmacy Assets in good faith and is granted the protections provided to a good faith purchaser under § 363(m) of the Bankruptcy Code.

12.     The ten-day stay under Bankruptcy Rule 6004(h) is waived.  This Order shall be effective immediately upon entry and the Debtors and Purchaser authorized to close the Sale immediately upon entry of the Order.

13.     The requirements set forth in Bankruptcy Rule 6003(b) are satisfied by the contents of the Motion or otherwise waived.

14.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

15.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order including, among other things, jurisdiction to interpret, implement, and enforce the terms and provision of this Order and the Purchase Agreement (and ancillary documents related thereto) and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale.

16.     To the extent there are any inconsistencies between the terms of this Order and the Purchase Agreement (including any ancillary documents) the terms of this Order shall control.

**MOTION TO SELL CERTAIN PHARMACY ASSETS**

**Page 3 of 4**

17.     The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

AND IT IS SO ORDERED.

**<u>EXHIBIT B</u>**

Draft

## PURCHASE AND SALE AGREEMENT

This PURCHASE AND SALE AGREEMENT (this "*Agreement*") is made and entered this __ day of April 2009 by and between BI-LO, LLC, a Delaware limited liability company with its corporate offices located at 208 BI-LO Boulevard, Greenville, SC 29607 ("*Seller*") and _____ on behalf of its affiliates and subsidiaries, with its principal office located at _____(the "*Purchaser*").   The Seller and the Purchaser are each a "*Party*" and collectively referred to herein as the "*Parties*".

### WITNESSETH

WHEREAS, the Seller currently operates a pharmacy business (the "*Pharmacy*") inside the Seller's establishment located at 2226 Park Rd., charlotte, NC 28203, (the "*Pharmacy Location*");

WHEREAS, the Seller plans to close the Pharmacy; and

WHEREAS, Purchaser wishes to acquire certain assets used by the Seller in connection with the operation of the Pharmacy, and the Seller has agreed to sell, transfer, and convey the same to the Purchaser.

NOW, THEREFORE, in consideration of the foregoing, of the covenants, agreements and undertakings hereinafter contained, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

1.      Definitions.  As used in this Agreement, the following capitalized terms shall have the assigned meanings:

"*Closing*" shall mean the consummation of the transactions contemplated herein.

"*Closing Date*" shall mean April 25, 2009.

"*Purchased Assets*" shall mean (i) the prescription drug inventory located at the Pharmacy as of the Closing Date and (ii) any over-the-counter medications considered to be inventory of the Pharmacy and located at the Pharmacy as of the Closing Date.

 "*Pharmacy Records*" shall mean all prescription files, customer prescription lists, and related records of the Pharmacy, whether stored electronically or on paper, related to prescriptions issued by the Pharmacy during the two year period prior to the date of this Agreement that are in the possession of the Seller as of the Closing Date; provided, however, that Pharmacy Records shall not include any accountings of disclosures retained by Seller in order to allow Seller to fulfill its obligations under the Health Insurance Portability and Accountability Act of 1996 ("*HIPAA*").

2.      Transfer of Purchased Assets and Pharmacy Records.  Subject to and upon the terms and conditions of this Agreement, at Closing, the Seller will (i) sell, transfer, convey, assign, and deliver to the Purchaser all of the Seller's rights, title and interest in and to the Purchased Assets and (ii) transfer to the Purchaser custody of and all of the Seller's rights, title and interest in and to the Pharmacy Records, and the Purchaser will purchase the Purchased

Assets and acquire custody of the Pharmacy Records, all upon the terms and subject to the conditions set forth in this Agreement.  The Purchased Assets will be conveyed free and clear of all security interests, encumbrances, liabilities, obligations, liens, pledges, and claims, of any nature whatsoever (each an "*Encumbrance*").   The Purchaser shall obtain custody of the Pharmacy Records free and clear of any Encumbrances other than the rights extended by applicable laws, rules and regulations to patients with respect to such patients' Prescription Record (collectively, the "*Patient Rights*").

3.      No Assumed Liabilities; No Assets Transferred Other than the Purchased Assets and the Pharmacy Records.  The Purchaser will not assume, nor will the Purchaser be obligated to pay, perform or discharge, any claims, debts, liabilities, obligations, liens, encumbrances, loans, or undertakings of the Seller, whether fixed, unliquidated, absolute, contingent or otherwise.  The Seller specifically reserves and retains all rights, title and interests to any and all assets owned by it unless the same are specifically transferred to the Purchaser under this Agreement.  Without limiting the foregoing in any way, it is specifically agreed and understood that the Purchased Assets and Pharmacy Records will not include (i) cash, real estate, fixtures, furniture, and/or equipment of the Seller, (ii) the Seller's accounts receivable, or (iii) any computer hardware or software owned or licensed by the Seller and used in connection with the operation of the Pharmacy.

4.      Purchase Price.  The Purchaser will pay to the Seller in immediately available funds the sum of the following amounts (collectively, the "*Purchase Price*"): (i) the amount calculated in accordance with Section 5 of this Agreement (the "*Inventory Purchase Price*") and (ii) **one hundred fifty thousand dollars ($150,000)** (the "*Pharmacy Records Purchase Price*"). The Inventory Purchase Price will be paid by Purchaser to Seller no later than three (3) business days following the Closing Date. The Pharmacy Records Purchase Price shall be paid by Purchaser to Seller on the Closing Date.

5.      Inventory.  Commencing at 9:00 am on the Closing Date, the Seller shall allow, and the Purchaser shall cause, _____ (the "*Inventory Taker*") to take a physical inventory of the Purchased Assets located at the Pharmacy (the "*Inventory*").  Seller shall have the right to monitor the inventory.  The Purchaser and Seller shall pay equally the fees and costs associated with the use of the Inventory Taker.  The Pharmacy will be closed for business during the Inventory and will remain closed subsequent thereto.  The Inventory Purchase Price shall be calculated in the following manner:

(a) with respect to brand name prescription drug inventory, the product of the average wholesale price (AWP) for each item included in the Inventory multiplied by 85%;

(b) with respect to generic prescription drug inventory, the product of the AWP for each item included in the Inventory multiplied by 55% or actual cost as supplied by the Seller's wholesaler at the time of inventory;

(c) with respect to insulin, the product of the AWP for each item included in the Inventory multiplied by 86%;

(d) with respect to syringes, the product of the Seller's retail price for each item included in the Inventory multiplied by 75%; and

2

(e) with respect to all other items, including over-the counter medications, chemicals and supplies, the Seller's net acquisition cost for the items included in the Inventory; provided, that if the Seller does not have documentation supporting the acquisition costs for any items included in the Inventory, then the Purchaser will pay to the Seller a price which approximates the Seller's estimated acquisition cost for identical merchandise stocked at the Seller's stores.

Notwithstanding the foregoing, for purposes of calculating the Inventory Purchase Price, no value shall be assigned to (i) out-of-date prescription drugs or over-the-counter medications, (ii) prescription drugs or over-the-counter medications with an expiration or last sale date of less than sixty (60) days after Closing, (iii) prescription drugs or over-the-counter medications with a missing or illegible expiration date, (iv) prescription drug inventory not in its original container or package, (v) prescription drug inventory not listed in the current *Red Book* or *Blue Book*, or (vi) sample pharmacy inventory (collectively, the "*Excluded Pharmaceuticals*").  Partially filled (open) stock containers of pharmacy brand name and/or generic drug product(s) will be counted by visually estimating to the nearest tenth (1/10) of a full container.  In addition, the Purchaser shall not pay more than a total of fifty dollars ($50) for chemicals included in the Inventory, or more than a total of $100 for supplies included in the Inventory.  The Inventory and the calculation of the Inventory Purchase Price will be carried out expeditiously until completed and the Parties agree to commit their best efforts and to work in good faith to complete the Inventory and the calculation of the Inventory Purchase Price.

6.    Closing.    (a) The consummation of the transactions contemplated in this Agreement will take place at Closing.  At Closing, Seller will deliver to Purchaser, title and custody in and to the Purchased Assets and the Pharmacy Records by delivery of a Bill of Sale substantially in the form of **Exhibit A** attached hereto (the "*Bill of Sale*").  The Purchaser shall be responsible for the packaging and transport of the Purchased Assets, as well as any written records included in the Pharmacy Records, from the Pharmacy.

(b)    In order to accommodate Purchaser's desire to integrate records and ensure uninterrupted prescription services to Seller's customers, Seller agrees to use its commercially reasonable efforts to deliver to Purchaser any requested information with respect to the Pharmacy Records maintained by Seller in electronic format in order to allow Purchaser to prepare for the conversion of the files (the "*Requested Pharmacy Records*").  With respect to the Requested Pharmacy Records, Purchaser agrees that prior to the Closing, Purchaser shall not use or disclose the Requested Pharmacy Records for any purpose other than integrating such records into Purchaser's electronic prescription records system.

7.    Representations and Warranties of the Seller.  The Seller hereby represents and warrants to the Purchaser as follows:

(a)    Organization, Standing and Qualification.  The Seller is validly existing and in good standing under the laws of the State of North Carolina and has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated hereby. The Seller is entitled to carry on its business as now being conducted at the Pharmacy and to own, lease or operate its property as and in the places where such business is now conducted.

(b)    Execution, Delivery and Performance of Agreement; Authority.  Neither the execution, delivery nor performance of this Agreement by the Seller will, with or without the giving of notice or the passage of time, or both, conflict with any provision of the Seller's

3

articles of organization or operating agreement, or result in a default, right to accelerate or loss of right under, or result in the creation of any lien, charge or encumbrance pursuant to, any franchise, mortgage, deed of trust, lease, license, agreement, understanding, law, rule or regulation or any judgment or decree to which the Seller is a party or by which the Seller, the Pharmacy Records or the Purchased Assets may be bound.  The Seller has full power and authority to enter into this Agreement and to carry out the transactions contemplated hereby, and this Agreement constitutes a valid and binding obligation of the Seller.  All proceedings or action required to be taken by the Seller relating to the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been taken or will be taken at or prior to Closing.

(c)    Title.  The Seller at Closing will have (i) good and marketable title to the Purchased Assets, free and clear of all Encumbrances, and (ii) good and marketable title to the Pharmacy Records free and clear of all Encumbrances other than the Patient Rights.

(d)    Tax Returns.  All required federal, state, and local tax returns of the Seller have been accurately prepared and timely filed, and all federal, state, and local taxes required to be paid with respect to the periods covered by such returns have been paid in full.

(e)    Litigation.  There is no claim, legal action, suit, arbitration, governmental investigation or other legal or administrative proceeding, nor any order, decree or judgment in progress, pending or in effect, or to the knowledge of the Seller, threatened against, relating to or which may materially and negatively affect the Pharmacy Records or the Purchased Assets, or which may interfere with the consummation of the transactions contemplated herein.

8.    Representations and Warranties of the Purchaser.  The Purchaser represents and warrants to the Seller as follows:

(a)    Authorization and Approval of Agreements.  All proceedings or corporate action required to be taken by the Purchaser relating to the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been taken or will be taken at or prior to Closing.

(b)    Execution, Delivery and Performance of Agreement.  Neither the execution, delivery nor performance of this Agreement by the Purchaser will, with or without the giving of notice or the passage of time, or both, conflict with, result in a default, right to accelerate or loss of right, under any provision of the Purchaser's articles of incorporation, articles of organization, operating agreement, partnership agreement and/or by-laws (as applicable to the Purchaser as a result of its business form) or any mortgage, deed of trust, lease, license, agreement, understanding, law, ordinance, rule or regulation or any order, judgment or decree to which the Purchaser is a party or by which it may be bound or affected

9.    Pre-Closing and Post-Closing Covenants of Seller.  The Seller covenants and agrees that from the period of the execution of this Agreement through the earlier of (i) the closing of the Pharmacy, or (ii) the Closing Date, the Seller shall use its reasonable efforts to preserve the business operated at the Pharmacy intact, and to preserve the good business relationships with its suppliers, customers and others having business relations with said business, and (ii) conduct the Pharmacy business in the ordinary course and consistent with prior practice, subject to causes beyond the Seller's reasonable control; provided, however, that

4

following the execution of this Agreement and through the Closing Date, Seller shall have the right to remove Excluded Pharmaceuticals, supplies and chemicals from the Pharmacy.  In addition, the Purchaser agrees that the Seller will not be in violation or breach of its obligations pursuant to this paragraph as the result of the transfer of any patient record to another pharmacy at the request of a patient.  The Seller shall comply with all applicable laws, rules or regulations requiring that Seller post notice at the Pharmacy to inform patients that the Pharmacy Records will be transferred to Purchaser.

10.    <u>Post-Closing Obligation of Purchaser</u>.  The Purchaser covenants and agrees that following the Closing the Purchaser shall keep, maintain and protect the privacy, confidentiality and security of the Pharmacy Records in accordance with the privacy and security provisions of the HIPAA as well as in accordance with any other applicable state law.  Purchaser also agrees to provide to Seller a copy of individual prescription records, upon reasonable prior written notice, in order to comply with or defend recovery pursuant to an audit by a third party payor.

11.    <u>Conditions Precedent to the Seller's Obligations</u>.  All obligations of the Seller hereunder are subject to the fulfillment of the following conditions:

(a)    All representations and warranties of the Purchaser contained herein will be true and correct in all material respects when made and as of Closing;

(b)    All other material obligations required by the terms of this Agreement to be performed by the Purchaser at or before Closing will have been duly and properly performed; and,

(c)    Purchaser shall have delivered the Purchase Price to Seller in immediately available funds.

12.    <u>Conditions Precedent to the Purchaser's Obligations</u>.  All of the obligations of the Purchaser hereunder are subject to the fulfillment of the following conditions:

(a)    All representations and warranties of the Seller contained herein will be true and correct in all material respects when made and as of Closing; and

(b)    All other material obligations required by the terms of this Agreement to be performed by the Seller at or before Closing will have been duly and properly performed.

13.    <u>Indemnification by Seller</u>.  The Seller hereby agrees to indemnify, defend and hold the Purchaser harmless from and against any loss, liability or damage (including, but not limited to, reasonable attorney fees) (collectively, "_Losses_") suffered or incurred by the Purchaser arising out of or related to:  (i) any breach of any covenant, warranty, or representation made by the Purchaser in this Agreement; and (ii) any and all liabilities and obligations arising from the Seller's possession or use of the Pharmacy Records or Purchased Assets, or (iii) any other liabilities or obligations arising from the operation of the Pharmacy up to and including Closing, including, but not limited to, Losses suffered or incurred by the Purchaser by reason of or in connection with the Seller's failure to discharge any liabilities or obligations of the Seller, whether to its creditors or otherwise.

5

14.   <u>Indemnification by the Purchaser</u>.  The Purchaser hereby agrees to indemnify, defend and hold the Seller harmless from and against any Losses suffered or incurred by the Seller arising out of or related to:  (i) any breach of any covenant, warranty, or representation made by the Purchaser in this Agreement; and (ii) any and all liabilities and obligations arising from the Purchaser's possession or use of the Pharmacy Records or Purchased Assets following the Closing.

15.   <u>Survival of Representations and Warranties; Indemnification is Exclusive Remedy</u>.  Each representation, warranty, and pre-Closing covenant made by the Parties in this Agreement or in any documents, certificate or other instrument delivered by or on behalf of the Parties pursuant to this Agreement will survive the Closing.  The provisions of Sections 13 and 14 of this Agreement shall be of no force or effect until after the Closing.  Following the Closing, and in the absence of fraud, the sole and exclusive remedy for the breach of any representation, warranty, covenant, condition or agreement contained in this Agreement or otherwise relating to this Agreement shall be the indemnification provided for in Sections 13 and 14 of this Agreement.

16.   <u>Notices</u>.   All notices required to be given to any person hereunder will be effective upon receipt if sent via certified mail, postage prepaid and addressed to the address set forth for each Party on the signature page of this Agreement.

17.   <u>Miscellaneous</u>.

(a)   This Agreement and the Bill of Sale (individually and collectively, the "<u>*Documents*</u>") constitute the entire agreement of the Parties, and there are no other terms, obligations, covenants, representations, statements or conditions, whether oral or written, of any kind whatsoever, with respect to the subject matter hereof.  None of the Documents may be modified, amended or terminated except by a written agreement executed by all parties.

(b)   No waiver of any breach or default hereunder will be considered valid unless in writing and signed by the Party giving such waiver, and no such waiver will be deemed a waiver of any subsequent breach or default of the same or similar nature.

(c)   Neither party may assign or otherwise transfer this Agreement without the prior written consent of the other party; ***provided, however,*** that a party may assign or transfer this Agreement without the other party's consent to a purchaser of all or substantially all of the business or assets of such party so long as the transferring party provides written notice to the other party of such assignment or transfer within thirty (30) days following such assignment or transfer.  Except as authorized in this paragraph, any other purported assignment or transfer without consent shall be void and unenforceable.  This Agreement shall be binding upon, inure to the benefit of, and be enforceable by the parties hereto and their respective successors and permitted assigns.

(d)   The paragraph headings contained herein are for convenience only and are not intended to define or limit the contents of said paragraphs.

(e)   Each Party will cooperate with the other, will take such further action and will execute and deliver such further documents as may be reasonably requested by the other Party in order to carry out the provisions and purposes of this Agreement.

6

(f)     The Purchaser will pay all sales and transfer taxes, if any, payable in connection with the sale, conveyance, assignment, transfer and delivery of the Purchased Assets and the Pharmacy Records to the Purchaser hereunder.

(g)     This Agreement may be executed via facsimile and/or in one or more counterparts, all of which when taken together will be deemed one original.

(h)     This Agreement will be governed by and construed in accordance with the laws of the State of South Carolina without giving effect to its conflict of law principles.

(i)     All terms, words, and phrases used in this Agreement, regardless of the number and gender in which they are used, will be deemed and construed to include any other number, whether singular or plural, and any other gender, as the context or sense of the Documents imply as if such words had been fully and properly written in said number and/or gender.

(j)     The Parties execute this Agreement voluntarily and with full knowledge of its legal significance and acknowledge that they have read this Agreement, have been afforded an opportunity to seek legal counsel of their own choosing, and are aware of the content and legal effect of this Agreement.

(k)     This Agreement will not be binding on the Parties until such time as this Agreement has been fully executed and a copy of said fully executed Agreement delivered to each Party.

(l)     Notwithstanding any presumption to the contrary, all covenants, conditions and representations contained herein which by their nature, impliedly or expressly, involve performance of any particular acts after Closing or which cannot be ascertained to have been fully performed until after Closing, will survive Closing.

(m)     The Parties agree that for a period of two (2) years that each will keep the terms of this Agreement in strictest confidence and not disclose such terms to any third party, other than a Party's legal counsel, advisors, or any party during a due diligence process that is based on a bona fide offer to purchase all or substantially all of such party's business or assets.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their duly authorized officers to be effective as of the day and year first above written,

**THE SELLER:**                                    **THE PURCHASER:**

                                                   **BI-LO, LLC**

**By:** _____    **By:** _____

**Its:** Authorized Representative         **Its:** Authorized Representative


**Notice Address:**                            **Notice Address:**

                                                   BI-LO, LLC
                                                   208 BI-LO Boulevard
                                                   Greenville, SC 29607
                                                   Attention:    Pharmacy Department

                                                   with a copy to:

                                                   BI-LO, LLC
                                                   208 BI-LO Boulevard
                                                   Greenville, SC 29607
                                                   Attention:      Legal

8

EXHIBIT A

**BILL OF SALE**

KNOW ALL MEN BY THESE PRESENTS, that BI-LO, LLC ("_Seller_") for and in consideration of the Purchase Price and for other good and valuable consideration in hand paid by_____ ("_Purchaser_"), the receipt and sufficiency of which is hereby acknowledged, hereby (i) sells, transfers, conveys, assigns, and delivers to the Purchaser all of the Seller's rights, title and interest in and to the Purchased Assets, and (ii) transfers to the Purchaser custody of and all of the Seller's rights, title and interest in and to the Pharmacy Records (as more particularly set forth in a certain Purchase and Sale Agreement dated as of _____ __, 2009 by and between the Seller and the Purchaser (the "_Agreement_"); furthermore, all capitalized terms not defined herein will have the meanings ascribed to them in the Agreement.

TO HAVE AND TO HOLD said Purchased Assets and Pharmacy Records unto the Purchaser, its successors and assigns, to and for its own proper use and benefit forever.

IN WITNESS WHEREOF, the Seller has caused this Bill of Sale to be executed by its duly authorized agent as of the _____ day of _____, 2009.

**Seller:**

_____

**By:**    _____

**Its**:    _____

9