## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

---------------------------------------------------------x

In re:

BI-LO, LLC, <u>et al.</u>,

                  Debtors.

---------------------------------------------------------x

Case No 09-02140-hb

Chapter 11

Jointly Administered

## THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' (I) OBJECTION TO MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER (A) EXTENDING THE TIME PERIOD DURING WHICH THE DEBTORS HAVE THE EXCLUSIVE RIGHT TO FILE A PLAN AND DISCLOSURE STATEMENT AND TO SOLICIT ACCEPTANCES AND (B) EXTENDING THE DEADLINE UNDER SC LBR 3016-1 FOR DEBTORS TO FILE A PLAN AND DISCLOSURE STATEMENT AND (II) CROSS-MOTION PURSUANT TO SECTIONS 1121(C), 1121(D) AND 105 OF THE BANKRUPTCY CODE FOR ENTRY OF AN ORDER (A) MODIFYING THE DEBTORS' EXCLUSIVE PERIODS TO PERMIT CO-EXCLUSIVITY FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO FILE A PLAN OF REORGANIZATION JOINTLY WITH THE TERM LENDERS, AND (B) APPROVING DUAL TRACKS FOR FILING A PLAN OF REORGANIZATION AND SOLICITING VOTES OR (C) ALTERNATIVELY, <u>TERMINATING DEBTORS' EXCLUSIVE PERIODS</u>

The Official Committee of Unsecured Creditors (the "Committee") appointed in the above-captioned Chapter 11 cases of BI-LO, LLC, *et al.* (collectively, "BI-LO" or the "Debtors"), by its undersigned co-counsel, Otterbourg, Steindler, Houston & Rosen, P.C., and the McCarthy Law Firm, LLC, submits this (I) Objection (the "Objection") to the Motion of the Debtors for Entry of an Order (A) Extending the Time Period During Which the Debtors Have the Exclusive Right to File a Plan and Disclosure Statement and to Solicit Acceptances and (B) Extending the Deadline Under SC LBR 3016-1 for Debtors to File a Plan and Disclosure Statement (the "Extension Motion") and (II) Cross-Motion (the "Cross-Motion") pursuant to Sections 1121(c), 1121(d), and 105 of the Bankruptcy Code for Entry of an Order (A) Modifying the Debtors' Exclusive Periods to Permit Co-

1369045.9

Exclusivity for the Committee to File a Plan of Reorganization Jointly with the Term Lenders, and

(B) Approving Dual Tracks for Filing a Plan of Reorganization and Soliciting Votes, or (C)

Alternatively, Terminating Debtors' Exclusive Periods.   In support of the Objection and Cross-

Motion, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.       The Committee, a statutory fiduciary under the Bankruptcy Code, represents the

interests of thousands of general unsecured creditors, whose pre-petition obligations, the Debtors

represent in their Schedules, aggregate in the tens of millions of dollars (which amount can

dramatically increase if the Debtors do not successfully reorganize).   In furtherance of its fiduciary

duties, the Committee wants these cases to conclude successfully, with a viable, reorganized

company that will continue to employ 15,000 people, purchase goods from its vendors and provide

landlords with a continuing tenant.   The Committee's goal is to be able to support a plan of

reorganization that achieves such results.

2.       As this Court is aware, there are different factions in these cases.   The Debtors, by

their own admissions, are not independent, but are controlled by Lone Star, their equity security

holder.   Lone Star, as used herein, is comprised of Lone Star Fund V (U.S.), L.P., LSF V

International Finance, L.P. (Bermuda) and certain of their affiliates, including the investment

management arm, Hudson Advisors, L.L.C. (collectively, "Lone Star"), which is continuing to

exercise its purported governance rights over the Debtors post-petition.[1]   The Committee is rightfully

concerned, given the statements made in the Extension Motion, as well as statements made on the

record at various hearings, that the Debtors have concluded -- prematurely -- that there is equity

value in the Debtors' estates and, accordingly, that the Debtors are predisposed to file a plan skewed

---

[1]    *See* Debtors' Extension Motion at ¶59.  In addition, certain of the Debtors' professionals previously worked for
Lone Star and continue to represent Lone Star in matters unrelated to these cases.

in favor of equity.[2]  The Committee is also distressed over the ability of the Debtors to propose a plan that is feasible and otherwise confirmable, if new equity in the Debtors is not one of the "currencies" available for distribution to creditors.

3.      By contrast, there are parties in the Debtors' capital structure -- most particularly, the Debtors' pre-petition term loan lenders, holding approximately $260 million in debt secured by first and second liens on substantially all of the Debtors' assets -- that have advised the Committee that they do not believe there is value for current equity in these cases and have different ideas about restructuring the Debtors.

4.      Because of the Committee's concern over the lack of meaningful communication between the Debtors and its major constituencies (and the Committee's desire to avoid a liquidation,. a point recognized by the Debtors in their Extension Motion[3]), beginning approximately five months ago  the Term Lenders and the Committee initiated discussions regarding the general parameters of a plan of reorganization.  Shortly thereafter, C&S Wholesale Grocers, Inc. ("C&S")  (whose supply and distribution agreement requires modification for a successful reorganization), joined these discussions.  The centerpiece of those negotiations was a significant de-leveraging of the Debtors' balance sheet -- that is, the Debtors carry too much debt, and unless that debt is reduced, reorganized BI-LO is a likely candidate for a "Chapter 22."

5.      The Committee's discussions have resulted in a term sheet (the "Creditors' Term Sheet") for a plan of reorganization that resolves this primary concern.  In order to de-lever the Debtors' balance sheet, the Creditors' Term Sheet provides, as a key element, for the conversion of a substantial portion of the Term Lenders' secured debt to equity and an investment of new equity by one or more of the Term Lenders.  Specifically, approximately $110 million of the Term Lender's

---

[2]    *See* Debtors' Extension Motion at ¶58.

[3]    *See* Debtors' Extension Motion at ¶40.

secured debt will be converted to equity and the $72 million of new equity capital will be infused and will be used to repay all amounts under the DIP facility, and pay all administrative and priority claims, among other things, thereby leaving the proposed new $125 Revolving Exit Facility virtually unused, other than usual standby Letters of Credit.  A copy of the Creditors' Term Sheet is annexed hereto as Exhibit "A".  Based on the Creditors' Term Sheet, the reorganized Debtors would be significantly de-levered and would be projected to have net borrowing availability of at least twice the amount that the Debtors had upon entry into Chapter 11.

6.    The Committee has committed to support the plan envisioned in the Creditors' Term Sheet, while reserving its right, in its fiduciary capacity, with respect to other proposals that may arise.  In the current economic environment, it is highly unusual for a retailer attempting to reorganize in Chapter 11 to have an agreement between an official committee of unsecured creditors (the fiduciary for general unsecured creditors) and secured lenders whereby secured debt is converted into equity, have a plan sponsor willing to infuse significant equity capital, and simultaneously reaching agreement with a key stakeholder, which controls the supply and distribution of approximately 70% of a debtors' inventory.  It has been the lack of one or more of these items that has been a primary factor in the increased number of retail Chapter 11 cases that have resulted in liquidation.

7.    The Committee wants to avoid a confirmation fight regarding the feasibility of a plan of reorganization of the type that it suspects is likely to be proposed by the Debtors that preserves Lone Star's equity intact and keeps excessive debt on the Debtors' balance sheet.  Such a fight runs the significant risk that the Debtors will be unable to confirm a plan and liquidation will ensue, particularly in view of the significant time constraints imposed on retail debtors since the enactment of the 2005 amendments to the Bankruptcy Code.

8.      The proposal to infuse new equity capital into the Debtors will not remain extant indefinitely.[4]  It is unique in this economic climate, as even the Debtors acknowledge,[5] to be offered a significant capital infusion.  There is no guaranty that the proposed plan investors' offer will still be available when and if the Debtors are ready to consider a plan of reorganization involving the extinction of old equity and the infusion of new equity capital by a plan investor.

9.      Thus far, the Debtors have not presented the terms of a plan of reorganization to their creditor constituencies.  Whatever efforts the Debtors may be making with respect to examining its restructuring options, such as finding a strategic purchaser or refinancing their debt, they have refused to share specifics with the Committee, even weeks after the completion and presentation of the five year business plan, notwithstanding a creditors' committee's central role in the formulation of a plan of reorganization in this and any other bankruptcy case, and the Committee's contractual and fiduciary duties to keep confidential any such information.  The Debtors do not appear to appreciate the need to quickly formulate a plan of reorganization that can result in a successful reorganization.  While the Debtors choose not to engage in plan discussions with their creditors, such creditors have worked together to formulate concrete terms of a plan of reorganization.  The Committee believes it has a fiduciary obligation to creditors to move forward with the Plan contemplated by the Creditors' Term Sheet to maximize value for its constituency.

10.      Accordingly, instead of allowing the Debtors to continue to have the sole exclusive right to file a plan of reorganization, and hold creditors "hostage," the Committee seeks, by its Cross-Motion, an order that extends the Debtors' exclusive period to file a plan of reorganization and disclosure statement (the "Exclusive Period") and to solicit acceptances thereof (the

---

[4]    The Plan Proponents and the Investors (as defined in the Creditors' Term Sheet) expect to file an investment agreement as a Supplement to the Cross-Motion and Joinder, evidencing the Investors' commitment to make the new equity investment in the reorganized Debtors prior to the hearing.  The Investors will be under no obligation to continue the commitment to the extent that the Cross-Motion is not granted.

[5]    *See* Debtors' Extension Motion at ¶21.

1369045.9

"Acceptance Period"), but <u>only</u> upon the condition that the Committee and the Term Lenders are granted <u>co-exclusivity</u> to jointly file a plan. The Committee submits that modifying the Debtors' Exclusive Period and Acceptance Period in this manner is a prudent way to proceed, and is required to maximize estate value for all constituencies.

11.    Under this proposal, the Committee and the Term Lenders would only be permitted to <u>jointly</u> file a plan of reorganization. Neither party could act independently from the other and the Court and the Debtors can take comfort in knowing that a statutory fiduciary -- the Committee -- has <u>veto</u> power over any plan based upon the Creditors' Term Sheet. If during the time of co-exclusivity, the Debtors are able to propose a plan that the Committee believes is fair, feasible, provides an appropriate distribution to the unsecured creditors, and will result in a viable reorganized entity, the Committee is free to support the Debtors' plan. The most important thing is that options will be available to creditors so that the "playing field" will be leveled during plan negotiations. In fact, courts have encouraged the filing of competing plans as a way of encouraging the parties to more earnestly negotiate with one another in an attempt to arrive at a consensual plan -- which is the Committee's goal.

12.    In sum, if the Court is to extend the Debtors' Exclusive Period and Acceptance Period, it should do so only if it grants co-exclusivity to the Committee and the Term Lenders, jointly, as described above. Clearly, as the Court has the authority to deny the Debtors' Extension Motion to extend the exclusive periods, it surely has the authority to grant the extension on the condition of co-exclusivity, in the interests of the creditors and the Debtors' estates as a whole. Alternatively, if the Court does not grant the Committee's Cross-Motion to modify exclusivity in this fashion, then, for the reasons set forth herein and in the Limited Objection of the Term Lender Committee to Debtors' Motion to Extend Their Exclusive Periods, to be filed in support of this

Cross Motion, which legal analysis is incorporated herein by reference, the Court should deny the

Debtors' Extension Motion and terminate the Debtors' Exclusive Period and Acceptance Period.

## BACKGROUND

### A.    Bankruptcy Cases

13.    On March 23, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for

reorganization under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  On

March 24, 2009, this Court entered an Order directing joint administration of these Chapter 11 cases.

The  Debtors  continue  to  operate  their  businesses  and  manage  their  properties  as

debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108 of the Bankruptcy Code.  No

trustee or examiner has been appointed in these cases.

14.    On March 30, 2009, the United States Trustee appointed a nine member Committee

pursuant to Sections 1102(a) and 1102(b) of the Bankruptcy Code.  The Committee selected C&S

Wholesale Grocers, Inc. and Kraft/Nabisco as its Co-Chairpersons.  On March 31, 2009, the

Committee selected Otterbourg, Steindler, Houston & Rosen, P.C. to serve as its lead co-counsel,

and the McCarthy Law Firm, LLC, to serve as its South Carolina co-counsel, and on April 1, 2009,

the Committee selected FTI Consulting, Inc., to serve as its financial advisors.

15.    The Debtors have represented, among other things, that BI-LO operates as a regional

retail supermarket chain under the "BI-LO" and "Super BI-LO" banners.  BI-LO is the parent

company of seven wholly-owned subsidiaries.  As of the Petition Date, BI-LO was one of the largest

food retailers in the Southeast United States, operating more than 200 stores in South Carolina,

North Carolina, Georgia and Tennessee, with the majority of stores located in South Carolina.

BI-LO's corporate headquarters are located in Greenville, South Carolina and it employs more than

15,000 employees.  BI-LO offers both national brand products as well as many private label products

for sale in its grocery stores.

16.     Substantially all of the equity interests in BI-LO Holding LLC and BI-LO, LLC are indirectly owned by Lone Star, which, together with other affiliates of Lone Star, comprise a private equity fund headquartered in Dallas, Texas.   The remaining equity interests, aggregating approximately 2.6%, are held by certain current and former employees of the Debtors.

**B.     The Debtors' Capital Structure**

17.     Prior to the Petition Date, the Debtors were parties to a Credit Agreement, dated March 26, 2007 with GE Business Financial Services, Inc. ("GE"), as Administrative Agent, and certain lenders party to the Credit Agreement (the "ABL Lenders") from time to time, which provided for a $100 million revolving credit facility (the "Revolving Loan") used for general corporate purposes.   The Revolving Loan was scheduled to mature on March 26, 2009.

18.     Prior to the Petition Date, the Debtors were also parties to a term loan Credit Agreement, dated March 26, 2007 with The Bank of New York Mellon, as Administrative Agent, and the Term Lenders party thereto, which provided for a $260 million term loan (the "Term Loan"). The Term Loan matured on March 26, 2009.

19.     In connection with these pre-petition loan agreements, the Debtors granted liens and security interests on substantially all of their personal property assets in favor of the ABL Lenders and the Term Lenders.   The priorities of the ABL Lenders and the Term Lenders with respect to the collateral are set forth in an intercreditor agreement, but, generally speaking, the Term Lenders have a second lien interest on inventory and accounts receivable, and a first lien on all other assets.

20.     GE, as Agent, and certain lenders, agreed to provide debtor-in-possession financing (the "DIP Facility") to the Debtors post-petition in the amount of $125 million, "rolling up," and thus paying off the Revolving Loan.

C.    **Status of Case**

21.    Lone Star acquired the Debtors in January 2005, and thereafter, as the equity owner of the Debtors, it focused its efforts on marketing and selling the businesses, even while the operational side of the businesses was in a steep decline and the maturity of $260 million in Term Lender debt loomed.  It appears that the Debtors ignored all realistic restructuring possibilities prior to filing, and declined to engage in meaningful negotiation with the Term Lenders about the treatment of their loans.  This left the Debtors ill prepared for entry into Chapter 11, and resulted in the chaotic and adversarial commencement of these cases.[6]

22.    On June 17, 2009, the Debtors filed the Extension Motion, requesting entry of an order extending for five (5) months the time period during which the Debtors have the exclusive right to file a plan of reorganization and disclosure statement, and to solicit acceptances.  The Debtors also sought an extension of the deadline set forth in SC LBR 3016-1 for the Debtors to file a plan of reorganization and disclosure statement through and including December 20, 2009.

23.    The Committee's suspicion that the Debtors' decision making was controlled by Lone Star was confirmed in the Extension Motion, in which the Debtors leave no doubt that Lone Star is "calling the shots":

> Apart from its interest derived from its investment, as the owner, Lone Star participates in the governance of the Debtors postpetition, just as it did prepetiton. . . .  There is no difference between publicly and privately owned firms in this regard; corporate governance does not change merely because the entity files a Chapter 11 petition, and Lone Star is properly participating in these Chapter 11 Cases by exercising those governance rights.

---

[6]    For a description of certain of the adversarial matters, see Statement of the Official Committee of Unsecured Creditors in Support of (I) the Ad Hoc Committee of Term Lenders' Cross-Motion for Adequate Protection and Reservation of Rights with Respect to the Debtors' Motion for Interim and Final Orders (A) Approving Senior Secured Superpriority Post-Petition Financing, (B) Authorizing Use of Cash Collateral, (C) Granting Liens and Providing Superpriority Administrative Expense Status, (D) Granting Adequate Protection, (E) Modifying Automatic Stay and (F) Scheduling Final Hearing and (II) Emergency Motion of the Debtor Designating C&S Wholesale Grocers, Inc. as a Critical Vendor, dated April 20, 2009 [Dkt. No. 448].

*See* Debtors' Extension Motion at ¶59.

24.    That any plan proposed by the Debtors would seek to preserve Lone Star's equity was equally made clear in the Extension Motion wherein the Debtors categorically assert their "belief" that equity is entitled to receive or retain value in a plan:

> The Debtors believe that their estates are more valuable than the sum of all claims. Assuming that is correct, then the equity security holder, Lone Star (through its affiliate, LSF5 BI-LO Investments, LLC, the immediate non-debtor parent of the Debtors) is entitled to receive or retain value pursuant to a plan in respect of its security investment.

Debtors' Extension Motion at ¶58.[7]

25.    On June 18, 2009, counsel for the Committee and the Term Lenders sent a letter to counsel for the Debtors requesting that the Debtors consent to an order providing the Committee and the Term Lenders, jointly, with co-exclusivity pursuant to Section 1121 of the Bankruptcy Code.

26.    On June 22, 2009, the Debtors rejected the Committee's and the Term Lenders' request for co-exclusivity, but instead filed a Supplement to the Debtors' Extension Motion, modifying the Extension Motion by reducing the requested extension of the Exclusive Period and the SC LBR 3016-1 deadline to ninety days after its original deadline (i.e., October 19, 2009) and an extension of the Acceptance Period for sixty days after that (i.e., December 18, 2009).

27.    Following extensive negotiations between and among the Debtors, the Committee and the Term Lenders, the Committee and the Term Lenders did not file papers in response to the Debtors' Motion, but instead agreed that (a) the hearing on the Motion would be continued until September 16, 2009, with an objection deadline of August 31, 2009; (b) the time period during

---

[7]    As of the date that the Debtors filed the Motion, as far as the Committee was aware, there were no valuations of the Debtors' business to support such a declaratory statement, the general unsecured claims bar date had not passed (it was August 13, 2009) and the government claims bar date had not, and still has not, passed (September 20, 2009). Since then, the Debtors have presented their five year business plan, from which an enterprise value can readily be ascertained, and the general unsecured claims bar date has passed. The claims register indicates that close to $200 million in liquidated unsecured claims have been filed, together with numerous claims in an unliquidated and contingent amount.

which the Debtors have the exclusive right to file a plan of reorganization and disclosure statement would be extended through September 21, 2009; (c) the time period to solicit acceptances of a Plan would be extended through November 21, 2009; and (d) the deadline set forth in SC LBR 3016-1 for the Debtors to file a plan of reorganization and disclosure statement would extended through September 21, 2009. The agreement of the parties was announced in open court at the hearing on June 30, 2009 and set forth in a Consent Order of the same date [Docket No. 882].

D.      **The Creditors' Term Sheet**

28.     Although the Debtors acknowledge that for the past two years the vast majority of retail cases have ended in liquidation,[8] they have inexplicably refused all suggestions that BI-LO seek to exit Chapter 11 as promptly as possible. However, the Debtors simply do not have the luxury of time. While the period under Section 365(d)(4) of the Bankruptcy Code has largely been extended through negotiations between the Debtors and its landlords (prompted by the Committee), the extension is only through March 31, 2010. However, as the Committee is painfully aware, pursuant to the DIP Facility, unless the Debtors obtain further extensions to assume or reject leases from Landlords by on or about January 27, 2010, the borrowing base formula is reduced by the cost of the inventory in each store location not providing such an extension. The time in which the Debtors must modify the existing supply agreement with C&S is even shorter -- December 1, 2009.

29.     Past precedent would indicate that the minimum time to confirm a plan of reorganization under the Bankruptcy Code, assuming there is consensus among all interested parties, is approximately 90 days from the date the disclosure statement is filed. In the real world, the time is significantly longer, and if past is prologue, as this Court is aware, the time in these cases is likely to be much more than "significantly longer". In sum, there is no time to lose. The Debtors, however,

---

[8]     See Debtors' Extension Motion at ¶ 40.

have yet to conduct any substantive negotiations concerning their plan details with the Committee, the Term Lenders or C&S, certainly three of the most significant creditor constituencies in this case.

30.    Notwithstanding that the Debtors completed and presented the five year business plan to the various creditor constituencies, among others, on August 4, they have not sought to determine enterprise value, from which equity value and debt capacity, among other things, are determined and engage in plan negotiations with creditor constituencies.  Instead, the Debtors have apparently chosen alternatives, such as "testing the debt market" and looking for a "strategic buyer".

31.    Discussions between the Committee and the Term Lenders resulted in the Creditors' Term Sheet delivered to the Committee by the Term Lenders.  A plan based upon the Creditors' Term Sheet would significantly reduce the amount of debt on the Debtors' balance sheet and dramatically improve its borrowing availability, both critical factors if the Debtors are to emerge from Chapter 11 as a viable, reorganized entity.  The Creditors' Term Sheet includes the following provisions, among others:

- conversion of approximately $110 million of the Term Lenders' secured debt to equity;

- equity investment of $72 million of new liquidity by one or more of the Term Lenders; and

- distribution to a Liquidating Trust for the benefit of general unsecured creditors of $17 million of cash, a $5.5 million note payable in installments over two years, irrevocable assignment of, generally, all estate claims (other than commercial or tort claims and defenses, intercompany claims by and between the 10 Debtors and claims released under the Creditors' Plan), and the right to reconcile and object to general unsecured claims.

32.    If a plan based upon the Creditors' Term Sheet is filed and is confirmed, the reorganized Debtors will have a de-levered balance sheet, sufficient liquidity and a distribution and supply agreement that will not burden the reorganized Debtors, landlords will have continued

tenants, vendors will have a customer to which they can sell their goods, and, nearly all of the

Debtors' 15,000 employees will have continued employment.  It is expected that all but ten to fifteen

of the Debtors' current locations will remain in operation if the Creditors' Term Sheet is the basis of

a plan.

## ARGUMENT

## I.

### The Debtors' Exclusive Periods Should Be Modified to Permit Co-Exclusivity for the Committee and the Term Lenders to Jointly File a Plan

33.     The Debtors seek an extension of the Exclusive Period until October 19, 2009, and an

extension of the Acceptance Period until December 18, 2009.  However, the Court should only grant

that request under the condition that the Committee and the Term Lenders, jointly, have co-

exclusivity to propose a plan of reorganization based upon the Creditors' Term Sheet.

34.     By this Cross-Motion, the Committee, in the first instance, seeks not to terminate the

Debtors' exclusive periods, but to modify such periods to provide for co-exclusivity, thereby balancing the

"playing field" and increasing the likelihood of the Debtors' successful reorganization.  This will prevent

the Debtors from using their bargaining position to attempt to impose an unsatisfactory plan on unsecured

creditors.  The creditors should not be held hostage by the Debtors or by Lone Star.

**A.      This Court Should Allow The Committee, Jointly with the Term Lenders, the Opportunity to Prepare and File a Plan and Accompanying Disclosure Statement**

35.     Under Section 1121(c) of the Bankruptcy Code, once the Debtors' exclusive time to

file a plan of reorganization has expired, either by its own accord or because it has been terminated,

the Bankruptcy Code specifically permits a "creditors' committee" or any other "party in interest" to

file a plan of reorganization. *11 U.S.C. § 1121(c)*.

36.     Moreover, under Section 1121(d) of the Bankruptcy Code, the Court may deny the

Debtors' motion for an extension of its exclusivity period or even terminate the Debtors'

exclusivity period early. As a court is permitted to deny a request to extend exclusivity or can terminate exclusivity early, it follows that a court is also permitted to grant the extension of exclusivity, but only on the condition of co-exclusivity for the Committee and the Term Lenders.

37.    Granting creditors the co-exclusive right to file a Plan is not a novel concept. Other bankruptcy courts have granted creditors the opportunity to file a competing Plan. *See*, *e.g.*, *In re Integrated Resources, Inc.*, 135 B.R. 746, 748 (Bankr. S.D.N.Y. 1992) (stating that "with the desire to ameliorate the then-existing impasse to a consensual plan, [the] Court terminated the application of the exclusive period as to the Creditors' Committees"); *In re Crescent Mfg. Co.*, 122 B.R. 979, 980 (Bankr. N.D. Ohio 1990) (the debtor and the official committee of unsecured creditors agreed that the committee could file a plan during the last twelve days of the debtor's exclusive period). As noted in *In re United Press Int'l, Inc.*, 60 B.R. 265 (Bankr. D.D.C. 1986), in which the court granted the official committee of unsecured creditors and the union representing many of the debtor's employees the right to file a nonliquidating plan during the initial 120-day period of exclusivity, in so doing, the Bankruptcy Court was

> opening up the right to file a plan on a limited basis to those two entities (besides the Debtor itself) that have the most at stake in this case and have shown themselves to be responsible parties, while refraining from opening the floodgates completely. The statute does not expressly prohibit this eminently sensible middle course, and I can perceive no reason to find any such prohibition by implication.

60 B.R. at 276, n.12.

*38.*    In addition, Section 105(a) of the Bankruptcy Code empowers this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." *11 U.S.C. § 105(a)*.

39.    The limited modifications to the Debtors' Exclusive Period and Acceptance Period, as requested herein, would not adversely impact the Debtors' ability to propose a its own plan of

reorganization. *See In re All Seasons Indus., Inc.,* 121 B.R. 1002, 1005 (Bankr. N.D. Ind. 1990).

Rather, granting co-exclusivity at this time will permit the possible "dual-tracking" of the

Committee's and Term Lenders' joint plan and any Debtors' plan (to the extent one is filed), and

permit unsecured creditors to evaluate both plans. Indeed, courts have recognized the benefits

conferred by the filing of competing plans:[9]

> In some instances, authority to file a competing plan may
> additionally motivate the debtor to more earnestly negotiate an
> acceptable consensual plan. . . . The ability to file a competing
> plan, thereby allowing creditors to cast ballots for multiple plans,
> also encourages a chapter 11 policy of "creditor democracy." The
> creditor body benefits because a competing plan allows each
> individual creditor to decide which plan best comports with its
> respective economic interests. Unless there exists some
> countervailing Code provision or bankruptcy policy which mandates
> to the contrary, creditors should be allowed to propose and vote on a
> competing chapter 11 plan.

*In re Mother Hubbard, Inc.,* 152 B.R. 189, 195-96 (Bankr. W.D. Mich. 1993) (internal citations

and footnotes omitted).

40.     Allowing the Committee and the Term Lenders to jointly file a plan would not

prejudice the Debtors or other creditors, but would enhance creditor democracy and enable

creditors to make a choice instead of having one imposed upon them.

41.     Accordingly, there is no harm in permitting the Committee and the Term Lenders to have

the right to file a plan and related disclosure statement, and there would be tremendous potential benefit for

creditors. The Committee is hopeful that the Debtors will embrace the Creditors' Term Sheet to enable a

quick, efficient and consensual emergence from Chapter 11.

---

[9] Even if the Committee and the Term Lenders do not ultimately file a competing plan, the ability to do so will have a
similar benefit of encouraging the Debtors to negotiate and explore other alternatives.

**B.    The Limited Relief Requested by the Committee Is Necessary To Ensure that Creditor Interests Are Adequately Protected And to Counter-Balance Any Undue Pressures of Equity Interests**

42.     As discussed above, given the admitted control of the Debtors by Lone Star,[10] the Debtors' stated inclination to file a plan of reorganization that preserves Lone Star's equity,[11] and the Debtors unwillingness to discuss the terms of a plan with the Committee and other critical constituencies, the Committee is concerned that the Debtors will file a plan of reorganization that inappropriately favors current equity. A possible result is that the current offer for capital infusion as part of the Creditors' Term Sheet will be withdrawn and a protracted confirmation fight will ensue over a Debtor-sponsored plan. Such a scenario will not assist the Debtors' reorganization efforts. A protracted confirmation battle, which may not result in a confirmed plan, or which may result in a confirmed plan, but one that will handicap the Debtors' ability to survive as a viable entity, could lead to the eventual liquidation of the Debtors.

43.     The Debtors have "an obligation to the community of interest that sustained the corporation, to exercise judgment in an informed, good faith effort to maximize the corporation's long-term wealth creating capacity." *Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.,* Civ. A. No. 12150, 1991 WL 277613, at *34 (Del. Ch. Dec. 30, 1991). As such, the Debtors must explore every reasonable alternative that may result in the maximization of value, and not just the route that preserves Lone Star's ownership.

44.     The Debtors asserted in their Motion that they could not begin to formulate a plan of reorganization prior to completing their five year business plan. Even assuming the validity of this statement, the Debtors have now completed and presented the five year business plan to all creditor constituencies. Yet, the Debtors still have not engaged in substantive discussions regarding

---

[10]    *See* Debtors' Extension Motion at ¶59.

[11]    *See* Debtors' Extension Motion at ¶58.

enterprise value, equity value and debt capacity, the foundations for a plan of reorganization. While the Debtors waste time, valuable opportunities, such as the commitment of a plan sponsor to infuse capital, will be lost.

45.      The Committee's concerns regarding the Debtors' unwillingness to engage in any meaningful discussions regarding the terms of a plan of reorganization are exacerbated by statements made by the Debtors throughout these cases. The Debtors have already made the declaratory statement that "their estates are more valuable than the sum of all claims."[12] Yet, at the time that the Debtors filed the Motion, there had been no valuations of the Debtors' business to support such a conclusory statement, and the general unsecured claims bar date (August 13, 2009) and the bar date for filing governmental claims (September 20, 2009) had not yet passed.

46.      The unsecured claims bar date has now passed. According to the claims register, there are close to $200 million in liquidated unsecured claims, together with numerous claims filed in unliquidated or contingent amounts. Given the potential amount of unsecured claims (reconciliation has not begun and the government bar date has not passed) and having reviewed the intercompany, affiliated and related claims of the Bruno's estate, and the claim of the United Food and Commercial Workers Unions and Employers Pension Fund, filed in the amount of $63 million, plus contingent and unliquidated amounts, it is not only possible, but probable, that the sum of all claims will *be far in excess* of the value of the estates and it may take years to determine the ultimate amount of general unsecured claims. Thus, in accordance with the "absolute priority rule", a determination of whether equity is "in the money", cannot be made in the foreseeable future.

47.      The Committee also believes that a plan of reorganization that preserves Lone Star's equity will necessarily entail the continuation of virtually all of the prepetition debt on the Debtors' balance sheet, which will make the Debtors' prospects for reorganization that much more difficult.

---

[12]      *See* Debtors' Extension Motion at ¶58.

While the Committee will be pleasantly surprised if such is not the case, the Committee wants to exercise every option available to increase the likelihood of a successful reorganization. As such, as a fiduciary in these cases, the Committee believes it prudent to allow for a competing plan of reorganization, both to provide creditors with an alternative or, at a minimum, to encourage the Debtors and all parties in interest to negotiate in earnest. *Cf. Bank of Am. Nat'l Trust and Savings Assoc. v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 454-57 (1999) (reasoning that where existing equity is proposing to retain ownership interest in reorganized debtor, plan process should be opened to allow competing plans to be filed).

## II.

### If Co-Exclusivity is Not Granted, the Debtors' Requested Extension Should Be Denied

**A.      The Debtors Must Show Cause to Extend Exclusivity**

48.      Section 1121(d) of the Bankruptcy Code permits this Court, on request of a party-in-interest, to extend or reduce "for cause" the Exclusive Periods during which the Debtors may file a plan of reorganization and solicit acceptances thereof. *See 11 U.S.C. 1121(d)*[13]*; In re Adelphia Commc'ns Corp.,* 342 B.R. 122, 131 (S.D.N.Y. 2006) (citations omitted). *See also In re UNR Indus., Inc.,* 72 B.R. 789, 791 (Bankr. N.D. Ill. 1987); *Texas Extrusion Corp. v. Lockheed Corp. (In re Texas Extrusion Corp.),* 844 F.2d 1142, 1160-61 (5th Cir. 1988) (finding no error in bankruptcy court's decision to terminate the initial exclusive periods); *In re Crescent Beach Inn, Inc.,* 22 B.R. 155, 160 (Bankr. D. Me. 1982) (terminating the initial exclusive periods); *In re Situation Mgmt. Sys.,* 252 B.R. 859, 865-66 (Bankr. D. Mass. 2000) (granting committee's motion to terminate the exclusive

---

[13]      Section 1121(d) of the Bankruptcy Code provides, in relevant part:

   [O]n request of a party in interest made within the respective period specified in subsection (b) and (c) of this section and after notice and a hearing, the court may for cause reduce or increase the 120-day period or the 180-day period referred to in this section.

periods); *In re Davis,* 262 B.R. 791, 799 (Bankr. D. Ariz. 2001) (denying debtor's motion to extend the exclusive periods); *In re Curry Corp.,* 148 B.R. 754, 755-56 (Bankr. S.D.N.Y. 1992) (same).

49.　　The Debtors, as the movants, bear the burden of showing that "cause" exists to extend their respective exclusivity periods. *In re R.G. Pharmacy, Inc.*, 374 B.R. 484 (Bankr. D. Conn. 2007); *see also In re Curry*, 148 B.R. at 756; *In re Dow Corning Corp.*, 208 B.R.661, 663 (Bankr. E.D. Mich. 1997). "A request to either extend or reduce the period of exclusivity is a serious matter. Such a motion should 'be granted neither routinely or cavalierly.'" *All Seasons,* 121 B.R. at 1004 (*quoting In re McLean Indus., Inc.,* 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987)). The Debtors have fallen woefully short of meeting this burden and, therefore, the Committee requests that, if this Court denies the Committee's request for co-exclusivity, that, alternatively, the Debtors' Extension Motion should be denied.

50.　　In passing upon a request for extension of a debtor's exclusive period, a court needs to consider more than just the articulated cause presented to it. *See All Seasons,* 121 B.R. at 1004. It must also consider the competing interests which Congress sought to balance when it enacted the time table set forth in section 1121(d):

> Section 1121 was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of chapter 11 debtors.

*In re Timbers of Inwood Forest Assoc., Ltd.*, 808 F.2d 363, 372 (5th Cir. 1987) (en banc), *aff'd* 484 U.S. 365 (1988).

51.　　Whether the statutory exclusive periods should be extended is a fact-specific inquiry. The Bankruptcy Code does not define "cause." However, Congress gave bankruptcy courts broad flexibility in making this determination, and bankruptcy courts have considered such factors as: (i) whether the debtors have made good faith progress towards reorganization, *Adelphia Commc'ns,* 342 B.R. at

131, (ii) the creditors' loss of confidence in the capability of debtor's management, *All Seasons,* 121 B.R. at 1006, and (iii) whether the debtor has demonstrated reasonable prospects for filing a viable plan. *In re Express One Int'l, Inc.,* 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996).[14]

**B.    The Debtors' Have Failed to Meet Their Burden to Extend Exclusivity**

52.    Here, the Debtors have offered no evidence to support a finding that "cause" exists to extend their Exclusive Period and Acceptance Period.  Indeed, the Debtors' Extension Motion is replete with conclusory allegations that the foregoing factors have been satisfied without any support.

53.    The Debtors point to the size and complexity of these cases as a basis to extend its exclusivity.  In fact, it is because the Debtors' Chapter 11 cases are large and complex that it is imperative that the Debtors' exclusive periods, if not modified to allow the Committee and the Term Lenders to jointly file a plan, be terminated.

54.    The Debtors have refused to discuss the terms of a plan of reorganization with their creditor constituencies.  Instead of trying to begin to reach a consensus among their creditors, the Debtors spent the first three months of these cases litigating with their creditor constituencies and opposing or creating obstacles to the entry of standard orders, such as the granting of adequate protection.  The Debtors even acknowledge that due to the complexity and size of the Chapter 11 cases, they require additional time to negotiate with the numerous parties in interest,[15] and stated that they would not do so until after the five year business plan was completed.  The Debtors have since completed the five year business plan and presented it to the Committee, yet the Debtors still have

---

[14]    Other considerations include, (1) the size and complexity of the case; (2) the necessity of sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information; (3) the fact that the debtor is paying its bills as they become due; (4) whether the debtor has made progress in negotiations with its creditors; (5) the amount of time which has elapsed in the case; (6) whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and (7) whether an unresolved contingency exists.  *See Adelphia Commc'ns. Corp.*, 352 B.R. at 586-587; *R.G. Pharmacy*, 374 B.R. at 487; *Dow Corning*, 208 B.R. at 664;  *Express One*, 194 B.R. at 100.

[15]    *See* Debtors' Extension Motion at ¶ 70.

not engaged the Committee in any plan discussions, notwithstanding the Committee's request for details of a possible plan of reorganization.

55.    The Debtors' assertion that they have made good faith progress towards reorganization is self-serving and misleading.  They list several orders that have been entered in these cases as support for their progress to date.  The vast majority of these orders (_e.g._, authorization to use cash collateral, approval of debtor-in-possession financing, engagement of professionals) are first day orders that are routinely entered within the first week, if not the first or second day, of a bankruptcy filing.  Certainly, the entry of these standard orders, which occurred at least several weeks subsequent to the filing, demonstrates anything but significant progress towards reorganization, and should not be evidence of the progress the Debtors have made to date towards reorganization.

56.    By contrast, the Committee and the Term Lenders have done what the Debtors have not -- negotiated a plan of reorganization that is confirmable, will de-lever the Debtors' balance sheet and will increase the likelihood of successfully reorganizing the Debtors' businesses.  The Debtors have ignored the primary cause of the Debtors' Chapter 11 filing, an over-levered balance sheet, and continue to refuse to discuss with its creditor constituencies the obvious solution.  Instead, the Debtors repeatedly complain to this Court, the Committee, the Term Lenders, and others, that the Creditors' Term Sheet has not been shared with them.  The Committee and the Term Lenders have already made substantial progress towards building a consensus among the creditors for a viable plan of reorganization and request the opportunity to file that plan.

57.    A close reading of the Exclusivity Motion raises the concern that Lone Star intends to drag these cases out as long as possible to try and pressure creditors into accepting a plan that provides undeserved value to Lone Star.  _See, e.g.,_ Exclusivity Motion at ¶18-21 (Before proposing a plan, the Debtors intend to "consider" (a) reorganization, (b) sale of the business, (c) liquidation, (d)

refinancings, and (e) recapitalizations, and the Debtors assert that such an exhaustive process "will require a longer lead time today than prior to the deterioration of credit and equity markets last year, as lenders, investors, and buyers now take longer to complete due diligence, negotiate terms, and arrange funding."). *See also id.* at ¶ 16 (the Debtors have "launched a complete review of the business of the Debtors, from bottom to top, with the goal of formulating a business plan . . . . [comprised of] eight separate, though interrelated work streams supported by a large number of separate analyses. . . .").

58.    The Committee and the Term Lenders have concluded that if the plan process is left solely in the hands of the Debtors as controlled by Lone Star, the resulting delay and Lone Star's machinations/litigation will be highly detrimental to the Debtors' estates and creditors.   If the exclusivity Motion is denied and exclusivity terminated, such action will not prejudice the Debtors' rights to propose a plan.

### III.

### The Debtors' Exclusive Period and Acceptance Period Should Be Terminated

59.    If the Committee's motion for co-exclusivity is denied, the Debtors' current Exclusive Period and Acceptance Period should be immediately terminated to allow creditors under Bankruptcy Code Section 1121(c) to file a plan of reorganization.

60.    The primary consideration for the bankruptcy court in determining whether to terminate the debtor's exclusivity is the best interests test.  This consideration can override the analysis of other factors considered in determining whether "cause" exists to terminate exclusivity.  *See Adelphia Commc'ns.,* 352 B.R. at 590 *(citing Dow Corning,* 208 B.R. at 670) ("When the Court is determining whether to terminate a Debtor's exclusivity, the primary consideration should be whether or not doing so would facilitate moving the case forward.  And that is a practical call that can override a mere toting up

of the factors.").  Courts have also terminated exclusivity to "avoid allowing the debtor to hold the creditors and other parties in interest 'hostage' so that the debtor can force its view of an appropriate plan upon the other parties."  *In re Public Serv. Co. of New Hampshire,* 88 B.R. 521, 537 (Bankr. D.N.H. 1988); *see also Mother Hubbard,* 152 B.R. at 195; *Curry,* 148 B.R. at 756 (denying debtors' motion to extend exclusive periods, noting that extensions "should not be employed as a tactical device to put pressure on creditors to yield a plan that they might consider unsatisfactory").

61.    For all the reasons set forth above, the Debtors' Exclusive Period and Acceptance Period should be immediately terminated.

WHEREFORE, the Committee respectfully requests that the Court enter an Order in substantially the form attached hereto as Exhibit "B" modifying the Exclusive Period and the Acceptance Period to permit the Committee and the Term Lenders to jointly file a plan of reorganization or, alternatively, to deny the Debtors' Extension Motion and terminate the Exclusive Period and the Acceptance Period, and grant such other and further relief as may be just and proper.

Dated:  August 31, 2009

Respectfully submitted,

**McCARTHY LAW FIRM, LLC**

/s/ G. William McCarthy Jr.
G. William McCarthy, Jr. (S.C. Dist. Ct. ID # 2762)
Daniel J. Reynolds, Jr., Esq. (S.C. Dist. Ct. ID# 9232)
1715 Pickens Street (29201)
P.O. Box 11332
Columbia, SC 29211-1332
Telephone:   (803) 771-8836
Facsimile:    (803) 779-0267
Counsel for the Official Committee of Unsecured
Creditors of BI-LO, LLC, et al.
dreynolds@mccarthy-lawfirm.com

**OTTERBOURG, STEINDLER,
HOUSTON & ROSEN, P.C.**
Glenn B. Rice
Peter Feldman
230 Park Avenue
New York, NY 10169
Telephone:   (212) 661-9100
Facsimile:    (212) 682-6104
Counsel for the Official Committee of Unsecured
Creditors of BI-LO, LLC, et al.
grice@oshr.com
pfeldman@oshr.com

# Exhibit A

**BI-LO, LLC**

### CREDITORS' PLAN TERM SHEET

**As of August 31, 2009**

*This Term Sheet (the "Term Sheet") has been prepared in the context of settlement discussions among various parties in interest in the chapter 11 cases of In re Bi-Lo LLC, et al. (the "Debtors") concerning a plan of reorganization for the Debtors (the "Creditors' Plan").  The Term Sheet does not constitute, nor shall it be deemed to constitute, an offer or agreement by any person.  Any offer or agreement in connection with the matters described in this Term Sheet shall be subject to, and exclusively evidenced by, definitive legal documentation in form and substance satisfactory to any party to be bound thereby. The Term Sheet is not intended to be all-inclusive.  Any terms and conditions that are not specifically addressed in the Term Sheet are subject to future negotiations between the relevant parties.*

*THIS TERM SHEET IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OF THE DEBTORS OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  NOTHING HEREIN SHALL BE DEEMED TO BE THE SOLICITATION OF AN ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN.*

I.    **Key Parties**

| | |
|---|---|
| **Plan Proponents** | The Ad Hoc Committee of Term Lenders (the "Term Lenders Committee") and the Official Committee of Unsecured Creditors (the "UCC" and, collectively with the Term Lender Committee, the "Plan Proponents"). |
| **Investors** | One or more affiliates of Wellspring Capital Management (collectively, "Wellspring") and H.I.G. Bayside Capital (collectively, "Bayside" and, together with Wellspring, the "Investors"). |
| **Term Lenders** | Entities affiliated with Ares Management LLC, Canyon Partners Incorporated, Kohlberg Kravis Roberts & Co., and Bank of America/Merrill Lynch (collectively, the "Four Term Lenders"), C. Saunders, and Grace Bay Holdings LLC that hold term notes (and collectively, the "Term Notes") issued pursuant to that certain $260,000,000 Credit Agreement (the "Credit Agreement") dated as of March 26, 2007 among, *inter alia*, Bi-Lo Holding, LLC, Bi-Lo, LLC, and the lenders from time to time party thereto (the "Term Lenders"). |
| **UCC** | The Official Committee of Unsecured Creditors appointed by the United States Trustee in the Debtors' Chapter 11 Cases |

| Plan Debtors | Each of the Debtors in the chapter 11 cases (the "Chapter 11 Cases") styled as In re Bi-Lo LLC, et al., currently pending before the United States Bankruptcy Court for the District of South Carolina (the "Bankruptcy Court"), which cases are being jointly administered under case number 09-02140-hb. |

## II.    Proposed Chapter 11 Plan

| Equity Sponsorship of Reorganized Debtors by Investors Pursuant to a Chapter 11 Plan | The Plan Proponents seek to propose the Creditors' Plan to reorganize the Debtors (the "Reorganized Debtors") and restructure the Debtors' capital structure to, among other things, reduce the amount of debt, amend the Debtors' relationship with C&S Wholesale Grocers, Inc. ("C&S"), the Debtors' largest supplier, provide recoveries to unsecured creditors, and provide sufficient liquidity from a new revolving loan facility to permit the Reorganized Debtors to continue their operations. |
| | The Investors have agreed to provide a New Equity Investment (as defined below) in the Reorganized Debtors to fund the Creditors' Plan, subject to entry into an investment agreement (the "Investment Agreement") and satisfaction of the terms and conditions set forth therein. |
| New Equity Investment | On the effective date of the Creditors' Plan (the "Effective Date"), reorganized Bi-Lo Holding, LLC (or such other successor entity selected or created as the holding company for the Reorganized Debtors, the "Reorganized Parent") shall issue new common shares of equity (the "Investor Shares") to the Investors and any of the Four Term Lenders subscribing to the Term Lender Rights Offering (as defined below), which shares will represent 51.9% of the common shares of Reorganized Parent (the "Reorganized Shares"), subject to dilution from any options or other similar stock grants with respect to the management incentive program described below (the "MIP"). |
| | The aggregate purchase price of the Investor Shares will be $72 million (the "New Equity Investment"), payable in cash on the Effective Date. Wellspring and Bayside will collectively commit to fund the entire New Equity Investment, subject to the Term Lenders Rights Offering (as defined below). |
| | Each of the Four Term Lenders shall have the right to subscribe for its Pro Rata Share of the New Equity Investment in excess of $60 million (the "Term Lender Rights Offering"), that is, $12 million. |
| | Wellspring and Bayside shall apportion their commitment for the New Equity Investment such that, after taking into consideration equity to be issued to Wellspring and Bayside, either directly or through an affiliate, |

under the Creditors' Plan in their capacity as term lenders under the Credit Agreement, and the exercise of any Term Lender Liquidity Rights (as defined below), their percentage ownership of the Reorganized Parent will be equal.

**Proceeds of Share Sale**    The proceeds of the sale of the Investor Shares together with available cash of the Debtors and drawings on the New Working Capital Facility (as defined below) will be applied to (a) repay all amounts outstanding under the DIP financing, (b) settle in cash all administrative and priority claims that are outstanding on the Effective Date, and (c) provide certain cash payments to general unsecured creditors in accordance with the provisions set forth herein.

## III.    Classification of Claims and Treatment of Classes

**Administrative and Priority Claims**

- *Administrative Expense Claims*    Except to the extent that a holder has been paid by the Debtors, in whole or in part, prior to the Effective Date or agrees to a less favorable treatment, each holder of an allowed administrative expense claim shall be paid in full, in cash, the full amount of its unpaid claim on or as soon as reasonably practicable following the later to occur of (a) the Effective Date and (b) the date on which such claim becomes allowed.

- *DIP Facility Claims*    Except to the extent that the holders of the DIP Facility Claims agree to different treatment, the DIP Facility Claims shall be repaid in full, in cash on the Effective Date of the Creditors' Plan in full and final satisfaction, settlement, release and discharge of and in exchange for such DIP Facility Claims.

- *Secured Tax and Priority Tax Claims*    Except to the extent that a holder has been paid by the Debtors, in whole or in part, prior to the Effective Date or agrees to a less favorable treatment, each holder of an allowed secured tax claim or allowed priority tax claim shall, in full and final satisfaction, release and discharge of its claim (a) be paid in full, in cash, the full amount of its unpaid claim on or as soon as reasonably practicable following the later to occur of (x) the Effective Date and (y) the date on which such claim becomes allowed or (b) receive such other terms determined by the Bankruptcy Court to provide the holder deferred cash payments having a value, as of the Effective Date, equal to such claim.

- *Other Priority Claims*    Except to the extent that a holder has been paid by the Debtors, in whole or in part, prior to the Effective Date or agrees to a less favorable treatment, each holder of an allowed other priority claim shall receive, in full and final satisfaction, release and discharge of such other unpaid priority claim, cash in the full amount of the claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, and (ii) the

date such claim becomes allowed.

## Secured Claims

- *Term Loan Facility*

Each holder of an allowed claim arising under the Credit Agreement shall receive in full and final satisfaction, release and discharge of its claim its pro rata share of: (i) the New Term Notes (as defined below), subject to the New Term Loan Agreement (as defined below), (ii) 43.1% of the Reorganized Shares (the "<u>Term Lender Shares</u>"), subject to the Term Lender Liquidity Right (as defined below) and dilution from any options or other similar grants with respect to the MIP, and (iii) the net proceeds of the sales of Non-Core Real Property (as defined below) in excess of $5.5 million. The Term Lenders will have the right, but not the obligation, to cause the Reorganized Debtors to transfer the Non-Core Real Property to persons designated by the Term Lenders if such property has not been sold within 2 years after the Effective Date (which transfer will be subject to the Reorganized Debtors' interest in such Non-Core Real Property to the extent that they have not realized $5.5 million in net proceeds from the sale of other Non-Core Real Property).

- *Miscellaneous Secured Claims*

To the extent not previously paid pursuant to an order of the Bankruptcy Court authorizing payment of lien claims during the chapter 11 cases, all holders of claims secured by valid liens (including, without limitation, mechanics', materialsmens', artisans', tax and any other lien) against property not abandoned or sold shall be reinstated or shall receive (a) payment in full, in cash; (b) the collateral securing such claim; or (c) such other treatment as agreed between the holder of such claim and the Plan Proponents.

## Unsecured Claims

- *General Unsecured Claims*

On the Effective Date, the following will be distributed to a liquidating trust for the benefit of holders of allowed General Unsecured Claims: (i) a cash payment in an amount equal to $17 million less any cash paid to satisfy Convenience Class Claims (as defined below) (the "<u>General Unsecured Claims Fund</u>"), (ii) a $5.5 million non-interest bearing note of the Reorganized Debtors payable in installments (to be agreed upon) over 2 years; (iii) the irrevocable assignment of, generally, all estate claims (other than commercial contract or tort claims and defenses, intercompany claims by and between the 10 Debtors, and claims released under the Creditors' Plan); and (iv) the right to reconcile and object to General Unsecured Claims and Convenience Claims.

The Creditors' Plan shall provide a mechanism for distributions to holders of General Unsecured Claims pending a resolution of disputed claims.

Litigation or other dispute resolution of estate claims shall be funded by the General Unsecured Claims Fund, with such funding to be reimbursed

out of proceeds of such litigation or other dispute resolution.

Notwithstanding anything herein to the contrary, to the extent that the General Unsecured Creditors' class votes to accept the Creditors' Plan, C&S shall waive its right to receive a distribution as a holder of any General Unsecured Claims.

- *Convenience Claims*          To the extent appropriate, holders of allowed general unsecured claims less than or equal to a dollar amount to be determined by the UCC (the "<u>Convenience Class Cap</u>") shall receive in full and final satisfaction, release and discharge of such allowed claim, cash in an amount equal to __% of such allowed claim.  Any holder of an allowed general unsecured claim in excess of the Convenience Class Cap may elect to reduce its claim to the Convenience Class Cap.

**Equity Interests**          Non-Debtor holders of preferred and common equity interests in the Debtors will not receive or retain any property or interest on account of their interests, and all such interests will be cancelled and extinguished.


IV.    **<u>Substantive Consolidation</u>**

**Substantive Consolidation**          Solely in connection with distributions to be made under the Creditors' Plan, such plan is predicated upon, and it shall be a condition precedent to its confirmation, that the Bankruptcy Court provide for the substantive consolidation of the Debtors.


V.    **<u>Provisions for Implementation of the Plan</u>**

**New Working Capital Facility**          On the Effective Date, the Investors shall have procured a new working capital revolving credit facility (the "<u>New Working Capital Facility</u>") for the Reorganized Debtors in an amount up to $125 million, secured by the same type of collateral as the existing ABL facility (the "<u>ABL Collateral</u>") and on terms and conditions reasonably acceptable to the Investors.

**New Term Credit Agreement**          **Amount:** On the Effective Date, the Reorganized Debtors will issue new term notes (the "<u>New Term Notes</u>") in an aggregate amount of $152.1 million, that will be issued pursuant to a new credit agreement (the "<u>New Term Credit Agreement</u>").

          **Borrower:** Reorganized Bi-Lo LLC

          **Guarantors:** Reorganized Bi-Lo Holdings LLC and all of its

subsidiaries other than the Borrower.

**Collateral:** The New Term Notes will be secured by a second lien on the ABL-type collateral pledged to secure the New Working Capital Facility, and a first lien on substantially all of the remaining assets of the Reorganized Debtors.

**Interest Rate:** Libor plus 8%, 8%, 10%, 12% in years 1-4, respectively. Libor Floor of 3%.

**Maturity:** Forty-eight months after the Effective Date.

**Refinancing:** The Borrower will use commercially reasonable efforts to refinance the New Term Notes within one year of the Effective Date. The Borrower will pay the specified fee on the principal amount of the New Term Notes that remain outstanding on each of the following dates:

- 2% - 12 months after the Effective Date

- 1% - 18 months after the Effective Date

- 1% - 24 months after the Effective Date

**Amortization:** None until maturity.

**Mandatory Prepayments:** Customary for financings of this type.

**Optional Prepayments:** Customary for financings of this type.

**Affirmative Covenants:** Customary for financings of this type.

**Negative Covenants:** To be tested quarterly. Consolidated gross total leverage test, defined as total funded debt (excluding the undrawn portion of any outstanding letters of credit and any capital lease obligations) divided by fully loaded EBITDA based on the following cushion to a mutually-agreeable plan:



| | Year Ended | | | |
|---|---|---|---|---|
| Initial | 2010 | 2011 | 2012 | 2013 |
| 30.0% | 30.0% | 30.0% | 25.0% | 20.0% |

Fixed charge coverage test, defined as EBITDAR (fully loaded EBITDA plus total rent expenses) divided by Fixed Charges (cash interest expense plus mandatory term loan principal repayments plus cash taxes plus [total rent expense]) based on the following cushion to a mutually-agreeable

plan:

| | Year Ended | | | |
|---|---|---|---|---|
| Initial | 2010 | 2011 | 2012 | 2013 |
| 30.0% | 30.0% | 30.0% | 25.0% | 20.0% |

**Events of Default:** Customary for financings of this type.

| | |
|---|---|
| **Term Lender Liquidity Right** | Each of the Four Term Lenders shall have the right (the "Term Lender Liquidity Right") to put up to 50% of its pro rata share of the Term Lender Shares (the "Exchanged Shares") to the Investors, or to have the Reorganized Debtors distribute cash in lieu of such Exchanged Shares (the "Cash in Lieu") on the Effective Date.  Wellspring and Bayside will be obligated to purchase the Exchanged Shares, or fund the distribution of such Cash in Lieu (in exchange for which Wellspring and Bayside will receive the Exchanged Shares ), at a price equal to the reorganized value of the Exchanged Shares as of the Effective Date. |
| **Non-Core Real Property** | "Non-Core Real Property" shall mean one or more of the interests in the real property owned by the Debtors listed on Schedule 1 hereto that are designated by Wellspring as being "non-core" in the exercise of its reasonable business judgment, which designations shall be made by the last date on which the Investors may exercise a "due diligence out" of their commitment to fund the New Equity Investment. |
| | Wellspring shall use commercially reasonable efforts to cause the Reorganized Debtors to sell the Non-Core Real Property within two years of the Effective Date.  The Term Lenders will have the right, but not the obligation, to cause the Reorganized Debtors to transfer the Non-Core Real Property to persons designated by the Term Lenders if such property has not been sold within 2 years after the Effective Date (which transfer will be subject to the Reorganized Debtors' interest in such Non-Core Real Property to the extent that they have not realized $5.5 million in net proceeds from the sale of other Non-Core Real Property). |
| **Governance** | The initial board of Reorganized Parent will consist of 7 members: |

- 4 of which will be appointed by Wellspring, one of which will be an industry executive; and

- 3 of which will be appointed by Bayside and the Four Term Lenders, provided that Bayside will appoint at least one of such directors.

| | |
|---|---|
| **Management Incentive Plan** | The Reorganized Parent will enter into a stock option plan with key managers that will represent approximately 10% of the equity of the Reorganized Parent on a fully diluted basis. |

| | |
|---|---|
| **Shareholders' Agreement/LLC Operating Agreement** | The holders of the Reorganized Shares will enter into a shareholders agreement (which agreement will be a Creditors' Plan document) consistent with the Shareholders' Agreement Term Sheet that will be annexed to the Investment Agreement. |
| **Registration Rights Agreement** | The Reorganized Parent and the holders of the Reorganized Shares will enter into a registration rights agreement (which agreement will be a Creditors' Plan document), consistent with the Registration Rights Term Sheet that will be annexed to the Investment Agreement. |
| **C&S Amendment** | The Creditors' Plan will provide for the assumption of the C&S Supply Agreement, as amended consistent with the C&S Amendment Term Sheet that will be annexed to the Investment Agreement.  Among other things, the C&S Amendment Term Sheet provides that C&S will receive 5% of the Reorganized Shares, subject to dilution from any options or other similar grants with respect to the MIP. |
| **Definitive Documentation** | The Investors and the Plan Proponents will negotiate in good faith definitive documentation for the Creditors' Plan consistent with the terms hereof, including, without limitation, the form of confirmation order and any other necessary documents to effectuate the Creditors' Plan. |
| **Other Terms and Conditions** | The Creditors' Plan and all related documentation shall reflect the terms and conditions of this Term Sheet to the parties' mutual satisfaction and shall contain such other terms and conditions as the parties mutually agree. |
| | Upon execution of an Investment Agreement, this Term Sheet will become part of such agreement. |
| | The Creditors' Plan will provide estate releases to third parties that provide substantial contributions under such plan, including the Term Lenders, the Investors, and C&S. |

Exhibit B

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF SOUTH CAROLINA**

| | | |
|---|---|---|
| IN RE: | ) | **CHAPTER 11** |
| | ) | |
| **BI-LO, LLC, et al.,** | ) | **Case No.09-02140-hb** |
| | ) | |
| Debtors.[1] | ) | **Jointly Administered** |

**ORDER PURSUANT TO SECTIONS 1121(C), 1121(D) AND 105 OF THE BANKRUPTCY CODE GRANTING THE CROSS-MOTION OF THE  OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO PERMIT CO-EXCLUSIVITY FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO FILE A PLAN OF REORGANIZATION JOINTLY WITH THE TERM LENDERS, AND (B) APPROVING DUAL TRACKS FOR FILING A PLAN OF REORGANIZATION AND SOLICITING VOTES**

The relief set forth on the following pages, for a total of 3 pages including this page, is hereby **ORDERED**.

---

[1] . The Debtors and the last four digits of their respective tax identification numbers are: BI-LO, LLC (0130); BI-LO Holding, LLC (5011); BG Cards, LLC (4159); ARP Ballentine LLC (6936); ARP James Island LLC (9163); ARP Moonville LLC (0930); ARP Chickamunga LLC (9515); ARP Morganton LLC (4010); ARP Hartsville LLC (7906); and ARP Winston Salem LLC (2540).

1373343.2

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| In re: | ) | **Case No. 09-02140-hb** |
| | ) | |
| **BI-LO, LLC, *et al.*,** | ) | **Chapter 11** |
| | ) | |
| | ) | **Jointly Administered** |
| Debtors.[2] | ) | |

**ORDER PURSUANT SECTIONS 1121(C), 1121(D) AND 105 OF THE BANKRUPTCY CODE GRANTING THE CROSS-MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO PERMIT CO-EXCLUSIVITY FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO FILE A PLAN OF REORGANIZATION JOINTLY WITH THE TERM LENDERS, AND (B) APPROVING DUAL TRACKS FOR FILING A PLAN OF REORGANIZATION AND SOLICITING VOTES**

This matter having come before the Court upon the Motion of BI-LO, LLC, *et al.* (collectively, "BI-LO" or the "Debtors"), For Entry of an Order (A) Extending the Time Period During Which the Debtors Have the Exclusive Right to File a Plan and Disclosure Statement and to Solicit Acceptances (the "Extension Motion") and the (I) Objection (the "Objection") to the Extension Motion and (II) Cross-Motion (the "Cross-Motion") for Entry of an Order (A) Modifying the Debtors' Exclusive Periods to Permit Co-Exclusivity for the Committee to File a Plan of Reorganization Jointly with the Term Lenders, and (B) Approving Dual Tracks for Filing a Plan of Reorganization and Soliciting Votes, or (C) Alternatively, Terminating Debtors' Exclusive Periods filed by The Official Committee of Unsecured Creditors (the "Committee") appointed in the above-captioned Chapter 11 cases, and the Limited Objection of the Term Lender Committee to the Extension Motion, and Joinder of the Term Lenders in the Cross Motion, and due notice of the Extension Motion and the Cross-Motion having been provided and

---

[2]    The Debtors and the last four digits of their respective tax identification numbers are: BI-LO, LLC (0130); BI-LO Holding, LLC (5011); BG Cards, LLC (4159); ARP Ballentine LLC (6936); ARP James Island LLC (9163); ARP Moonville LLC (0930); ARP Chickamunga LLC (9515); ARP Morganton LLC (4010); ARP Hartsville LLC (7906); and ARP Winston Salem LLC (2540).

1373343.2

it appearing that no other or further notice of the Extension Motion and Cross-Motion need be

provided; and the Court having determined after a hearing held on September 16, 2009, that the

relief sought in the Cross-Motion is in the best interests of the Committee, the Term Lenders, the

Debtors, their estates and all parties in interest; and after due deliberation and sufficient cause

appearing therefore, it is HEREBY ORDERED

1.   That pursuant to Sections 1121(c), 1121(d) and 105 of the Bankruptcy Code,

the Cross-Motion is granted; and the Committee and the Term Lenders, jointly, are granted co-

exclusivity with the Debtors to file a plan and disclosure statement through October 19, 2009,

and to seek acceptances thereof through and including December 18, 2009, without prejudice to

the rights of the Committee and Term Lenders, jointly, to seek further extensions of such

periods.

2.   The Debtors are granted co-exclusivity with the Committee and the Term

Lenders, to file a plan and disclosure statement through October 19, 2009, and to seek

acceptances thereof through and including December 18, 2009, without prejudice to the rights of

the Debtors to seek further extensions of such periods.

3.   The Court retains jurisdiction with respect to all matters arising from or related

to the implementation of this Order.

DONE AND ORDERED.

1373343.2