THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| In re: | ) | Case No. 09-02140-hb |
| | ) | |
| Bi-Lo, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors.[1] | ) | Joint Administration |
| | ) | |

**DISCLOSURE STATEMENT ACCOMPANYING THE
JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE
BANKRUPTCY CODE FOR DEBTORS PROPOSED BY THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS AND THE AD HOC COMMITTEE OF TERM
LENDERS**

OTTERBOURG, STEINDLER,
HOUSTON & ROSEN, P.C.

Scott L. Hazan
Glenn B. Rice
Enid Nagler Stuart
230 Park Avenue
New York, New York 10169
Telephone: (212) 661-9100
Facsimile: (212) 682-6104

-and-
McCARTHY LAW FIRM, LLC
G. William McCarthy, Jr. (S.C. Dist. Ct. ID # 2762)
Daniel J. Reynolds, Jr. (S.C. Dist. Ct. ID# 9232)
1715 Pickens Street (29201)
P.O. Box 11332
Columbia, South Carolina 29211-1332
Telephone: (803) 771-8836
Facsimile: (803) 779-0267
*Attorneys for the Ad Hoc Committee of Term Lenders*

JONES DAY

Paul D. Leake
Erica M. Ryland
Scott J. Friedman

222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
-and-
McNAIR LAW FIRM, P.A.
Michael M. Beal (S.C. Dist. Ct. ID # 1253)
Michael H. Weaver (S.C. Dist. Ct. ID # 9847)
Post Office Box 11390
Columbia, South Carolina 29211
Telephone: (803) 799-9800
Facsimile: (803) 753-3277

*Attorneys for the Official Committee of
Unsecured Creditors*

Dated: November 20, 2009

---

[1] The Debtors and their respective case numbers are as follows: BI-LO, LLC, Case No. 09-02140-hb; BI-LO Holding, LLC, Case No. 09-02142-hb; BG Cards, LLC, Case No. 09-02143-hb; ARP Ballentine, LLC, Case No. 09-02144-hb; ARP Chickamauga LLC, Case No. 09-02146-hb; ARP Hartsville LLC, Case No. 09-02147-hb; ARP James Island, LLC, Case No. 09-02149-hb; ARP Moonville LLC, Case No. 09-02150-hb; ARP Morganton LLC, Case No. 09-02152-hb; ARP Winston Salem LLC, Case No. 09-02154-hb.

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................1

    A.    THE PLAN PROPONENTS ......................................................2

        1.    Creditors' Committee ....................................................2

        2.    Term Lender Committee ................................................3

    B.    WHO MAY VOTE ON THE PLAN............................................4

    C.    VOTING PROCEDURES, BALLOTS, AND VOTING DEADLINE................5

    D.    THE BANKRUPTCY CODE'S VOTING RULES FOR ACCEPTANCE OF A PLAN................6

    E.    THE CONFIRMATION HEARING AND DEADLINE FOR OBJECTIONS TO CONFIRMATION ................6

    F.    ABOUT THIS DISCLOSURE STATEMENT ................7

II.    SUMMARY OF THE PLAN ................13

    A.    OVERVIEW OF CHAPTER 11 PROCESS ................13

    B.    OVERVIEW OF THE LARGEST CONSTITUENCIES ................14

    C.    comparison of prepetition and proposed post-reorganization capital structure ................15

    D.    GENERAL SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS ................16

    E.    General Summary Of Treatment of Executory Contracts and Unexpired Leases ................19

III.    GENERAL INFORMATION ................19

    A.    THE DEBTORS ................19

    B.    BUSINESS OVERVIEW ................19

        1.    Introduction ................19

        2.    Suppliers of the Debtors' Inventory ................20

        3.    Competition ................20

        4.    Employees ................20

        5.    Executive Officers ................20

        6.    Properties/Leases ................21

        7.    Legal Proceedings ................22

    C.    CAPITAL STRUCTURE AS OF THE COMMENCEMENT DATE................22

        1.    The Debtors' Equity Ownership................22

# TABLE OF CONTENTS
(continued)

Page

|     |     | 2. | The Debtors' Significant Prepetition Debt Obligations | 22 |
|     |     | 3. | Selected Historical Financial Information | 23 |
| IV. | EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES | | | 23 |
| V. | POST-BANKRUPTCY OPERATIONS AND SIGNIFICANT EVENTS | | | 23 |
|     | A. | ADMINISTRATION OF THE CHAPTER 11 CASES | | 23 |
|     | B. | CASH COLLATERAL; DEBTOR IN POSSESSION FINANCING; ADEQUATE PROTECTION | | 25 |
|     | C. | SIGNIFICANT EVENTS AND ORDERS GRANTED DURING THE CHAPTER 11 CASES | | 26 |
|     |     | 1. | Vendor Related Matters | 26 |
|     |     |     | a. C&S Critical Vendor Motion | 26 |
|     |     |     | b. Section 503(b)(9) Program | 26 |
|     |     |     | c. Other Vendor Related Matters | 26 |
|     |     | 2. | Ahold Cost Sharing Agreement | 27 |
|     |     | 3. | Unexpired Leases of Non-Residential Real Property; Landlord Waivers | 27 |
|     |     | 4. | Employee Matters | 28 |
|     |     | 5. | Out of the Ordinary Course Sales of the Debtors' Assets | 29 |
|     |     | 6. | Other Matters | 29 |
|     |     | 7. | Exclusivity; Receipt of Other Offers; Termination of Exclusivity | 30 |
|     | D. | BAR DATE | | 31 |
| VI. | INVESTMENT AGREEMENT | | | 31 |
| VII. | REORGANIZED DEBTORS | | | 32 |
|     | A. | BUSINESS OF REORGANIZED DEBTORS | | 32 |
|     | B. | EQUITY OWNERSHIP | | 32 |
|     | C. | LIQUIDITY AND CAPITAL STRUCTURE | | 32 |
|     | D. | NEW C&S AGREEMENT | | 33 |
|     | E. | MANAGERS AND OFFICERS | | 33 |
|     | F. | RESTRUCTURING TRANSACTIONS | | 33 |
|     | G. | FINANCIAL PROJECTIONS | | 34 |

# TABLE OF CONTENTS
(continued)

| | | | | Page |
|---|---|---|---|---|

VIII.  TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN .........................34

    A.  DEEMED SUBSTANTIVE CONSOLIDATION OF THE DEBTORS ............34

    B.  CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS ..............................................................................35

        1.  Administrative Claims...............................................................35

            a.  DIP Financing Claims ...............................................36

            b.  Fee Claims ..................................................................36

            c.  All Other Administrative Claims.................................36

            d.  Bar Date for Administrative Claims.............................36

        2.  Priority Tax Claims .................................................................37

        3.  Classified Claims and Interests ...............................................37

            a.  Class 1 - Priority Non-Tax Claims .............................37

            b.  Class 2 - Secured Claims ...........................................37

            c.  Class 3 - Term Lender Claims.....................................38

            d.  Class 4 - General Unsecured Claims (Other Than Convenience Claims)....................................................39

            e.  Class 5 – Convenience Claims ...................................40

            f.  Class 6 – Intercompany Claims ..................................40

            g.  Class 7 - Section 510(b) Claims .................................40

            h.  Class 8 - Old Equity Interests ....................................41

            i.  Class 9 - Subsidiary Equity Interests..........................41

    C.  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ....................................................................................41

        1.  Assumption of Certain Executory Contracts and Unexpired Leases .......41

        2.  Rejection of Certain Executory Contracts and Unexpired Leases ..........41

        3.  Cure Amounts; Certain Amendments to Contract Rejection Schedule ......................................................................42

        4.  Effect of Certain Provisions; Change of Ownership; Etc.........................43

        5.  Bar Date for Rejection Damages for Executory Contracts and Unexpired Leases Set Forth on Contract Rejection Schedule.................43

        6.  Confirmation Order Shall be Approval of Assumption and Rejections ...............................................................44

# TABLE OF CONTENTS
(continued)

**Page**

|   |   | 7. | Contracts and Leases Entered into after the Commencement Date | 44 |
|---|---|----|------|----|
|   |   | 8. | Employment, Compensation, and Benefit Matters; Retiree Benefits | 44 |
| IX. | Securities to be Distributed to Creditors under the Plan and Other Post-Reorganization Indebtedness | | | 45 |
|   | A. | COMMON UNITS | | 45 |
|   |   | 1. | General | 45 |
|   |   | 2. | Restrictions on Transfer | 45 |
|   |   | 3. | Tax Matters | 46 |
|   | B. | NEW TERM NOTES | | 46 |
|   | C. | EXIT FACILITY | | 47 |
| X. | The Creditors' Trust | | | 47 |
|   | A. | GENERAL | | 47 |
|   | B. | THE TRUSTEE; THE TRUST ADVISORY BOARD | | 47 |
|   | C. | PURPOSE OF THE CREDITORS' TRUST | | 48 |
|   | D. | TRANSFERABILITY; DISTRIBUTIONS | | 49 |
|   | E. | COSTS AND EXPENSES; TAX MATTERS | | 49 |
|   | F. | CREDITORS' COMMITTEE INVESTIGATION | | 50 |
|   |   | 1. | Introduction | 50 |
|   |   | 2. | Areas of Investigation | 51 |
|   |   | 3. | Potential Estate Claims | 51 |
| XI. | METHODS FOR DISBURSEMENTS TO CREDITORS AND RESOLUTION OF DISPUTED CLAIMS | | | 52 |
|   | A. | DISBURSEMENTS UNDER THE PLAN | | 52 |
|   |   | 1. | Disbursing Agents | 52 |
|   |   | 2. | Distributions for Claims Allowed as of the Effective Date | 53 |
|   |   | 3. | Surrender of Certificates, etc | 53 |
|   |   | 4. | Tax Matters | 53 |
|   |   | 5. | Delivery of Distributions | 53 |
|   |   | 6. | Distributions of Cash | 54 |
|   |   | 7. | Timing of Distributions | 54 |
|   |   | 8. | Minimum Distributions | 54 |

# TABLE OF CONTENTS
(continued)

**Page**

| | 9. | Unclaimed Distributions; Time Bar to Cash Payments | 54 |
| | 10. | Distributions to Holders as of the Record Date | 55 |
| | 11. | Allocation Between Principal and Accrued Interest | 55 |
| | 12. | Cancellation of Existing Securities and Agreements | 55 |
| B. | | RESOLUTION OF DISPUTED CLAIMS | 55 |
| | 1. | Objections to and Settlement of Claims | 55 |
| | 2. | Distributions to Holders of Allowed Claims | 56 |
| | 3. | Limited Recourse for Disputed General Unsecured Claims | 57 |
| | 4. | Estimation of Claims | 57 |
| | 5. | Special Rules for Distributions to Holders of Disputed Claims | 57 |
| | 6. | Litigation Claims | 57 |
| | 7. | Nonpayment of Claims of Parties Holding Recoverable Property; Setoff | 57 |
| XII. | | CONFIRMATION AND IMPLEMENTATION OF THE PLAN | 58 |
| | A. | CONDITIONS TO CONFIRMATION AND EFFECTIVENESS | 58 |
| | B. | IMPLEMENTATION OF THE PLAN | 59 |
| | 1. | Legal Existence On the Effective Date | 59 |
| | 2. | Action to Facilitate Consummation of the Plan | 59 |
| | 3. | C&S Settlement | 60 |
| XIII. | | EFFECT OF CONFIRMATION OF THE PLAN | 61 |
| | A. | EMERGENCE FROM BANKRUPTCY COURT PROTECTION | 61 |
| | B. | CONTINUED LEGAL EXISTENCE AND REVESTING OF ASSETS AND CAUSES OF ACTION | 61 |
| | C. | DISCHARGE AND RELEASE OF THE DEBTORS BY HOLDERS OF CLAIMS AND EQUITY INTERESTS | 62 |
| | D. | EXCULPATION AND RELEASES OF NON-DEBTORS | 64 |
| | 1. | Exculpation | 64 |
| | 2. | Releases by the Debtors | 64 |
| | E. | Releases by Holders of Claims and Interests | 64 |
| | F. | EXEMPTION FROM TRANSFER TAXES | 65 |
| | G. | Post-Effective Date Professional Fees; Reimbursable Expenses | 65 |

## TABLE OF CONTENTS
(continued)

**Page**

H.      DISSOLUTION OF CREDITORS' COMMITTEE ..............................................66

XIV.   CERTAIN RISKS TO BE CONSIDERED IN CONNECTION WITH THE
PLAN......................................................................................................................66

A.      BANKRUPTCY RISKS......................................................................................66

B.      RISKS RELATED TO OWNERSHIP OF NEW TERM NOTES OR
NEW COMMON UNITS....................................................................................68

1.      Risks to Business Operations ................................................................68

2.      Financial and Market Risks ...................................................................69

C.      RISKS TO BENEFICIARIES OF THE CREDITORS' TRUST........................71

XV.    SECURITIES LAWS MATTERS WITH RESPECT TO DISTRIBUTIONS ...............73

A.      GENERAL ...........................................................................................................73

B.      BANKRUPTCY CODE EXEMPTIONS FROM REGISTRATION
REQUIREMENTS ...............................................................................................73

1.      Initial Offer and Sale ............................................................................73

2.      Subsequent Transfers............................................................................74

XVI.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF
CONSUMMATION OF THE PLAN.......................................................................75

A.      GENERAL ...........................................................................................................75

B.      U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS .......76

C.      U.S. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF
CLAIMS ...............................................................................................................77

1.      Holders of Allowed Claims in Class 3 .................................................77

2.      Holders of Allowed Claims in Class 4 .................................................78

3.      Holders of Allowed Claims in Class 5 .................................................79

D.      CERTAIN OTHER TAX CONSIDERATIONS FOR HOLDERS OF
CLAIMS ...............................................................................................................79

1.      Pre-Effective Date Interest ...................................................................79

2.      Post-Effective Date Interest..................................................................79

3.      Reinstatement of Claims........................................................................80

4.      Bad Debt Deduction ..............................................................................80

5.      Market Discount ....................................................................................80

6.      Installment Method................................................................................80

## TABLE OF CONTENTS
(continued)

**Page**

7.    Information Reporting and Backup Withholding....................................80

E.    IMPORTANCE OF OBTAINING PROFESSIONAL TAX
ASSISTANCE.................................................................................................81

XVII.  CONCLUSION AND RECOMMENDATION ..............................................82

**EXHIBITS**

EXHIBIT A    Plan of Reorganization

EXHIBIT B    Disclosure Statement Order

EXHIBIT C    Selected Historical Financial Information

EXHIBIT D    Financial Projections

EXHIBIT E    Best Interests Analysis

EXHIBIT F    Valuation Analysis

EXHIBIT G    Investment Agreement

TABLE OF CONTENTS

# I.  INTRODUCTION

On March 23, 2009 (the "Commencement Date"), each of the above-captioned debtors (collectively, the "Debtors" or the "Company") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), thereby commencing the above-captioned cases in the United States Bankruptcy Court for the District of South Carolina (the "Bankruptcy Court"), jointly administered as Case No. 09-02140-HB (the "Chapter 11 Cases"). Since that time, the Debtors have continued to operate their business under the supervision of the Bankruptcy Court, as "debtors in possession," *i.e.*, debtors in possession of their property and business.

Chapter 11 is the business restructuring chapter of the Bankruptcy Code.  Under chapter 11, a debtor is authorized to continue to operate its business in the ordinary course, while working with its key creditors to achieve consensus on a restructuring of its financial and legal affairs, so that the restructured enterprise can emerge from the Bankruptcy Court's protection with a new and viable capital structure for the future.  Typically, the debtor in possession, rather than representatives of its creditors, proposes a chapter 11 plan.  In this case, however, the representatives of the Debtors' largest creditor constituencies are the co-proponents of a chapter 11 plan for the Debtors.

In an effort to facilitate the Debtors' emergence from bankruptcy with significantly less leverage and more liquidity than the Debtors had at the commencement of the Chapter 11 Cases, and to enable the Debtors to emerge from the costly bankruptcy process on an expeditious timetable, and to settle certain claim related disputes without time consuming and costly litigation, the Official Committee of Unsecured Creditors (the "Creditors' Committee") and the ad hoc committee (the "Term Lender Committee" and, together with the Creditors' Committee, the "Plan Proponents") of term lenders under the Term Loan Agreement (the "Term Lenders") negotiated the principal terms of a chapter 11 plan of reorganization for the Company.  The negotiated terms have been incorporated into a chapter 11 plan (the "Plan"), the form of which is attached hereto as Exhibit A.  The Plan Proponents have obtained approval from the Bankruptcy Court to file the Plan and a related disclosure statement.

This document is the Plan Proponents' formal disclosure statement (the "Disclosure Statement") concerning the Plan.  As described more fully herein, if the Plan is approved and becomes effective, the Debtors will emerge with substantially less leverage and additional liquidity than they had on the Commencement Date.  The Debtors commenced these cases with almost $295 million in undisputed non-contingent debt under their prepetition credit facilities.  After giving effect to the transactions contemplated by the Plan, the Plan Proponents believe that the Debtors' non-contingent funded debt will be reduced by more than $[120] million.  This reduction in leverage is accomplished by the conversion of a significant portion of the Term Lenders' claims into equity and the investment of $79.5 million in new equity capital in the reorganized Debtors (the "Reorganized Debtors").  The new investors (the "Investors") are led by WCM-BL Holding, LLC ("Wellspring") and BILO Recovery, LLC ("Bayside").  Both of the Investors are affiliated with certain of the Term Lenders.

The Plan also contemplates that the Reorganized Debtors will have access to a new revolving credit facility upon their emergence from bankruptcy, in an amount of up to $125 million, with the expectation that a substantial portion of which will be undrawn and available upon emergence. The Plan also provides for substantial recoveries for the unsecured creditors of the estates through a

creditors' trust, which will be funded with $30 million in cash, and receive potential causes of action including, among others, potential causes of action against the Debtors' current owner -- Lone Star -- and its affiliates. The Plan also provides for the full payment of all allowed administrative and priority claims, including payment of the Debtors' postpetition financing facility (the "DIP Facility").

The Plan implements a global resolution of potential issues among the Creditors' Committee, the Term Lenders, and C&S Wholesale Grocers, Inc. ("C&S"), key parties in these Chapter 11 Cases. The treatment of Claims of non-priority unsecured creditors and Term Lenders, the deemed consolidation described in Section 2.1(b) of the Plan, the assumption of the New C&S Agreement, the issuance of the C&S New Common Units, and the release and exculpation provisions represent a global resolution and settlement pursuant to section 1123(a)(5) and 1123(b)(3) of the Bankruptcy Code with respect to C&S' Claims, the Term Lender Claims, and the General Unsecured Claims.

Included in the global resolution are settlements of potential disputes regarding the value of the Term Lenders' collateral, the amount of the Term Lenders' secured claim, and the amount of any C&S claim (including claims based on BI-LO's obligations with respect to its guaranty of the supply agreement of a former subsidiary). **As part of this global settlement, the Debtors and their estates, and holders of claims not opting out of the release on their Ballots, will release the Released Parties from any claims and causes of action as specified in the Plan.**

To summarize, the chapter 11 plan confirmation process is described in detail in this Disclosure Statement. To become effective, a chapter 11 plan of reorganization must be formally "accepted" by the vote of certain creditors, as provided by the Bankruptcy Code. Prior to voting on a plan, however, the plan proponent(s) must provide adequate information about the plan in a formal "disclosure statement" that will enable parties in interest to make an informed judgment about the plan.

As explained more fully herein, once a chapter 11 plan has been accepted by the requisite creditor votes, it must then be "confirmed" by the Bankruptcy Court to insure that it satisfies all legal requirements of the Bankruptcy Code. This determination is made by the Bankruptcy Court at a hearing (known as the "confirmation hearing") on notice to all relevant parties in interest. After a chapter 11 plan has been confirmed, it becomes effective according to its terms. Upon that effective date, the debtor is legally deemed to have emerged from chapter 11 and to have commenced its new, reorganized post-bankruptcy existence.

**A table of terms defined herein indicating the pages on which such terms are defined is attached hereto as Annex I. All capitalized terms in this Disclosure Statement not otherwise defined herein have the meanings given to them in the Plan.**

A.     THE PLAN PROPONENTS

As stated above, the Creditor's Committee and the Term Lender Committee are co-proponents of the Plan.

1.      Creditors' Committee

On March 30, 2009, the United States Trustee appointed a nine-member committee pursuant to Sections 1102(a) and 1102(b) of the Bankruptcy Code. The Creditors' Committee is

comprised of the following entities (which are representatives of several trade vendors and one landlord):

- Kraft/Nabisco (co-chair)

- C&S Wholesale Grocers, Inc. (co-chair)

- Kellogg Company

- Sara Lee Corp.

- Cardinal Health 110, Inc.

- Developers Diversified Realty Corp.

- Coca-Cola Bottling, Inc.

- Flowers Baking Co. of Morristown, LLC

- Bottling Group, LLC (Pepsi)

The Creditors' Committee has retained Otterbourg, Steindler, Houston & Rosen, P.C. and McCarthy Law Firm, LLC as its legal counsel and FTI Consulting, Inc. as its financial advisor.

  2.  Term Lender Committee

The Term Lender Committee is comprised of the following entities (and/or certain affiliated entities):

- Ares Management LLC

- Canyon Capital Advisors, LLC

- Kohlberg Kravis Roberts & Co. (Fixed Income) LLC

- Merrill Lynch Credit Products, L.L.C.

- C. Saunders LLC (affiliated with Wellspring)

- Grace Bay Holdings II, LLC (affiliated with Bayside)

The six members of the Term Lender Committee and/or certain of their affiliated entities own, manage, and/or act as investment advisors for all of the Term Lenders. The Term Lender Committee has retained Jones Day and McNair Law Firm, P.A. as its legal counsel and Houlihan Lokey as its financial advisor.

B.      WHO MAY VOTE ON THE PLAN

Under the provisions of the Bankruptcy Code, not all parties in interest are entitled to vote on a chapter 11 plan.  Creditors or equity interest holders whose claims or equity interests are not impaired by a plan are deemed to accept the plan under section 1126(f) of the Bankruptcy Code, and are not entitled to vote.  Conversely, creditors or equity interest holders whose claims or interests are impaired by the Plan, and who will receive no distribution under the plan, are also not entitled to vote, because they are deemed to have rejected the plan under section 1126(g) of the Bankruptcy Code. Finally, creditors whose claims arose after the Commencement Date will have their claims satisfied in full under the Plan, and thus are also not entitled to vote on the Plan.

Furthermore, even if a class of creditors is entitled to vote on the Plan, only those creditors whose Claims are considered "allowed" for voting purposes, as set forth in the order approving this Disclosure Statement (the "Disclosure Statement Order" or the "Solicitation Procedures Order") are entitled to vote on the Plan, unless the Bankruptcy Court specifically orders otherwise.  With certain exceptions, to be "allowed" for purposes of voting on the Plan, such Claim either must be set forth in a filed proof of claim or must have been listed in a fixed amount on the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007 as on file with the Bankruptcy Court (collectively, as they may be amended from time to time, the "Schedules"), and not listed as "unliquidated," "contingent," or "disputed" in the Schedules.  The "allowed" amount of a claim for purposes of voting on the Plan (and not for purposes of receiving a distribution under the Plan) is determined by the tabulation rules set forth in the Disclosure Statement Order, and the allowed amount will depend on, among other things, whether an objection to a claim has been filed, whether the claim has been filed in a contingent or unliquidated amount, or whether the claim is based upon a contract or lease on the Contract Rejection Schedule.

Based on these voting rules set forth in the Bankruptcy Code, the following table sets out the voting rights for each category of Allowed Claims or Equity Interests under the Plan; refer to Section II.D (Summary of the Plan - General Summary of Classification and Treatment of Claims and Equity Interests) of this Disclosure Statement for a description of the types of Claims or Equity Interests covered by each category.

| Category of Allowed Claims and Equity Interests | Impaired? | Entitled to Vote? |
|---|---|---|
| Class 1 - Priority Non-Tax Claims | No | No (Deemed to Accept) |
| Class 2 - Secured Claims | No | No (Deemed to Accept) |
| Class 3 - Term Lender Claims | Yes | Yes |
| Class 4 - General Unsecured Claims | Yes | Yes |
| Class 5 - Convenience Claims | Yes | Yes |
| Class 6 - Intercompany Claims | No | No (Deemed to Accept) |
| Class 7 - Section 510(b) Claims | Yes | No (Deemed to Reject) |
| Class 8 - Old Equity Interests | Yes | No (Deemed to Reject) |
| Class 9 - Subsidiary Equity Interests | No | No (Deemed to Accept) |

C.    VOTING PROCEDURES, BALLOTS, AND VOTING DEADLINE

Pursuant to the Disclosure Statement Order, the Bankruptcy Court set _____ ___, 2009 as the Record Date for voting on the Plan.  Accordingly, only holders of Claims of record as of that date who otherwise are entitled to vote under the Plan will receive a form on which such holder is to indicate acceptance or rejection of the Plan (a "Ballot") and may vote on the Plan.

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan.  If you hold Claims in more than one Class and you are entitled under the Plan to vote Claims in more than one Class, you will receive separate Ballots, which must be used for each separate Class of Claims.  In addition, if you hold more than one Claim in a Class, you may receive more than one Ballot.  In that case, you must vote all Claims in the same Class either to accept or reject the Plan and may not split your votes.  After carefully reviewing the Plan, this Disclosure Statement, the Disclosure Statement Order and the instructions on your Ballot, please vote and return your Ballot(s) to the "Voting Agent" at the address specified below.  All Ballots, in order to be counted, must be properly completed in accordance with the voting instructions on the Ballot and received no later than _____ ___, 2009, at 5:00 p.m. (prevailing Pacific Time) (the "Voting Deadline") by [_____] c/o Kurtzman Carson Consultants LLC (the "Voting Agent"), via regular mail or delivery or courier at:

[_____]
c/o Kurtzman Carson Consultants LLC
2335 Alaska Avenue
El Segundo, CA 90245

> **TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT PRIOR TO THE VOTING DEADLINE OF [_____ _____, 2009] AT 5:00 P.M., PREVAILING PACIFIC TIME.  ANY EXECUTED BALLOT RECEIVED THAT FAILS TO CLEARLY INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN SHALL NOT BE COUNTED.**

**EACH HOLDER OF A CLAIM IN A CLASS ENTITLED TO VOTE UNDER THE PLAN MUST VOTE ALL OF ITS CLAIMS IN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT THEIR VOTES.   BY SIGNING AND RETURNING A BALLOT, EACH OF SUCH HOLDERS WILL CERTIFY TO THE BANKRUPTCY COURT AND THE PLAN PROPONENTS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLAIMS, THEN ANY SUCH EARLIER BALLOTS ARE REVOKED.**

If you are a holder of a Claim entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot, or lost your Ballot, or if you have any questions concerning the procedures for voting on the Plan, please call [_____].

D.      THE BANKRUPTCY CODE'S VOTING RULES FOR ACCEPTANCE OF A PLAN

        The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class who hold at least two-thirds in dollar amount and more than one-half in number of the allowed claims in that Class who cast ballots for acceptance or rejection of the plan.  Thus, for example, acceptance of the Plan by Class 4 will occur only if at least two-thirds in amount and a majority in number of the holders of allowed claims voting in Class 4 vote in favor of acceptance.  A particular creditor's vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

E.      THE CONFIRMATION HEARING AND DEADLINE FOR OBJECTIONS TO CONFIRMATION

        In addition to obtaining the requisite votes from creditors, the Plan must also be approved or "confirmed" by the Bankruptcy Court.   The Bankruptcy Court has scheduled a hearing (the "Confirmation Hearing") on _____, 2010, at __:___ __.m. (prevailing Eastern Time) to be held at the United States Bankruptcy Court for the District of South Carolina, Donald Stuart Russell Federal Courthouse, 201 Magnolia Street, Spartanburg, South Carolina 29306.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of adjournment at the Confirmation Hearing, or at any subsequent adjourned Confirmation Hearing.

        Any objection to the confirmation of the Plan must be made in writing and specify in detail (1) the name and address of the objector, (2) all grounds for the objection, and (3) the amount of the Claim or number of Equity Interests held by the objector.

        Any objection to confirmation of the Plan must be filed with the Bankruptcy Court, with a copy to the chambers of the Honorable Judge Helen E. Burris, United States Bankruptcy Judge, and served so that it is received by the Bankruptcy Court, the chambers, and the following parties on or before_____, 2010 at __:___ __.m. (prevailing Eastern Time):

    (a) counsel to the Term Lender Committee, Jones Day, 222 East 41st Street, New York, New York 10017 (Attn:  Erica M. Ryland, Esq.) and McNair Law Firm, P.A., Post Office Box 11390, Columbia, South Carolina 29211 (Attn:  Michael M. Beal, Esq.);

    (b) counsel to the Creditors' Committee, Otterbourg, Steindler, Houston & Rosen, P.C., 230 Park Avenue, New York, New York 10169 (Attn:  Glenn B. Rice, Esq. and Scott L. Hazan, Esq.) and McCarthy Law Firm, LLC, 1715 Pickens Street (29201), P.O. Box 11332, Columbia, South Carolina 29211-1332 (Attn:  G. William McCarthy, Jr., Esq.);

    (c) counsel to the Debtors, Vinson & Elkins L.L.P., 3700 Trammell Crow Center, 2001 Ross Avenue, Dallas, Texas, 75201-2975 (Attn:  Josiah M. Daniel, III, Esq.), Vinson & Elkins L.L.P., 666 Fifth Avenue, 26th Floor, New York, New York 10103 (Attn: Dov Kleiner, Esq.) and Nelson Mullins Riley & Scarborough, LLP, 1320 Main Street, 17th Floor, PO Box 11070 (29211), Columbia, South Carolina 29201 (Attn:  George B. Cauthen, Esq.);

(d) counsel to Bayside, Greenberg Traurig, LLP, 200 Park Avenue New York, New York 10166 (Attn: Nancy A. Mitchell, Esq.);

(e) counsel to Wellspring, Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022 (Attn: Adam Harris, Esq.); and

(f) the Office of the United States Trustee for the District of South Carolina, 1835 Assembly Street, Suite 953, Columbia, South Carolina 29201 (Attn: J. Timothy Stack, Esq.).

F.    ABOUT THIS DISCLOSURE STATEMENT

The purpose of this Disclosure Statement is to provide parties in interest with adequate information to make an informed judgment about the Plan. In addition, it describes the voting procedures that certain holders of Claims who are entitled to vote under the Plan must follow for their votes to be counted.

This Disclosure Statement contains general information regarding the Company's pre-bankruptcy or "prepetition" business operations and finances, the events leading up to the commencement of the Chapter 11 Cases, certain events that have occurred during the Chapter 11 Cases, and the anticipated organization, operations, and financing of the Reorganized Debtors if the Plan is confirmed and becomes effective. This Disclosure Statement also generally describes the terms and provisions of the Plan, including certain effects of confirmation and consummation of the Plan, the manner in which distributions will be made under the Plan, and certain risk factors associated with the ultimate recoveries to creditors under the Plan.

The information provided in this Disclosure Statement was derived from various sources, including pleadings filed with the Bankruptcy Court in the Chapter 11 Cases, other public sources, and information provided by the Debtors during the Chapter 11 Cases.

Because the Debtors themselves have provided significant portions of the information contained herein, the Plan Proponents have been unable to make independent investigation and verification of all such information. However, since this Disclosure Statement was approved on notice to the Debtors, any material disagreement of facts are presumed to be resolved or otherwise set forth herein. Certain of the materials contained in this Disclosure Statement are taken directly from other readily accessible documents or are digests of other documents. Additionally, while the Plan Proponents have made every effort to retain the meaning of such other documents or portions that have been summarized, the Plan Proponents urge that any reliance on the contents of such other documents should depend on a thorough review of the documents themselves. In the event of a discrepancy between this Disclosure Statement and the actual terms of a document, the actual terms of such document shall govern and apply. The statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified, and neither the delivery of this Disclosure Statement nor any exchange of rights made in connection with it shall, under any circumstances, create an implication that there has been no change in the facts set forth herein since the date of this Disclosure Statement.

No statements concerning the Debtors, the value of their property, or the value of any benefit offered to the holder of a Claim or Equity Interest in connection with the Plan should be relied on other than as set forth in this Disclosure Statement. In arriving at a decision, parties should not rely

on any representation or inducement made to secure their acceptance or rejection that is contrary to information contained in this Disclosure Statement, and any such additional representations or inducements should be immediately reported to counsel for the Creditors' Committee or the Term Lenders.

Accompanying this Disclosure Statement are copies of:

1.      the Plan (<u>Exhibit A</u>);

2.      the Disclosure Statement Order dated _____, 2009, which, among other things, approves this Disclosure Statement as containing adequate information, establishes the procedures for the solicitation of votes to accept or reject the Plan, schedules the Confirmation Hearing, and sets the voting deadline and the deadline for objecting to confirmation of the Plan (<u>Exhibit B</u>);

3.      Selected Historical Financial Information for the Debtors (<u>Exhibit C</u>);

4.      the Financial Projections for the Reorganized Debtors (<u>Exhibit D</u>);

5.      the Best Interests Analysis (<u>Exhibit E</u>);

6.      the Valuation Analysis (<u>Exhibit F</u>); and

7.      the Investment Agreement (<u>Exhibit G</u>)

All of these documents are incorporated by reference into this Disclosure Statement and deemed to be a part hereof.   Other supporting documents relating to the implementation of the Plan (the "<u>Plan Documents</u>") are voluminous and are not reproduced in this Disclosure Statement, and will be on file with the Bankruptcy Court for inspection or copying by parties in interest and will also be available at the website of **Kurtzman Carson Consultants LLC (the "<u>Voting Agent</u>"), http://www.kccllc.net/bilo**.   The Plan Documents will be made available by no later than 10 days before the Voting Deadline.

**THE PLAN PROVIDES FOR THE FOLLOWING RELEASES AND EXCULPATORY PROVISIONS:**

**(A)      <u>EXCULPATION</u>.   FROM AND AFTER THE EFFECTIVE DATE, NONE OF THE EXCULPATED PARTIES[1], SHALL HAVE OR INCUR ANY LIABILITY TO ANY ENTITY FOR ANY ACT OR OMISSION IN CONNECTION WITH, RELATED TO, OR ARISING OUT OF, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION,**

---

[1]   The Exculpated Parties are: the Specified Released Parties (defined in note three below), the Debtors, the Reorganized Debtors, and, with respect to acts or omissions occurring on or after the Commencement Date, each of the Debtors' respective officers, managers, directors, principals, members, partners, stockholders, employees, agents, professionals, advisors, and attorneys who served in such capacities after the Commencement Date, acting in such capacities, and all of the successors and assigns of any of the foregoing, *provided, however*, that the Exculpated Parties' shall not include any of the Excluded Parties, nor any of the Excluded Parties' respective agents, advisors, and attorneys, acting in such capacity.

DISSEMINATION, IMPLEMENTATION, CONFIRMATION, OR APPROVAL OF THE PLAN, THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN, OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT PROVIDED FOR OR CONTEMPLATED IN CONNECTION WITH THE CONSUMMATION OF THE TRANSACTIONS SET FORTH IN THE PLAN; PROVIDED, HOWEVER, THAT THE FOREGOING PROVISIONS SHALL NOT AFFECT: (1) THE LIABILITY OF ANY ENTITY THAT IS AN EXCLUDED PARTY OR (2) THE LIABILITY OF ANY ENTITY THAT RESULTS FROM ANY ACT OR OMISSION TO THE EXTENT THAT SUCH ACT OR OMISSION IS DETERMINED BY A FINAL ORDER OF THE BANKRUPTCY COURT TO HAVE CONSTITUTED GROSS NEGLIGENCE OR WILLFUL MISCONDUCT. NOTWITHSTANDING THE FOREGOING, THE EXCULPATION OTHERWISE PROVIDED FOR IN SECTION 4.2(F) OF THE PLAN SHALL NOT APPLY TO EXCLUDED PARTIES, OR ANY OF THEIR RESPECTIVE MEMBERS, OFFICERS, DIRECTORS, EMPLOYEES, ADVISORS, PROFESSIONALS, ATTORNEYS, OR AGENTS, ACTING IN SUCH CAPACITY.

(B)    RELEASES BY THE DEBTORS.  AS OF THE EFFECTIVE DATE, THE DEBTORS, ON BEHALF OF THEMSELVES AND ALL OF THEIR SUCCESSORS AND ASSIGNS, AND EACH OF THE DEBTORS' ESTATES (THE DEBTORS AND THEIR ESTATES BEING REFERRED TO HEREIN COLLECTIVELY AS THE "RELEASING PARTIES") SHALL BE DEEMED TO HAVE FOREVER RELEASED, WAIVED, AND DISCHARGED THE RELEASED PARTIES[2] FROM ALL CAUSES OF ACTION THAT ANY RELEASING PARTY HAS, HAD, OR MAY HAVE AGAINST ANY RELEASED PARTY BASED IN WHOLE OR IN PART ON ANY ACT, OMISSION, TRANSACTION, OR OTHER OCCURRENCE TAKING PLACE ON, OR PRIOR TO, THE EFFECTIVE DATE IN ANY WAY RELATING TO THE DEBTORS, THE CHAPTER 11 CASES, THEIR COMMENCEMENT, THE PLAN, THE ABL CREDIT AGREEMENT, THE TERM LOAN AGREEMENT, ANY DOCUMENT OR AGREEMENT RELATED THERETO, THE ABL LENDER CLAIMS, THE TERM LENDER CLAIMS OR ANY RELATIONSHIP WITH THE DEBTORS; PROVIDED, HOWEVER, THAT SUCH RELEASE SHALL NOT APPLY TO ANY OBLIGATIONS OF THE RELEASED PARTIES UNDER THE PLAN, ANY PLAN DOCUMENT, OR ANY COMMERCIAL AGREEMENT ASSUMED BY THE DEBTORS OR THE REORGANIZED DEBTORS.    SUCH RELEASE SHALL BE EFFECTIVE NOTWITHSTANDING THAT ANY RELEASING PARTY OR OTHER ENTITY MAY THEREAFTER DISCOVER FACTS IN ADDITION TO, OR DIFFERENT FROM, THOSE WHICH THAT ENTITY PREVIOUSLY KNEW OR BELIEVED TO BE TRUE, AND WITHOUT REGARD TO THE SUBSEQUENT DISCOVERY OR EXISTENCE OF SUCH DIFFERENT OR ADDITIONAL FACTS, AND THE RELEASING PARTIES AND ANY SUCCESSORS OR ASSIGNS ARE HEREBY EXPRESSLY DEEMED TO HAVE WAIVED ANY AND ALL RIGHTS THAT THEY MAY HAVE UNDER ANY STATUTE OR COMMON

---

[2] The Released Parties are:  the Specified Released Parties and each of the Debtors' officers, managers, directors, and employees if designated to be an officer, manager, director or employee after the Effective Date, each acting in such capacities, and all of the successors and assigns of the foregoing, *provided, however*, that the Released Parties shall not include any of the Excluded Parties, nor any of the Excluded Parties' respective agents, advisors, and attorneys, acting in such capacity; *provided, further, however*, that, solely with respect to a Trust Cause of Action, Released Parties shall not include the Specified Executives.

LAW PRINCIPLE WHICH WOULD LIMIT THE EFFECT OF THE FOREGOING RELEASE, WAIVER, AND DISCHARGE TO THOSE CLAIMS ACTUALLY KNOWN OR SUSPECTED TO EXIST ON THE EFFECTIVE DATE.

(C)    LIMITED RELEASES BY THE DEBTORS.   AS OF THE EFFECTIVE DATE, THE DEBTORS, ON BEHALF OF THE RELEASING PARTIES, SHALL BE DEEMED TO HAVE FOREVER RELEASED, WAIVED, AND DISCHARGED THE RELEASED VENDORS FROM ALL CAUSES OF ACTION THAT ANY OF THE RELEASING PARTIES HAS, HAD, OR MAY HAVE AGAINST ANY RELEASED VENDOR ARISING UNDER SECTION 547 OF THE BANKRUPTCY CODE.

(D)    RELEASES BY HOLDERS OF CLAIMS AND INTERESTS.   EACH ENTITY THAT (1) AS OF THE EFFECTIVE DATE, HOLDS OR HELD A CLAIM (WHETHER OR NOT ALLOWED) AGAINST OR AN EQUITY INTEREST IN A DEBTOR, AND (2) DOES NOT OPT OUT OF THIS PROVISION BY MAKING AN APPROPRIATE ELECTION ON ITS BALLOT SHALL BE DEEMED TO HAVE FOREVER RELEASED, WAIVED, AND DISCHARGED THE SPECIFIED RELEASED PARTIES[3] FROM ALL CAUSES OF ACTION THAT ANY ENTITY HAS, HAD, OR MAY HAVE AGAINST ANY SPECIFIED RELEASED PARTY BASED IN WHOLE OR IN PART ON ANY ACT, OMISSION, TRANSACTION, OR OTHER OCCURRENCE TAKING PLACE ON, OR PRIOR TO, THE EFFECTIVE DATE IN ANY WAY RELATING TO THE DEBTORS, ANY OF THEIR CURRENT OR FORMER SUBSIDIARIES (INCLUDING BRUNO'S), THE CHAPTER 11 CASES, THEIR COMMENCEMENT, THE PLAN, THE INVESTMENT AGREEMENT, THE ABL CREDIT AGREEMENT, THE TERM LOAN AGREEMENT, ANY DOCUMENT OR AGREEMENT RELATED THERETO, THE ABL LENDER CLAIMS, THE TERM LENDER CLAIMS OR ANY RELATIONSHIP WITH THE DEBTORS, PROVIDED, HOWEVER, THAT SUCH RELEASE SHALL NOT APPLY TO ANY OBLIGATIONS OF THE SPECIFIED RELEASED PARTIES UNDER THE PLAN, ANY PLAN DOCUMENT OR ANY COMMERCIAL AGREEMENT ASSUMED BY THE DEBTORS OR THE REORGANIZED DEBTORS.  ANY ENTITY ACQUIRING A CLAIM OR EQUITY INTEREST FROM AN ENTITY THAT IS BOUND BY THE RELEASE SET FORTH IN SECTION 4.2(i) OF THE PLAN SHALL BE BOUND TO THE RELEASE WITH RESPECT TO SUCH ACQUIRED CLAIM OR EQUITY INTEREST.

(E)    NOTWITHSTANDING ANYTHING TO THE CONTRARY.   IN SECTIONS 4.2(F), (G), (H), OR (I) OF THE PLAN, THE PROVISIONS SET FORTH IN SUCH SECTIONS SHALL NOT MODIFY, RELEASE, OR OTHERWISE LIMIT THE LIABILITY OF AN ENTITY NOT SPECIFICALLY RELEASED HEREUNDER, INCLUDING ANY ENTITY THAT IS A CO-OBLIGOR OR JOINT TORTFEASOR OF AN ENTITY SPECIFICALLY RELEASED HEREUNDER, OR THAT IS OTHERWISE LIABLE UNDER

---

[3] The Specified Released Parties are:  the DIP Agent, the DIP Lenders, the Prepetition Agents, the Prepetition Lenders, the Term Loan Predecessor Agent, the Lender Indemnified Entities, the Term Lender Committee, the Creditors' Committee, the Exit Facility Agent, the Exit Facility Lenders, the Investors, C&S and each of their respective officers, managers, directors, principals, members, partners, stockholders, employees, agents, professionals, advisors, and attorneys, acting in such capacities, and all of the successors and assigns of any of the foregoing.

**THEORIES OF VICARIOUS LIABILITY OR OTHER DERIVATIVE LIABILITY OR THAT IS A NON-DEBTOR THIRD PARTY GUARANTOR OF ANY OBLIGATIONS OF THE DEBTORS, AND AS TO SUCH, ALL RIGHTS ARE RESERVED <u>PROVIDED</u>, <u>HOWEVER</u>, THAT ANY RECOVERY AGAINST SUCH NON-SPECIFICALLY RELEASED ENTITY SHALL BE REDUCED BY ANY AMOUNT THAT SUCH ENTITY COULD RECOVER FROM A SPECIFICALLY RELEASED ENTITY AND, AS A RESULT OF SUCH REDUCTION, SUCH NON-SPECIFICALLY RELEASED ENTITY MAY NOT SEEK, AND IS ENJOINED PURSUANT TO THE PLAN FROM SEEKING, CONTRIBUTION, INDEMNIFICATION, REIMBURSEMENT, OR ANY OTHER RECOVERY FROM SUCH SPECIFICALLY RELEASED ENTITY.**

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT CONSTITUTES NEITHER A GUARANTY OF THE ACCURACY NOR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT NOR AN ENDORSEMENT OF THE MERITS OF THE PLAN BY THE BANKRUPTCY COURT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF, AND OBTAINING CONFIRMATION OF, THE PLAN AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE.  THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.  NO SOLICITATION OF VOTES MAY BE MADE EXCEPT AFTER DISTRIBUTION OF THIS DISCLOSURE STATEMENT.

ANY STATEMENTS IN THIS DISCLOSURE STATEMENT CONCERNING THE PROVISIONS OF ANY OTHER DOCUMENT ARE NOT NECESSARILY COMPLETE, AND IN EACH INSTANCE REFERENCE IS HEREBY MADE TO SUCH DOCUMENT FOR THE FULL TEXT THEREOF.   CERTAIN DOCUMENTS DESCRIBED OR REFERRED TO IN THIS DISCLOSURE STATEMENT HAVE NOT BEEN ATTACHED AS EXHIBITS BECAUSE OF THE IMPRACTICABILITY OF FURNISHING COPIES OF SUCH DOCUMENTS TO ALL RECIPIENTS OF THIS DISCLOSURE STATEMENT OR BECAUSE SUCH DOCUMENTS HAVE NOT BEEN FINALIZED AND WILL BE FILED WITH THE BANKRUPTCY COURT AFTER THE DATE OF THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.

THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "<u>SEC</u>") OR ANY STATE SECURITIES REGULATOR, AND NEITHER THE SEC NOR ANY STATE SECURITIES REGULATOR HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING SECURITIES OF, OR CLAIMS AGAINST, THE DEBTORS ARE NOT ENTITLED TO RELY UPON THIS DISCLOSURE

STATEMENT FOR SUCH PURPOSE, BUT ONLY FOR THE PURPOSE OF DETERMINING WHETHER TO ACCEPT OR REJECT THE PLAN.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND IN ITS EXHIBITS HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT NECESSARILY BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS OR THE REORGANIZED DEBTORS.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD-LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS, AND FINANCIAL PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS.  THE WORDS "BELIEVE," "MAY," "WILL," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT," AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS.  THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES, AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED IN SECTION XIV. (CERTAIN RISKS TO BE CONSIDERED IN CONNECTION WITH THE PLAN) BELOW.  IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS.  NEITHER THE PLAN PROPONENTS NOR THE REORGANIZED DEBTORS UNDERTAKE ANY OBLIGATION TO PUBLICLY UPDATE OR REVISE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.

CERTAIN HOLDERS OF CLAIMS MAY BE LIABLE FOR CAUSES OF ACTION BELONGING TO THE DEBTORS OR THEIR ESTATES.  UNLESS OTHERWISE SPECIFIED, THESE CAUSES OF ACTION WILL NOT BE WAIVED UPON CONSUMMATION OF THIS PLAN.

**ALL CREDITORS ENTITLED TO VOTE ON THE PLAN ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS ATTACHED TO THE PLAN, THE PLAN DOCUMENTS, AND THIS DISCLOSURE STATEMENT.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS**

**OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT WILL BE CORRECT AT ANY TIME AFTER THIS DATE. IN THE EVENT OF ANY CONFLICT BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.**

## II. SUMMARY OF THE PLAN

A.    OVERVIEW OF CHAPTER 11 PROCESS

The following is a brief overview of certain material provisions of the Plan. This overview is qualified in its entirety by reference to the provisions of the Plan, which is attached hereto as Exhibit A, and the exhibits thereto, as amended from time to time. The Plan Proponents will file the Plan Documents with the Bankruptcy Court and make them available for review at www.kccllc.net/bilo no later than ten days before the Voting Deadline.

The confirmation of a plan, which is the vehicle for satisfying the rights of holders of claims against and equity interests in a debtor, is the overriding purpose of a chapter 11 case. Although referred to as a plan of reorganization or liquidation, a plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of assets. In either event, upon confirmation of the plan, it becomes binding on the debtor and all of its creditors and stakeholders, and the obligations owed by the debtor to those parties are compromised and exchanged for the obligations specified in the plan (if any). In these Chapter 11 Cases, the Plan contemplates a reorganization of each of the Debtors and is therefore referred to as a "joint plan of reorganization."

The requirements for confirmation, including the vote of creditors to accept the Plan and certain of the statutory findings that must be made by the Bankruptcy Court, are set forth in Section XII.A of this Disclosure Statement. The occurrence of the effective date (*i.e.*, the date that the Plan becomes effective) is subject to certain conditions, which are summarized in Section XII.A of this Disclosure Statement. There is no assurance that these conditions will be satisfied.

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the applicable requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of a plan of reorganization are that the plan: (1) is accepted by the requisite holders of claims and interests in impaired classes of the debtor; (2) is in the "best interests" of each holder of a claim or interest in each impaired class under the plan for the debtor; and (3) complies with the applicable provisions of the Bankruptcy Code. In this instance, only holders of Allowed Claims in Classes 3, 4, and 5 are entitled to vote to accept or reject the Plan. *See* Sections I.B and VIII.B.3 of this Disclosure Statement.

The Plan Proponents believe that if the Plan is confirmed and becomes effective, the Reorganized Debtors will be restored to viability, for the benefit of the Debtors' customers, vendors, suppliers, employees, creditors, and other stakeholders.

B.   <u>OVERVIEW OF THE LARGEST CONSTITUENCIES</u>

        The following chart sets forth the Debtors' organizational structure as of the
Commencement Date.



(The other seven debtors are wholly owned by BI-LO LLC)

Despite the hundreds of millions of dollars of indebtedness and the thousands of creditors as of the Commencement Date, the constituencies in these Chapter 11 Cases fall into 4 general groups. More specifically, there are (a) lenders, (b) vendors (including C&S), (c) landlords (and Ahold, as guarantor, of numerous leases), and (d) miscellaneous claimants (including the asserted claims of Bruno's estate and pension plan).

C.    COMPARISON OF PREPETITION AND PROPOSED POST-REORGANIZATION CAPITAL STRUCTURE

The Plan Proponents believe that the Plan will result in a significant deleveraging of the Debtors' balance sheet and will result in healthy, viable Reorganized Debtors.

The following chart is a comparison between the Debtors' prepetition and estimated post-reorganization capital structure (on a consolidated basis).  The assumptions behind the comparisons are set forth in the text at the end of the comparison.

| | Commencement Date | Post-Reorganization |
|---|---|---|
| Revolving Loan Availability | $[34] million (approximately) | $[___] (estimated) |
| Principal Amount of Funded Debt (exclusive of undrawn letters of credit) | $295.975 million<br>• $35.975 million under the ABL Credit Agreement<br>• $260 million under the Term Loan Agreement | $____<br>• $[__] million drawn under Exit Facility (estimated)<br>• $164.1 million New Term Notes |
| Equity Ownership of BI-LO Holding, LLC | 100% -- LSF5 BI-LO Investments, LLC | 51.9% -- the Investors<br>43.1% -- the Term Lenders<br>5% -- C&S |

For purposes of this comparison, the Revolving Loan Availability is assumed to be the total commitments, reduced by outstanding borrowings plus issued but undrawn letters of credit.  The comparison assumes a $125 million Exit Facility.  The Revolving Loan Availability further assumes that $[__] million will be drawn on the Exit Facility on the Effective Date, and that $[___] million in outstanding but undrawn letters of credit will be replaced by letters of credit issued in the aggregate amount of [____] under the Exit Facility.  In addition to the funded debt amounts, as of the Commencement Date, the face amount of the outstanding letters of credit was $29,694,584.

Finally, the chart above sets forth the equity ownership percentages of BI-LO Holding, LLC ("BI-LO Holding").  The post-reorganization ownership of New Common Units of Reorganized BI-LO Holding (the "New Common Units") assumes that none of the Term Lenders will elect to exercise either the Term Lender Liquidity Right or the Term Lender Investment Right.  The New

Common Unit percentages for Investors do not include, and such percentages for Term Lenders do include, New Common Units to be issued to Term Lenders that are affiliates of the Investors (*i.e.*, C. Saunders, LLC and Grace Bay Holdings II, LLC). The allocation of New Common Units between the Investors (*i.e.*, Wellspring and Bayside) and their respective affiliated entities is intended to be equal. The ownership interests set forth above of the Investors, Term Lenders and C&S will be subject to dilution not reflected in the chart resulting from the subsequent issuance of additional New Common Units pursuant to the Management Incentive Plan described below.

D.    GENERAL SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

As stated above, the Plan implements a global resolution of potential issues among the Creditors' Committee, the Term Lenders, and C&S, key parties in these Chapter 11 Cases. The treatment of Claims of non-priority unsecured creditors and Term Lenders, the deemed consolidation described in Section 2.1(b), the assumption of the New C&S Agreement, the issuance of the C&S New Common Units, and the release and exculpation provisions, represents a global resolution and settlement pursuant to section 1123(a)(5) and 1123(b)(3) of the Bankruptcy Code with respect to C&S' Claims, the Term Lender Claims and the General Unsecured Claims. Included in the global resolution are settlements of potential disputes regarding the value of the Term Lenders' collateral, the amount of the Term Lenders' secured claim, and the amount of any C&S claim (including claims based on BI-LO's obligations with respect to its guaranty of the supply agreement of a former subsidiary).

The following table summarizes the treatment for the holders of the Claims and Equity Interests described below, and such treatment is in full and complete settlement, satisfaction, and discharge of such Claim or Equity Interest. For a more detailed description of the type of Claim or Equity Interest in each class and the treatment, *see* Section VIII.B.3 of this Disclosure Statement. The table is predicated on certain estimates and subject to various assumptions, including those described in the text following the table. If the actual claim amounts or values differ from the estimated or assumed amounts, the actual recoveries may differ materially from the amounts set forth in the table.

| Class and Description of Claims | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Recovery Percentage |
|---|---|---|---|
| **Class 1** <br><br> Priority Non-Tax Claims | Each holder of an Allowed Priority Non-Tax Claim shall receive cash in an amount equal to such Allowed Priority Non-Tax Claim on the Distribution Date or such other treatment as may be agreed upon in writing by such holder and the Plan Proponents or, after the Effective Date, the Reorganized Debtors. | | 100% |
| **Class 2** <br><br> Secured Claims | At the option of the Reorganized Debtors, each holder of an Allowed Secured Claim shall: <br> (a) have such Allowed Claim reinstated and rendered unimpaired in accordance with section 1124 of the | | 100% |

| | | | |
|---|---|---|---|
| | Bankruptcy Code; <br> (b) be paid Cash in an amount equal to such Allowed Secured Claim, including such interest as is required to be paid pursuant to section 506(b) of the Bankruptcy Code; or <br> (c) receive the Collateral securing such Claim. | | |
| **Class 3** <br><br> Term Lender Claims | Each Term Lender shall receive: <br> (a) its Pro Rata Share of: <br> (i) the New Term Notes in the aggregate principal amount of $164.1 million; and <br> (ii) New Common Units representing 43.1% of the New Common Units issued and outstanding immediately following the Effective Date (subject to reduction by participation in the Term Lender Liquidity Right); <br><br> (b) if such Term Lender (other than C. Saunders, LLC or Grace Bay Holdings II, LLC) elects to participate in the Term Lender Liquidity Right, additional Cash in an amount equal to the product of (i) the number of such Term Lender's Exchanged Units and (ii) the "Deemed Unit Price;" and <br><br> (c) if such Term Lender (other than C. Saunder, LLC or Grace Bay Holdings II, LLC) elects to participate in the Term Lender Investment Right, a number of additional New Common Units equal to the quotient obtained by dividing (i) the amount invested by such Term Lender pursuant to the Term Lender Investment Right, by (ii) the Deemed Unit Price, but only against delivery of the amount invested; <br><br> In addition, the Term Lenders shall be (a) reimbursed for (i) the "Deferred Fee" payable to the financial advisors to the Term Lender Committee, (ii) the reasonable fees and expenses of the Term Loan Agent, the Term Lender Committee, or the Term Lenders  incurred on or after the Effective Date in addressing customary post-closing matters, and (iii) any obligations incurred by the Term Lenders in connection with the Exit Facility, and (b) entitled to retain any adequate protection payments. | $260 million principal amount, plus interest, fees, charges, expenses, and other amounts provided for under the Term Loan Agreement | |
| **Class 4** <br><br> General Unsecured Claims (other than Convenience | Each holder of an Allowed General Unsecured Claim shall receive its Pro Rata Share of the Trust Recoveries to be distributed by the Creditors' Trust in accordance with the Terms of the Trust Agreement.  The Trust Assets are (a) $30 million in Cash,  (b) the Trust Causes of Action and (c) all rights and remedies and evidentiary privileges | | |

| Claims) | (including the attorney-client privilege) relating in any way to Trust Causes of Action, and the proceeds of the foregoing. | | |
|---|---|---|---|
| **Class 5** <br> Convenience Claims | Each holder of an Allowed Convenience Claim shall receive Cash in an amount equal to [25]% of its Allowed Convenience Claim | | [25]% |
| **Class 6** <br> Intercompany Claims | Each holder of an Allowed Intercompany Claim shall have such Allowed Claim reinstated and rendered unimpaired. | | 100% |
| **Class 7** <br> Section 510(b) Claims | No property will be distributed to or retained by holders of Section 510(b) Claims. | $0 | 0% |
| **Class 8** <br> Old Equity Interests | No property will be distributed to or retained by holders of Old Equity Interests. | N/A | 0% |
| **Class 9** <br> Subsidiary Equity Interests | Each holder of an Allowed Subsidiary Equity Interest shall have such Allowed Interest reinstated and rendered unimpaired. | N/A | 100% |

Each amount designated in the table above as the "Estimated Percentage Recovery" for each Class is the quotient derived by dividing the assumed value of the consideration available to be distributed to all holders of Allowed Claims in that Class by the estimated aggregate amount of all Allowed Claims in that Class. The Plan Proponents estimated the Estimated Aggregate Claims Amounts shown in the chart based upon a preliminary review of the Debtors' claims register, the Debtors' publicly filed schedules of assets and liabilities, and other information received from the Debtors. The Plan Proponents may substantially revise these estimates following additional analysis of the Claims ultimately filed. Further, the amount of any Disputed Claim that ultimately is allowed by the Bankruptcy Court may be significantly more or less than the Plan Proponents' estimated Allowed amount of that Claim. For purposes of this estimate, C&S is assumed to have no Claims in any of these classes as a result of the global resolution with C&S and, there is assumed to be no additional recovery for the Creditors' Trust on account of the potential Trust Causes of Action, which may or may not be asserted and which may or may not result in any additional recoveries if asserted.

For purposes of the estimated recovery for the Term Lenders, the assumed value of the New Common Units to be distributed under the Plan is [the midpoint] of the valuation range for such units provided by the Plan Proponents' financial advisors pursuant to the Valuation Analysis set forth in Exhibit F to this Disclosure Statement. The Plan Proponents can provide no assurances that the New Common Units will have that value. *See* Section XIV (Certain Risks To Be Considered In Connection With The Plan) of this Disclosure Statement. In addition, the New Common Units will not be listed on any national securities exchange or quoted on any inter-dealer quotation system, and the Plan

Proponents do not anticipate that the New Common Units will be so listed or quoted in the foreseeable future, thus restricting their marketability. The range of estimates for the Term Lender Claims is an estimate based upon the range of claims that may be asserted by the Term Lenders (which claims may include interest at the default rate, prepetition and postpetition fees and expenses (including fees and expenses of counsel or other professionals)). The recovery analysis assumes that adequate protection payments are included in the recovery, as are amounts to be reimbursed by the Reorganized Debtors (other than fees and expenses relating to the Exit Facility). The recovery percentage does not include any amounts payable as reimbursement of fees or expenses under the Investment Agreement, and does not include additional prepetition interest based on a conversion of LIBOR based loans to Base Rate Loans assuming the occurrence of a prepetition default.

E.   General Summary Of Treatment of Executory Contracts and Unexpired Leases

Prior to confirmation of the Plan, the Plan Proponents will file and serve the Contract Rejection Schedule, and for contracts and leases to be assumed the Cure Amount Schedule. Upon consummation of the Plan, the Reorganized Debtors will have assumed and cured any previous defaults under the assumed executory contracts or unexpired leases. The Claims arising from any rejections will be discharged in consideration for the specified treatment under the Plan. As noted below, the Plan sets a bar date for parties to file claims arising from the rejection of executory contracts and unexpired leases.


III.  GENERAL INFORMATION

A.   THE DEBTORS

BI-LO, LLC ("BI-LO") is a Delaware limited liability company. BI-LO operates as a regional retail supermarket chain under the "BI-LO" and "Super BI-LO" banners. BI-LO's corporate headquarters is located in Greenville, South Carolina, and the Debtors currently employ approximately 14,000 employees. Debtor BI-LO Holding, LLC, a holding company, owns 100% of BI-LO and BG Cards, LLC. BI-LO, in turn, owns 100% interest in the following Debtors: ARP Ballentine, LLC, ARP Chickamauga LLC, ARP Hartsville LLC, ARP James Island, LLC, ARP Moonville LLC, ARP Morganton LLC, and ARP Winston Salem LLC. BI-LO is the only significant operating Debtor. BG Cards, LLC provides gift cards to BI-LO in exchange for certain *de minimis* payments. Six out of seven of BI-LO's subsidiaries hold one or more pieces of real property.

B.   BUSINESS OVERVIEW

1.   Introduction

The Debtors are in the business of operating a supermarket chain that currently consists of more than 200 stores. The Debtors offer both national brand products as well as many private label products for sale in their grocery stores. Substantially all of the Debtors' stores offer grocery, meat, seafood, produce, deli, bakery, flora, health and beauty, and other general merchandise items routinely sold in the supermarket business. Many of the Debtors' stores also include pharmacies, special merchandise, and other customer services, including check-cashing services, Western Union Services,

DVD rentals, Coinstar© machines, banking/automatic teller machines, and third party merchandise kiosks. Additionally, certain of the Debtors' South Carolina locations contain J.J. Poloi coffeehouses.

As of the Commencement Date, BI-LO was one of the largest food retailers in the southeastern United States, operating more than 200 stores in South Carolina, North Carolina, Georgia and Tennessee, with the majority of stores located in South Carolina. The Debtors' profits are predominantly generated through the sale of its products at profitable price levels to their customers.

2. Suppliers of the Debtors' Inventory

C&S is the Debtors' largest supplier, providing the Debtors in excess of 70% of their inventory. C&S delivers goods to the Debtors pursuant to the Amended and Restated BI-LO LLC Supply Agreement by and between C&S and BI-LO dated as of March 23, 2007 (as amended, modified, or supplemented from time to time through the Commencement Date, the "C&S Agreement"). In addition to supplying the majority of the Debtors' goods, C&S provides distribution and delivery services to the Debtors under the C&S Agreement. The Debtors' retail products are delivered to its stores primarily from warehouses that are either subleased to C&S from BI-LO or owned by C&S.

To facilitate C&S's distribution of goods to the Debtors, BI-LO and C&S, among others, entered into the Asset Purchase Agreement dated as of December 22, 2004 (the "C&S Purchase Agreement") which was subsequently incorporated into the C&S Agreement. Under the C&S Purchase Agreement, BI-LO, among other things, (1) subleased to C&S distribution facilities in Mauldin, South Carolina and Chattanooga, Tennessee, and (2) sold to C&S a distribution facility in Mauldin, South Carolina. Immediately prior to the Commencement Date, on March 22, 2009, BI-LO entered into an amendment to the C&S Agreement that, among other things, eliminated or deferred certain surcharges, and obligated C&S to continue performance under the C&S Agreement pending assumption or rejection of the C&S Agreement under § 365 of the Bankruptcy Code.

Cardinal Health, Inc. ("Cardinal") provides substantially all of the Debtors' prescription and over-the-counter drugs, comprising approximately 10% of the Debtors' merchandise. In addition to C&S and Cardinal, approximately 500 other vendors and third party food manufactures deliver the remaining approximately 20% of the Debtors' merchandise directly to their stores.

3. Competition

The Debtors operate in a highly-competitive supermarket industry that is generally characterized by intense competition and narrow profit margins. The Debtors compete directly with national, regional, and local supermarket chains and independent supermarkets, as well as with Wal-Mart and similar supercenters and other non-traditional grocery retailers, such as dollar discount stores, drug stores, convenience stores, warehouse club stores, and conventional department stores.

4. Employees

The Debtors currently employ approximately 14,000 employees. None of its employees is represented by a union.

5. Executive Officers

The following table sets forth certain information regarding the Debtors' executive officers:

| Name / Position | Experience / Responsibilities |
|---|---|
| Michael D. Byars<br>*President and Chief Executive Officer* | Before joining the BI-LO team in February 2009, Mr. Byars most recently served as President and CEO of Minyard Food Stores in the Dallas/Fort Worth area for 5 years. Prior to his tenure at Minyard Food Stores, Mr. Byars spent over 25 years with Food Lion, most recently with their Florida-based Kash-N-Karry Supermarket division. |
| Brian P. Carney<br>*Chief Financial Officer* | Mr. Carney has served as Executive Vice President and Chief Financial Officer of BI-LO since October 2005. Prior to joining BI-LO, he spent 8 years as Executive Vice President and Chief Financial Officer of Jo-Ann Stores. Prior to that, served as Chief Financial Officer for Revco Drug Stores, where he worked for 8 years. Before joining Revco, Mr. Carney worked as an accountant at Arthur Andersen for 7 years. |
| Kenneth E. Jones<br>*Vice President Treasurer* | Prior to joining BI-LO in April 2005, Mr. Jones served as Vice President and Treasurer for Denny's Corp. where he directed its centralized treasury organization as well as corporate financial planning and investor relations. |

6.     Properties/Leases

As of the Commencement Date, the Debtors were party to approximately 250 unexpired leases of nonresidential real property (each, a "Lease" and, collectively, the "Leases"), the vast majority of which were being used to operate the Debtors' stores. As of the Commencement Date, some of the Leases were "dark" (*i.e.*, locations at which the Debtors were not operating stores), and certain of those locations were subleased to third parties.

The Debtors currently operate over 200 stores. Substantially all of the stores are operated from leased premises. Koninklijke Ahold N.V. ("Ahold"), the former owner of the Debtors, has guaranteed the Debtors' performance under approximately two-thirds of the Leases.

Prior to the Commencement Date, the Debtors assigned certain leases to other parties and remain liable with respect thereto. The Plan Proponents believe that BI-LO's liabilities on certain of the assigned leases are contingent as of the date hereof, while with respect to others, the liabilities may be non-contingent.

The Debtors own over 20 parcels of real property. Most of these parcels do not have operating stores at this time, although some of the parcels may be located near the Debtors' current store operations. Some of these parcels may be designated as Non-Core Real Property that may be sold or otherwise transferred. The net book value of these owned properties (whether or not designated as Non-Core Real Property) was scheduled by the Debtors on their Schedules as $[_____].

7.      Legal Proceedings

In addition to the Chapter 11 Cases, the Debtors are involved in judicial and administrative proceedings from time to time concerning matters arising in connection with the conduct of their businesses. The Plan Proponents believe, based on currently available information, that the results of such other proceedings, in the aggregate, will not have a material adverse effect on the Company's financial condition or operations as many of those prepetition proceedings will be addressed in the claims resolution process.

C.      CAPITAL STRUCTURE AS OF THE COMMENCEMENT DATE

1.      The Debtors' Equity Ownership

BI-LO Holding, the direct or indirect parent of the other Debtors, is a wholly-owned subsidiary of LSF5 BI-LO Investments, LLC.  Substantially all of the equity interests in BI-LO Holding and BI-LO are indirectly owned by Lone Star Fund V (U.S.), L.P., LSF V International Finance, L.P. (Bermuda) or their affiliates, which, together with other affiliates, comprise or are affiliated with a private equity fund headquartered in Dallas, Texas.  The remaining indirect equity interests of BI-LO Holding, aggregating approximately 2.6%, are held by certain current and former employees of the Debtors.  Lone Star acquired BI-LO, as well as the Bruno's supermarket chain, in 2005 from Ahold, an international conglomerate operator of supermarkets, with stores in the United States and Europe.

2.      The Debtors' Significant Prepetition Debt Obligations

BI-LO and certain of its affiliates are parties to the ABL Credit Agreement, with GE Business Financial Services, Inc. (formerly known as Merrill Lynch Capital, a division of Merrill Lynch Business Financial Services Inc.) as administrative agent and the ABL Lenders.  The ABL Credit Agreement provided for a $100 million revolving credit facility (the "ABL Facility") used for general corporate purposes, including swingline loan commitments.  The ABL Facility had a sublimit for letters of credit in the amount of $30,000,000.  As of the Commencement Date, the outstanding principal amount of all loans under the ABL Credit Agreement was not less than $35,975,000, and in addition, there were issued and outstanding letters of credit thereunder with a face amount of $29,694,584.  The ABL Facility matured March 26, 2009.

As previously discussed, BI-LO and certain of its affiliates were also parties to the Term Loan Agreement with The Bank of New York Mellon, as administrative agent, and the Term Lenders, which provided for a $260 million term loan (the "Term Loan").  As of the Commencement Date, the outstanding principal amount of all loans under the Term Loan Agreement was not less than $260 million.  The Term Loan matured on March 26, 2009.

The Borrower under each of the ABL Credit Agreement and the Term Loan Agreement is BI-LO and the other Debtors are each guarantors of BI-LO's obligation.  The credit facilities are each secured by liens and security interests on substantially all of the Debtors' personal property assets and approximately 14 leases.  An intercreditor agreement specifies the priorities of the liens, security, and mortgages granted in connection with the ABL Credit Agreement and the Term Loan Agreement. Generally, the liens and security interests securing the ABL Credit Agreement are senior to the liens and security interests securing the Term Loan Agreement with respect to accounts receivable, inventory, pharmacy scripts, deposit accounts, and money contained in certain accounts, and certain other assets.

The liens, security interests, and mortgages securing the Term Loan Agreement are senior to those securing the ABL Credit Agreement with respect to equipment, investment property (including equity in subsidiaries), intellectual property, real estate, and all other assets.

### 3.      Selected Historical Financial Information

Attached as Exhibit C to this Disclosure Statement is selected consolidated historical financial information for BI-LO Holding, LLC and its subsidiaries (on a consolidated basis).

## IV.  EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

In the years preceding the Debtors' Chapter 11 Cases, the Debtors operating performance declined substantially.  BI-LO's earning before interest, taxes, depreciation, and amortization (adjusted to reflect rent under both operating and capital leases) declined from $114 million in 2006, to $96 million in 2007, to $78 million in 2008 (based on unaudited financials).

Apparently aware of its deteriorating performance, and prior to the commencement of these cases, the Debtors initiated a series of actions in an effort to enhance its competitive situation, including the implementation of measures to reduce general and administrative costs.  The Debtors also engaged Mr. Byars as chief executive officer in February 2009.  On March 22, 2009, the day before commencing these Chapter 11 Cases, the Debtors amended the C&S Agreement which had the effect of, among other things, delaying or deferring certain charges.

Both the ABL Credit Agreement and the Term Loan Agreement were scheduled to mature on March 26, 2009.  The Term Lenders were unable to reach an agreement on the terms regarding the extension of maturity on the Term Loans, and the Debtors were not able to refinance the Term Loans.  With the looming debt maturity under the Term Loan, the Debtors commenced the Chapter 11 Cases on March 23, 2009.

## V.  POST-BANKRUPTCY OPERATIONS AND SIGNIFICANT EVENTS

The Debtors commenced their Chapter 11 Cases on March 23, 2009.   Since the Commencement Date, the Debtors have operated their businesses and managed their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

A.      ADMINISTRATION OF THE CHAPTER 11 CASES

During the first few months of the Chapter 11 Cases, the Bankruptcy Court entered a series of orders designed to minimize any disruption of business operations and to facilitate their reorganization, including the retention of various professionals.  The Bankruptcy Court entered orders:

- Designating the Debtors' Chapter 11 Cases as Complex Chapter 11 Cases

- Directing joint administration of the Debtors' Chapter 11 Cases

- Granting authority to turn over certain funds held in trust and to continue performance and honor obligations under consignment arrangements

- Authorizing the Debtors to pay certain prepetition wages, salaries, and other compensation

- Authorizing the Debtors to pay certain prepetition claims of alcoholic beverage claimants and state governments for lottery ticket proceeds

- Authorizing the Debtors to continue their existing cash management system, maintain existing bank accounts, and maintain existing investment practices

- Authorizing the employment of Kurtzman Carson Consultants LLC, as claims, noticing, and ballot agent

- Authorizing the Debtors to continue to provide employee medical benefits and to pay related prepetition claims

- Granting authority for the Debtors to honor certain prepetition customer programs

- Establishing procedures for interim compensation and reimbursement of expenses for professionals and official committee members

- Establishing certain notice, case management, and administrative procedures

- Authorizing the Debtors' retention and compensation of certain professionals utilized in the ordinary course of business

- Authorizing the Debtors to remit and pay certain taxes and fees

- Authorizing the continuation of insurance policies and payment of all obligations in respect thereto

- Authorizing the Debtors to pay certain prepetition claims of vendors and PACA claimants and approving procedures related thereto

- Determining adequate assurance for payment of future utility services

- Authorizing the retention of Nelson Mullins Riley & Scarborough, L.L.P. as local counsel to the Debtors

- Authorizing the retention of AP Services, LLC to provide restructuring services and to designate Michael Feder as the Debtors' chief restructuring officer

- Authorizing the retention of Vinson & Elkins L.L.P. as counsel for the Debtors


B.    CASH COLLATERAL; DEBTOR IN POSSESSION FINANCING; ADEQUATE PROTECTION

       Upon the commencement of the Chapter 11 Cases, the Debtors sought authority to use cash collateral and to obtain postpetition financing from a postpetition credit facility to be provided by

General Electric Capital Corporation ("GECC").  The DIP Facility included, among other things, the "roll-up" of the outstanding prepetition claims under the ABL Credit Agreement.  After filing their motion to approve the DIP Facility, two other parties offered to provide postpetition financing on terms such parties thought were superior to those contemplated by the proposed DIP facility.  Thereafter, the Debtors conducted a process during which all three potential lenders could submit or revise their offers.  Ultimately, the Debtors determined to enter into a credit facility with GECC and sought Bankruptcy Court approval of same.  The Court entered an interim order on April 8, 2009 and, after a contested hearing, entered a final order on April 16, 2009 with respect to the $125 million DIP Facility.  Upon closing of the DIP Facility, the obligations under the ABL Credit Agreement were satisfied, with the exception of the potential contingent claims, which the Plan Proponents do not believe will result in any further liability for the Debtors.

The DIP Facility is a $125 million senior secured, superpriority credit facility, subject to availability determined by a borrowing base and certain reserves.  The DIP Facility is secured by a senior lien on the collateral pledged to secure the ABL Facility (including liens on, among other things, accounts receivable, chattel paper, money, and inventory) and a junior lien on substantially all of the remaining assets of the Reorganized Debtors (including liens on, among other things, equipment, leasehold interests in real estate, and intellectual property).  The DIP Facility may also be secured, to a limited extent, by a senior lien on the unencumbered real property owned or leased by the Debtors.  Claims under the DIP Facility are entitled to priority over all other claims in the Debtors' Chapter 11 Cases.  The DIP Facility matures on April 8, 2010, unless there is an earlier triggering event.  The borrowing base for the DIP Facility provides for additional reserves for inventory at leased stores if the Debtors' deadline to assume or reject such lease pursuant to Bankruptcy Code § 365(d)(4) falls within a date that is nine weeks away (or six weeks away in certain circumstances).  As discussed below, the Debtors have received extensions from the majority of their lessors through March 31, 2010, thus preserving much of their liquidity under the DIP Facility until the middle of January 2010.  As of the date hereof, the Debtors have not disclosed any defaults with regard to the DIP Credit Agreement.

As part of their process to obtain postpetition financing, the Debtors offered only a minimum of adequate protection to the Term Lenders despite the fact that the Debtors' proposed DIP Facility would "prime" the Term Lenders liens on and security interests in certain assets.  The Term Lender Committee requested that the Debtors make periodic cash payments as adequate protection against the diminution in value of the Term Lenders' collateral, including cash collateral.  On April 20, 2009, the Creditors' Committee filed a statement in support of the adequate protection payments to the Term Lenders, the C&S critical vendor motion (discussed below) and a section 503(b)(9) program (discussed below), in an effort that represented a global resolution among the parties.  Such parties agreed generally to such resolution, although the Debtors did not agree to the adequate protection payments for the Term Lenders.  After the parties engaged in discovery, the Debtors and the Term Lender Committee ultimately reached a resolution on April 22, 2009 on the amount of adequate protection payments, and this agreement was set forth in a consent order entered on May 1, 2009.  In connection with this litigation, the Debtors filed a motion to value the Term Lenders' collateral, which motion was adjourned without date pursuant to the May 1, 2009 consent order.  The May 1, 2009 order provided for an initial adequate protection payment of $2.45 million, plus monthly payments of $1.45 million commencing on June 1, 2009.

C.    SIGNIFICANT EVENTS AND ORDERS GRANTED DURING THE CHAPTER 11 CASES

      1.    Vendor Related Matters

         a.    C&S Critical Vendor Motion

C&S delivers approximately 70% of the inventory sold in the Debtors' stores.  On March 25, 2009, the Debtors filed a motion seeking to designate C&S as a critical vendor, to pay it prepetition amounts owed in the amount of $20,998,000, and to grant it certain releases.  Various parties, including the Term Lender Committee filed responses in connection with the C&S critical vendor motion.  The Creditors' Committee also filed its April 20, 2009 statement in connection with its proposed global resolution (the "Global Resolution").  On May 21, 2009, the Debtors supplemented their motion (i) to reflect a corrected balance of $17,310,881 of prepetition amounts owed to C&S, (ii) to request that C&S be given an allowed, administrative claim in the amount of $5,232,973, and (iii) to narrow the releases to payments made, actions taken or payments or transfers made within 91 days of the commencement of these Chapter 11 Cases.  On May 31, 2009, the Bankruptcy Court entered an order approving this motion.

         b.    Section 503(b)(9) Program

On May 22, 2009, as part of the Global Resolution proposed by the Creditors' Committee, the Debtors filed a motion seeking approval to offer a program that provides for the expedited payment of administrative expense claims related to goods delivered to the Debtors within the 20 days prior to the Commencement Date and the release of certain preference actions to eligible vendors that agree to provide normalized trade credit and promotional programs to the Debtors.  Eligible vendors were defined as vendors that were not parties to an executory contract with the Debtors.  The outstanding balance for goods delivered by these vendors within 20 days of the Commencement Date was approximately $22.2 million.  Objections were filed to this motion, and after an evidentiary hearing, the Bankruptcy Court denied the motion by an order dated June 19, 2009, due to, among other reasons, concerns regarding the lack of analysis regarding the amount, scope, and effect of the proposed releases.

After the denial of the motion, the Debtors conducted an analysis of the potential preference actions that would be released pursuant to the section 503(b)(9) program, and the Debtors also learned that certain significant vendors would not participate in the section 503(b)(9) program without the release of preference actions.  The Debtors filed a motion for a rehearing for approval of their section 503(b)(9) program.  At the rehearing, the Debtors, among other things, introduced evidence regarding their analysis of the amount, scope, and effect of the proposed releases.  By an order entered on August 11, 2009, the Bankruptcy Court approved the motion.  Approximately __ vendors representing approximately ___ of the claims eligible to participate in the section 503(b)(9) participated in the program.

         c.    Other Vendor Related Matters

In addition to the information described above, there are several other vendor-related incidents that have occurred during the Chapter 11 Cases, including:

- Certain orders were entered with respect to relief from the automatic stay for certain vendors to exercise set-off rights.

- Several vendors and other parties in interest have sought allowance and payment of administrative expense claims.

2.       Ahold Cost Sharing Agreement

Ahold, the former owner of the Debtors, guarantees about two-thirds of the Debtors' Leases (the guaranteed leases, the "<u>Ahold Leases</u>").  On April 3, 2009, the Debtors filed a motion for authority to enter into the Ahold Cost-Sharing Agreement (as amended, the "<u>Ahold Agreement</u>"). Under the Ahold Agreement, if the Debtors determine to reject any real property lease (whether or not an Ahold Lease), they must provide Ahold with 30 days notice prior to seeking authorization for such rejection.  If Ahold consents to the rejection, the Debtors may proceed to seek authorization for the rejection.  If Ahold does not consent to the rejection, the Debtors may not reject the lease (until the deadline to assume or reject leases).  However, Ahold will reimburse the Debtors for all rent and other administrative obligations due under the lease, net of any sublease income.  In addition, the Ahold Agreement also provided for, among other things, agreed-upon procedures for the marketing of any Ahold Leases which the Debtors would have rejected but for Ahold's non-consent.   In that circumstance, Ahold can require the Debtors to seek to assume and assign such lease to Ahold or its designee.  In exchange for these rights, Ahold would pay a portion (*i.e.*, 45%) of the rental obligations on certain designated leases until October 20, 2009, subject to a maximum amount of $4.2 million.  The Bankruptcy Court approved the Ahold Agreement on April 16, 2009.

As of November 12, 2009 the Bankruptcy Court has approved the assumption and assignment of 7 unexpired leases to Ahold or its affiliates in connection with the Ahold Agreement, and also approved the assumption and assignment of any subleases relating to such leases to Ahold or its affiliates.

3.       Unexpired Leases of Non-Residential Real Property; Landlord Waivers

The Bankruptcy Court entered an order approving the Debtors' motion for approval of procedures for rejecting the Leases, as well as orders approving the rejection of certain Leases.  As of the date hereof, approximately 25 Leases have been rejected, including store leases and warehouse leases, and as noted above, 7 leases were assumed and assigned to affiliates of Ahold (exclusive of 3 leases assigned to affiliates of Ahold subject to a sublease by the Debtors).

On June 8, 2009, the Bankruptcy Court entered an order approving the Debtors' application to retain DJM Asset Management, LLC ("<u>DJM</u>") to provide lease mitigation and appraisal services to the Debtors.  DJM among other things, is assisting the Debtors in renegotiating their above-market Leases, providing appraisal services for all the Leases, and assisting the Debtors in assigning, for value, the Leases for locations which the Debtors no longer wish to maintain.  The appraisal services to be performed by DJM are limited to appraisal of only the Leases which, in the Debtors' business judgment, warrant the expense of such an appraisal.  DJM has been involved in the Debtors obtaining the agreement from most of the Debtors' landlords to extend the section 365(d)(4) period in which the Debtors may determine whether to assume or reject leases.   In addition, the Debtors have already obtained certain rent concessions.

The Bankruptcy Court approved an extension of the time in which the Debtors must elect to assume or reject the Leases through October 19, 2009.   Pursuant to section 365(d)(4) of the

Bankruptcy Code, no further extensions could be granted without landlord consent. As noted above, the Debtors have obtained consents from the substantial majority of their landlords to further extend this time period to March 31, 2010. In consideration of such extensions, the Bankruptcy Court, among other things, approved releases of certain potential preference claims against such landlords.

On October 15, 2009 the Bankruptcy Court approved the Debtors' assumption of 10 unexpired leases of nonresidential real property for which the relevant landlords had not consented to an extension of the Debtors' time to elect to assume or reject such leases. In addition, by orders entered October 15, 2009 and October 19, 2009, the Bankruptcy Court approved the assignment of 3 leases to Ahold, subject to a sublease back to the Debtors on substantially the same terms as the underlying lease, which sublease is terminable on March 31, 2010. Ahold guaranteed these 3 leases and the landlords had not extended the Debtors' time to assume or reject. As noted above, the Bankruptcy Court has also approved the assumption and assignment to Ahold or its affiliates of certain unexpired leases or subleases that the Debtors intended to reject.

4.      Employee Matters

Early in the Chapter 11 Cases, the Bankruptcy Court entered orders authorizing the Debtors to honor and pay prepetition employee obligations, including salary, wages, and employee benefits (including medical and other benefits), and authorized the Debtors to pay covered medical benefit claims provided they were not in excess of the retention amounts.

The Debtors maintain a group healthcare program that is administered pursuant to an Administrative Services Agreement, effective January 1, 2009, as amended by the Specific Stop Loss & Aggregate Insurance Protection addendum, dated February 20, 2009 but effective January 1, 2009 (the "BC/BS Contract") between BI-LO and Blue Cross Blue Shield of South Carolina ("BCBSSC"). The Debtors' group healthcare program is primarily self-funded in that BI-LO is responsible for paying the first layer of costs of heath care claims covered by the program, subject to certain limits and an excess coverage layer of insurance. Under the BC/BS Contract, BCBSSC processes and remits payments for medical benefit claims on behalf of BI-LO. BCBSSC collects a fee for its services and has negotiated medical care discounts with various providers that reduce the cost of certain medical benefits provided by BI-LO to its employees. On July 25, 2009, the Bankruptcy Court entered an order authorizing the Debtors to assume the BC/BS Contract, as amended, and the payment of a cure amount estimated to be approximately $4.3 million. Among other things, the amendment extended the maturity of the contract by one year and provided for other revised and additional terms.

On June 30, 2009, the Debtors obtained Bankruptcy Court authorization to implement three employee bonus programs. The General Management Incentive Plan is a quarterly bonus program for approximately 250 of the Debtors' salaried and executive-level employees and is based on the achievement of certain pre-established performance metrics related to overall corporate sales and EBITDA. The Store Management Incentive Plan is a quarterly bonus program for approximately 1,700 store-level employees consisting of eligible store directors, assistant store directors, co-managers, and key store department managers, and payment is based on the achievement of certain pre-established performance metrics related to specific stores sales, overall corporate sales, and EBITDA. The Pharmacy Incentive Plan is a quarterly bonus program for approximately 270 eligible pharmacy managers and staff pharmacists and is based on the achievement of certain pre-established performance metrics related to overall corporate sales and EBITDA.

Thereafter, on September 2, 2009, the Debtors filed a motion requesting approval of its employee incentive compensation plan for their three senior executives. These executives have historically been covered by the employee bonus program (in particular, the General Management Incentive Plan) which, as discussed above, was previously approved by the Bankruptcy Court. The three senior executives are Mr. Michael Byars (the Debtors' Chief Executive Officer), Mr. Brian Carney, (the Debtors' Chief Financial Officer), and Mr. Kenneth Jones (the Debtors' Treasurer). The program for each of these executives includes a long term value creation incentive bonus that is tied to financial performance for fiscal years 2010 and 2011. In addition, the programs for Messrs. Byars and Carney include certain guaranteed and incentive bonuses, as well as case bonuses tied to the recoveries obtained by unsecured creditors in these Chapter 11 Cases. The actual compensation for these executives has been filed under seal. The Bankruptcy Court authorized the Debtors' entry into these agreements on November 6, 2009.

5.    Out of the Ordinary Course Sales of the Debtors' Assets

BI-LO operated a pharmacy business at a retail store in Charlotte, North Carolina. Prior to the expiration date of the store lease for that location, the Debtors were required to remove all inventory and equipment located on the premises. In preparation for the store closing, the Debtors solicited bids from potential purchasers for the sale of certain of the pharmacy's inventory and related records. The Bankruptcy Court approved the sale to CVS/pharmacy free and clear of all liens, claims, and encumbrances and approved disbursement of the net proceeds thereof for the benefit of the DIP Lenders.

The Debtors owned certain personal property, including fixtures and equipment, that were either located at premises where the Debtors no longer operated grocery stores or that were otherwise unnecessary for the Debtors' operations. The Debtors requested and obtained court permission to hire Grafe Auction Company to conduct public auctions to sell these assets, free and clear of all liens, claims, and encumbrances, and to distribute the net proceeds from such sales for the benefit of the Term Lenders. As of the date hereof, the net proceeds of such sales were approximately [$319,780.40].

On August 6, 2009, the Debtors filed a motion requesting approval of expedited procedures enabling the Debtors to sell, transfer, or abandon assets with a de minimis value (*i.e.*, with a book value of $250,000 or less) to the estates. The Bankruptcy Court entered an order approving this motion on August 20, 2009. To date there have been no sales, transfers or abandonments of assets pursuant to this motion.

6.    Other Matters

In addition to the events listed above, several other events have occurred during these Chapter 11 Cases, including:

- A consent order was entered on July 16, 2009, which modified the automatic stay to allow certain state court litigation.

- The Bankruptcy Court authorized the appointment of a consumer privacy ombudsman by an order entered May 1, 2009, and the United States Trustee subsequently appointed Lucy L. Thomson as the consumer privacy ombudsman.

- The Bankruptcy Court entered an order approving the rejection of the Debtors' equipment leases with CCA Financial, LLC (under which the Debtors leased certain hardware and software, including a computer and related software licenses, to facilitate secure paycheck cashing services) and with Konica Minolta EquipLease (under which the Debtors leased certain photo lab equipment, including a scanner, printer, film processor, and media card).

- On September 16, 2009, the Bankruptcy Court denied the motion of a BI-LO employee requesting relief from the automatic stay to allow him to pursue an employment discrimination claim.

- On October 26, 2009, the Bankruptcy Court entered an order approving the assumption, as modified, an executory contract with National Music Rack, Inc.

The following motions have been filed in the Chapter 11 Cases and are still pending. These include the following:

- On October 29, 2009, the Debtors filed a motion seeking approval to establish and implement procedures to resolve claims.

- On July 24, 2009, the Debtors filed a motion seeking approval of procedures to settle certain pre-petition litigation claims by and against the Debtors. The motion requests Bankruptcy Court approval to settle threatened or actual "slip and fall" and other types of personal injury cases and lawsuits.

7.    Exclusivity; Receipt of Other Offers; Termination of Exclusivity

On June 17, 2009, the Debtors filed a motion to extend their exclusive period to file a chapter 11 plan. The Term Lender Committee and the Creditors' Committee objected to the motion.

On October 7, 2009, after 2 days of hearings, the Bankruptcy Court entered an order modifying the Debtors' exclusivity period in which to file a plan of reorganization such that the Creditors' Committee may file a chapter 11 plan of which it is either the sponsor or co-sponsor. As a result, the Creditors' Committee is permitted to file this Plan, which is co-proposed by the Term Lender Committee.

D.    BAR DATE

The deadline for all persons or entities, other than governmental units, to file a proof or proofs of claim against one or more of the Debtors was August 13, 2009, and for governmental units, September 21, 2009. As of November 17, 2009, approximately 1,647 proofs of claims have been filed.

VI. INVESTMENT AGREEMENT

On September 15, 2009, the Plan Proponents filed with the Bankruptcy Court the Investment Agreement dated as of September 11, 2009, among Wellspring, Bayside, the Term Lenders party thereto, and the Creditors' Committee. A copy of the Investment Agreement is annexed hereto as Exhibit G. The Investment Agreement memorializes the agreement between the Investors, the Term

Lenders and the Creditors' Committee regarding the terms of the Plan and the terms and conditions under which the Investors will be bound to invest the funds constituting the Investor New Funding Amount. As described in greater detail in the chart below, the Investment Agreement also specifies various termination rights. [On _____, the parties to the Investment Agreement entered into [Amendment 1 to the Investment Agreement].]

Under the Investment Agreement, the Term Lenders party thereto and each of the Plan Proponents agreed, with certain limitations, to not solicit offers or engage in negotiations with third parties (other than the Debtors or other parties in interest) regarding other proposals for a plan of reorganization for the Debtors. However, if either of the Plan Proponents receive a proposal that satisfied certain conditions, including that the proposal could reasonably be expected to result in a proposal that would constitute a "superior" proposal (that is, which would provide recoveries under the Plan in excess of certain defined thresholds), the Plan Proponents would be free to engage in discussions with the party making such a proposal. In that circumstance, the Plan Proponent that has received a qualified proposal is permitted to engage in discussions with the third party, subject to the satisfaction of certain conditions. However, before another offer (that qualifies as a superior proposal) may be accepted, the applicable Plan Proponent must further negotiate with Wellspring and give Wellspring the opportunity to improve Wellspring's proposal. The applicable Plan Proponent may accept the other proposal only if certain other conditions are satisfied. If either Plan Proponent accepts the superior proposal, the Investment Agreement may be terminated. In addition to the foregoing, the Creditors' Committee also has broad discretion to withdraw from the Investment Agreement if it determines such a withdrawal is warranted by its fiduciary duties.

The Investment Agreement obligates the Term Lenders party thereto to pay certain amounts to the Investors in certain circumstances. With certain limitations and exceptions, if the Term Lenders or the Term Lender Committee opts to accept a superior proposal made by a third party, or the Investors terminate their commitments under certain circumstances and the Term Lenders do not oppose a superior proposal that closes within a year of termination, the Term Lenders would be obligated to pay the Investors a termination fee and a reimbursement of expenses (which expenses are subject to a cap). With respect to any such fees and expenses paid by the Term Lenders, the Term Lender Committee is entitled to seek Bankruptcy Court approval of an administrative claim for substantial contribution under section 503(b) of the Bankruptcy Code. Moreover, in the event the Plan is confirmed and becomes effective, the Investors will cause the Reorganized Debtors to reimburse their expenses, subject to a cap, and the Term Lenders will be reimbursed for any amounts paid in connection with the Exit Facility.

## VII.  REORGANIZED DEBTORS

A.    BUSINESS OF REORGANIZED DEBTORS

Following implementation of the Plan, the Reorganized Debtors will operate in excess of 200 supermarkets in the southeastern United States largely in accordance with the Debtors' existing business plan. The Reorganized Debtors, however, will emerge from chapter 11 with significantly reduced leverage and enhanced liquidity as a result of the investment of significant new equity capital in the Company in connection with the Plan. Wellspring, which is the lead investor, will have significant input based on its ability to designate a majority of the members of the Reorganized BI-LO Holding's board of managers.

B.    EQUITY OWNERSHIP

        The equity ownership of the Reorganized Debtors, assuming that no Term Lenders elect
to participate in the Term Lender Liquidity Right or the Term Lender Investment Right, will be 51.9%
owned by the Investors, 43.1% owned by the Term Lenders (including the Designated Term Lenders
that are affiliated with the Investors), and 5% owned by C&S.    The Investors will each own
approximately equal percentages of the equity after giving effect to equity received on account of
affiliated entities that are Term Lenders.    The equity interests of the Investors, Term Lenders, and C&S
will be subject to dilution by the equity issued pursuant to the Management Incentive Plan.

        If all of the eligible Term Lenders elect to participate in the Term Lender Investment
Right, the Term Lenders (including the Designated Term Lenders) would own [__]% of the New
Common Units and the Investors would own ___% of the New Common Units.    If all of the eligible
Term Lenders elect to participate in the Term Lender Liquidity Right, the Term Lenders (including the
Designated Term Lenders) would own [__]% of the New Common Units and the Investors would own
___% of the New Common Units.

        Reorganized BI-LO Holding will be a Delaware limited liability company that will elect
to be treated as of the Effective Date as a corporation for all federal income tax purposes, unless
Wellspring and all of the Term Lenders jointly determine that such limited liability company should be
treated as a pass-thru entity for tax purposes.    For more information about the rights associated with the
New Common Units, *see* Section IX.A of this Disclosure Statement.

C.    LIQUIDITY AND CAPITAL STRUCTURE

        The Reorganized Debtors will have access to up to $125 million under the Exit Facility,
which is anticipated to be substantially undrawn at exit, thus providing significant liquidity.    The Plan
Proponents anticipate that the Reorganized Debtors will enter into this new secured credit facility, which
will be a working capital facility for the Reorganized Debtors, secured by the same type of collateral as
the ABL Facility and on terms reasonably satisfactory to Wellspring (and, with respect to any
intercreditor provisions, in form and substance reasonably satisfactory to the Term Lender Committee).

        Other than trade debt and miscellaneous secured debt, the debt as of the Effective Date is
anticipated to be only the drawn portion of the Exit Facility, and the New Term Notes (in the amount of
$164.1 million).

D.    NEW C&S AGREEMENT

        In addition to the improved balance sheet, the Reorganized Debtors will have a revised
supply agreement with C&S.

E.    MANAGERS AND OFFICERS

        On the Effective Date, the initial board of managers of Reorganized BI-LO Holding will
be comprised of seven members:    (1) four of which will be designated by Wellspring, one of which will
be an industry executive, and (2) three of which will be designated by the Term Lenders (other than C.
Saunders, LLC and Grace Bay Holdings II, LLC) and Bayside, *provided* that Bayside (unless
Wellspring has assumed Bayside's obligations under the Investment Agreement) will designate one of

such members.   The identities and affiliations of all board members on the Effective Date will be disclosed in a filing with the Bankruptcy Court at or prior to the Confirmation Hearing.

Each individual serving as an officer of BI-LO Holding immediately prior to the Effective Date shall hold the same office of Reorganized BI-LO Holding on and after the Effective Date unless and until changed by the board of managers of Reorganized BI-LO Holding on or after the Effective Date.

On the Effective Date, the initial board of managers of the Reorganized BI-LO Holding shall cause the appointment of the managers of the initial board of managers of each of the Reorganized Subsidiaries.   Thereafter, the terms and manner of selection of managers or each of the Reorganized Subsidiaries shall be as provided in its Reorganized Debtor LLC Agreement.

Subject to the Restructuring Transactions, each individual serving as an officer of a Debtor immediately prior to the Effective Date shall hold the same offices of the applicable Reorganized Subsidiary on and after the Effective Date, unless and until changed by such Reorganized Subsidiary's board of mangers after the Effective Date.

F.   RESTRUCTURING TRANSACTIONS

As of the effective date, the Plan Proponents, with the consent of Wellspring, may take certain actions, as appropriate, to merge, dissolve, or otherwise alter or terminate the existence or form of a Debtor as of the Effective Date, including:

- the execution and delivery of appropriate agreements or other documents of transfer, merger, consolidation, restructuring, disposition, liquidation, or dissolution, containing (i) terms that are consistent with the terms of the Plan and the requirements of applicable law and (ii) such other terms as the applicable entities may agree;

- the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty or obligation, containing (i) terms consistent with the terms of the Plan and the requirements of applicable law and (ii) such other terms as the applicable entities may agree;

- the filing of appropriate certificates or articles of merger, consolidation, continuance, or dissolution, or similar instruments, with the applicable governmental authorities pursuant to applicable law; and

- the taking of all other actions that the applicable entities determine to be necessary or appropriate, including the making of filings, recordings, or payments to any governmental authority that may be required by applicable law in connection with the foregoing.

G.   FINANCIAL PROJECTIONS

Attached as Exhibit D to this Disclosure Statement are Financial Projections, which are dependent upon the validity of the assumptions contained in the Financial Projections.   For more information about the uncertainties associated with the Financial Projections, see Section XIV (Certain

Risks to be Considered in Connection with the Plan – Risks Related to Ownership of New Term Notes or New Common Units – Financial and Market Risks) of this Disclosure Statement.

## VIII.  TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

*The following summary is general in nature and does not include all provisions of the Plan.  The Plan Proponents urge holders of Claims to carefully read the Plan itself in its entirety, a copy of which is annexed to this Disclosure Statement as Exhibit A.  In the event of an inconsistency between this description and the actual terms of the Plan, the Plan will control.*

## A.   DEEMED SUBSTANTIVE CONSOLIDATION OF THE DEBTORS

Substantive consolidation is an equitable remedy that a bankruptcy court can apply in Chapter 11 Cases involving affiliated debtors.   Substantive consolidation involves the theoretical pooling and merging of the assets and liabilities of the affected debtors.   All of the debtors in the substantively consolidated group are treated as if they were a single corporate and economic entity.   Consequently, a creditor of one of the substantively consolidated debtors is treated as a creditor of the substantively consolidated group of debtors, and issues of individual corporate ownership of property and individual corporate liability on obligations are ignored.   The proponent of substantive consolidation bears the burden of proving that the legal requirements for substantive consolidation have been satisfied.

The Plan provides for a limited form of substantive consolidation.   Under the Plan, the Debtors will be substantively consolidated solely for the limited purpose of voting on the Plan and calculating creditor entitlements.   Solely for purposes of confirmation of the Plan, the Plan Proponents intend to seek this form of "deemed" substantive consolidation of the Debtors' cases, and they believe that they will be successful in satisfying their burden of proof with respect to the limited consolidation contemplated by the Plan.

Accordingly, entry of the Confirmation Order shall constitute the approval, pursuant to section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of the Chapter 11 Cases solely for the purposes of voting on, confirmation of, and distributions under the Plan and for no other purpose.   In furtherance thereof, on and after the Effective Date:  (1) all guarantees of the Debtors of the obligations of any other Debtor shall be eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors; and (2) each and every Claim (other than an Intercompany Claim) in the Chapter 11 Case of any of the Debtors shall be deemed one Claim against and obligation of the consolidated Debtors.   The Plan does not contemplate the merger or dissolution of any of the Debtors (other than pursuant to a Restructuring Transaction) or the transfer or commingling of any assets of any of the Debtors, except to accomplish the distributions under the Plan.   Such treatment of assets shall not have an effect on the legal or corporate structures of the Reorganized Debtors or any obligation incurred pursuant to the Plan or after the Effective Date.

Notwithstanding the deemed substantive consolidation of the Chapter 11 Cases for purposes indicated above, each Reorganized Debtor shall pay all United States Trustee quarterly fees under 28 U.S.C. § 1930(a)(6), plus interest due and payable under 31 U.S.C. § 3717, on all disbursements, including plan payments and disbursements in and outside of the ordinary course of

business, until the entry of a final decree closing the Chapter 11 Cases as contemplated by Bankruptcy Rule 3022, dismissal of the cases, or conversion of the cases to a case under chapter 7.

B.   CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

The Plan classifies different types of Claims and Equity Interests separately and provides different treatment for each Class in accordance with the class' relative legal rights.  If the Plan is confirmed by the Bankruptcy Court, each holder of an Allowed Claim or Allowed Equity Interest in a particular Class will receive the same treatment as the other holders in the same Class of Claims or Equity Interests, whether or not such holder voted to accept the Plan.  The treatment will be in exchange for and in full settlement, satisfaction, and discharge of the holder's respective Claims against or Equity Interests in a Debtor, except as otherwise provided in the Plan.  Moreover, upon confirmation, the Plan will be binding on all holders of a Claim or Equity Interest regardless of whether such holders voted to accept the Plan.

1.      Administrative Claims

An Administrative Claim is a claim against a Debtor or its Estate arising on or after the Commencement Date and prior to the Effective Date for a cost or expense of administration of the Chapter 11 Cases, that is entitled to priority or superpriority pursuant to sections 364(c)(1), 503(b), 503(c), 507(a)(1), 507(a)(2) or 507(b) of the Bankruptcy Code, including DIP Financing Claims, Fee Claims, Reclamation Claims and actual and necessary costs and expenses incurred after the Commencement Date of preserving the Estates (such as postpetition trade payables that have not been paid as of the Effective Date).  Such actual and necessary expenses include claims for wages, salaries, commissions, and goods and services provided to the Debtors following the commencement of the Chapter 11 Cases.  In addition, to the extent provided in section 503(b)(9) of the Bankruptcy Code, Administrative Claims include Claims for the value of any goods received by the Debtors within 20 days before Commencement Date in which goods have been sold to the Debtors in the ordinary course of business.  Reclamation Claims are Administrative Claims to the extent that a seller is entitled to reclaim goods pursuant to section 546(c) of the Bankruptcy Code and provided that such goods are not subject to the prior rights of a holder of a security interest.  Other Administrative Claims are those claims for payments authorized by the Bankruptcy Court to be paid under the DIP Credit Agreement and the claims of professional advisors serving in the Chapter 11 Cases that are entitled to payment from the Debtors' Estates.

a.      DIP Financing Claims

On the Effective Date, (1) the DIP Agent shall receive (for the benefit of and distribution to each of the DIP Lenders according to the DIP Credit Agreement), in full and complete settlement, satisfaction, and discharge of all DIP Financing Claims, Cash in the amount of the Allowed DIP Financing Claims and (2) all Letters of Credit issued and outstanding under the DIP Credit Agreement shall either be (A) returned to the issuer undrawn and marked cancelled or (B) collateralized either in Cash or a back-to-back letter of credit, in an amount equal to [105]% of the face amount.

b.      Fee Claims

All entities seeking allowance by the Bankruptcy Court of a Fee Claim shall prepare final applications for allowance of compensation for services rendered and reimbursement of expenses

incurred through the Effective Date, and shall file and serve such applications no later than the date that is 45 days after the Effective Date.  The failure to timely file such application shall result in the Fee Claim being forever barred and discharged.  Objections to a Fee Claim must be filed and served no later than 20 days after service of the application seeking allowance of such Fee Claim.  As soon as practicable (but no later than 5 Business Days) after a Final Order by the Bankruptcy Court allowing a Fee Claim, the Disbursing Agent shall pay the holder thereof Cash in the unpaid Allowed amount of such claim.

c.      All Other Administrative Claims

All Allowed Administrative Claims will be paid in full in Cash.  Except as otherwise specifically provided in Section 2.2 of the Plan, unless such holder agrees to a different treatment, or unless an order of the Bankruptcy Court provides otherwise, on the Distribution Date, each holder of an Allowed Administrative Claim shall, in full and complete settlement, satisfaction, and discharge of such Claim, receive Cash in an amount equal to such Allowed Administrative Claim; *provided, however*, that (1) an Administrative Claim representing a liability incurred in the ordinary course of business of a Debtor shall be paid in full in the ordinary course of business by the Debtors or the Reorganized Debtors, in accordance with the terms and subject to the conditions of any agreements governing such ordinary course liability, and (2) an Administrative Claim representing a liability incurred outside of the ordinary course of business of a Debtor, and pursuant to an agreement, shall be paid in full by the Debtors or the Reorganized Debtors, in accordance with the terms and subject to the conditions of such agreement.

d.      Bar Date for Administrative Claims

Except as otherwise provided with respect to Fee Claims, requests for payment of Administrative Claims must be filed and served on the Reorganized Debtors and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order, or other order of the Bankruptcy Court no later than the Bar Date established by order of the Bankruptcy Court for such Administrative Claims or if no Bar Date has been set for such Administrative Claims, 60 days after the Effective Date.  Any holder of an Administrative Claim that was required to, but did not, file a proof of claim or request for payment of Administrative Claims on or before any previously applicable bar date, and any other holder of an Administrative Claim that is required to, but does not, file and serve a request for payment of such Administrative Claim in accordance with Section 2.2(d) of the Plan shall be forever barred from asserting such Administrative Claim against the Debtors, the Reorganized Debtors, their respective properties, or any assets of the Debtors' Estates, and such Administrative Claims shall be deemed waived and released as of the Effective Date.  Objections to any Administrative Claim must be filed by the Reorganized Debtors by the Claims Objection Deadline.

2.      Priority Tax Claims

Priority Tax Claims are the claims of a governmental unit against a Debtor or its Estate that are given priority pursuant to section 507(a)(8) of the Bankruptcy Code.

Each holder of an Allowed Priority Tax Claim shall, in full and complete settlement, satisfaction, and discharge of such Claim, receive, at the option of the Reorganized Debtors:  (i) the amount of such holder's Allowed Priority Tax Claim, plus interest on the unpaid amount of such Claim

from the Effective Date at the rate applicable under non-bankruptcy law, in quarterly Cash installment payments over a period ending not later than five years after the Commencement Date (provided that the Reorganized Debtors may prepay the balance of any such Allowed Priority Tax Claim at any time without premium or penalty); (ii) Cash on the Distribution Date in the amount equal to the Allowed Priority Tax Claim; or (iii) such other treatment as may be agreed upon in writing by such holder and the Plan Proponents, subject to approval of the Bankruptcy Court, or, after the Effective Date, the Reorganized Debtors.

Notwithstanding the foregoing, the holder of an Allowed Priority Tax Claim shall not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim. Any such Claim or demand for any such penalty shall be discharged under the Plan, and the holder of an Allowed Priority Tax Claim shall be barred from collecting or attempting to collect such penalty from the Reorganized Debtors or their property.

3.    Classified Claims and Interests

a.    Class 1 - Priority Non-Tax Claims

Priority Non-Tax Claims are Claims that are entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code, other than Administrative Claims and Priority Tax Claims. These include Claims, to the extent remaining unpaid, for certain employee and employee benefit obligations and for deposits given to the Debtors by individuals for personal, family or household use. The priority amount of these Claims is subject to certain statutory limits.

On the Distribution Date, each holder of an Allowed Priority Non-Tax Claim shall, in full and complete settlement, satisfaction, and discharge of such Claim, receive either:  (i) Cash in the amount of such holder's Allowed Priority Non-Tax Claim; or (ii) such other treatment as may be agreed upon in writing by such holder and the Plan Proponents, or, after the Effective Date, the Reorganized Debtors.

Class 1 is unimpaired under the Plan. Each holder of an Allowed Priority Non-Tax Claim is conclusively presumed to have accepted the Plan and is not entitled to vote on the Plan.

b.    Class 2 - Secured Claims

Secured Claims are Claims that are secured by a valid lien (but only to the extent of the value of such Collateral) or a permissible setoff (but only to the extent subject to a permissible setoff), other than the Term Lender Claims.  These Claims are miscellaneous secured claims, setoffs and Secured Claims for Taxes.

On the Distribution Date, each holder of an Allowed Secured Claim, if any, shall, in full and complete settlement and satisfaction of such Claim, at the sole option of the Reorganized Debtors: (i) have such Claim reinstated and rendered unimpaired in accordance with section 1124 of the Bankruptcy Code; (ii) receive Cash in an amount equal to such Allowed Secured Claim, including such interest as is required to be paid pursuant to section 506(b) of the Bankruptcy Code; or (iii) receive the Collateral securing such Allowed Secured Claim.

Class 2 is unimpaired under the Plan. Each holder of an Allowed Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote on the Plan.

c.      Class 3 - Term Lender Claims

Term Lender Claims are Claims of the Term Lenders under or evidenced by the Term Loan Agreement. For purposes of the Plan, the Term Lender Claims are Allowed in the principal amount of $260 million, plus interest, fees, charges, expenses, and other amounts provided for under the Term Loan Agreement. As a result of the global resolution and settlement, and the structure of the treatment of impaired creditors, it is unnecessary to determine at this time the exact amount of the Allowed Term Lender Claims.

Generally, each of the Term Lenders will be entitled to their Pro Rata Share of certain consideration and the reimbursement of certain expenses. In addition, Term Lenders other than Grace Bay Holdings II, LLC and C. Saunders LLC will be given the opportunity to acquire certain additional New Common Units, or to receive Cash in lieu of certain of the New Common Units that they would otherwise be entitled to under the Plan.

Each Term Lender shall receive its Pro Rata Share of the New Term Notes which shall be issued in an aggregate amount of $164.1 million under a new credit agreement, certain terms of which are summarized, in Section IX.B of this Disclosure Statement.

Each Term Lender will also receive its Pro Rata Share of the New Common Units. More information about the rights of the New Common Units can be found in Section IX.A of this Disclosure Statement. In aggregate, the Term Lenders shall receive 43.1% of the New Common Units. Additionally, a "Deferred Fee" in the amount of $[____] payable to Houlihan Lokey, the financial advisors for the Term Lender Committee, and customary post-closing fees, costs and expenses of the Term Lenders Term Loan Agent and the Term Lender Committee incurred on or after the Effective Date shall be paid by the Reorganized Debtors. The Reorganized Debtors shall also reimburse the Term Lenders, for any fees, costs, expenses, and indemnification obligations incurred on or after the Effective Date in connection with the Exit Facility. The Term Lenders will be entitled to retain any adequate protection payments made during the Chapter 11 Cases.

If a Term Lender (other than Grace Bay Holdings II, LLC and C. Saunders LLC) would prefer a greater cash recovery in lieu of its portion of the New Common Units in the Reorganized Debtors, it may elect to participate in the "Term Lender Liquidity Right." If the Term Lender so chooses, then the Term Lender shall receive Cash in lieu of the number of New Common Units such Term Lender chose to exchange. Such Term Lenders may elect to receive Cash in lieu of up to 50% of the New Common Units to which such Term lender would have otherwise been entitled to pursuant to the Plan. The additional Cash to be received under this Term Lender Liquidity Right would be $[_____] for each New Common Unit exchanged. Such Term Lender's Pro Rata Share of the New Common Shares will be reduced accordingly. Such Term Lender may participate in the Term Lender Liquidity Right by making an appropriate election on a Ballot that is submitted in compliance with the Solicitation Procedures Order.

Moreover, if a Term Lender (other than Grace Bay Holdings II, LLC and C. Saunders LLC) would like to acquire additional New Common Units, it may elect to participate in the "Term

Lender Investment Right," in which case such Term Lender will also receive a number of additional New Common Units equal to the amount invested by such Term Lender divided by $[_____]. Each such Term Lender may elect to participate in the Term Lender Investment Right up to the extent of its proportionate share of $12 million.  Such Term Lenders may participate in the Term Lender Investment Right by making an appropriate election on a Ballot that is submitted in compliance with the Solicitation Procedures Order.

If an eligible Term Lender elects to participate in the Term Lender Liquidity Right, such Term Lender may not elect to participate in the Term Lender Investment Right.

Class 3 is impaired under the Plan.  Each holder of an Allowed Term Lender Claim is entitled to vote to accept or reject the Plan.

d.    Class 4 - General Unsecured Claims (Other Than Convenience Claims)

General Unsecured Claims are Claims other than a Secured Claim, Administrative Claim, Priority Tax Claim, Non-Tax Priority Claim, Term Lender Claim, Intercompany Claim, Section 510(b) Claim, or any Claim for a Cure Amount.  For purposes of the treatment on account of General Unsecured Claims, Class 4 excludes Convenience Claims, which are General Unsecured Claims in an amount less than or equal to $[25,000] or General Unsecured Claims for which the holder thereof has voluntarily agreed on its Ballot to reduce its General Unsecured Claim to $[25,000] and accept treatment in Class 5.  General Unsecured Claims include, among others, prepetition claims of trade vendors (other than claims that have been previously paid and or that are entitled to priority pursuant to section 503(b)(9) of the Bankruptcy Code), claims relating to the rejection of executory contracts and unexpired leases, and prepetition tort claims.

On the Effective Date, the Trust Assets shall be transferred to the Creditors' Trust.  Each holder of an Allowed General Unsecured Claim (other than a Convenience Claim) shall, in full and complete settlement, satisfaction, and discharge of such Claim, be entitled to receive its Pro Rata Share of the Trust Recoveries to be distributed by the Creditors' Trust in accordance with the terms of the Trust Agreement.  The Trustee shall make the initial distribution of the Trust Recoveries to holders of Allowed General Unsecured Claims (other than Convenience Claims) as soon as practicable after the Effective Date as authorized by the Trust Advisory Board after a sufficient reserve has been established for Convenience Claims, Disputed and unliquidated Claims, and sufficient funds have been segregated for, among other things, any Taxes and expenses in connection with the pursuit of the Trust Causes of Action and Claims objections and reconciliations in accordance with Section 7.2 of the Plan.

The Trust Recoveries are the Trust Assets (*i.e.*, $30 million in Cash and the Trust Causes of Action), but only to the extent of Cash proceeds, and net of (i) Taxes, (ii) fees, costs, and expenses of the Creditors' Trust, and (iii) the amount necessary to provide for the recoveries to holders of Allowed Convenience Claims (including, without limitation, the Maximum Allowable Amount of Disputed Convenience Claims as of the applicable Distribution Date).

The right of a holder of an Allowed General Unsecured Claim to receive distributions from the Creditors' Trust shall be non-transferable except upon death of the interest holder or by operation of law.

Class 4 is impaired under the Plan. Each holder of an Allowed General Unsecured Claim is entitled to vote to accept or reject the Plan.

e.      Class 5 – Convenience Claims

Convenience Claims are claims that would otherwise be General Unsecured Claims, but that are in an amount less than or equal to $[25,000], or for which the holder of such Claim voluntarily agreed on its Ballot to reduce its General Unsecured Claim to $[25,000] and accept treatment as a Convenience Claim in Class 5, in each case, that is liquidated in amount and is not contingent as to liability as of the Record Date. Except for provisions relating to the treatment of General Unsecured Claims (other than Convenience Claims) and the consequences thereof, and provisions specifically limited to Class 4, the provisions of the Plan and this Disclosure Statement relating to General Unsecured Claims are also applicable to Convenience Claims.

On the Effective Date, the Trust Assets shall be transferred to the Creditors' Trust. On the Distribution Date, each holder of an Allowed Convenience Claim shall, in full and complete settlement, satisfaction, and discharge of such Claim, receive (from the Creditors' Trust) Cash in an amount equal to the product of [.25] multiplied by such holder's Allowed Convenience Claim (as reduced, if applicable, pursuant to an election made by the holder on its Ballot to reduce its General Unsecured Claim and to accept treatment in Class 5). The Trustee shall make the initial distribution to holders of Allowed Convenience Claims as soon as practicable after the Effective Date as authorized by the Trust Advisory Board after a sufficient reserve has been established for Disputed Convenience Claims.

Class 5 is impaired under the Plan. Each holder of an Allowed Convenience Claim is entitled to vote to accept or reject the Plan.

f.      Class 6 – Intercompany Claims

On the Effective Date, all Allowed Intercompany Claims shall be reinstated and rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

Class 6 is unimpaired under the Plan. Each holder of an Allowed Intercompany Claim is conclusively presumed to have accepted the Plan and is not entitled to vote on the Plan.

g.      Class 7 - Section 510(b) Claims

On the Effective Date, all Section 510(b) Claims shall be extinguished and discharged and the holder thereof shall receive no distributions under the Plan on account of such Section 510(b) Claims.

Class 7 is impaired under the Plan. Each holder of a Section 510(b) Claim is deemed not to have accepted the Plan and is not entitled to vote on the Plan.

h.      Class 8 - Old Equity Interests

On the Effective Date, each and every Old Equity Interest shall be cancelled and discharged and the holder thereof shall receive no distribution under the Plan.

Class 8 is impaired under the Plan. Each holder of an Old Equity Stock Interest is deemed not to have accepted the Plan and is not entitled to vote on the Plan.

i. Class 9 - Subsidiary Equity Interests

On the Effective Date, all Allowed Subsidiary Equity Interests shall be reinstated and rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

Class 9 is unimpaired under the Plan. Each holder of an Allowed Subsidiary Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote on the Plan.

C. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

1. Assumption of Certain Executory Contracts and Unexpired Leases

Any executory contract or unexpired lease not set forth on the Contract Rejection Schedule, or previously assumed or rejected pursuant to an order of the Bankruptcy Court or deemed rejected pursuant to Section 365(d)(4) of the Bankruptcy Code will be "assumed" under the Plan (except as set forth below) on the Effective Date. To the extent that the parties to executory contracts and unexpired leases assumed pursuant to the Plan and the Plan Proponents (with the consent of Wellspring) have agreed prior to the Effective Date to modifications of such agreements as a condition for such assumption and definitive documentation evidencing such modifications have been executed, such executory contracts and unexpired leases shall be deemed assumed as modified. Unless otherwise provided, each executory contract or unexpired lease assumed shall include any modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other documents that in any manner affects such contract or lease.

2. Rejection of Certain Executory Contracts and Unexpired Leases

All executory contracts and unexpired leases set forth on the Contract Rejection Schedule will be rejected pursuant to the Plan, on the Effective Date. Subject to the prior consent of Wellspring, the Plan Proponents shall be permitted the right to amend and modify the Contract Rejection at any time prior to the tenth day prior to the Confirmation Hearing without further notice other than filing amended schedules and serving the non-Debtor parties.

By rejecting the agreements set forth on the Contract Rejection Schedule, the Debtors are effectively breaching them, and the Debtors (and the Reorganized Debtors) will be discharged from any further obligations under the agreements. Pursuant to the provisions of the Bankruptcy Code, the non-Debtor counterparty to a rejected agreement is entitled to file a claim for any damages arising from the rejection, subject to the Debtors' defenses to such damage claims. All Claims for rejection damages are considered prepetition Claims under the Bankruptcy Code. These Claims are treated as General Unsecured Claims under the Plan, unless the non-Debtor counterparty holds a valid interest in collateral or a permissible setoff to secure the Debtors' performance under the agreement, in which case the counterparty's damage claim is treated as a Secured Claim to the extent of the value of the collateral or the setoff.

Unless otherwise provided, each executory contract or unexpired lease listed or to be listed on the Contract Rejection Schedule shall include: (a) any modifications, amendments,

supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other documents that in any manner affects such contract or lease, irrespective of whether such agreement, instrument, or other document is listed on the Contract Rejection Schedule; and (b) with respect to such executory contracts and unexpired leases that relate to the use or occupancy of real property, all executory contracts or unexpired leases appurtenant to the premises listed on the Contract Rejection Schedule, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements, vault, tunnel or bridge agreements or franchises, and any other interests in real estate or rights *in rem* relating to such premises to the extent any of the foregoing are executory contracts or unexpired leases that have not been previously rejected by a Debtor. Listing a contract or lease on the Contract Rejection Schedule does not constitute an admission by a Plan Proponent, Wellspring, or a Reorganized Debtor that a Debtor or Reorganized Debtor has any liability thereunder, or that such contract or lease is executory or unexpired.

3.     Cure Amounts; Certain Amendments to Contract Rejection Schedule

The "assumption" of an executory contract or unexpired lease, on the Effective Date, will obligate the Reorganized Debtors to pay in full any amounts that are in arrears or otherwise in default under the agreement on the Effective Date (the "<u>Cure Amounts</u>"), and will obligate the Reorganized Debtors to perform under the agreement in the form that it was assumed.

Except as otherwise agreed to by the Plan Proponents (with the consent of Wellspring) and the non-Debtor party to an executory contract or unexpired lease, on the Effective Date or as set forth herein, the Reorganized Debtors shall cure any and all undisputed defaults under any executory contract or unexpired lease that is assumed pursuant to the Plan in accordance with section 365 of the Bankruptcy Code. The Cure Amount for each executory contract and unexpired lease that is assumed pursuant to the Plan shall be set forth on the Cure Amount Schedule. For the avoidance of doubt, if an executory contract or unexpired lease is not listed on the Contract Rejection Schedule or the Cure Amount Schedule, such contract or lease is to be assumed and the cure amount is deemed to be zero. To the extent that a non-debtor counterparty to an executory contract or unexpired lease disagrees with the deemed Cure Amount or the Cure Amount set forth on the Cure Amount Schedule with respect to such contract or lease, such party must file a notice of dispute with the Bankruptcy Court and serve such notice on the Plan Proponents by no later than five (5) days prior to the Confirmation Hearing. Unless the parties to the contract or lease agree otherwise, all disputed defaults that are required to be cured shall be cured within thirty (30) days of the entry of a Final Order determining the amount, if any, of the Debtors' or the Reorganized Debtors' liability with respect thereto; *provided, however,* that if, prior the applicable payment date, the Plan Proponents (with the consent of Wellspring), or, from and after the Effective Date, the Reorganized Debtors, file a motion to reject such contract or lease in accordance with Section 3.2(a) of the Plan, the Cure Amount shall not be required to be paid unless and until the motion to reject is denied or withdrawn with prejudice, in which case, the Cure Amount shall be paid within ten (10) days after such denial or withdrawal. If an executory contract or unexpired lease is removed from the Contract Rejection Schedule at any time prior to the tenth (10th) day before the Confirmation Hearing, the Plan Proponents will file an addendum to the Cure Amount Schedule, stating the Cure Amount for such contract or lease, and give notice to the applicable non-Debtor counterparty.

4.     Effect of Certain Provisions; Change of Ownership; Etc.

Upon the Effective Date, the Reorganized Debtors shall succeed to the rights and benefits of the Debtors and shall enjoy all of the Debtors' rights and benefits under each executory contract or unexpired lease which is assumed, without the necessity of obtaining any party's written consent to the assumption of such rights and benefits or the transactions contemplated by the Plan, and each party shall be deemed to have waived any right to object, consent, condition or otherwise restrict any assumption of such executory contract or unexpired lease or any of the transactions contemplated by the Plan, including without limitation the vesting in the Reorganized Debtors of the rights, benefits and other property of the Estates (as defined in the Plan) and the change of ownership upon issuance of the equity securities under the Plan, and neither consummation of the Plan nor any such transaction shall give rise to any rights of termination or result in a default under any such executory contract or unexpired lease.

In addition to the right to amend the Contract Rejection Schedule noted above, the Plan Proponents (prior to the Effective Date), with the consent of Wellspring, and the Reorganized Debtors after the Effective Date of the Plan may file a motion to amend the Contract Rejection Schedule and/or reject any executory contract or unexpired lease for which a notice of dispute to a Cure Amount proposed by the Plan Proponents has been timely filed, if Wellspring determines (after consultation with the Plan Proponents) in its discretion, or, after the Effective Date, the Reorganized Debtors determine in their discretion, that in light of the Cure Amount asserted by the non-Debtor party or in light of the Bankruptcy Court fixing a Cure Amount that is materially higher than the Cure Amount anticipated by the Plan Proponents (and/or Wellspring), assumption of such executory contract or unexpired lease is not in the best interests of the Debtors or Reorganized Debtors.  Any non-Debtor party may object to being added to the Contract Rejection Schedule by filing an objection with the Bankruptcy Court and serving such objection on the Plan Proponents, and, after the Effective Date, the Reorganized Debtors and the Creditors' Trust, within 10 days after service of notice of addition to the Contract Rejection Schedule.

5.      Bar Date for Rejection Damages for Executory Contracts and Unexpired Leases
        Set Forth on Contract Rejection Schedule

The Plan provides that if the rejection of an executory contract or unexpired lease pursuant to the Plan gives rise to a Claim against a Debtor or its Estate, or if a contract or lease is listed on the Contract Rejection Schedule as being a non-executory contract or an expired lease, then any Claim related to the foregoing shall be forever barred and shall not be enforceable against the Debtors, the Reorganized Debtors, their respective successors, or their respective properties unless a proof of claim is filed in accordance with the procedures set forth in the Confirmation Order no later than the latest of: (1) thirty (30) days after the Effective Date, (2) the date that is thirty (30) days after service of a notice that an executory contract or unexpired lease has been added to the Contract Rejection Schedule, (3) if any objection to addition of an executory contract or unexpired lease to the Contract Rejection Schedule is timely filed, the date that is thirty (30) days after the withdrawal of, or overruling of, such objection, (4) such later date as may be agreed by the Plan Proponents prior to the Effective Date or Reorganized Debtors and the Creditors' Trust after the Effective Date, or (5) such other date as may be fixed by the Bankruptcy Court.  The form for such proof of claim is available upon request to the Claims Agent, Kurtzman Carson Consultants LLC.  The Plan Proponents intend to attempt to send notice to all non-Debtor counterparties whose executory contracts or unexpired leases are listed on the Contract Rejection Schedule that their contracts are scheduled to be rejected under the Plan.  As a precautionary measure, however, persons with agreements with the Debtors should check the docket of the Chapter 11

Cases after the Contract Rejection Schedule has been filed to determine if their agreements are being assumed or rejected under the Plan, in order to timely file a proof of claim.

6.    Confirmation Order Shall be Approval of Assumption and Rejections

The Confirmation Order shall, subject to the Effective Date, constitute the Bankruptcy Court's approval of such assumptions and rejections pursuant to sections 365 and 1123 of the Bankruptcy Code and findings by the Bankruptcy Court that the requirements of section 365 of the Bankruptcy Code have been satisfied with respect to each executory contract or unexpired lease to be assumed or rejected pursuant to the Plan and that such assumed executory contracts or unexpired leases shall inure to the benefit of the Reorganized Debtors.

7.    Contracts and Leases Entered into after the Commencement Date

Contracts and leases entered into after the Commencement Date by any Debtor, and any executory contracts and unexpired leases assumed by any Debtor prior to confirmation of the Plan, shall be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business and shall survive and remain unaffected by entry of the Confirmation Order.

8.    Employment, Compensation, and Benefit Matters; Retiree Benefits

Except to the extent set forth on Schedule 3.5 of the Plan, to be filed as a Plan Document, or except as otherwise provided under the Plan, (including as set forth on the Contract Rejection Schedule), and in each case subject to the Reorganized Debtors' right to amend, modify or terminate in accordance with the terms thereof, all prepetition compensation and benefit plans, policies and programs of the Debtors applicable to their employees, including, all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, life, accidental death and dismemberment and workers' compensation insurance plans and contracts which have not been previously rejected, terminated or modified shall be treated as executory contracts and assumed by the Debtors.

The Debtors shall assume the obligations and shall continue to make the payment of all retiree benefits (if any), as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(1) or (g) of such section 1114, at any time prior to the Confirmation Date, for the duration of the period (if any) that the Debtors are obligated to provide such benefits.

IX.    SECURITIES TO BE DISTRIBUTED TO CREDITORS UNDER THE PLAN AND OTHER POST-REORGANIZATION INDEBTEDNESS

A.    COMMON UNITS

1.    General

On the Effective Date, Reorganized BI-LO will issue the number of New Common Units authorized to be distributed on the Effective Date. Each Term Lender, C&S and the Investors, will be required to execute the Reorganized BI-LO Holding LLC Agreement as a condition to receiving any

New Common Units and becoming a member of Reorganized BI-LO Holding.  The Reorganized BI-LO Holding LLC Agreement will be substantially in the form filed with the Court as a Plan Document.

The holders of New Common Units shall have certain rights as equity holders of Reorganized BI-LO Holding. These include the right to receive any dividends or distributions of Reorganized BI-LO Holding (such dividends and distributions to be made by the board of managers in its sole discretion).  In addition to the restrictions on transfer described below, there are several other provisions affecting the ownership of the New Common Units which are more fully described in the Reorganized BI-LO Holding LLC Agreement, including the payment of management fees to Wellspring and Bayside and the registration rights of the members following an IPO (as defined below).

2.    Restrictions on Transfer

The New Common Units may be subject to significant transfer restrictions prior to an initial public offering of the equity interests in Reorganized BI-LO Holding (an "IPO"). These restrictions will be fully described in the Reorganized BI-LO Holding LLC Agreement and will generally provide that: (a) no transfers will be permitted without the approval of the board of managers and the holders of a majority of the Reorganized BI-LO's outstanding equity interests to the extent that such transfers would cause the Reorganized BI-LO to become subject to the reporting requirements of any securities laws, or would be reasonably likely to result in the loss of any licenses or approvals that are material to Reorganized BI-LO or its subsidiaries; (b) any transfers during the first 30 months following the execution of the Reorganized BI-LO Holding LLC Agreement (the "ROFR Period") by a holder of the New Common Units to a third party shall be subject to a right of first refusal in favor of (i) first, Reorganized BI-LO Holding and (ii) second, Wellspring and Bayside; and (c) any transfers following the ROFR Period shall be subject to a right of first offer in favor of (i) first, Reorganized BI-LO Holding and (ii) second, Wellspring and Bayside.

The holders of New Common Units (the "Members") will also be subject to drag along rights whereby the board of managers may cause all of the Members to sell all or a portion of their equity interests in Reorganized BI-LO Holding, on a pro rata basis, or otherwise support a sale of all or substantially all of the assets of Reorganized BI-LO Holding to a buyer that is not affiliated with Wellspring or Bayside if such a sale would result in a change of control of the Reorganized BI-LO Holding.  Additionally, in connection with the proposed sale of equity interests of Reorganized BI-LO Holding by any holder of New Common Units that holds more than 18% of the aggregate among of equity interests then outstanding in any transaction or series of related transactions, prior to an IPO, the other Members will be entitled to exercise tag along rights on a pro rata basis, subject to the same terms and conditions.

3.    Tax Matters

Reorganized BI-LO Holding will be a Delaware limited liability company that will elect to be treated as of the Effective Date as a corporation for all federal income tax purposes, unless Wellspring and all of the Term Lenders jointly determine that such limited liability company should be treated as a pass-thru entity for tax purposes.

The tax treatment of Reorganized BI-LO Holding cannot be changed prior to an IPO without the consent of the members who are Term Lenders and Investors on the Effective Date (and any

transferee that is an affiliate or affiliated fund or entity with a common investment advisor as one of such Term Lenders or Investors)

B.   NEW TERM NOTES

On the Effective Date, Reorganized BI-LO will be authorized to issue the New Term Notes in an aggregate principal amount of $164.1 million. Certain of the terms of the New Term Notes are set forth below:

| Borrower | Reorganized BI-LO |
|---|---|
| Guarantors | The other Reorganized Debtors |
| Facility Type | Term Loan |
| Amount | $164.1 million |
| Maturity | Fourth anniversary of the Effective Date |
| Amortization; Prepayments | No amortization; mandatory and optional prepayment provisions that are customary for financings of this type. |
| Interest Rate | LIBOR + 8% for years 1 and 2; LIBOR + 10% for year 3; LIBOR + 12% for year 4; LIBOR floor of 3% |
| Fees | 2% of principal balance outstanding on the date that is 12 months after the Effective Date, 1% of principal balance outstanding on the date that is 18 months after the Effective Date, 1% of principal balance on the date that is outstanding on 24 months after the Effective Date; and other customary fees |
| Security | Second lien on ABL type-collateral behind the Exit Facility; first lien on substantially all of the Reorganized Debtors other assets |
| Intercreditor | Lien priority and other rights with respect to Exit Facility will be set forth in an intercreditor agreement, which is to be reasonably satisfactory to the Term Lenders. |
| Representations, Warranties, Covenants, Events of Default | Customary for financings of this type.<br><br>Gross total leverage test (total funded debt, excluding undrawn letters of credit and capital lease obligations, divided by fully loaded EBITDA) and a fixed charge coverage test (EBITDAR (fully loaded EBITDA plus rent) divided by fixed charges (cash interest expense, mandatory principal repayments plus taxes plus total rent expense)) to be tested quarterly and determined by reference to a business plan agreed upon by the Term Lenders and Investors, with a cushion of 30% to such plan through 2011, 25% for 2012, and 20% for 2013. |

The form of the agreement governing the New Term Notes will be filed with the Bankruptcy Court as a Plan Document.

C.    EXIT FACILITY

        The Exit Facility provided for under the plan will be a secured credit facility providing financing for certain of the Reorganized Debtors.

X.  THE CREDITORS' TRUST

A.    GENERAL

        Pursuant to the Plan, the Creditors' Trust will be established as of the Effective Date. The Creditors' Trust will include the Trust Assets: (a) $30 million in cash, (b) the Trust Causes of Action and (c) all rights and remedies and evidentiary privileges (including the attorney-client privilege) relating in any way to Trust Causes of Action, and the proceeds of the foregoing.

        The Creditors' Trust shall have a term of five years from the Effective Date, which can, with limited exceptions, be extended by the Trust Advisory Board with Bankruptcy Court approval.

B.    THE TRUSTEE; THE TRUST ADVISORY BOARD

        The trustee (the "Trustee") for the Creditors' Trust shall be designated by the Creditors' Committee.  The Trustee shall be independent of the Debtors and the Reorganized Debtors.  The Trustee may retain, in its sole discretion, the Trustee's Professionals, to aid in the performance of its responsibilities pursuant to the Plan, including the liquidation and distribution of Trust Assets, and compensate the Trust Professionals from the Trust Assets.  The Trustee shall have all the rights and powers set forth in the Trust Agreement, including the right to (1) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan and the Trust Agreement; (2) to investigate potential Trust Causes of Action, including the right to seek testimony and the production of documents pursuant to all subpoenas issued under Rule 2004 of the Bankruptcy Rules by either the Creditors' Committee before the Effective Date or the Trustee after the Effective Date; (3) if Trust Causes of Action are deemed to exist following the investigation, commence, prosecute, appeal, settle, abandon or compromise any Trust Cause of Action; (4) liquidate Trust Assets; (5) resolve Disputed Claims in Class 4 and Class 5; (6) object to Disputed Claims in Class 4 and Class 5 and prosecute, settle, compromise, withdraw, or resolve such objections; (7) make distributions from the Trust Recoveries in accordance with the provisions of this Plan and the Trust Agreement; and (8) establish and administer any necessary reserves for Disputed Claims that may be required.  In connection with the Plan, the Investors have required that if the Trustee determines to assert any Trust Cause of Action against one or more of the Specified Executives, the Trustee shall be permitted to satisfy any judgment, settlement, or other obligation or amount due on account of any Trust Causes of Action from any of the Specified Executives solely from the proceeds (howsoever denominated) of any insurance policy that provides coverage to the Debtors or the Debtors' directors and officers or from any insurance company that has issued any such policy.

        The trust advisory board (the "Trust Advisory Board") shall be comprised of three voting members (which shall be designated as provided below) and one *ex-officio*, non-voting member (which shall be designated from time to time by the Reorganized Debtors), with the role of such *ex-officio*, non-voting member to be specified in the Trust Agreement, provided, that such *ex-officio* member shall not have any right to participate in any matters with respect to the Trust Causes of Action against any insured under any insurance policy to which any of the Reorganized Debtors are also insured absent the

consent of the Trustee and the Trust Advisory Board.  The Creditors' Committee shall give the Term Lender Committee and the Investors written notice of the identities of the initial three voting members of the Trust Advisory Board, and file such notice with the Bankruptcy Court, on a date that is not less than 10 days prior to the Confirmation Hearing.  The Trustee shall consult regularly with the Trust Advisory Board when carrying out the purpose and intent of the Creditors' Trust and shall take direction from the Trust Advisory Board as set forth in the Trust Agreement.  Members of the Trust Advisory Board shall be entitled to reimbursement of the reasonable and necessary expenses incurred by them, payable by the Creditor Trust.  The Trust Advisory Board shall, by majority vote, (i) approve all settlements of Trust Causes of Action that the Trustee or any member of the Trust Advisory Board may propose, (ii) authorize the Trustee to invest in certain investments, and (iii) remove the Trustee for any reason.  Neither the Trust Advisory Board, nor its representatives, shall have any liability except for such person's own gross negligence or willful misconduct, and the Trust Advisory Board shall not be liable for any act or omission done in accordance with the advice or opinions of its professionals.

C.    PURPOSE OF THE CREDITORS' TRUST

On or prior to the Effective Date, the Creditors' Trust shall be established pursuant to the Trust Agreement for the purpose of, among other things, and without limitation (1) investigating potential Trust Causes of Action; (2) if Trust Causes of Action are deemed to exist following the investigation, commencing, prosecuting, appealing, settling, abandoning or compromising any Trust Causes of Action; (3) liquidating Trust Assets; (4) resolving Disputed Claims in Class 4 and Class 5; (5) objecting to Disputed Claims in Class 4 and Class 5, and prosecuting, settling, compromising, withdrawing, or resolving such objections; (6) making distributions from the Trust Recoveries; and (7) establishing and administering any necessary reserves for Disputed Claims that may be required, all in accordance with the terms of the Plan and the Trust Agreement, and take all other actions as may be necessary to effectuate the foregoing.

On the Effective Date, the Debtors' Estates shall transfer and shall be deemed to have irrevocably transferred to the Creditors' Trust, for and on behalf of the beneficiaries of the Trust, with no reversionary interest in the Debtors or the Reorganized Debtors, the Trust Assets.  In addition, the Debtors shall transfer to the Trustee for the Creditors' Trust all rights and remedies relating to the Trust Causes of Action, including the Debtors' evidentiary privileges (including the attorney-client privilege) solely as they relate to Trust Causes of Action.  The Trustee shall be permitted to satisfy any judgment, settlement, or other obligation or amount due on account of any Trust Causes of Action from any of the Specified Executives solely from the proceeds (howsoever denominated) of any insurance policy that provides coverage to the Debtors or the Debtors' directors and officers or from any insurance company that has issued any such policy.

Upon such transfer, the Debtors, the Debtors' Estates, and the Reorganized Debtors shall have no other or further rights or obligations with respect thereto.  Notwithstanding the foregoing, the Reorganized Debtors shall provide to the Trustee reasonable access during normal business hours, upon reasonable notice, to personnel and books and records of the Reorganized Debtors to enable the Trustee to perform the Trustee's tasks under the Trust Agreement and the Plan, and the Debtors and the Reorganized Debtors shall permit the Trustee and the Trust Advisory Board reasonable access to information related to the Trust Causes of Action and in furtherance of the claims reconciliation process that is reasonably requested by the Trustee, as more specifically set forth in the Trust Agreement; *provided, however,* that the Reorganized Debtors shall not be required to make out-of-pocket

expenditures in response to such requests determined by them in their sole discretion to be unreasonable. The Reorganized Debtors shall provide the Trustee with office space, telephone and photocopy facilities at the Reorganized Debtors' headquarters at no charge. The Reorganized Debtors shall not be entitled to compensation or reimbursement (including reimbursement for professional fees) with respect to fulfilling their obligations as set forth in this Article. The Bankruptcy Court shall retain jurisdiction to determine the reasonableness of a request for assistance and/or related expenditure. Any requests for assistance that interferes with the Reorganized Debtors' business operations shall be considered unreasonable.

D.      TRANSFERABILITY; DISTRIBUTIONS

Interests in the Creditors' Trust shall be uncertificated and shall be non-transferable except upon death of the interest holder or by operation of law. Holders of interests in the Creditors' Trust shall have no voting rights with respect to such interests. The Creditors' Trust shall have a term of five years from the Effective Date, subject to the rights of the Trust Advisory Board to extend such term with Bankruptcy Court approval in accordance with the provisions of the Trust Agreement.

The Trust Agreement shall be deemed to be a joint interest agreement between and among the Trustee and the members of the Trust Advisory Board, and accordingly, privileged communications may be shared among the Trustee and the Trust Advisory Board without compromising the privileged nature of such communications, in accordance with the "common interest" doctrine and any other doctrine or privilege that may be effective for such purposes.

Distributions of the Trust Recoveries shall be made in accordance with the provisions of the Plan and the Trust Agreement.

E.      COSTS AND EXPENSES; TAX MATTERS

All costs and expenses associated with the administration of the Creditors' Trust (including costs and expenses associated with objecting to, settling, estimating, or otherwise resolving General Unsecured Claims that are Disputed and acting as the Disbursing Agent with respect to General Unsecured Claims) shall be the responsibility of and paid by the Creditors' Trust. Neither the Debtors nor the Reorganized Debtors shall have any obligation to fund any costs or expenses of the Creditors' Trust.

The Creditors' Trust is intended to be treated for U.S. federal income tax purposes in part as a liquidating trust within the meaning of Treasury Regulations Section 301.7701-4(d) and in part as one or more disputed claims reserves taxed as discrete trusts pursuant to Section 641 *et seq*. of the Internal Revenue Code (the "IRC"). For federal income tax purposes, the transfer of the Trust Assets to the Creditors' Trust will be treated as a transfer of the Trust Assets from the Debtors to the holders of Allowed General Unsecured Claims, subject to any liabilities of the Debtors or the Creditors' Trust payable from the proceeds of such assets, followed by such holders' transfer of such assets (subject to such liabilities) to the Creditors' Trust. The holders of Allowed General Unsecured Claims will thereafter be treated for federal income tax purposes as the grantors and deemed owners of their respective shares of the Creditors' Trust Assets (subject to such liabilities). For the avoidance of doubt, the holders of Allowed General Unsecured Claims are not intended to be treated for federal income tax purposes as receiving the Trust Assets that are allocated to the disputed claims reserve until such time as

the disputed claims reserve makes distributions, in which case (and at such time) the holders of Allowed General Unsecured Claims are intended to be treated as receiving the distributions actually received from the disputed claims reserve, if any.  The Creditors' Trust Agreement will:  (i) require that the Trustee file income tax returns for the Creditors' Trust as a grantor trust (and file separate returns for the disputed claims reserves as discrete trusts pursuant to IRC Section 641 *et seq*.); (ii) pay all Taxes owed on any net income or gain of the Creditors' Trust, including net income or gain of the disputed claims reserves, on a current basis from Trust Assets; (iii) provide for consistent valuations for all Trust Assets by the Trustee and holders of Allowed General Unsecured Claims, and require that such valuations be used for all Tax reporting purposes; (iv) provide for the Creditors' Trust's termination no later than five years after the Effective Date unless the Bankruptcy Court approves a fixed extension based upon a finding that an extension is necessary for the Creditors' Trust to resolve all Claims, reduce all Trust Assets to Cash and liquidate; (v) limit the investment powers of the Trustee in accordance with IRS Revenue Procedure 94-45; and (vi) require that the Creditors' Trust distribute at least annually all net income and the net proceeds from the sale or other disposition of all Trust Assets in excess of amounts reasonably necessary to maintain the value of the remaining Trust Assets and pay claims and contingent liabilities, including Disputed Claims.

The Trustee may provide holders of interests in the Creditors' Trust with copies of annual, audited financial statements.

F.    CREDITORS' COMMITTEE INVESTIGATION

The following is a summary of an investigation initiated and performed by the Creditors' Committee.  The description set forth below solely represents the views of the Creditors' Committee and nothing herein is, or shall be, construed to be an admission by the Term Lender Committee.  To the extent that terms are defined in this section, the ascribed meaning of those terms only applies to this section.

1.    Introduction

During the course of the Chapter 11 Cases, the Creditors' Committee, as a fiduciary in these cases, initiated an investigation (the "Investigation") into certain pre-petition events and transactions to preliminarily determine if any claims relating to such pre-petition events and transactions are held by the Debtors' estates, and if so, to assess their viability and potential value.

To date, the Investigation has included the review of documents produced by the Debtors at the written request of the Creditors' Committee.  In addition, the Creditors' Committee has, or will in the future, issue subpoenas pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure ("Rule 2004") to obtain documents and testimony as permitted by Rule 2004, to among others, and without limitation, former officers and directors, consultants and holders of equity interests of the Debtors and certain additional Persons that the Creditors' Committee believes may possess knowledge relevant to the Investigation.

2.    Areas of Investigation

Prior to the Petition Date, the Debtors were involved in a series of interrelated transactions.  Set forth below is a brief description of certain of those interrelated transactions that are the subject of the Creditors' Committee's Investigation.

[This section may contain information that is subject to a confidentiality agreement with the Debtors. Accordingly, pending further consultation with the Debtors as to the confidential nature of certain of the information, the information in this section is not being included in the Disclosure Statement at this time. The information in this section will be inserted after further consultation with the Debtors, or, if need be, pursuant to order of the Bankruptcy Court.]

3.    Potential Estate Claims

While the Committee's Investigation is ongoing and there has been no determination that estate claims exist, or if so, their viability and value, the Committee believes that the Debtors' estates may have suffered material harm as a result of the prepetition acts and omissions of certain parties relating to the above described events, as well as others that may yet be discovered. The Committee will continue to investigate such prepetition acts and omissions to determine whether viable causes of action exist and whether to pursue such causes of action.

Pursuant to the Plan, it is difficult to calculate or estimate the extent of injury that may have been caused to BI-LO. There is no assurance that there will be any recovery on account of estate causes of action against persons who injured BI-LO. The officers and directors of the Debtors who, upon information and belief, were each retained and employed with the consent of and at the direction of Lone Star, are covered by directors' and officers' liability insurance, which provide insurance coverage in the aggregate amount of $60 million, and which, subject to the terms and conditions thereof, may under certain circumstances be applicable. In addition, it is believed that there are additional sources of recovery from other entities that may have harmed BI-LO. Any return based upon estate causes of action is highly speculative.

Under the terms of the Plan, Trust Causes of Action, as defined in the Plan, are to be assigned to a Creditors' Trust created for the benefit of general unsecured creditors. The Trustee of the Creditors' Trust, at the direction of the Trust Advisory Board, will be charged with the responsibility for determining whether claims exist and, if so, which claims to pursue, and litigating such claims. The rights and obligations of the Trustee and the Trust Advisory Board selected to oversee the Trust will be set forth in a Trust Agreement. As noted above, investigatory work is continuing and nothing herein is intended to limit in any way the causes of action that may exist or that the Trustee may assert.

It cannot be predicted at this date which claims the Trustee will determine exist or would choose to pursue. Nor can the outcome of any such litigation be foreseen. Nor would it be in the estates' interest at this juncture to lay out a road map for potential defendants by providing a detailed report of the evidentiary basis for such claims. However, the Committee believes that credible evidence exists and is continuing to be developed that may form the basis for asserting various estate causes of action.

Accordingly, based upon the evidence reviewed to date, the Committee believes, but has not yet determined, that the Debtors' estates may have legal claims against, among others, certain of the Debtors' current or former (i) officers or directors, including, without limitation, Brian Hotarek, Brian P. Carney, Kenneth E. Jones, Kevin L. Mcdougall, Michael Byars, Michael G. Crandall, Michael R. Yakovsky, R. Randall Onstead, Robert Zielinski, Scott North, Mark T. Miller, Eric Ullman, Laura Southall, Tony Pilegge, Bob Riddell and Michael Feder; (ii) direct or indirect holders of an Equity Interest, including each of the Lone Star entities, and each partner thereof; (iii) Hudson and any other

manager of the Debtors; (iv) owner (Ahold); (v) attorneys, (vi) law firms; (vii) auditors; (viii) accounting firms; (ix) accountants; (x) investment banks, including Blair & Company; (xi) investment bankers; and (xii) consulting firms, consultants or advisors.

These potential claims include, without limitation, such claims as breach of fiduciary duties of due care, loyalty, good faith, and candor; gross negligence; fraud; aiding and abetting breach of fiduciary duty; breach of contract; professional negligence; malpractice and related misconduct; contract claims; alter ego and related claims; undercapitalization of BI-LO; avoidance actions under state law and bankruptcy law, including claims for avoidance of fraudulent conveyances and preferential transfers; and certain additional bankruptcy-related claims.  Additional contract claims may also exist.

## XI.  METHODS FOR DISBURSEMENTS TO CREDITORS AND RESOLUTION OF DISPUTED CLAIMS

A.    DISBURSEMENTS UNDER THE PLAN

1.    Disbursing Agents

The disbursing agent for distributions on account of all Claims (other than General Unsecured Claims) shall be Reorganized BI-LO Holding or its designee acting in such capacity, and for General Unsecured Claims  shall be the Creditors' Trust or its designee (in each case, when acting in such capacity, the "Disbursing Agent").  The applicable Disbursing Agent shall make all distributions required under the Plan.

No Disbursing Agent shall be required to give any bond or surety or other security for the performance of its duties unless (A) such Disbursing Agent is not a Reorganized Debtor or the Creditors' Trust and either the Reorganized Debtors or the Trustee require its or their respective designee to provide any bond, surety or other security for the performance of such designee's duties as designee, or (B) otherwise ordered by the Bankruptcy Court.  In the event that a Disbursing Agent is required to give a bond or surety or other security for the performance of its duties, all costs and expenses of procuring any such bond or surety or other security shall be borne by Reorganized BI-LO or the Creditors' Trust with respect to distributions on account of Claims in Class 4 and Class 5.

As set forth in greater detail in the Plan, any Disbursing Agent, in its capacity as such, together with each of its officers, managers, directors, employees, agents, and representatives (acting in such capacity), is exculpated by all holders of Claims and all other parties in interest from any and all Causes of Action, and other assertions of liability (including breach of fiduciary duty), arising out of the discharge of the powers and duties conferred upon such Disbursing Agent, by the Plan, any Final Order of the Bankruptcy Court entered pursuant to or in the furtherance of the Plan, or applicable law, except solely for actions or omissions arising out of such Disbursing Agent's gross negligence or willful misconduct.  No holder of a Claim or an Equity Interest, or representative thereof, shall have or pursue any Claim or Cause of Action (A) against any Disbursing Agent, in its capacity as such, or any of its officers, managers, directors, employees, agents, or representatives (acting in such capacity) for making payments or any other distributions in accordance with the Plan, or (B) against any holder of a Claim for receiving or retaining payments or transfers of property as provided for by the Plan.

2.    Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided, distributions of Cash to be made on the Effective Date to holders of Claims (except for Claims in Class 4) as provided by Article II of the Plan that are Allowed as of the Effective Date shall be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable, but in any event no later than  30 days (1) after the Effective Date or (2) such later date when the applicable conditions of this Article are satisfied.  Distributions on account of Claims Allowed after the Effective Date will be made pursuant to the Plan.

3.       Surrender of Certificates, etc.

A Disbursing Agent, may require, as a condition to making any payment or distribution under the Plan, that each holder of an Allowed Claim (other than a Term Lender Claim) surrender the note, certificate or other document evidencing such Allowed Claim to Reorganized BI-LO or its designee or the Creditors' Trust with respect to distributions on account of Claims in Class 4 or Class 5. In that event, any holder of an Allowed Claim that fails to surrender such note, certificate, or other document (or, in lieu thereof, if requested by the applicable Disbursing Agent, furnish an indemnity or bond in form, substance and amount reasonably satisfactory to the applicable Disbursing Agent) before the date that is 180 days after the Effective Date shall be deemed to have forfeited all rights and may not participate in any distribution under the Plan.

4.       Tax Matters

In connection with the Plan, to the extent applicable, any Disbursing Agent shall comply with all applicable Tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan shall be subject to applicable withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, any Disbursing Agent shall be authorized to take any actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including (A) requiring recipients to fund the payment of such withholding as a condition to delivery, (B) entering into arrangements for the sale of a portion of property otherwise to be distributed under the Plan in order to generate sufficient funds to pay applicable withholding Taxes, or (C) establishing any other mechanism the Disbursing Agent believes are reasonable and appropriate (such as requiring Claim holders to submit appropriate Tax and withholding certifications).

Each entity receiving a distribution of Cash, New Term Notes, New Common Units, or any other consideration pursuant to the Plan will have sole and exclusive responsibility for the satisfaction and payment of any Tax obligations imposed on it by any governmental unit on account of the distribution, including income, withholding, and other Tax obligations.

5.       Delivery of Distributions

Subject to Bankruptcy Rule 9010 and except as otherwise set forth in the Plan, all distributions under the Plan shall be made to the holder of each Allowed Claim at the address of such holder as listed on the Schedules as of the Record Date, unless the Plan Proponents or, on and after the Effective Date, Reorganized BI-LO (or, in the case of holders of Allowed General Unsecured Claims in Class 4, the Creditors' Trust), have been notified in writing of a change of address, including by the filing of a timely proof of claim by such holder that provides an address for such holder different from the address reflected on the Schedules.  All distributions to any holder of a Term Lender Claim or a DIP Financing Claim shall be made to or as directed by the Term Loan Agent or DIP Agent, respectively.

Each Term Lender and C&S shall be required to execute the Reorganized BI-LO Holding LLC Agreement and the Registration Rights Agreement and no such party shall have (1) any legal or beneficial interest in the New Common Units or be registered on the Reorganized BI-LO Holding books and records as a holder of any of the New Common Units, unless and until it has executed and delivered the Reorganized BI-LO Holding LLC Agreement or (2) rights under the Registration Rights Agreement until it has executed and delivered the Registration Rights Agreement.

6.        Distributions of Cash

Any distribution of Cash under the Plan shall, at the applicable Disbursing Agent's option, be made by check drawn on a domestic bank or wire transfer, except that (a) the payment of Cash to the holders of Allowed DIP Financing Claims shall be made by wire transfer of immediately available funds as directed by the DIP Agent and (2) the payment of Cash to Term Lenders shall be made by wire transfer of immediately available funds as directed by the Term Loan Agent.

7.        Timing of Distributions

Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

8.        Minimum Distributions

No payment of Cash less than $25 shall be made by the Disbursing Agent to any holder of a Claim unless: (i) a request therefor is made in writing to the Disbursing Agent no later than 30 days after the Effective Date; *provided* that any such payment shall be withheld until final distribution under the Plan, or (ii) such payment, is on account of an Allowed Convenience Claim.

9.        Unclaimed Distributions; Time Bar to Cash Payments

All distributions under the Plan that are unclaimed for a period of six months after distribution thereof or returned as undeliverable shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and revested in the Reorganized Debtors or the Creditors' Trust (with respect to General Unsecured Claims to the extent of any distribution from the Creditors' Trust), as applicable, and any entitlement of any holder of any Claim to any distributions shall be extinguished and forever barred.

Checks issued by a Disbursing Agent in respect of Allowed Claims shall be null and void if not negotiated within 180 days after the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the applicable Disbursing Agent by the holder of the Allowed Claim to whom such check originally was issued.  Any Claim with respect to such a voided check shall be made within 180 days after the issuance of such check.  After such date, all Claims in respect of void checks shall be discharged and forever barred.

10.        Distributions to Holders as of the Record Date

As of the close of business on the Record Date for distributions under the Plan, the claims register shall be closed, and there shall be no further changes in the record holder of any Claim.  No Disbursing Agent shall have any obligation to recognize any transfer of any Claim occurring after the

Record Date, and shall instead be authorized and entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the claims register as of the close of business on the Record Date.

              11.      Allocation Between Principal and Accrued Interest

To the extent applicable, all distributions to a holder of an Allowed Claim shall apply first to the principal amount of such Claim until such principal amount is paid in full and then to any interest accrued on such Claim as of the Commencement Date and thereafter, to the extent the Debtors' Estates are sufficient to satisfy such principal and interest accrued as of the Commencement Date, to any interest accrued on such Claim from the Commencement Date through the Effective Date, until paid in full.

              12.      Cancellation of Existing Securities and Agreements

On the Effective Date, the promissory notes, membership interests, and other agreements, instruments, or documents evidencing any Claim or Old Equity Interest, other than an Allowed Secured Claim or an Allowed Subsidiary Equity Interest that is reinstated and rendered unimpaired pursuant to the Plan, shall be deemed cancelled without further act or action and the obligations of the Debtors under the credit agreements, limited liability company or operating agreements, and other agreements, instruments, or documents governing such Claims and Equity Interests, as the case may be, shall be discharged.

B.    RESOLUTION OF DISPUTED CLAIMS

              1.      Objections to and Settlement of Claims

On and after the Effective Date, (a) the Reorganized Debtors shall have the exclusive right and authority to make and file objections to Claims other than General Unsecured Claims and (b) the Creditors' Trust shall have the exclusive right and authority to make and file objections to General Unsecured Claims.

On and after the Effective Date, the Reorganized Debtors (with respect to all Claims other than General Unsecured Claims) and the Creditors' Trust (with respect to General Unsecured Claims) shall be entitled to compromise, settle, otherwise resolve, or withdraw any objection to Claims, and compromise, settle or otherwise resolve Disputed Claims without further order of the Bankruptcy Court.

Unless otherwise ordered by the Bankruptcy Court, all objections to Claims that are the subject of proofs of claim or requests for payment filed with the Bankruptcy Court (other than applications for allowance of Fee Claims) shall be filed and served upon the holder of the Claim as to which the objection is made on or prior to the applicable Claims Objection Deadline.

              2.      Distributions to Holders of Allowed Claims

Claims (other than Class 4 General Unsecured Claims) that are not Allowed as of the Effective Date but that become Allowed will be paid on the Distribution Date following the calendar quarter in which such Claim becomes Allowed.

Class 4 General Unsecured Claims, if Allowed as of the Effective Date, will receive their Pro Rata Share of Trust Recoveries (which is net of Taxes, fees, costs, and expenses of the Creditors' Trust).  For purposes of calculating the initial distribution and interim distributions from the Creditors' Trust, the Pro Rata Share treats Disputed Class 4 Claims as Allowed Class 4 Claims in the Maximum Allowable Amount.  In addition, the Trust Agreement may also provide, for interim distributions from the Creditors' Trust, that the Trustee may withhold appropriate reserves for Disputed and unliquidated claims,  Taxes, fees, costs, and expenses of the Creditors' Trust.

As Class 4 General Unsecured Claims become Allowed (or are not Allowed), or as there are additional Trust Recoveries, there may be additional interim distributions made by the Trustee or its designee to holders of Allowed Class 4 General Unsecured Claims.  In general, as of any Distribution Date, a holder of an Allowed Class 4 General Unsecured Claim should have received total distributions equal to its Pro Rata Share (determined as of such date) of the Trust Recoveries that have been distributed as of such Distribution Date.  That is, as Disputed Claims are resolved in an amount less than the Maximum Allowable Amount (that is, Allowed in an amount less than the amount reserved for), or if the Creditors' Trust distributes additional Trust Recoveries, holders of Allowed General Unsecured (other than Convenience Claims) Claims may receive additional recoveries.  Such distributions are subject to the requirements for distributions set forth Sections 6.1 or 6.2 of the Plan, including provisions with respect to minimum distributions, unclaimed distributions, returned distributions, or parties holding recoverable claims or set offs.  In addition, Convenience Claims that become Allowed should receive a distribution on the applicable Distribution Date.

More specifically, on each Distribution Date, the applicable Disbursing Agents shall make all distributions that become deliverable to holders of Allowed Claims during the preceding calendar quarter; *provided*, *however*, that if the Trustee determines, with the consent of the Trust Advisory Board, that the amount of any quarterly distribution otherwise to be made by the Creditors' Trust is too small to justify the administrative costs associated with such distribution, the Trustee may postpone such quarterly distribution until the next Distribution Date that the Trustee, with the consent of the Trust Advisory Board, deems practicable.

Subject to Section 6.2(b)(1) of the Plan, on each Quarterly Distribution Date, each holder of an Allowed General Unsecured Claim (other than a Convenience Claim) that has been Allowed as of the applicable Quarterly Test Date shall receive, from the Creditors' Trust, its Pro Rata Share of the Trust Recoveries in the amount of the difference between (A) the amount such holder would have received on the Effective Date, if its Claim had been Allowed as of the Effective Date, if all other Claims that were Allowed or disallowed on or prior to the Quarterly Test Date were Allowed or disallowed as of the Effective Date, and if the Trust Recoveries that are available for distribution or that were previously distributed had been available for distribution of the Effective Date, minus (B) the aggregate amount of Trust Recoveries previously distributed on account of the Claim.

The Trust Agreement may include additional provisions to address distributions to holders of Allowed Class 4 General Unsecured Claims and Disputed General Unsecured Claims.  Any distributions made out of the Creditors' Trust shall be made net of any applicable Taxes.

3.    Limited Recourse for Disputed General Unsecured Claims

Each Disputed General Unsecured Claim that ultimately becomes an Allowed Claim shall have recourse only to the assets of the Creditors' Trust, and the holder may not otherwise look to the Debtors or Reorganized Debtors, their respective properties, or any property previously distributed on account of any Allowed Claim.

4.     Estimation of Claims

The Reorganized Debtors (or, with respect to General Unsecured Claims, the Creditors' Trust) may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether any party previously objected to such Claim or whether the Bankruptcy Court has ruled on such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection. All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

5.     Special Rules for Distributions to Holders of Disputed Claims

Except as otherwise agreed by the relevant parties, the Reorganized Debtors (or, with respect to the General Unsecured Claims, the Creditors' Trust) shall not be required to (a) make any partial payments or partial distributions to a person, estate or trust with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order or (b) make any distributions on account of an Allowed Claim of any person, estate or trust that holds both an Allowed Claim and a Disputed Claim, unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order and both Claims have been Allowed.

6.     Litigation Claims

Any Litigation Claim that has been determined and liquidated shall be deemed an Allowed Claim only to the extent that the holder of such Claim can establish that such Claim is not recoverable from third parties through the Debtors' insurance coverage (exclusive of the Debtors' self-insurance).

7.     Nonpayment of Claims of Parties Holding Recoverable Property; Setoff

Notwithstanding any other provision of the Plan, and except with respect to payments or other distributions to any of the Released Parties, no payments or other distributions shall be made on account of any Claims (whether or not entitled to priority pursuant to section 507 of the Bankruptcy Code or otherwise, and whether or not secured by collateral) of holders from which property is recoverable or alleged to be recoverable pursuant to section 542, 543, 550, or 553 of the Bankruptcy Code or that is or is alleged to be a transferee of a transfer avoidable under section 544, 545, 547, 548, or 549 of the Bankruptcy Code until (A) the holder has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 542, 543, 550 or 553 of the Bankruptcy Code or (B) the Bankruptcy Court determines by Final Order that the holder need not pay such amount or turn over such property.

Subject to the provisions of section 553 of the Bankruptcy Code, in the event that a Reorganized Debtor or the Creditors' Trust has a Cause of Action of any nature whatsoever against the holder of a Claim, (A) such Reorganized Debtor or the Creditors' Trust, as applicable, may, but is not required to, setoff against the Claim (whether or not entitled to priority pursuant to section 507 of the Bankruptcy Code or otherwise, and whether or not secured by collateral) such Cause of Action against the holder and (B) the applicable Reorganized Debtor or Creditors' Trust, as applicable, may, but is not required to, setoff against any payments or other distributions to be made in respect of such Claim hereunder such Cause of Action against the holder.

Neither the failure to setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by a Debtor or Reorganized Debtor or Creditors' Trust of any Cause of Action that it has against the holder of a Claim.

## XII.  CONFIRMATION AND IMPLEMENTATION OF THE PLAN

A.   <u>CONDITIONS TO CONFIRMATION AND EFFECTIVENESS</u>

Even if the requisite number of creditors vote to accept the Plan, *see* Section I.D (Introduction - The Bankruptcy Code's Voting Rules for Acceptance of a Plan) of this Disclosure Statement, it must still be confirmed by the Bankruptcy Court.  At the Confirmation Hearing, the Plan Proponents must demonstrate to the Bankruptcy Court that the Plan satisfies all the confirmation requirements set forth in section 1129 of the Bankruptcy Code.  One such requirement is that a plan provide a recovery to every creditor or equity interest holder that is equal to or greater than the value the creditor or equity interest holder would recover if the Chapter 11 Cases were converted to a liquidation under chapter 7 of the Bankruptcy Code.  This requirement is known colloquially as the "best interests" test, referring to the best interests of creditors and equity holders.  The Debtors, with the assistance of their advisors, have done a Best Interests Analysis to determine the likely recoveries to creditors if the Chapter 11 Cases were converted to a liquidation under chapter 7 of the Bankruptcy Code.  This Best Interests Analysis is annexed to this Disclosure Statement as <u>Exhibit E</u>.  It shows that recoveries to creditors under the Plan will be greater than would be available in a chapter 7 liquidation.

The Plan Proponents have determined to seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.  To do so, the Plan Proponents will be required to prove at the Confirmation Hearing that the Plan (i) does not discriminate unfairly in its relative treatment of Claims and Equity Interests, and (ii) is "fair and equitable" in respecting the legal priorities of holders of Claims and Equity Interests.  The Plan Proponents anticipate that they will be able to demonstrate to the Bankruptcy Court at the Confirmation Hearing that they have satisfied all the legal and factual requirements for confirmation of the Plan, including the "best interests" test, the "fair and equitable" test, and the "no unfair discrimination" test, and thus demonstrate that the Plan should be confirmed.

The following are additional conditions to the confirmation that have been agreed between the Plan Proponents and the Investors pursuant to the Plan:  (i) the Confirmation Order shall be in form and substance reasonably satisfactory to the Plan Proponents and Wellspring; (ii) all exhibits, schedules and other attachments to the Plan and all Plan Documents shall be in form and substance reasonably satisfactory to the Plan Proponents and Wellspring.

Once the Confirmation Date occurs, the Plan will become effective when the following conditions have been satisfied (or waived as provided in the Plan): (i) the Confirmation Order, in form and substance reasonably satisfactory to the Plan Proponents and Wellspring shall have been entered by the Bankruptcy Court, shall have become a Final Order, and shall not have been modified or vacated on appeal or otherwise, and no stay of the Confirmation Order shall be in effect; (ii) the conditions to the Investors' funding of Cash in an amount equal to the Investor Funding Amount as set forth in the Investment Agreement shall have been satisfied or waived in accordance with the terms thereof; (iii) the conditions to the Plan Proponents' closing under the Investment Agreement shall have been satisfied or waived in accordance with the terms thereof; (iv) each exhibit, document or agreement to be executed in connection with the Plan shall be in form and substance satisfactory to the Plan Proponents and Wellspring; (v) all other actions, documents, and agreements determined by the Plan Proponents and Wellspring to be necessary to implement the Plan shall have been effected or executed and shall be in form and substance satisfactory to the Plan Proponents and Wellspring; (vi) all authorizations, consents, regulatory approvals, rulings, letters, no action letters, opinions or documents that are determined by the Plan Proponents to be necessary to implement the Plan have been received; and (vii) the Plan shall not have been materially amended, altered or modified from the Plan confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section 9.6 of the Plan.

These conditions can be waived by the Plan Proponents, except that the condition to the Investors' funding of the Investor Funding Amount as set forth in the Investment Agreement may only be waived by the Plan Proponents if either both Investors have waived such conditions or if Wellspring has waived such condition and has assumed Bayside's obligations under the Investment Agreement. In addition, the form of the Reorganized BI-LO Holding LLC Agreement, the New Term Notes, the Exit Facility, and the Registration Rights Agreement are deemed under the Plan to be in form and substance satisfactory to the Creditors' Committee.

B.    IMPLEMENTATION OF THE PLAN

1.    Legal Existence On the Effective Date

Each of the Reorganized Debtors shall continue to exist as a separate legal entities, each a limited liability company organized under the laws of the State of Delaware, with all limited liability company powers in accordance with applicable laws, and shall exist and operate pursuant to its Reorganized Debtor LLC Agreement.

2.    Action to Facilitate Consummation of the Plan

The following events shall occur and be effective as of the Effective Date or such other date specified in the documents effectuating the same and shall be authorized and approved without any further action by any of such managers, directors, or members of any of the Debtors or Reorganized Debtors:

- the Restructuring Transactions;

- execution and delivery of the Reorganized Debtor LLC Agreements, including the Reorganized BI-LO Holding LLC Agreement;

- execution and delivery of the Registration Rights Agreement;

- issuance of New Common Units as contemplated by the Plan and the Investment Agreement;

- execution and delivery of the credit agreement governing the New Term Notes and issuance of the New Term Notes pursuant thereto as contemplated by the Plan;

- execution and delivery of the Exit Facility Agreement;

- execution and delivery of the New Intercreditor Agreement;

- execution and delivery of the New C&S Agreement;

- execution and delivery of the Trust Agreement and transfer of the Trust Assets to the Creditors' Trust;

- election or appointment of the initial managers, directors, and officers of the Reorganized Debtors, and the execution of indemnification agreements or the procurement of manager, director, or officer insurance coverage, in each case, in connection therewith;

- execution of the Management Services Agreement; and

- execution and delivery of such other agreements, instruments, or documents, and taking of such other actions, provided for under, or necessary or appropriate to effectuate, the Plan.

3.    C&S Settlement

As part of the global settlements discussed in Section 2.1 of the Plan, on the Effective Date, pursuant to the Plan, a settlement with C&S shall be implemented.  Under the settlement, the Reorganized Debtors will assume the New C&S Agreement and issue the C&S New Common Units to C&S, and the Debtors shall grant C&S a full release of any and all claims they may have against C&S. C&S, on the other hand, will agree to the assumption of the New C&S Agreement by the Reorganized Debtors and will relinquish any and all Claims of C&S against the Debtors or their Estates, and C&S shall have no further Claims and Causes of Action against the Debtors or their Estates (or, as of the Effective Date, the Reorganized Debtors), except as provided for in the New C&S Agreement.  The various forms of value and consideration being provided by C&S, the Reorganized Debtors and the Debtors in connection with the settlement are mutually dependent upon one another and therefore are not severable from one another.  Absent any portion of the consideration described herein, one or more of the parties to the settlement would not have consented to the settlement.  In the Plan and any related documents, C&S is not settling, relinquishing, releasing or waiving any claims, rights or defenses it has or may have against chapter 11 debtor BFW Liquidation, LLC, f/k/a Bruno's Supermarkets, LLC or any other related entity with respect to the bankruptcy proceeding captioned "In re: BFW Liquidation, LLC, f/k/a Bruno's Supermarkets, LLC, Debtor, 09-00634 BGC11", pending in the United States Bankruptcy Court for the Northern District of Alabama.

XIII.  EFFECT OF CONFIRMATION OF THE PLAN

A.    EMERGENCE FROM BANKRUPTCY COURT PROTECTION

On and after the Effective Date, each Reorganized Debtor will be released from the custody and jurisdiction of the Bankruptcy Court and may operate its business and may use, acquire, and dispose of property without supervision or approval by the Bankruptcy Court, except for those matters as to which the Bankruptcy Court specifically retains jurisdiction under the Plan or the Confirmation Order.  On and after the Effective Date, except as otherwise provided in the Plan, each Debtor will, as a Reorganized Debtor, continue to exist as a separate legal entity, with all the powers of a limited liability company under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable state law.

B.    CONTINUED LEGAL EXISTENCE AND REVESTING OF ASSETS AND CAUSES OF ACTION

On the Effective Date, except as otherwise provided for in the Plan or the Confirmation Order, (1) the property of each Debtor's Estate shall vest in each respective Reorganized Debtor, free and clear of all liens, Claims, charges, encumbrances, interests, Old Equity Interests, and Causes of Action against or in each Debtor or Reorganized Debtor or its property (*provided*, *however*, that, if applicable, any property, including Causes of Action other than Trust Causes of Action, of a dissolving Subsidiary's Estate shall vest in Reorganized BI-LO or another Reorganized Debtor in accordance with the terms of the Restructuring Transactions, free and clear of all liens, Claims, charges, encumbrances, Old Equity Interests and Causes of Action against each Debtor or Reorganized Debtor or its property) and (2) any and all Trust Assets, including Trust Causes of Action belonging to the Debtors or their Estates shall be preserved for, assigned to, and shall vest in the Creditors' Trust.

In accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors shall retain and may (but are not required to) enforce all Causes of Action other than (a) Causes of Action released pursuant to the Plan and (b) Trust Causes of Action.  The Reorganized Debtors, in their sole and absolute discretion, shall have the right to bring, settle, compromise, or enforce any such retained Causes of Action without further approval of the Bankruptcy Court.  A non-exclusive schedule of Causes of Action retained by the Debtors will be set forth on Schedule 5.9(a) of the Plan, which will be filed as a Plan Document.

In accordance with section 1123(b)(3) of the Bankruptcy Code, the Trustee on behalf of the Creditors' Trust shall receive and may (but is not required to) enforce all Trust Causes of Action. The Trustee on behalf of Creditors' Trust, in its sole and absolute discretion, shall have the right to bring, settle, compromise, or enforce any such retained Causes of Action without further approval of the Bankruptcy Court.

Causes of Action include, among other things, the recoveries of preferences and fraudulent conveyances, or various non-bankruptcy causes of action.  The Plan Proponents are unable to estimate at this time the likely recoveries from the pursuit of such Causes of Action.  These Causes of Action (other than Trust Causes of Action) will inure to the benefit of the Reorganized Debtors and their respective stakeholders.  Trust Causes of Action are any and all Causes of Action held as of the

Effective Date by the Debtors' estates against Lone Star, Ahold, Bruno's, and each of their respective officers, managers, directors, principals, members, partners, stockholders, employees, agents, professionals, advisors, and attorneys, each acting in such capacities, any director or officer of any of the Debtors who ceased to serve in such capacities prior to the Commencement Date and the Specified Executives, and all of the successors and assigns of the foregoing, in connection with or relating to (A) acquisition of the Debtors by one or more Lone Star entities from one or more Ahold entities, (B) the spin-off of one or more Bruno's entities by any of the Debtors to one or more Lone Star entities, (C) any transaction involving any Debtor and any Bruno's entity, (D) any transaction involving any Debtor and any Ahold entity (other than in connection with an executory contract or unexpired lease assumed or to be assumed by the Debtors), and (E) any transaction involving any Debtor and any Lone Star entity. The Plan Proponents are unable to estimate at this time the likely recoveries, if any, from the pursuit of the Trust Causes of Action. Any net proceeds of Trust Causes of Action will inure to the benefit of the Creditors' Trust and its beneficiaries.

C.    DISCHARGE AND RELEASE OF THE DEBTORS BY HOLDERS OF CLAIMS AND EQUITY INTERESTS

The rights afforded in the Plan and the payments and distributions to be made hereunder shall discharge all Claims and Causes of Action against a Debtor or its Estate arising prior to the Effective Date and all Old Equity Interests shall be cancelled, to the extent permitted by section 1141 of the Bankruptcy Code. The Confirmation Order, except as provided herein or therein, shall be, subject to the occurrence of the Effective Date, a judicial determination of discharge of all Claims and Causes of Action against a Debtor and the termination of all Old Equity Interests. Such discharge shall void any judgment against a Debtor at any time obtained to the extent it relates to a discharged Claim or Cause of Action or the terminated Old Equity Interests, and all entities shall be precluded from asserting against a Debtor, a Reorganized Debtor, or any of their respective property, or any assignee of a Debtor or its estate, any Claim or Cause of Action based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder filed a proof of claim. As provided in section 524 of the Bankruptcy Code, entry of the Confirmation Order, subject to the occurrence of the Effective Date, shall operate as an injunction against the prosecution of any action, including any lawsuit, mediation or arbitration, against a Debtor, a Reorganized Debtor, or any of their property to the extent such action relates to a discharged Claim or Cause of Action or the terminated Old Equity Interests. Notwithstanding the foregoing paragraph, nothing herein shall be deemed to prevent any party in interest from pursuing an action to enforce the terms of the Plan or the Confirmation Order.

On the Effective Date, except as otherwise provided in the Plan or in the Confirmation Order, all entities who have been, are, or may be holders of Claims against or Old Equity Interests in a Debtor shall be enjoined from taking any of the following actions against or affecting a Debtor, a Reorganized Debtor, or their property with respect to such Claims or Old Equity Interest (other than actions brought to enforce any rights or obligations under the Plan and appeals, if any, from the Confirmation Order):

- commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind against a Debtor, a Reorganized Debtor, or their property, or any direct or indirect successor in interest to a Debtor or assignee of a Debtor or any assets or property of such transferee or successor (including all suits, actions, and proceedings that

are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice);

- enforcing, levying, attaching, collecting, or otherwise recovering by any manner or means whether directly or indirectly any judgment, award, decree or order against a Debtor, a Reorganized Debtor, or their property, or any direct or indirect successor in interest to a Debtor or assignee of a Debtor or any assets or property of such transferee or successor;

- creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any lien against a Debtor, a Reorganized Debtor, or their property, or any direct or indirect successor in interest to a Debtor or assignee of a Debtor or any assets or property of such transferee or successors;

- except as otherwise provided in the Plan, asserting any setoff, right of subrogation, or recoupment of any kind, directly or indirectly against any obligation due a Debtor, a Reorganized Debtor, or their property, or any direct or indirect successor in interest to a Debtor or assignee of a Debtor or any assets or property of such transferee or successor; and

- proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan.

On the Effective Date, except as otherwise provided in the Plan or in the Confirmation Order, all entities who have been, are, or may be holders of any Claims or Causes of Action released pursuant to Sections 4.2(g) or 4.2(i) of the Plan or exculpated pursuant to Section 4.2(f) of the Plan will be permanently enjoined from taking, directly or indirectly, any of the following actions against any Released Party or Exculpated Party or its property on account of such released or exculpated Claims and Causes of Action (A) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind; (B) enforcing, levying, attaching, collecting, or otherwise recovering by any manner or means whether directly or indirectly any judgment, award, decree, or order; (C) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any lien; (D) except as otherwise provided in the Plan, asserting any setoff, right of subrogation, or recoupment of any kind; and (E) proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan.

D.    EXCULPATION AND RELEASES OF NON-DEBTORS

1.    Exculpation

From and after the Effective Date, none of the Exculpated Parties shall have or incur any liability to any entity for any act or omission in connection with, related to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, implementation, confirmation, or approval of the Plan, the property to be distributed under the Plan, or any contract, instrument, release, or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; *provided, however*, that the foregoing provisions shall not affect or apply to:  (a) the liability of any entity that is an Excluded Party or any of the Excluded Parties' respective members, officers, directors, employees, advisors, professionals, attorneys, or agents, acting

in such capacity, or (b) the liability of any entity that results from any act or omission to the extent that such act or omission is determined by a Final Order of the Bankruptcy Court to have constituted gross negligence or willful misconduct.

      2.       Releases by the Debtors

      As of the Effective Date, the Debtors, on behalf of themselves and all of their successors and assigns, and each of the Debtors' Estates (the Debtors and their Estates being referred to herein collectively as the "Releasing Parties") shall be deemed to have forever released, waived, and discharged the Released Parties from all Causes of Action that any Releasing Party has, had, or may have against any Released Party based in whole or in part on any act, omission, transaction, or other occurrence taking place on, or prior to, the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, their commencement, the Plan, the ABL Credit Agreement, the Term Loan Agreement, any document or agreement related thereto, the ABL Lender Claims, the Term Lender Claims or any relationship with the Debtors; *provided, however*, that such release shall not apply to any obligations of the Released Parties under the Plan, any Plan Document, or any commercial agreement assumed by the Debtors or the Reorganized Debtors.  Such release shall be effective notwithstanding that any Releasing Party or other entity may thereafter discover facts in addition to, or different from, those which that entity previously knew or believed to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and the Releasing Parties and any successors or assigns are hereby expressly deemed to have waived any and all rights that they may have under any statute or common law principle which would limit the effect of the foregoing release, waiver, and discharge to those claims actually known or suspected to exist on the Effective Date.

      In addition, the Debtors, on behalf of the Releasing Parties, shall be deemed to have released the Released Vendors from all causes of action arising under section 547 of the Bankruptcy Code (this release does not include non-bankruptcy causes of action).

E.     Releases by Holders of Claims and Interests

      Each entity that (1) as of the Effective Date, holds or held a Claim (whether or not allowed) against or an Equity Interest in a Debtor, and (2) does not opt out of this provision by making an appropriate election on its Ballot shall be deemed to have forever released, waived, and discharged the Specified Released Parties from all causes of action that any entity has, had, or may have against any Specified Released Party based in whole or in part on any act, omission transaction, or other occurrence taking place on, or prior to, the Effective Date in any way relating to the Debtors, any of their current or former subsidiaries (including Bruno's), the Chapter 11 Cases, their commencement, the Plan, the Investment Agreement, the ABL Credit Agreement, the Term Loan Agreement, any document or agreement related thereto, the ABL Lender Claims, the Term Lender Claims or any relationship with the Debtors, provided, however, that such release shall not apply to any obligations of the Released Parties under the Plan, any Plan Document or any commercial agreement assumed by the Debtors or the Reorganized Debtors.  Any entity acquiring a Claim or Equity Interest from an entity that is bound by the release set forth in Section 4.2(i) of the Plan shall be bound to the release with respect to such acquired Claim or Equity Interest.

      Notwithstanding anything to the contrary in Sections 4.2(f), (g), (h), or (i) of the Plan, the provisions set forth in such sections shall not modify, release, or otherwise limit the liability of an entity

not specifically released hereunder, including any entity that is a co-obligor or joint tortfeasor of an entity specifically released hereunder, or that is otherwise liable under theories of vicarious liability or other derivative liability or that is a non-Debtor third party guarantor of any obligations of the Debtors, and as to such, all rights are reserved, *provided, however*, that any recovery against such non-specifically released entity shall be reduced by any amount that such entity could recover from a specifically released entity and, as a result of such reduction, such non-specifically released entity may not seek, and is enjoined pursuant to the Plan from seeking, contribution, indemnification, reimbursement, or any other recovery from such specifically released entity.

F.    EXEMPTION FROM TRANSFER TAXES

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of New Term Notes or New Common Units under the Plan, the creation of any mortgage, deed of trust, lien or other security interest, the making or assignment of any lease or sublease, the execution and delivery of the Exit Facility, the sale or transfer of Non-Core Real Property, any Restructuring Transaction, the creation of the Creditors' Trust and the transfer of any Trust Assets to or from the Creditors' Trust, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including any merger agreements or agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale or assignments executed in connection with any of the forgoing or pursuant to the Plan, will not be subject to any stamp Tax, real estate transfer Tax, mortgage recording Tax, sales or use Tax, or other similar Tax.

G.    Post-Effective Date Professional Fees; Reimbursable Expenses.

From and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of professional persons employed subsequent to the Effective Date at the request of the Reorganized Debtors, respectively, including those fees and expenses incurred by such professionals subsequent to the Effective Date at the request of the Reorganized Debtors in connection with the implementation and consummation of the Plan.

On the Effective Date, the Reorganized Debtors shall pay to Wellspring and, if Bayside is an Investor as of the Effective Date, Bayside, in accordance with and to the extent contemplated by the Investment Agreement, the reasonable, actual out-of-pocket fees, costs, and expenses of Wellspring, Wellspring Capital Partners IV, L.P., Bayside, and H.I.G. Bayside Capital and or their respective designated affiliates under the Investment Agreement incurred on or after March 23, 2009 through the Effective Date in connection with preparation or negotiation of, finalization of, or performance of obligations under, the Investment Agreement, the Plan, the Plan Documents, including the fees, costs, and expenses of legal counsel and other advisors, including such fees, costs, and expenses incurred in addressing customary post-closing matters and any filing fees incurred in connection with obtaining any requisite regulatory approvals; *provided, however*, that such amounts shall not exceed $3 million in the aggregate (exclusive of reimbursement of fees, costs and expenses relating to the Exit Facility or the commitment letter relating thereto).

H.      DISSOLUTION OF CREDITORS' COMMITTEE.

On the Effective Date, the Creditors' Committee shall be dissolved and its members shall be released of all of their duties, responsibilities, and obligations in connection with the Chapter 11 Cases; *provided, however*, that the Creditors' Committee shall exist and its retained professionals shall be retained after such date with respect to (A) preparing and prosecuting Fee Claims for its retained professionals, including responding to any objections to such applications, whether formal or informal, and attendance at any hearings with respect to such applications; (B) preparing and prosecuting objections to Fee Claims of other professionals, and (C) defending against any challenge to the provisions of the Plan or the Confirmation Order, including appeals. The Reorganized Debtors shall pay the reasonable fees and expenses of the Creditors' Committee and its retained professionals upon submission of monthly statements to the Reorganized Debtors with respect to clause (A). The Plan Proponents will specify in the Confirmation Order the circumstances under which the Reorganized Debtors will pay the reasonable fees and expenses of the Creditors' Committee and its retained professionals with respect to clause (B) and (C).

## XIV.  CERTAIN RISKS TO BE CONSIDERED IN CONNECTION WITH THE PLAN

The Plan sets forth the means for satisfying the Claims against the Debtors.  Certain Claims and Equity Interests receive no distributions pursuant to the Plan.  Prior to voting to accept or reject the Plan, holders of Claims should read carefully the following discussion of some of the risks set forth below, as well as the other information set forth in the Disclosure Statement and the Plan (and the documents delivered together with, or incorporated by reference, either in the Plan or the Disclosure Statements (including Plan Documents)) prior to voting to accept or reject the Plan.  These risks should not be regarded as constituting the only risks involved in connection with the Plan and its implementation, or alternatives to the Plan.

A.      BANKRUPTCY RISKS

***There is a Risk That the Plan Might Not Be Confirmed and Consummated.***

Although the Plan Proponents believe that the Plan will satisfy all requirements for confirmation under the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Thus, even if the requisite acceptances of the Plan are received, there is no assurance that the Bankruptcy Court will confirm the Plan.

Even if all impaired Classes accept or could be deemed to have accepted the Plan, the Plan may not be confirmed by the Bankruptcy Court.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things:  (a) that the Confirmation of the Plan not be followed by a need for further liquidation or reorganization; (b) that the value of distributions to dissenting holders not be less than the value of distributions to such holders if the Debtors were liquidated under chapter 7 of the Bankruptcy Code; and (c) that the Plan and the Plan Proponents otherwise comply with the applicable provisions of the Bankruptcy Code.  Although the Plan Proponents believe that the Plan will meet all applicable tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Pursuant to the "cramdown" provisions of section 1129 of the Bankruptcy Code, the Bankruptcy Court can confirm the Plan at the Plan Proponents' request if at least one impaired Class has

accepted the Plan (with such acceptance being determined without including the acceptance of any "insider" in such Class) and, as to each impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such impaired Class. The Plan Proponents believe that the Plan complies with these requirements as to each impaired Class.

The Plan Proponents believe the Plan is "fair and equitable" to equity because there is no residual value for equity after giving effect to all Claims that must be paid prior to equity receiving a recovery. The Plan Proponents expect that LSF5 BI-LO Investments, LLC, the sole equity holder of BI-LO Holding, will argue to the contrary. There is no assurance that the Bankruptcy Court will agree with the Plan Proponents' position.

The Plan provides for certain conditions that must be satisfied or waived prior to the Confirmation Date and for certain other conditions that must be satisfied or waived prior to the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan to confirmation of the Plan or to the Effective Date of the Plan will be satisfied or waived. Failure to meet any of these conditions could result in the Plan not being consummated. Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

If the Plan is not confirmed and consummated, there can be no assurance that the Plan Proponents will be able to reach an agreement on a new chapter 11 plan, or that the Debtors will be able to reach an agreement with their creditor constituencies. Even if such a new agreement were to be reached, there can be no assurances that the new agreement would provide for treatment for creditors that is as favorable as is contained in the Plan.

The Debtors may seek confirmation of a competing chapter 11 plan. There can be no assurance that if the there are two or more competing plans (including the Plan), that the Bankruptcy Court will determine to confirm this Plan, even assuming this Plan satisfies all the necessary requirements to confirmation of a chapter 11 plan.

### *The Plan Proponents Will Not Control Operation of the Debtors Pending the Effective Date*

The Plan Proponents will not control the operation of the Debtors pending the Effective Date. There can be no assurance that the Debtors will take such actions as may be necessary to enable the Plan Proponents to satisfy the conditions precedent to the Effective Date.

### *Additional Bankruptcy-Specific Risk Factors*

In addition to the foregoing, the following risk factors are some, but not all, of the variables that may have an impact on the Plan, or the information contained in the Disclosure Statement, and exhibits thereto: adverse affect on public perception of the Company as a result of the bankruptcy filing; possibility that an insufficient number of holders of Claims will vote in favor of the Plan; possibility the Plan will be confirmed over the objection and non-acceptance by certain Classes; and possibility of a conversion of the Chapter 11 Cases from chapter 11 to chapter 7 if a plan of reorganization is not timely confirmed and consummated.

B.    RISKS RELATED TO OWNERSHIP OF NEW TERM NOTES OR NEW COMMON UNITS

      1.    Risks to Business Operations

### Competition

The food retailing business is highly competitive.  Supermarket chains generally compete on the basis of location, quality of products, service, price, product variety and store condition.  The Debtors compete with several national, regional and local supermarket chains, including Wal-Mart, as well as similar supercenters and other non-traditional grocery retailers such as dollar discount stores, drug stores, convenience stores, warehouse club stores and conventional department stores.  Heightened competition could include the intensification of price competition, the entry of new competitors and the expansion, renovation and opening of new stores by new and existing competitors.  If the Debtors or Reorganized Debtors fail to successfully respond to competitive pressures in this industry, or to effectively implement their strategies to respond to these pressures, their operating results may be negatively affected.  Some of the Debtors' principal competitors have greater financial resources than the Debtors and either have or may in the future use those resources to take steps which may have an adverse effect on the Debtors' competitive position and financial performance.

### Geographic Concentration

The Debtors operate in the southeastern United States.  The Debtors may be adversely effected by a decline in economic conditions, or a natural or other catastrophic event, that impacts this region.

### C&S Supply Relationship; Dependency on Suppliers

C&S supplies approximately 70% of the Company's merchandise.  Any material change in C&S's method of operation or a termination or material modification of the Debtors' contractual relationships with C&S could have an adverse impact on the Debtors' supply chain, sales, and earnings.  If the supply contract with C&S is terminated, the Debtors may be unable to locate alternative, comparable sources from which to purchase its retail merchandise, which could increase its costs and adversely affect its results of operations. Moreover, if there is a comparable replacement for C&S, a change in suppliers could cause a delay in distribution and a possible loss of sales, which would affect operating results adversely.

Cardinal provides the Debtors with its prescription and over-the-counter drugs, comprising approximately 10% of the Company's merchandise.  In addition to C&S and Cardinal, approximately 500 other vendors and third party food manufacturers deliver the remaining 20% of the Debtors' merchandise directly to their stores.  Any interruption in the ability of the Debtors to obtain merchandise and secure the delivery of such merchandise to its stores could materially and negatively impact the results of its operations.  Any adverse change to the terms on which the Debtors obtain merchandise and the delivery thereof could also materially and negatively impact the results of its operations.

### Dependencies on Leasehold Properties

The Debtors lease substantially all of their stores. Loss of any of these leases or the inability to renew any of these leases at reasonable rental rates could have a material adverse affect on the business. Furthermore, following assumption of certain leases pursuant to the Plan, the Debtors' leases will typically provide for multiple year durations, which decreases the Debtors' flexibility in closing any stores that may become under-performing after emergence from bankruptcy.

### Indebtedness

The Plan provides for a substantial deleveraging of the Debtors' balance sheet. However, the Reorganized Debtors will nevertheless be subject to significant indebtedness upon the Effective Date. This indebtedness could adversely affect the Reorganized Debtors by reducing their flexibility to respond to changing business and economic conditions and increasing their borrowing costs.

### Additional Risk Factors

In addition to the foregoing, the following risk factors are some, but not all, of the variables that may have an impact on the Plan, or the information contained in the Disclosure Statement, and exhibits thereto: the ability of the Reorganized Debtors to obtain and maintain any financing necessary for operations and other purposes; the ability to attract and retain qualified personnel; the ability of the Reorganized Debtors to attract and retain customers; the ability of the Reorganized Debtors to obtain and maintain normal credit terms with vendors and service providers; the Reorganized Debtors' ability to maintain contracts that are critical to its operations; the general economic environment in the United States and globally; trends in the grocery-store and supermarket industry; the potential impact of future hostilities, terrorist attacks, infectious disease outbreaks or other global events; and changes in prevailing interest rates.

2.    Financial and Market Risks

### Financial Projections Are Fundamentally Uncertain.

The Financial Projections attached as <u>Exhibit D</u> to this Disclosure Statement are dependent upon the validity of the assumptions contained in the Financial Projections. The Financial Projections are intended to illustrate the estimated effects of the Plan and certain related transactions on the results of operations, cash flow, and financial position of the Reorganized Debtors for the periods indicated. The Financial Projections are qualified by the introductory paragraphs thereto and the accompanying assumptions, and must be read in conjunction with such introductory paragraphs and assumptions, which constitute an integral part of the Financial Projections. The Financial Projections are based upon a variety of assumptions as set forth therein, and the Reorganized Debtors' future operating results are subject to and likely to be affected by a number of factors, including significant business, economic, regulatory and competitive uncertainties, many of which are beyond the control of the Debtors. Accordingly, actual results may vary materially from those shown in the Financial Projections.

The Financial Projections were not prepared with a view towards public disclosure or with a view towards complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information. The Plan Proponents do not

intend to update or otherwise revise the Financial Projections to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events. In the view of the Plan Proponents, however, the Financial Projections were prepared on a reasonable basis and represent a reasonable view of the expected future financial performance of the Reorganized Debtors after the Effective Date. Nevertheless, the Financial Projections should not be regarded as a representation or assurance by the Plan Proponents or any other person that the Financial Projections will be achieved. Parties in interest are therefore cautioned not to place undue reliance on the Financial Projections contained in this Disclosure Statement.

### *Historical Financial Information Will Not Be Comparable.*

As a result of the consummation of the Plan and the transactions contemplated by the Plan, the Reorganized Debtors will operate the existing business of the Company under a new capital structure. In addition, the Company will be subject to the fresh start accounting rules. Accordingly, the financial condition and results of the Company's operations from and after the Effective Date will not be comparable to the financial condition or results of operations reflected in the Company's historical financial statements.

### *There May Be No Market for the New Term Notes or the New Common Units on the Effective Date, There Are No Assurances One Will Develop And the New Term Notes or the New Common Units May Be Subject to Significant Transfer Restrictions.*

There may not be a market for the New Term Notes or the New Common Units. On the Effective Date, the New Common Units will not be listed on any national securities exchange or quoted on any inter-dealer quotation system, and the Plan Proponents do not anticipate that the shares will be so listed or quoted in the foreseeable future, thus restricting their marketability.

There are certain restrictions on the ability of the holders of the New Common Units to sell the New Common Units. The New Common Units will be subject to a right of first refusal for thirty months following the executing of the Reorganized BI-LO Holding LLC Agreement and a right of first offer thereafter, in each case prior to an initial public offering.

No assurance can be given that a holder of the New Term Notes or the New Common Units will be able to sell such securities in the future or as to the price at which any such sale would occur. If a trading market were to develop, the liquidity of the market for such securities, and the prices at which such securities would trade, will depend upon many factors, including the number of holders, investor expectations, and other factors beyond the control of the Plan Proponents.

### *Control by Investor Affiliates; A Significant Amount of the New Common Units May Be Held by a Few Shareholders.*

On the Effective Date, Reorganized Bi-Lo Holding, LLC will be controlled by Wellspring, which will have the right to designate four of the seven managers of Reorganized BI-LO Holding Board of Managers, and Bayside which will have the right to designate one manager. In addition, the Investors will own between [___] (assuming that no Term Lenders participate in the Term Lender Investment Right) and all of the eligible Term Lenders exercise the Term Lender Liquidity Right) and [____] (assuming the eligible Term Lenders acquire $12 million in New Common Units pursuant to the Term Lender Investment Right and no Term Lenders participate in the Term Lender

Liquidity Rights) prior to giving effect to dilution for the Management Incentive Plan.  In addition, entities affiliated with Wellspring and Bayside (*i.e.*, the Designated Term Lenders) will acquire New Common Units on account of their Term Loan Claims.  This concentration of ownership and control could facilitate or hinder a negotiated change of control of the Reorganized Debtors and, consequently, have an impact on the value of the New Common Units.

**Dividends on the New Common Units Are Not Anticipated.**

The Plan Proponents do not anticipate that cash dividends or other distributions will be paid with respect to the New Common Units in the foreseeable future.  In addition, the Reorganized Debtors will be subject to covenants that restrict their ability to pay dividends.

**The Ability of the Company to Repay the New Term Notes Will Depend on the Company's Financial Performance in the Future**.

The ability of the Reorganized Debtors to timely repay the New Term Notes will depend on the future performance of the Reorganized Debtors.  Future performance is, to an extent, subject to general economic, financial, competitive, legislative, regulatory, and other factors that will be beyond the control of the Reorganized Debtors.  While no assurance can be provided, based upon the current level of operations and anticipated increases in revenues and cash flow described in the Financial Projections, attached as Exhibit D hereto, the Plan Proponents believe that cash flow from operations and the liquidity provided by the Exit Facility and the Investor New Equity Commitment will be adequate to meet the future liquidity needs of the Reorganized Debtors.

C.    RISKS TO BENEFICIARIES OF THE CREDITORS' TRUST

**The General Unsecured Claims May Be Allowed in an Amount Materially Different from the Estimates**

This Disclosure Statement has been prepared based on preliminary information concerning filed Claims and the Debtors' publicly filed schedules of assets and liabilities.  Upon completion of more-detailed analysis of filed Claims, the actual amount of Allowed Claims may differ materially from the Plan Proponents' current estimates.

As noted above, approximately _____ Claims were filed against the Debtors, totaling in excess of $_____, plus contingent and unliquidated amounts.  The [Plan Proponents believe] that there may be valid objections to certain of the Claims that have been filed, and that the ultimate allowed amounts of those Claims will be significantly less than the asserted amount of such Claims.  The amount of Disputed Claims in these cases, however, is expected to be material.  These Disputed Claims, include, among other things, litigation claims and rejection claims, including rejection claims filed by landlords in excess of the applicable statutory limitations upon such Claims.

The Plan Proponents' estimates of the recoveries set forth in the Disclosure Statement are predicated upon an estimate of $_____ of General Unsecured Claims becoming Allowed Claims.  There can be no assurance that any estimated Claim amounts set forth in this Disclosure Statement are correct.  The actual Allowed amount of Claims likely will differ in some respect from the estimates and such difference may be material.  The estimated amounts are subject to certain risks, uncertainties, and assumptions.  Should one or more of these risks or uncertainties materialize, or should the underlying

assumptions prove incorrect, the actual Allowed amount of Claims may vary materially from those estimated herein.

Holders of Allowed Claims in Class 4 will receive a recovery that, in the aggregate, is a fixed amount for the entire Class. While that amount is not presently known (as a result of, among other things, uncertainty about the recoveries from litigation and the expenses of the Creditors' Trust), if a substantial number of unanticipated Class 4 Claims are filed, or Class 4 Claims are allowed in amounts in excess of estimates, the recovery to creditors in Class 4 Creditors could be substantially diluted.

### Risk Factors Relating to Securities Laws

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan from registration under the Securities Act of 1933, as amended (the "Securities Act") and state securities laws if three principal requirements are satisfied: (i) the securities must be offered and sold under a plan and must be securities of the debtor, an affiliate participating in a joint plan with the debtor or a successor to the debtor under the plan; (ii) the recipients of the securities must hold a prepetition or administrative expense claim against the debtor or an interest in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in such exchange and partly for cash or property. To the extent that the rights to distributions from the Creditors' Trust are deemed to constitute securities issued in accordance with the Plan, the Plan Proponents believe that such interests satisfy the requirements of section 1145(a)(1) of the Bankruptcy Code and, therefore, such interests are exempt from registration under the Securities Act and applicable state securities laws.

### Non-Transferability of Interests

Holders of Claims in Class 4 should be aware that their rights to distribution from the Creditors' Trust are not transferable. Therefore, there will not be any trading market for such rights, nor will those rights be listed on any public exchange or other market. The lack of liquidity of the rights to distributions from the Creditors' Trust may have a negative impact on their value.

### Expenses of the Creditors' Trust

The ultimate amount of Cash available for distribution to beneficiaries of the Creditors' Trust depends, in part, on the manner in which the Trustee operates the Creditors' Trust and the expenses the Trustee incurs. The expenses of the Trustee (including its professionals) and Taxes of the Trust will be given priority over distributions to holders of Claims in Class 4. As a result, the amount of professional or other expenses incurred by the Trustee will affect the amount of Cash remaining to satisfy Allowed Claims in such Class will decrease.

### Uncertainty of Value of Certain Creditors' Trust Assets

The ultimate amount of Cash available for distribution to holders of Allowed Claims in Class 4 also will be affected by, among other things, (i) whether, following the investigation of potential Trust Causes of Action, Trust Causes of Action are found to exist and the Trustee pursues such Trust Causes of Action and (ii) if Trust Causes of Action are pursued, the performance and relative success of the Trustee in pursuing the Trust Causes of Action, and (iii) the effect of any delays in liquidating such Trust Causes of Action. The less successful the Trustee is in pursuing Trust Causes of Action, if any are

pursued, the less Cash there will be available for distribution to satisfy Allowed Claims.  However, the Plan Proponents have not assumed any recovery on account of such potential Trust Causes of Action in estimating the recoveries to Allowed Claims under the Plan.

***Changes in Rules and Regulations***

In addition, the value of such rights, and the amount of distribution to the beneficiaries of the Creditors' Trust, will depend on the effects of any changes in tax and other government rules and regulations applicable to the Creditors' Trust.

XV.  SECURITIES LAWS MATTERS WITH RESPECT TO DISTRIBUTIONS

A.    GENERAL

No registration statement will be filed under the Securities Act or any state securities laws, with respect to the offer and sale under the Plan of New Common Units, New Term Notes or beneficial interests in the Creditors' Trust (which interests may be deemed to constitute "securities"). The Plan Proponents believe that the provisions of section 1145(a)(1) of the Bankruptcy Code exempt the offer and sale of such securities to holders of Claims in Classes 3, 4 and 5 under the Plan from federal and state securities registration requirements.

B.    BANKRUPTCY CODE EXEMPTIONS FROM REGISTRATION REQUIREMENTS

1.    Initial Offer and Sale

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under the Securities Act and state securities laws if three principal requirements are satisfied:

- the securities must be securities of the debtor, an affiliate participating in a joint plan with the debtor or a successor to the debtor under the plan;

- the recipients of the securities must hold a prepetition or administrative expense claim against the debtor or an interest in the debtor or an affiliate participating in a joint plan with the debtor; and

- the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor or an affiliate participating in a joint plan with the debtor, or principally in such exchange and partly for cash or other property.

The Plan Proponents believe that the offer and sale of New Common Units, New Term Notes and beneficial interests in the Creditors' Trust (to the extent such interests are deemed to constitute "securities") to holders of Claims in Classes 3, 4 and 5 under the Plan satisfy the requirements of section 1145(a)(1) of the Bankruptcy Code and are, therefore, exempt from registration under the Securities Act and state securities laws.

2.    Subsequent Transfers

In general, because under section 1145(c) of the Bankruptcy Code the New Common Units and New Term Notes offered and sold to holders of Claims in Class 3 under the Plan will be deemed to have been publicly offered, all resales and subsequent transactions in such securities will be exempt from registration under the Securities Act pursuant to section 4(1) thereof, unless the holder thereof is deemed to be an "affiliate" of Reorganized BI-LO or otherwise is deemed to be an "underwriter" with respect to such securities under section 2(11) of the Securities Act.

Pursuant to section 1145(b) of the Bankruptcy Code, the following persons will be considered to be "underwriters" under section 2(11) of the Securities Act:

- persons who purchase a claim against, an interest in or a claim for administrative expense against a debtor with a view to distributing any security received in exchange for such claim or interest;

- persons who offer to sell securities offered or sold under a plan for the holders of such securities;

- persons who offer to buy securities offered or sold under a plan from the holders of such securities, if the offer to buy is both with a view to distributing such securities and under an agreement made in connection with the plan, with the consummation of the plan or with the offer or sale of securities under the plan; and

- a person who is an "issuer" with respect to the securities, as defined in section 2(11) of the Securities Act.

Under section 2(11) of the Securities Act, an "issuer" includes any "affiliate" of the issuer.  Rule 144 under the Securities Act defines "affiliate" of an issuer as any person directly, or indirectly through one or more intermediaries, controlling, controlled by or under common control with the issuer.  Whether or not any particular person would be deemed to be an "affiliate" of Reorganized BI-LO or otherwise would be deemed to be an "underwriter" with respect to securities offered and sold under the Plan would depend upon various facts and circumstances applicable to that person.  Accordingly, the Plan Proponents express no view as to whether any person would be deemed to be an "affiliate" of Reorganized BI-LO or otherwise would be deemed to be an "underwriter" with respect to any securities.

State securities laws generally provide registration exemptions for subsequent transfers by a bona fide owner for the owner's own account and subsequent transfers to institutional investors. Such exemptions generally are expected to be available for subsequent transfers of the New Common Units and New Term Notes offered and sold to holders of Allowed Claims in Class 3 under the Plan.

**GIVEN, AMONG OTHER THINGS, THE COMPLEX NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN "AFFILIATE" OF REORGANIZED BI-LO OR OTHERWISE MAY BE AN "UNDERWRITER" WITH RESPECT TO THE NEW COMMON UNITS AND NEW TERM NOTES OFFERED AND SOLD UNDER THE PLAN, THE PLAN PROPONENTS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SUCH SECURITIES UNDER APPLICABLE**

**SECURITIES LAWS AND RECOMMEND THAT HOLDERS OF CLAIMS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES UNDER APPLICABLE SECURITIES LAWS.**

Notwithstanding the foregoing, (i) under the terms of the Reorganized BI-LO Holding LLC Agreement, transferability of New Common Units will be limited (*see* Section IX.A of this Disclosure Statement), and (ii) under the Credit Agreement governing the New Term Notes, transferability of New Term Notes may be limited. *Any persons intending to transfer New Common Units are urged to consult their own counsel as to the applicability of the provisions of the Reorganized BI-LO Holding LLC Agreement to any particular circumstances, and any persons intending to transfer New Term Notes are urged to consult their own counsel as to the applicability of the provisions of the Credit Agreement governing the New Term Notes to any particular circumstances.*

Under the terms of the Trust Agreement, beneficial interests in the Creditors' Trust will be non-transferable (except upon death or by operation of law). *See* Section X.D of this Disclosure Statement.

XVI.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN

A.    <u>GENERAL</u>

**TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER OF A CLAIM OR AN INTEREST IS HEREBY NOTIFIED THAT (1) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER OF A CLAIM OR AN INTEREST FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER OF A CLAIM OR AN INTEREST UNDER THE IRC; (2) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE SOLICITATION OF VOTES ACCEPTING THE PLAN; AND (3) A HOLDER OF A CLAIM OR AN INTEREST SHOULD SEEK ADVICE BASED UPON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

**A DESCRIPTION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN IS PROVIDED BELOW. THE DESCRIPTION IS BASED ON THE IRC, TREASURY REGULATIONS, JUDICIAL DECISIONS AND ADMINISTRATIVE DETERMINATIONS, ALL AS IN EFFECT ON THE DATE OF THIS DISCLOSURE STATEMENT AND ALL SUBJECT TO CHANGE, POSSIBLY WITH RETROACTIVE EFFECT. CHANGES IN ANY OF THESE AUTHORITIES OR IN THEIR INTERPRETATION COULD CAUSE THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO DIFFER MATERIALLY FROM THE CONSEQUENCES DESCRIBED BELOW.**

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND IN IMPORTANT RESPECTS UNCERTAIN. NO RULING HAS BEEN REQUESTED FROM THE INTERNAL REVENUE SERVICE (THE "IRS"); NO OPINION HAS BEEN REQUESTED FROM COUNSEL TO THE PLAN PROPONENTS CONCERNING**

- 75 -

**ANY TAX CONSEQUENCE OF THE PLAN; AND NO TAX OPINION IS GIVEN BY THIS DISCLOSURE STATEMENT.**

      **THE DESCRIPTION THAT FOLLOWS DOES NOT COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS.  FOR EXAMPLE, THE DESCRIPTION DOES NOT ADDRESS ISSUES OF SPECIAL CONCERN TO CERTAIN TYPES OF TAXPAYERS, SUCH AS DEALERS IN SECURITIES, LIFE INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, TAX EXEMPT ORGANIZATIONS AND NON-U.S. TAXPAYERS, NOR DOES IT ADDRESS TAX CONSEQUENCES TO HOLDERS OF EQUITY INTERESTS IN THE DEBTORS OR HOLDERS OF SECTION 510(b) CLAIMS AGAINST THE DEBTORS.  IN ADDITION, THE DESCRIPTION DOES NOT DISCUSS STATE, LOCAL, NON-U.S., OR NON-INCOME TAX CONSEQUENCES.**

      **FOR THESE REASONS, THE DESCRIPTION THAT FOLLOWS IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND PROFESSIONAL TAX ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST.  HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

B.   <u>U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS</u>

      The Plan Proponents believe, based upon the filings made by the Debtors in the Chapter 11 Cases, that each of the Debtors is a "disregarded entity" for federal income tax purposes; in other words, each of the Debtors is a single-member limited liability company that, pursuant to Treasury Regulations Section 301.7701-2(c)(2)(i), is disregarded for income tax purposes as an entity separate from its sole owner, LSF5 BI-LO Investments, LLC (the "Non-Debtor Parent," which the Plan Proponents believe is an entity that is taxed as a corporation).  As disregarded entities, all of the Debtors' income, gain, loss, assets, liabilities, operations, and activities, including accumulated net operating losses ("NOLs"), are imputed to the Non-Debtor Parent and reflected on its federal income tax return, and the Debtors are deemed not to exist for federal income tax purposes.  Accordingly, the Non-Debtor Parent, not the Debtors, would recognize any cancellation of debt ("COD") income triggered by the Plan.  The Non-Debtor Parent would also retain any NOLs and other Tax attributes that survive the effectiveness of the Plan, subject to limitations.

      The Plan provides that Reorganized BI-LO Holding will emerge as a Delaware limited liability company, which shall elect to be treated as a corporation for federal income tax purposes as of the Effective Date unless Wellspring and all of the Term Lenders jointly determine that such limited liability Company shall be treated as a pass-thru entity for tax purposes.  If Reorganized BI-LO Holding elects to be treated as a corporation, the Non-Debtor Parent will be deemed, for federal income tax purposes, to have contributed the Debtors' assets, subject to the Debtors' liabilities, to Reorganized BI-LO Holding in exchange for New Common Units and as transferring those New Common Units to the holders of Claims entitled to receive them under the Plan.  Because the Non-Debtor Parent would not have "control" of Reorganized BI-LO Holding after the deemed distribution, IRC Section 351's non-recognition provisions would not apply, the Non-Debtor Parent would recognize gain or loss on the deemed transfer of the Debtor assets, and Reorganized BI-LO Holding would take a basis in those assets

equal to their fair market values on the Effective Date.  If Reorganized BI-LO Holding does not elect to be treated as a corporation for federal income tax purposes, it will be treated as a partnership for such purposes.  In that event, IRC Section 721's non-recognition provisions would generally apply to the Non-Debtor Parent's deemed transfer of the Debtors' assets to Reorganized BI-LO Holding, the Non-Debtor Parent would recognize gain or loss on the deemed transfer of the New Common Units received in exchange to the holders of Claims entitled to receive them under the Plan, and Reorganized BI-LO Holding's basis in the Debtor assets would equal the basis of those assets immediately before their deemed transfer by Non-Parent Debtor.

C.   U.S. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS

The federal income tax consequences of the Plan to a holder of a Claim will depend, in part, on whether the Claim constitutes a "tax security" for federal income tax purposes, what type of consideration was received in exchange for the Claim, whether the holder reports income on the accrual or cash basis, whether the holder has taken a bad debt deduction or worthless security deduction with respect to the Claim and whether the holder receives distributions under the Plan in more than one taxable year.

There is no precise definition of the term "security" under the federal income tax law.  Rather, all facts and circumstances pertaining to the origin and character of a claim are relevant in determining whether it is a security.  Nevertheless, courts generally have held that a debt instrument having a term of less than five years will not be considered a tax security, while corporate debt evidenced by a written instrument and having an original maturity of ten years or more will be considered a tax security.

None of the exchanges occurring under the Plan with respect to holders of Claims in Classes 3, 4, or 5 is expected to constitute tax-free exchanges of securities.

1.    Holders of Allowed Claims in Class 3

Under the Plan, holders of Allowed Term Lender Claims in Class 3 will receive New Term Notes, New Common Units, Cash in lieu of New Common Units (if the holder has elected to participate in the Term Lender Liquidity Right), and additional New Common Units (if the holder has elected to participate in the Term Lender Investment Right).

A holder of an Allowed Term Lender Claim in Class 3 would recognize gain or loss in an amount equal to the difference between (a) the fair market value of the New Common Units, plus the issue price of the New Term Notes, plus the amount of any Cash received by the holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest) and (b) the holder's adjusted tax basis in its Allowed Claim (other than any Claim for accrued but unpaid interest).

Generally, any gain or loss recognized by a holder of an Allowed Term Lender Claim in Class 3 would be a long term capital gain or loss if the Claim is a capital asset in the hands of the holder and the holder has held such Claim for more than one year, unless the holder had previously claimed a bad debt or worthless securities deduction or the holder had accrued market discount with respect to such Claim.  See "Market Discount" below for a discussion of the character of any gain recognized from a Claim with accrued market discount.

Following the Effective Date, a holder of an Allowed Term Lender Claim in Class 3 will be required to recognize interest income on the New Term Notes in accordance with its regular method of tax accounting. If the New Term Notes are issued with original issue discount ("OID") the holder would be required to recognize the OID over the term of the New Term Notes, in advance of the holder's receipt of the associated Cash.

2.      Holders of Allowed Claims in Class 4

As described above in "The Creditors' Trust – Costs and Expenses; Tax Matters," the Creditors' Trust is intended to be treated for federal income tax purposes in part as a liquidating trust within the meaning of Treasury Regulations Section 301.7701-4(d) for the benefit of the holders of Allowed General Unsecured Claims. Accordingly, for federal income tax purposes, each holder of an Allowed General Unsecured Claim in Class 4 on the Effective Date should be treated as transferring its claim to the Debtors in exchange for the holder's Pro Rata share of the Trust Assets (subject to any Creditor Trust liabilities), followed by the holder's transfer of such assets (subject to such liabilities) to the Creditors' Trust.

The holder should realize gain or loss equal to the difference between the fair market value of its Pro Rata Share of the Trust Assets (reduced to reflect any liabilities to which such assets are subject) and the holder's adjusted basis in its Allowed General Unsecured Claim. Such gain or loss generally would be a long-term capital gain or loss if the Claim is a capital asset in the hands of the holder and the holder has held such Claim for more than one year, unless the holder had previously claimed a bad debt or worthless securities deduction or the holder had accrued market discount with respect to such Claim. See "Market Discount" below for a discussion of the character of any gain recognized from a Claim with accrued market discount. See "Installment Method" below for a discussion of the potential deferral of any such gain or loss.

Each holder of an Allowed General Unsecured Claim in Class 4 will be required to include in income the holder's Pro Rata Share of any income, gain, loss, deduction or credit recognized by the Creditors' Trust, including interest income. If the Creditors' Trust sells or otherwise disposes of a Trust Asset in a transaction in which gain or loss is recognized, each holder of an Allowed General Unsecured Claim will be required to include in income gain or loss equal to the difference between (i) the holder's Pro Rata Share of the Cash or property received in exchange for the asset sold or otherwise disposed of, and (ii) the holder's adjusted basis in the holder's Pro Rata Share of the asset. The character and amount of any gain or loss will be determined by reference to the character of the asset sold or otherwise disposed of. Holders of Allowed General Unsecured Claims in Class 4 will be required to report any income or gain recognized on the sale or other disposition of a Trust Asset whether or not the Creditors' Trust distributes the sales proceeds currently and may, as a result, incur a tax liability before the holder receives a distribution from the Creditors' Trust.

3.      Holders of Allowed Claims in Class 5

A holder of an Allowed Convenience Claim in Class 5 would recognize gain or loss in an amount equal to the difference between (a) the amount of Cash it receives in exchange for its Claim (other than any Claim for accrued but unpaid interest) and (b) the holder's adjusted tax basis in its Claim (other than any Claim for accrued but unpaid interest).

Such gain or loss generally would be a long term capital gain or loss if the Claim is a capital asset in the hands of the holder and the holder has held such Claim for more than one year, unless the holder had previously claimed a bad debt or worthless securities deduction or the holder had accrued market discount with respect to such Claim. See "Market Discount" below for a discussion of the character of any gain recognized from a Claim with accrued market discount. See "Installment Method" below for a discussion of the potential deferral of any such gain or loss.

D.    CERTAIN OTHER TAX CONSIDERATIONS FOR HOLDERS OF CLAIMS

1.    Pre-Effective Date Interest

In general, a Claim holder that was not previously required to include in its taxable income any accrued but unpaid pre-Effective Date interest on the Claim may be required to take such amount into income as taxable interest upon receiving a distribution with respect to such interest. A Claim holder that was previously required to include in its taxable income any accrued but unpaid pre-Effective Date interest on the Claim may be entitled to recognize a deductible loss to the extent that such interest is not satisfied under the Plan. The Plan provides that, to the extent applicable, all distributions to a holder of an Allowed Claim will apply first to the principal amount of such Claim until such principal amount is paid in full and then to any interest accrued on such Claim as of the Commencement Date and thereafter, to the extent the Debtors' Estates are sufficient to satisfy such principal and interest accrued as of the Commencement Date, to any interest accrued on such Claim from the Commencement Date through the Effective Date, until paid in full. There is no assurance, however, that the IRS will respect this treatment and will not determine that all or a portion of amounts distributed to such holder is properly allocable to prepetition interest. Each holder of a Claim on which interest has accrued is urged to consult its tax advisor regarding the tax treatment of its distributions under the Plan and the deductibility of any accrued but unpaid interest for federal income tax purposes.

2.    Post-Effective Date Interest

Holders of Claims in Class 4 and Class 5 may receive distributions subsequent to the Effective Date. The imputed interest provisions of the IRC may apply to treat a portion of any Post-Effective Date distribution as imputed interest. Imputed interest may, with respect to certain holders, accrue over time using the constant interest method, in which event the holder may, under some circumstances, be required to include imputed interest in income prior to receipt of a distribution.

3.    Reinstatement of Claims

Holders of Claims that will be reinstated generally would not recognize gain, loss or other taxable income upon the reinstatement of their Claims under the Plan. Taxable income, however, may be recognized by those holders if they are considered to receive interest, damages or other income in connection with the reinstatement or if the reinstatement is considered for tax purposes to involve a substantial modification of the Claim.

4.    Bad Debt Deduction

A holder who, under the Plan, receives on account of a Claim an amount less than the holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier year) to a bad debt deduction in some amount under IRC Section 166(a). The rules governing the character, timing and

amount of bad debt deductions place considerable emphasis on the facts and circumstances of the holder, the obligor, the instrument or claim, and the transaction establishing the loss with respect to which a deduction is claimed. Holders of Claims, therefore, are urged to consult their tax advisors with respect to their ability to take, and the amount and character of, such a deduction.

5.    Market Discount

A holder that purchased its Claim from a prior holder with market discount will be subject to the market discount rules of the IRC. Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of its Claim (subject to a de minimis rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

6.    Installment Method

A holder of a Claim constituting an installment obligation for tax purposes may be required to recognize currently any gain remaining with respect to the obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than its face value, distributed, transmitted, sold, or otherwise disposed of within the meaning of IRC Section 453B.

In addition, a holder of an Allowed Claim in Class 4 or Class 5 may be deemed to receive an installment obligation in satisfaction of its claim because of the potential additional payments such holders would receive if one or more Disputed Claims are disallowed. Under the IRC's installment method of reporting, any loss and a portion of any gain realized by the holder of a Claim in Class 4 or Class 5 would be deferred until the holder has received its final distribution from the Creditors' Trust. Holders of Allowed Claims in Class 4 and [Class 5] are urged to consult their tax advisors regarding the possible application of, or ability to elect out of, the installment method of reporting gain that may be recognized in respect of a Claim.

7.    Information Reporting and Backup Withholding

All distributions under the Plan will be subject to applicable federal income tax reporting and withholding. The IRC imposes "backup withholding" (currently at a rate of 28%) on certain "reportable" payments to certain taxpayers, including payments of interest. Under the IRC's backup withholding rules, a holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan, unless the holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional federal income tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of income tax. A holder of a Claim may be required to establish an exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

E.    <u>IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE</u>

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES.  ACCORDINGLY, HOLDERS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## XVII.  CONCLUSION AND RECOMMENDATION

The Plan Proponents believe that confirmation and implementation of the Plan is preferable to any alternative because the Plan Proponents believe the Plan will not only provide the greatest recoveries to creditors, but will also assure the Company's future viability, for the benefit of its clients, customers, employees, and all other parties in interest.  Accordingly, the Plan Proponents urge the creditors entitled to vote on the Plan to vote to accept the Plan.

Dated:          November 20, 2009

### **THE PLAN PROPONENTS**

| THE OFFICIAL COMMITTEE<br>By its counsel: | THE TERM LENDER COMMITTEE<br>By: Its counsel: |
|---|---|
| McCARTHY LAW FIRM, LLC | McNAIR LAW FIRM, P.A. |
| /s/ G. William McCarthy, Jr._____<br>G. William McCarthy, Jr. (S.C. Dist. Ct. ID # 2762)<br>Daniel J. Reynolds, Jr., Esq. (S.C. Dist. Ct. ID# 9232)<br>1715 Pickens Street (29201)<br>P.O. Box 11332<br>Columbia, SC 29211-1332<br>Telephone: (803) 771-8836<br>Facsimile: (803) 779-0267<br>dreynolds@mccarthy-lawfirm.com | /s/ Michael M. Beal_____<br>Michael M. Beal (S.C. Dist. Ct. ID # 1253)<br>Michael H. Weaver (S.C. Dist. Ct. ID # 9847)<br>Elizabeth (Lisa) J. Philp (S.C. Dist. ID #8033)<br>Post Office Box 11390<br>Columbia, South Carolina 29211<br>Tel: (803) 799-9800<br>Fax: (803) 753-3277<br>mbeal@mcnair.net<br>mweaver@mcnair.net |
| - AND - | - AND - |
| OTTERBOURG, STEINDLER,<br>HOUSTON & ROSEN, P.C. | JONES DAY |
| Glenn B. Rice<br>Scott L. Hazan<br>Enid Nagler Stuart<br>230 Park Avenue<br>New York, NY 10169<br>Telephone: (212) 661-9100<br>Facsimile: (212) 682-6104<br>grice@oshr.com<br>shazan@oshr.com<br>estuart@oshr.com | Paul D. Leake<br>Erica M. Ryland<br>Scott J. Friedman<br>JONES DAY<br>222 East 41st Street<br>New York, New York  10017<br>Telephone:  (212) 326-3939<br>Facsimile:  (212) 755-730<br>pdleake@JonesDay.com<br>emryland@JonesDay.com<br>sjfriedman@JonesDay.com |
| *Attorneys for the Official Committee of Unsecured Creditors.* | *Attorneys for the Term Lender Committee* |

## EXHIBIT A

**Plan of Reorganization**

**(to be provided)**

**<u>EXHIBIT B</u>**

**Disclosure Statement Order**

**(to be provided)**

## EXHIBIT C

**Selected Historical Financial Information**

**(to be provided)**

**<u>EXHIBIT D</u>**

**Financial Projections**

**(to be provided)**

# **EXHIBIT E**

**Best Interests Analysis**

**(to be provided)**

## **EXHIBIT F**

**Valuation Analysis**

**(to be provided)**

## **EXHIBIT G**

**Investment Agreement**

**(to be provided)**