## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| In re: | § | Case No. 09-02140 (HB) |
| | § | |
| **BI-LO, LLC,** *et al.*, | § | Chapter 11 |
| | § | |
| Debtors. | § | (Joint Administration) |
| | § | |
| | § | |

---

## DISCLOSURE STATEMENT FOR THE DEBTORS'
## THIRD AMENDED PLAN OF REORGANIZATION

---

**VINSON & ELKINS L.L.P.**
3700 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas 75201-2975
Telephone:  (214) 220-7700
Facsimile: (214) 220-7718
Josiah M. Daniel, III, (admitted *pro hac vice*)
Michael L. Raiff, (admitted *pro hac vice*)
Katherine D. Grissel, (admitted *pro hac vice*)


666 Fifth Avenue, 26th Floor
New York, New York  10103-0040
Telephone:  (212) 237-0110
Facsimile:  (917) 849-5361
Dov Kleiner, (admitted *pro hac vice*)
Alexandra S. Kelly, (admitted *pro hac vice*)

**NELSON MULLINS RILEY &
SCARBOROUGH, L.L.P.**
1320 Main Street, 17th Floor
Post Office Box 11070 (29211)
Columbia, SC 29201
Telephone: (803) 799-2000
Facsimile:  (803) 256-7500
George B. Cauthen, Federal Bar No. 81
Frank B.B. Knowlton, Federal Bar No. 2379
Betsy Johnson Burn, Federal Bar No. 7574
Jody A. Bedenbaugh, Federal Bar No. 9210


*Co-Counsel for the Debtors*

March 15, 2010

THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

TABLE OF CONTENTS

I.      INTRODUCTION AND OVERVIEW OF THIS DISCLOSURE STATEMENT........................1
        A.      Why You Have Received this Disclosure Statement........................................1
        B.      Other Frequently Asked Questions ................................................................1
        C.      Summary of Key Features of the Plan ...........................................................6
        D.      Legal Disclaimers Applicable to this Disclosure Statement ...........................10
II.     GENERAL INFORMATION ABOUT THE DEBTORS........................................12
        A.      Overview of Business Operations.................................................................12
        B.      Organizational Structure .............................................................................12
        C.      Stores and Facilities ...................................................................................13
        D.      Operational Matters ....................................................................................14
        E.      Management and Employees ........................................................................16
        F.      The Debtors' Prepetition Capital Structure...................................................18
        G.      Selected Historical Financial Information ....................................................19
        H.      Acquisition of the Debtors By Lone Star .....................................................19
        I.      BI-LO's Spin-Off of Bruno's Supermarkets.................................................19
        J.      Events That Lead to the Commencement of the Debtors' Chapter 11 Cases .................20
III.    THE DEBTORS' CHAPTER 11 CASES ...........................................................21
        A.      Overview of the Chapter 11 Process.............................................................21
        B.      Early Stages of the Debtors' Chapter 11 Cases ............................................22
        C.      Employee Matters........................................................................................25
        D.      Vendor Matters ...........................................................................................26
        E.      Asset Dispositions.......................................................................................27
        F.      Executory Contract and Lease Matters .........................................................27
        G.      Summary of Other Significant Motions........................................................30
        H.      The Debtors' Five Year Business Plan .........................................................31
        I.      Claims ........................................................................................................31
        J.      Causes of Action Created by the Bankruptcy Code Belonging to the Debtors'
                Estates ........................................................................................................36
        K.      Exclusivity and Plan Negotiations...............................................................37
        L.      Settlement Agreement Between Lone Star and Ahold ....................................38
        M.      Ahold's Purchase of the Term Loans............................................................39
IV.     LEGAL REQUIREMENTS FOR CONFIRMATION OF THE PLAN .......................41

|        | A.   | Section 1129 of the Bankruptcy Code .................................................................................41 |
|        | B.   | Best Interests Test/Best Interests Analysis ......................................................................42 |
|        | C.   | The "No Unfair Discrimination" and "Fair and Equitable" Requirements for Cram Down........................................................................................................................42 |
| V.     |      | OVERVIEW OF THE PLAN ...............................................................................................43 |
| VI.    |      | TREATMENT OF CLAIMS AND EQUITY INTERESTS ......................................................44 |
|        | A.   | Substantive Consolidation .................................................................................................44 |
|        | B.   | Administrative and Priority Tax Claims ...........................................................................45 |
|        | C.   | Classification and Treatment of All Other Claims and Equity Interests..........................47 |
| VII.   |      | TREATMENT OF EXECUTORY CONTRACTS  AND UNEXPIRED LEASES ....................49 |
|        | A.   | Assumption of Certain Executory Contracts and Unexpired Leases Under the Plan ...................................................................................................................................49 |
|        | B.   | Rejection of Certain Executory Contracts and Unexpired Leases Under the Plan ..........51 |
|        | C.   | Contracts and Leases Entered into Postpetition.................................................................52 |
|        | D.   | Employee and Retiree Compensation and Benefits............................................................52 |
| VIII.  |      | RELEASES OF THIRD PARTIES UNDER THE PLAN..........................................................53 |
|        | A.   | Background..........................................................................................................................53 |
|        | B.   | Releases By the Debtors and Exculpation Under the Plan ...............................................53 |
|        | C.   | Approval by the Bankruptcy Court....................................................................................54 |
| IX.    |      | PROCEDURES FOR DISTRIBUTIONS TO CREDITORS  AND RESOLUTION OF DISPUTED CLAIMS ............................................................................................................54 |
|        | A.   | General................................................................................................................................54 |
|        | B.   | Procedures for Distributions to Creditors .........................................................................55 |
|        | C.   | Procedures for Resolution of Disputed Claims..................................................................58 |
| X.     |      | THE CREDITORS' TRUST .....................................................................................................59 |
|        | A.   | The Administration of the Creditors' Trust ......................................................................59 |
|        | B.   | Tax Matters .........................................................................................................................60 |
| XI.    |      | CONFIRMATION AND IMPLEMENTATION  OF THE PLAN...............................................60 |
|        | A.   | General................................................................................................................................60 |
|        | B.   | Confirmation........................................................................................................................60 |
|        | C.   | Conditions to Consummation .............................................................................................61 |
|        | D.   | Implementation of the Plan .................................................................................................62 |
|        | E.   | Section 1145 Exemption ......................................................................................................63 |
|        | F.   | C&S Settlement ...................................................................................................................63 |
|        | G.   | Ahold/SFM Claims Settlement ...........................................................................................64 |
| XII.   |      | THE REORGANIZED DEBTORS...........................................................................................65 |

 A. Business ................................................................................ 65

 B. Financial Projections.......................................................... 65

 C. Liquidity and Capital Structure........................................ 65

 D. Ownership............................................................................. 65

 E. Governance .......................................................................... 65

XIII. CERTAIN MISCELLANEOUS PROVISIONS OF THE PLAN........... 66

 A. Payment of Statutory Fees ................................................. 66

 B. Dissolution of Creditors' Committee ................................ 66

 C. Nonseverability of Plan Provisions................................... 66

 D. Notices .................................................................................. 67

 E. Terms of Injunctions or Stays ........................................... 68

 F. Closing of Chapter 11 Cases ............................................. 68

 G. Governing Law .................................................................... 69

XIV. CERTAIN FEDERAL INCOME TAX ISSUES  RELATED TO THE PLAN........... 69

 A. General ................................................................................ 69

 B. Consequences to the Debtors ............................................ 70

 C. Federal Income Tax Treatment of the Creditors' Trust ........... 70

 D. Consequences to Holders of Claims ................................. 71

 E. Backup Withholding ............................................................ 72

XV. CERTAIN RISKS TO BE CONSIDERED IN  CONNECTION WITH THE DEBTOR'S PLAN........... 73

 A. Business Risks ..................................................................... 73

 B. Certain Bankruptcy Considerations ................................. 75

 C. Risks to Beneficiaries of the Creditors' Trust................. 76

XVI. RECOMMENDATION ........................................................................ 79

# EXHIBITS

**EXHIBIT A**          **Plan**

**EXHIBIT B**          **Order Approving Disclosure Statement**

---

**THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO THIS
DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN**

# I.
## INTRODUCTION AND OVERVIEW OF THIS DISCLOSURE STATEMENT

### A.      Why You Have Received this Disclosure Statement

BI-LO, LLC and its debtor affiliates (collectively, "<u>BI-LO</u>" or the "<u>Debtors</u>") commenced bankruptcy cases (the "<u>Chapter 11 Cases</u>") under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of South Carolina (the "<u>Bankruptcy Court</u>") on March 23, 2009 (the "<u>Petition Date</u>").  Since that time, BI-LO has taken a number of steps to rehabilitate its business, and it has now reached the final stage of the chapter 11 process where creditors will be asked to approve a plan of reorganization for BI-LO.  That plan of reorganization will determine how BI-LO's property will be distributed to satisfy the claims of its creditors and other parties in interest and will provide for BI-LO's emergence from bankruptcy.

The Bankruptcy Court has authorized the filing of the *Debtors' Third Amended Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (the "<u>Plan</u>"), a copy of which is attached hereto as **<u>Exhibit A</u>**.  Before voting on any chapter 11 plan, the Bankruptcy Code requires that creditors and other interested parties be given a "disclosure statement" that describes the plan, as well as background information about the debtor and its bankruptcy cases, to enable parties to make an informed decision about whether to vote to accept the plan.  The disclosure statement must be approved by the Bankruptcy Court before it is used to solicit votes to assure that it complies with the Bankruptcy Court's requirement that it contain adequate information.  Once it has been approved by the Bankruptcy Court, the disclosure statement is sent to all parties in interest, and creditors who are entitled to vote on the plan are also sent ballots to execute and return to the balloting agent before the voting deadline.

You have received this disclosure statement (the "<u>Disclosure Statement</u>") as a creditor or other party in interest in the BI-LO Chapter 11 Cases.  If you are a creditor entitled to vote, you should also find a ballot (the "<u>Ballot</u>") enclosed as well.  This Disclosure Statement and the form of the Ballot were approved by the Bankruptcy Court on [•], 2010 for transmittal to you.

---

**The Bankruptcy Court has also set certain important dates which you should be aware of:**

- Deadline for receipt of Ballots from creditors (the "<u>Voting Deadline</u>"):  **[•], 2010 at 8:00 PM Eastern Time**.

- Deadline for objections to confirmation of the Plan:  **[•], 2010 at 5:00 PM Eastern Time.**

- The hearing to consider confirmation of the Plan is scheduled for:  **[•], 2010 at 9:30 AM Eastern Time.**  The hearing will be held before the Honorable Helen E. Burris, United States Bankruptcy Judge at the Donald Stuart Russell Federal Courthouse, 201 Magnolia Street, Spartanburg, South Carolina 23906.

---

### B.      Other Frequently Asked Questions

#### *What is Chapter 11?*

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 of the Bankruptcy Code promotes equality of treatment for

similarly situated creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the bankruptcy commencement date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court, in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's debt in accordance with the terms of the confirmed plan.

### *Am I entitled to vote on the Plan?*

For purposes of voting on a chapter 11 plan, creditors' claims are typically separated into "classes" of claims with similar legal characteristics, and they vote by class. The Debtors' Plan provides for the following four classes to vote:

– Class 3 – Term Lender Claims – These are claims that arise from the $260 million secured Credit Agreement dated March 26, 2007 among BI-LO Holding, LLC, BI-LO, LLC, the lenders thereunder and the lenders' agents.

– Class 4 – General Unsecured Claims (other than Class 5 "Bruno's/Pension Fund Claims" and Class 6 "Convenience Claims" described below) – These are claims for which there is no allowed offset, collateral, or other interest to secure the claim.

– Class 5 – Bruno's/Pension Fund Claims – These are claims asserted by the bankruptcy estate of Bruno's Supermarkets LLC (or its successor) and the United Food and Commercial Workers Union and Employers Pension Fund.

– Class 6 – Convenience Claims – This class consists of individual creditors holding total unsecured claims that are no greater than (or are voluntarily reduced to) $5,000.

Even if you have a claim in one of the four voting classes, you are only entitled to vote your claim (if at all) in an amount determined by application of tabulation rules that are attached to the order approving the Disclosure Statement. A copy of that order is attached as **Exhibit B** to this Disclosure Statement. Moreover, if your claim is disputed, you may not be permitted to vote on the Plan.

***The amount of your claim for voting purposes as determined by these tabulation rules is solely for purposes of counting votes on the Plan. These tabulation rules do not determine whether your claim is or will be disputed, nor do they determine the amount of your claim for purposes of receiving a recovery under the Plan.***

Generally, if you are entitled to vote under the tabulation rules, you will receive a Ballot, and your Ballot will indicate the amount of the claim that you will be entitled to vote under the tabulation rules, unless you obtain a specific order of the Bankruptcy Court pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") prior to the Voting Deadline, and timely submit your Ballot.

*How do I fill out my Ballot?*

You must follow the instructions on the Ballot explaining how it is to be filled out.  If you fail to properly follow these instructions, your vote will not be counted.

*What is the "Record Date" for purposes of voting and distributions under the Plan?*

The Record Date for being eligible to vote on the Plan is [•], 2010.  If you purchased your claim from a creditor after that date, or sold your claim to someone else before that date, you are not entitled to vote.

The Record Date for being eligible to receive a distribution under the Plan is the date the Bankruptcy Court enters an order confirming the Plan.  If you purchased your claim from a creditor after that date, or sold your claim to someone else before that date, you are not entitled to receive any distribution under the Plan.

*What would I recover as a creditor under the Plan?*

The chart attached at the end of this section summarizes the treatment of creditors under the Plan.

*You are urged to carefully read the detailed discussion of the Plan contained herein before making a decision to vote.*

*What are the voting requirements for a plan to be considered approved by creditors?*

As noted, voting is done by class.  A plan is considered to have been "accepted" (*i.e.*, approved) by a class of creditors if those voting in favor of the plan constitute at least half the number of creditors voting and hold at least two-thirds of the amount of total claims being voted in that class.

A plan can be "confirmed" (*i.e.*, approved by the Bankruptcy Court as satisfying all legal standards) even if only one "impaired" class (*i.e.*, a class whose creditors are not being paid in full under the plan) votes in favor of it as long as it satisfies other conditions necessary for confirmation.  For a more detailed discussion of the requirements for confirmation of a plan, please see Section IV of this Disclosure Statement.

*Where do I send my Ballot to be counted?*

To be counted, all Ballots must be received by Kurtzman Carson Consultants LLC (who serves as the "Solicitation Agent" for all voting) at the following address:

> **BI-LO Claims Processing Center**
> **c/o Kurtzman Carson Consultants LLC**
> **Attn: Ballot Processing Department**
> **2335 Alaska Avenue**
> **El Segundo, CA  90245**

Ballots must be sent to the Solicitation Agent by U.S. mail, by hand delivery, or by couriers such as FedEx or UPS.  It is recommended – but not required – that you use hand delivery or a courier service,

which may be more reliable than the U.S. mail. *Ballots sent by facsimile, email or other electronic means will not be counted.*

### What is the deadline for voting on the Plan?

To be counted, Ballots must be *actually received* by Kurtzman Carson Consultants LLC by no later than [•], 2010 at **8:00 PM Eastern Time**.

### Can I change my mind once I have submitted a Ballot?

Yes, if you submit a new Ballot before the Voting Deadline. After the Voting Deadline, you cannot change your vote unless you first obtain permission from the Bankruptcy Court pursuant to Bankruptcy Rule 3018(a). If multiple Ballots are received from you, the most recent Ballot will be the one that is counted.

### Who do I contact if I believe I am entitled to vote but I did not receive a Ballot?

As noted above, if your claim is the subject of a dispute, you are not entitled to vote on the Plan unless you obtain an order of the Bankruptcy Court under Bankruptcy Rule 3018(a) before the Voting Deadline. If you nonetheless believe you are entitled to vote but did not receive a Ballot along with this Disclosure Statement, please contact the Solicitation Agent, Kurtzman Carson Consultants LLC, at the following toll-free number during regular business hours in Pacific Time: 866-967-0268 (or 310-751-2668 for international calls) or email them at **biloinfo@kccllc.net**.

### Why did I get more than one Ballot?

If you have claims in more than one class, or if you have more than one claim in a single class, you should have received a separate Ballot for each of your claims in each class that is entitled to vote.

### Who do I contact if I have other questions about the voting procedures or to obtain copies of other documents related to the Plan?

Please contact the Solicitation Agent, Kurtzman Carson Consultants LLC, at the following toll-free number during regular business hours in Pacific Time: 866-967-0268 (or 310-751-2668 for international calls) or email them at **biloinfo@kccllc.net**. You can also get copies of documents that have been filed in the Chapter 11 Cases at their website: **http://www.kccllc.net/bilo.**

### What do I do if I want to object to confirmation of the Plan?

You must make your objection in writing and specify in detail your name and address, all the reasons for your objection and the amount of claim(s) that you hold. You must then file it with the Bankruptcy Court, send a copy to the chambers of the Honorable Helen E. Burris, United States Bankruptcy Judge, at the Donald Stuart Russell Federal Courthouse, 201 Magnolia Street, Spartanburg, South Carolina, 23906, and send copies to the following parties:

*Attorneys for the Debtors:* Vinson & Elkins L.L.P., 3700 Trammell Crow Center, 2001 Ross Avenue, Dallas, Texas, 75201-2975 (Attn: Josiah M. Daniel, III, Esq.), Vinson & Elkins L.L.P., 666 Fifth Avenue, 26th Floor, New York, New York 10103 (Attn: Dov Kleiner, Esq. and Ali Kelly, Esq.) and Nelson Mullins Riley & Scarborough, LLP, 1320 Main Street, 17th Floor, PO Box 11070 (29211), Columbia, South Carolina 29201 (Attn: George B. Cauthen, Esq.);

*Attorneys for the Creditors' Committee:* Otterbourg, Steindler, Houston & Rosen, P.C., 230 Park Avenue, New York, New York 10169 (Attn: Scott L. Hazan, Esq. and Enid Nagler Stuart, Esq.) and McCarthy Law Firm, LLC, 1715 Pickens Street (29201), P.O. Box 11332, Columbia, South Carolina 29211-1332 (Attn: G. William McCarthy, Jr., Esq.);

*Attorneys for Lone Star:* King & Spalding LLP, 1100 Louisiana Street, Suite 4000, Houston, Texas 77002-5213 (Attn: Edward L. Ripley, Esq.) and Levy Law Firm, LLC, 2300 Wayne Street, Columbia, South Carolina 29201 (Attn: R. Geoffrey Levy, Esq.);

*Attorneys for Ahold*: White & Case LLP, 200 South Biscayne Boulevard, 49th Floor, Miami, Florida 33131 (Attn: John K. Cunningham, Esq. and Frank L. Eaton, Esq.) and Moore & Van Allen PLLC, 40 Calhoun Street, Suite 300, Post Office Box 22828, Charleston, South Carolina 29413-2828 (Attn: David B. Wheeler, Esq.); and

*The Office of the United States Trustee for the District of South Carolina*, 1835 Assembly Street, Suite 953, Columbia, South Carolina 29201 (Attn: J. Timothy Stack, Esq.).

All objections must be filed and copies received by these parties by the deadline set by the Bankruptcy Court, which is **[•], 2010 at 5:00 PM Eastern Time.**

[Remainder of page left blank; summary chart to follow]

### C.    Summary of Key Features of the Plan

The Plan is predicated on BI-LO continuing as a going concern and continuing to operate its store base of in excess of 200 stores.  After the company emerges from bankruptcy protection, BI-LO intends to maintain ordinary course relationships with its vendors and landlords as it did prior to its chapter 11 filings.  For example, BI-LO has approximately $7.0 million in prepaid vendor funds as of January 30, 2010 with its suppliers and will use those funds for promotional programs in the ordinary course of its business.  Distributions under the Plan will be funded by a combination of a new equity investment by LSF5 Grocery Holdings, LLC, an affiliate of BI-LO's current equity interest holder (the "Investor"), a new $200 million term loan and, if necessary, a draw on a new $150 million working capital facility.  The emerging BI-LO will have substantially reduced its debt and will have greatly improved its financial structure.

The following chart summarizes the estimated recovery to creditors, the creditors' trust (the "Creditors' Trust") created under the Plan, and certain other key features of the Plan.  This summary is provided for convenience only, and is qualified by the terms of the Plan itself.  To the extent of any inconsistency between the summary provided below and the Plan, the terms of the Plan shall govern.  Capitalized terms not otherwise defined in the Disclosure Statement that are used in the chart shall have the same meanings ascribed to them in the Plan.

The Plan is supported by and incorporates settlements by and among the Debtors, the Creditors' Committee, the Ahold Entities, C&S and the Lone Star Entities.

You are urged to read carefully Sections V through XIII of this Disclosure Statement, which contain important additional information about the Plan.

| Claim Type or Class | Recovery |
|---|---|
| Administrative Claims | Paid in full |
| Priority Tax Claims | Paid in full |
| *Class 1* – Priority Non-Tax Claims | The creditor will be paid in full or receive such other treatment as may be agreed in writing by such holder and the Debtors or, after the effective date of the Plan (the "Effective Date"), the reorganized Debtors (the "Reorganized Debtors").<br><br>*Estimated Amount of Total Class 1 Claims:  Minimal*<br><br>*Estimated Recoveries: 100%* |
| *Class 2* – Secured Claims | At the option of the Reorganized Debtors, the creditor will either (a) have such claim reinstated on its existing terms; or (b) receive such other treatment as may be agreed upon in writing by the creditor and the Debtors or, after the Effective Date, the Reorganized Debtors.<br><br>*Estimated Amount of Total Class 2 Claims:  Approximately $1.9 million*<br><br>*Estimated Recoveries: 100%* |

| Claim Type or Class | Recovery |
|---|---|
| *Class 3* – Term Lender Claims | The holders will receive $260 million in cash (less the aggregate principal amount of the Term Loans, if any, contributed by the Investor and the net proceeds paid from the sale of any Term Lender Claims collateral during the cases).<br><br>The Term Lenders will also be entitled to retain all "adequate protection" payments made by the Debtors during the Chapter 11 Cases and the proceeds of certain equipment sales (which together are estimated to be $18.7 million assuming a May 1, 2010 exit from bankruptcy).<br><br>*Estimated Amount of Total Class 3 Claims:  $260 million in principal plus certain interest and fees arising under the Term Loan Credit Agreement.*<br><br>*Estimated Recoveries: 94.5% of asserted claim* |
| *Class 4* – General Unsecured Claims other than Class 5 and Class 6 Claims | Each holder will receive its proportionate share of the Trust Assets, less amounts necessary to satisfy or reserve for Class 6 Claims, and be paid its proportionate share of Trust Recoveries.<br><br>Trust Recoveries consist of the cash contribution to the Creditors' Trust, minus trust expenses, taxes to be paid from the Creditors' Trust, and an estimated $0.7 - 1.5 million for the Convenience Claims Class.<br><br>The cash contribution from the Debtors' estates will be $40 million in cash (or $44 million if a majority of the Reorganized Debtors' assets are sold within 180 days of the Effective Date and the Investor receives in cash or other consideration a net return of at least $175 million, subject to certain deductions).<br><br>*Estimated Amount of Class 4 Claims: $65.0 -85.0  million*<br><br>*Estimated Recoveries: 43.7% - 57.8%* |
| *Class 5* – Bruno's and Pension Fund Claims | Each holder of an allowed Class 5 Claim shall be entitled to receive from the Investor (or its designee) payments in cash equal to the percentage paid to holders of allowed Class 4 Claims.  Lone Star Fund V (U.S.) LP shall guarantee the Class 5 payments to be made pursuant to the Plan.<br><br>*Estimated Amount of Class 5 Claims: $0.0 – 100.0 million*<br><br>*Estimated Recoveries: 43.7% - 57.8%* |

| Claim Type or Class | Recovery |
|---|---|
| *Class 6* – Convenience Claims ($5,000 or less) | Estimated as $1.2 - $2.5 million in this class.<br><br>Each holder of a Class 6 Convenience Claim will be entitled to receive 60% of its claim in a one-time cash payment from Trust Assets.  Other than this payment, the holders of Class 6 Convenience Claims will not receive distributions from Trust Assets. |
| *Class 7* – Old Equity Interests | There will be no recoveries to Old Equity Interests. |

| Description of Creditors' Trust | |
|---|---|
| **Feature** | **Summary** |
| Creditors' Trust Trustee | The proposed Trustee shall be selected by Ahold and the Creditors' Committee, and shall be identified by no later than 10 days prior to the Voting Deadline. |
| Creditors' Trust Advisory Board | The Trust Advisory Board shall be comprised of three voting members as follows: (1) an Ahold Entity representative, (2) a Kraft Food, Inc. representative (Ms. Sandra Schirmang) and (3) an American Greetings Service Corp. representative (Mr. Arthur P. Tuttle). |
| Key parties against whom the Trust Causes of Action (held by the Creditors' Trust for the benefit of Class 4 creditors) may be prosecuted | Subject to certain exceptions, the Creditors' Trust is assigned claims, causes of action, rights of set-off or other rights or defenses of the Debtors relating to any Class 4 or Class 6 Claim, including certain avoidance claims and causes of action arising under chapter 5 of the Bankruptcy Code or applicable state law. |
| Estimated Amount of Funded Debt on the Reorganized Debtors' Balance Sheet on Emergence from Chapter 11 | New Term Credit Facility (to be held by new lender(s)): $200 million<br><br>New ABL Facility: $[•] million |
| Interest Rate Charged Under the New Term Credit Facility | At the option of the Investor:<br>(i) 5% plus the greater of (A) Adjusted LIBOR and (B) 2% or<br>(ii) 4% plus Alternate Base Rate |
| Amount of Investor Equity | $150 million (in the form of cash or cancellation of Term Lender Claims) |
| Treatment of C&S Supply Agreement/C&S Settlement | Reorganized BI-LO will enter into an amended C&S supply agreement consistent with **Exhibit C** to the Plan that will, among other things:<br>▪ eliminate C&S's exclusive first right to negotiate for the acquisition of BI-LO stores; |

| Description of Creditors' Trust | |
|---|---|
| **Feature** | **Summary** |
| | ▪ waive inflation-related adjustments to certain charges, rebates and surcharges which will save BI-LO approximately $3.0 million annually; <br><br> ▪ provide BI-LO sublease savings of $52,524 per week or $2.7 million annually; and <br><br> ▪ provide for a cash payment of $15 million by BI-LO to C&S in full satisfaction of the obligations of BI-LO and BI-LO Holding, LLC under the existing supply agreement and guaranty. <br><br> In addition, the Debtors and C&S shall fully release each other for claims arising prior to the Debtors' emergence from chapter 11. There will also be a release of C&S's general unsecured claim pending in the Bruno's bankruptcy case. |
| Anticipated Number of Reorganized BI-LO Stores | Reorganized BI-LO will retain substantially all of the store locations currently in operation, subject to the Debtors obtaining necessary rent concessions from landlords at certain underperforming locations that were not yet conditionally assumed pursuant to prior order of the Court. |

**D.      Legal Disclaimers Applicable to this Disclosure Statement**

THIS DISCLOSURE STATEMENT (WHICH INCLUDES ITS VARIOUS PARTS, EXHIBITS, AND OTHER ATTACHMENTS) IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT IS NOT A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR AN ENDORSEMENT OF THE PLAN.

THIS DISCLOSURE STATEMENT SHOULD NOT BE TREATED AS PROVIDING ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE. CREDITORS ARE URGED TO CONSULT WITH THEIR OWN ADVISORS CONCERNING THE DEBTORS' CHAPTER 11 CASES, THE PLAN AND THE PROPOSED TRANSACTIONS CONTEMPLATED BY THE PLAN.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR OBJECTING TO CONFIRMATION OF THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PERSON FOR ANY OTHER PURPOSE.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE KEY FEATURES OF THE PLAN TO ASSIST PARTIES WITH THEIR REVIEW OF THE ACTUAL PLAN AND RELATED DOCUMENTS.  ALL CREDITORS ARE URGED TO REVIEW THE FULL TEXT OF EACH DOCUMENT AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT BEFORE DECIDING WHETHER TO VOTE TO ACCEPT THE PLAN.  THE PLAN IS ATTACHED AS AN EXHIBIT TO THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE ACTUAL PROVISIONS OF THE PLAN.  IN THE EVENT OF A CONFLICT BETWEEN THE PLAN AND THE DESCRIPTION OF ITS TERMS IN THIS DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN WILL GOVERN.

IN DECIDING WHETHER TO VOTE TO ACCEPT THE PLAN, CREDITORS MUST RELY ON THEIR OWN EVALUATION AND ANALYSIS, INCLUDING CAREFULLY CONSIDERING THE RISK FACTORS DISCUSSED IN SECTION XV HEREIN.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BELIEVED TO BE CORRECT AS OF THE DATE OF ITS FILING, UNLESS OTHERWISE SPECIFIED. READERS SHOULD NOT ASSUME THAT THERE HAVE BEEN NO CHANGES SINCE THAT DATE.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD-LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND FINANCIAL PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS.  THE WORDS "BELIEVE," "MAY," "WILL," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT" AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS.    THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS INCLUDING THOSE DESCRIBED IN THIS DISCLOSURE STATEMENT.  IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED

IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS. THE DEBTORS DO NOT UNDERTAKE ANY OBLIGATION TO PUBLICLY UPDATE OR REVISE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND MAY NOT HAVE BEEN PREPARED IN ACCORDANCE WITH ACCOUNTING PRINCIPLES GENERALLY ACCEPTED IN THE UNITED STATES.

ALTHOUGH THE ATTORNEYS, ACCOUNTANTS, ADVISORS AND OTHER PROFESSIONALS EMPLOYED BY THE DEBTORS HAVE ASSISTED IN PREPARING THIS DISCLOSURE STATEMENT BASED UPON FACTUAL INFORMATION AND ASSUMPTIONS RESPECTING FINANCIAL, BUSINESS AND ACCOUNTING DATA FOUND IN THE BOOKS AND RECORDS OF THE DEBTORS, THEY HAVE NOT INDEPENDENTLY VERIFIED THIS INFORMATION AND MAKE NO REPRESENTATIONS AS TO THE ACCURACY OF THIS INFORMATION. THESE ATTORNEYS, ACCOUNTANTS, ADVISORS AND OTHER PROFESSIONALS WILL HAVE NO LIABILITY FOR THE INFORMATION IN DISCLOSURE STATEMENT.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS IN CONNECTION WITH THE DEBTORS, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AND SHOULD NOT BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

CERTAIN HOLDERS OF CLAIMS OR EQUITY INTERESTS MAY BE LIABLE FOR CAUSES OF ACTION BELONGING TO THE DEBTORS OR THEIR ESTATES. UNLESS OTHERWISE SPECIFIED, THESE CAUSES OF ACTION WILL NOT BE WAIVED UPON CONSUMMATION OF THE PLAN.

THIS DISCLOSURE STATEMENT WILL NOT BE SUBMITTED TO, AND HAS NOT BEEN APPROVED OR DISAPPROVED BY, THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR STATE SECURITIES REGULATOR. NEITHER THE SEC NOR ANY SIMILAR STATE SECURITIES REGULATOR HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION IT CONTAINS.

**II.**
**GENERAL INFORMATION ABOUT THE DEBTORS**

**A.      Overview of Business Operations**

BI-LO, headquartered in Greenville, South Carolina, operates as a major food retailer primarily under the "BI-LO" and "Super BI-LO" banners.  As of the Petition Date, BI-LO was one of the largest food retailers in the Southeast United States, operating over 200 stores in South Carolina, North Carolina, Georgia and Tennessee, with the majority of stores in South Carolina.

BI-LO offers national brands as well as many of its own private-label products.  BI-LO earns income predominantly by selling products at price levels that produce revenues in excess of its costs.  Such costs include facility occupancy and operational costs and overhead expenses.

Substantially all of BI-LO's stores offer grocery, meat, seafood, produce, deli, bakery, floral, health and beauty and other general merchandise items.  A number of BI-LO's stores also include pharmacies, special merchandise and customer services including check-cashing services, Western Union services, DVD rentals, Coinstar® machines, banking/automatic teller machines and third-party merchandise kiosks.

**B.      Organizational Structure**

BI-LO is the parent of seven wholly-owned subsidiaries.  BI-LO's corporate headquarters are located in Greenville, South Carolina.  The corporate structure is summarized below:

- BI-LO's wholly owns seven subsidiaries: ARP Ballentine LLC, ARP James Island LLC, ARP Moonville LLC, ARP Chickamauga LLC, ARP Morganton LLC, ARP Hartsville LLC and ARP Winston Salem LLC.  Six of the subsidiaries hold one or more pieces of real property; the seventh holds no assets.

- BI-LO is wholly-owned by its parent, BI-LO Holding, LLC, a Delaware limited liability company ("BI-LO Holding").

- BI-LO Holding also wholly owns BG Cards, LLC, a South Carolina limited liability company, which provides store gift cards to BI-LO.

- BI-LO Holding is a holding company whose assets are its equity in BI-LO and BG Cards, LLC.

- BI-LO Holding is owned by LSF5 BI-LO Investments, LLC, its non-Debtor parent.

- BI-LO is the only operating Debtor.

BI-LO's corporate structure is reflected below.



## C.    Stores and Facilities

As of the Petition Date, the Debtors were party to approximately 250 unexpired leases of nonresidential real property (each, a "<u>Lease</u>" and, collectively, the "<u>Leases</u>"), some of which related to "dark" stores (*i.e.*, locations where operations had been shut down but BI-LO continued to be obligated to pay rent), or to stores that have been subleased to third parties for their use.

During the course of the Chapter 11 Cases, the Debtors have rejected (*i.e.*, terminated) Leases governing 29 store locations, including a number of dark stores, as well as certain Leases that were previously assigned to Bruno's.  As of the date of this Disclosure Statement, the Debtors operated 214 stores under Leases, and also maintain three Leases which relate to their headquarters in Greenville, South Carolina and a warehouse in Chattanooga, Tennessee.

|  | Owned | Leased | Total |
|---|---|---|---|
| **Operating Retail Stores** | 0 | 214 | 214 |
| **Corporate Headquarters** | 0 | 3 | 3 |
| **Dark Stores** | 0 | 4 | 4 |
| **Total** | 0 | 221 | 221 |

Current remaining lease terms under the Leases range from March 2010 to March 2030.  The large majority of the Leases contain renewal options, though the length of these renewal terms, as well as the number of renewal terms offered under a particular Lease, vary.

Koninklijke Ahold NV, or certain of its affiliates (collectively, "Ahold"), was the former owner of BI-LO and in that capacity entered into guarantees related to a majority of the Leases prior to the Petition Date.  To the extent that Ahold has to perform under any remaining guarantees, Ahold can assert a claim against the Debtors in these cases.

## D.    Operational Matters

### 1.    Suppliers and Raw Materials Sources

BI-LO receives the products sold in its stores and the raw materials used in its food preparation operations from a number of sources.  C&S Wholesaler Grocers, Inc. ("C&S") is BI-LO's largest supplier, providing BI-LO more than 70% of its retail merchandise.  C&S delivers goods to BI-LO pursuant to the *Amended and Restated BI-LO LLC Supply Agreement* by and between C&S and BI-LO dated as of March 23, 2007 (as amended, the "C&S Supply Agreement").  Cardinal Health provides substantially all of BI-LO's prescription and over-the-counter drugs, comprising approximately 10% of BI-LO's retail merchandise.  Approximately 500 different vendors and third party food manufacturers deliver the remaining 20% of BI-LO's merchandise directly to its stores.

In addition to supplying the majority of BI-LO's goods, C&S provides distribution and delivery services to BI-LO under the C&S Supply Agreement.  BI-LO's retail products are delivered to its stores primarily from warehouses that are either subleased to C&S from BI-LO or owned by C&S.  To facilitate C&S's distribution of goods to BI-LO, BI-LO and C&S, among others, entered into the *Asset Purchase Agreement* dated as of December 22, 2004 (the "C&S Purchase Agreement"), which was subsequently incorporated into the C&S Supply Agreement.  Under the C&S Purchase Agreement, BI-LO, among other things, (a) subleased to C&S BI-LO's rights to distribution facilities in Mauldin, South Carolina and Chattanooga, Tennessee, and (b) sold C&S its perishable distribution facility in Mauldin, South Carolina.  These distribution facilities comprise the C&S distribution centers for BI-LO's stores.  BI-LO also subleases from C&S, through take-back subleases, office and maintenance space in portions of the Mauldin property on which the distribution facilities are located.

BI-LO believes that its products and raw materials generally are available in sufficient quantities to adequately meet customer demand.  As with any supermarket, many brands have high consumer recognition.  Though BI-LO may be able to find alternate suppliers for a particular product type, it would likely experience negative customer response if it was unable to supply a particular brand of product.

2.      *Vendor Allowances*

BI-LO receives allowances or rebates from certain vendors in the form of promotional allowances, quantity discounts and payments under merchandising agreements and other allowances that relate to new item introductions, slotting fees, placement of the vendors' products in premier locations within BI-LO's stores and temporary price reductions offered to customers. The allowances reduce cost of sales if the product has been sold, or reduce ending inventory if the product has not yet been sold. These allowances will be used by the Reorganized Debtors post-bankruptcy in the ordinary course of business.

3.      *Competitors*

The supermarket industry is highly competitive and generally characterized by high inventory turnover and narrow profit margins. BI-LO must compete based on product quality, variety, and price, as well as location, service, convenience, and store condition. BI-LO competes directly with national, regional and local supermarket chains in addition to independent supermarkets. BI-LO also competes with supercenters and other non-traditional grocery retailers such as dollar-discount stores, drug stores, convenience stores, and warehouse club stores. Beyond retailers, BI-LO also faces competition from restaurants and fast-food chains due to consumers purchasing and consuming food away from home. The number and type of competitors varies by location, as does BI-LO's competitive position across individual operating markets. In general, BI-LO's principal supermarket competitors include (in alphabetical order): Food Lion, LLC, Harris Teeter Inc., Ingles Markets Inc., Kroger Co., Publix Supermarkets, Inc. and Wal-Mart, Inc.

4.      *Environmental Matters*

The Debtors are subject to federal, state and local environmental laws that apply to property ownership, property development and store operations. The Debtors may be subject to certain environmental regulations regardless of whether they lease or own stores or land, or whether environmental conditions were created by the owner, a prior tenant of the premises or the Debtors.

The Debtors believe that compliance with federal, state, and local environmental laws and regulations has not had a material effect on its capital expenditures, operating results or competitive position. However, it is possible that the Debtors' various environmental investigations of certain properties might not have revealed all potential environmental liabilities or might have underestimated certain potential environmental issues. It is also possible that future environmental laws and regulations or new interpretations of existing environmental laws will impose material environmental liabilities on the Debtors, or that current environmental conditions of properties that the Debtors own or lease will be adversely affected by hazardous substances associated with other nearby properties or the actions of unrelated third parties. The costs to defend any future environmental claims, perform any future environmental remediation, satisfy any environmental liabilities or respond to changed environmental conditions could have a material adverse effect on the Debtors' financial condition and operating results.

5.      *Trademarks*

The Debtors actively enforce and defend their rights related to their intellectual property portfolio, which is of material importance to their operations. Including the BI-LO and Super BI-LO trademarks, the Debtors own approximately forty-nine (49) trademarks that are registered in the United States Patent and Trademark Office.

6.      *Seasonality*

Due primarily to the influx of winter residents to the Southeast and increased purchases of food items for the Thanksgiving and Christmas holiday seasons, the Debtors typically experience increased sales during the months of November through April as compared to the rest of the year, although certain locations show increased sales during the summer months.

7.      *Government Regulation*

The Debtors are subject to regulation by a number of federal, state and local governmental agencies. The Debtors' stores also are subject to laws regarding zoning, land use, pharmacy operations, tobacco sales, and alcoholic beverage sales, among others. The Debtors believe they are in material compliance with these laws and regulations.

8.      *Customer Programs*

BI-LO may offer sales discounts to customers at the time of sale as part of its Customer Reward Card program, as well as other promotional events. In addition, BI-LO periodically offers awards to customers in the form of sales discounts to be used on a future purchase based on an accumulation of points as part of its Customer Reward Card program.

## E.    Management and Employees

1.      *Board of Directors*

BI-LO's board of directors oversees BI-LO's management, reviews its long-term strategic plans, and exercises direct decision-making authority in key areas.

Set forth below is information with respect to the members of BI-LO's board of directors serving during the Chapter 11 Cases:

- R. Randall Onstead, Jr. – Randall Onstead, Jr. has over 27 years experience in the retail food industry. He is the former Chairman and Chief Executive Officer of Randalls Food Markets, Inc., a $2.7 billion Houston-based supermarket chain. After Randalls, Mr. Onstead became a Managing Director of Chapman Partners, L.L.C., a private investment-banking firm and became President of Onstead Investments, L.P. Later he became President and Chief Executive Officer of Garden Ridge Corp., a Houston-based crafts and décor retailer with 44 stores in 13 states, then President of Dominick's Finer Foods, based in Oak Brook, IL. He also served as Interim Chief Executive Officer and President of BI-LO, LLC from October 31, 2008 to February 23, 2009. Mr. Onstead is not affiliated with Lone Star (as defined herein). He was appointed to BI-LO's board on November 8, 2008.

- John Kinzer – John Kinzer serves as a Director for the Private Equity Investments and Commercial Real Estate portfolio for Hudson Americas, an entity affiliated with the Debtors' shareholder, the private equity fund Lone Star. Prior to joining Hudson, he served as Chief Investment Officer for Provident Realty Advisors. Mr. Kinzer previously served as the Director of Acquisitions for Milestone Group. From 2000 to 2004, Mr. Kinzer was a Senior Acquisition Manager for the Archon Group in Dallas, Texas. Mr. Kinzer was appointed to BI-LO's board on February 16, 2009.

2.      *Executive Officers*

Set forth below is information with respect to the current key executive officers of BI-LO:

- Mike Byars, CEO – Mr. Byars most recently served as President and CEO of Minyard Food Stores in the Dallas/Fort Worth area for five years.  Prior to his tenure at Minyard Food Stores, Mr. Byars spent over 25 years with Food Lion, most recently with their Florida-based Kash N Karry Supermarket division.  Mr. Byars joined BI-LO in February 2009.

- Brian Carney, EVP/CFO – Mr. Carney has been employed by BI-LO since October 2005.  Prior to joining BI-LO, he spent eight years as EVP & CFO of Jo-Ann Stores and eight years as SVP & CFO for Revco Drug Stores.  He also spent seven years at Arthur Andersen.

- Ken Jones, SVP, Finance and Treasurer – Prior to joining BI-LO in April 2005, Mr. Jones served as VP and Treasurer for Denny's Corp., where he directed its centralized treasury organization as well as corporate financial planning and investor relations.

3.      *Additional Officers*

- Anthea Jones – Mr. Jones has over 25 years of experience in the supermarket industry.  He has been with the company for ten years and currently serves as the Senior Vice President of Store Operations.  Over his BI-LO career, Anthea has held various positions, including Group Vice President of Center Store, Vice President of Non-Foods and Pharmacy, Regional Vice President of Operations, and Director of Customer Service.  Prior to 1999, Anthea was Director of Store Operations with Food Lion and held other essential roles within that organization.

- William Nasshan – Mr. Nasshan has 34 years of experience in retail and joined BI-LO as Senior Vice President – Marketing and Merchandising in July 2009.  Prior to joining BI-LO, Bill spent two years with Shaw's Supermarkets, five years with The Borders Group, two years in Retail Consulting, and 24 years with Dominick's Finer Foods.  Bill has had successful experience in Store Operations, Marketing, Merchandising, and Procurement.

- Marc L. Lipshy – Mr. Lipshy is a Vice President of Hudson Advisors LLC.  He is employed as an attorney in the Legal Department of Hudson Advisors LLC and is responsible for the legal affairs relating to the North American investments of Lone Star Funds.  Mark is a director, manager or officer of numerous non-public companies which are owned or controlled by Lone Star Funds or affiliates of Lone Star Funds.  Prior to joining Hudson Advisors LLC, he was a partner with the law firm of Jenkens & Gilchrist, P.C.  He earned his BA degree from Tufts University, Medford, Massachusetts and his JD from The University of Texas School of Law, Austin, Texas.

- Layne B. LeBaron – Mr. LeBaron has served as Assistant Secretary for BI-LO since January 31, 2005 and concurrently serves as the Worldwide Compliance Manager for Hudson Advisors LLC.  Prior to joining Hudson in June 2004, he served as Regulatory Compliance Specialist for Aurum Technology Inc. from 2000 to 2004.  Prior to joining Aurum, he served as a Regulatory Compliance Analyst for Electronic Data Systems (EDS) from 1998 to 2000.

- Dwane H. Bryant – Mr. Bryant, currently serving as Vice President, General Counsel, and Secretary, has 19 years of experience in the retail grocery industry.  In addition to his J.D., Dwane holds a B.S. and an M.B.A. and earlier in his career, served the company in various financial positions.

### 4.    Employees

As of the Petition Date, the Debtors employed approximately 15,500 employees, of whom approximately 6,100 were employed on a full-time basis and 9,400 on a part-time basis.  None of the Debtors' employees are covered by a collective bargaining agreement.

## F.    The Debtors' Prepetition Capital Structure

### 1.    Prepetition ABL and Term Loan Credit Agreements

BI-LO and certain of its affiliates are parties to the *Credit Agreement* dated as of March 26, 2007 (the "ABL Credit Agreement") with GE Business Financial Services, Inc. (formerly known as Merrill Lynch Capital, a division of Merrill Lynch Business Financial Services Inc.), as administrative agent, and certain lenders (the "ABL Lenders"), which provided for a $100 million revolving credit facility (the "ABL Facility") used for general corporate purposes.  The ABL Facility matured on March 26, 2009.

In addition, BI-LO and certain of its affiliates are also parties to the *Credit Agreement* dated as of March 26, 2007 (the "Term Credit Agreement") with The Bank of New York Mellon, as Administrative Agent, and certain lenders (the "Term Lenders"), which provided for a $260 million term loan (the "Term Loan").  The Term Loan matured on March 26, 2009.

Pursuant to § 5.1(a) of each of the ABL Credit Agreement and the Term Credit Agreement, BI-LO, BI-LO Holding and their respective subsidiaries (the "Loan Parties") entered into Guarantee and Collateral Agreements, each dated as of March 26, 2007 (the "Guarantee and Collateral Agreements"), pursuant to which the Loan Parties granted liens and security interests on substantially all of their personal property assets in favor of the respective groups of Lenders.  Additionally, pursuant to § 6.9 of each of the ABL Credit Agreement and the Term Credit Agreement, BI-LO granted mortgage liens on 14 leasehold interests in their real estate holdings in favor of the respective groups of Lenders.

The priorities of the ABL Lenders and the Term Lenders regarding their collateral are contained in an Intercreditor Agreement dated as of March 26, 2007 (the "Intercreditor Agreement").

Under the Intercreditor Agreement, the ABL Lenders have a first lien on certain types of the collateral, primarily cash, pharmacy prescriptions, receivables and inventory (the "ABL Priority Collateral," as defined in the Intercreditor Agreement) and the Term Lenders have a first lien on the remaining types of collateral, primarily equipment, intellectual property such as trademarks, and the 14 leases (the "Term Priority Collateral," as defined in the Intercreditor Agreement).  The ABL Lenders have a second lien on the Term Priority Collateral, and the Term Lenders have a second lien on the ABL Priority Collateral.

As of the Petition Date, $260 million in principal amount was outstanding under the Term Loan, and $65.7 million in principal amount was outstanding under the ABL Credit Agreement (including $29.6 million in letters of credit).  All of the ABL amounts were refinanced after the Petition Date by the DIP Financing (as described below).

### 2.    Prepetition Ownership

Substantially all of the equity interests in BI-LO Holding and BI-LO are indirectly owned by Lone Star Fund V (U.S.), L.P., LSF V International Finance, L.P. (Bermuda) or their affiliates ("Lone Star"), which, together with other affiliates, comprise a private equity fund headquartered in Dallas, Texas.

G.      **Selected Historical Financial Information**

Attached as **Exhibit E** to the Plan is selected consolidated financial information for BI-LO Holding and its subsidiaries.

H.      **Acquisition of the Debtors By Lone Star**

On December 22, 2004,[1] Lone Star acquired all of the membership interests of BI-LO Holding from Ahold.  The purchase price was $567.3 million.  At that time, BI-LO Holding owned BI-LO, which in turn owned Bruno's Supermarkets, Inc., subsequently known as Bruno's Supermarkets LLC ("Bruno's").  BI-LO and Bruno's served different regions, demographics and customer bases, with BI-LO serving South Carolina, North Carolina, Georgia and Tennessee, and Bruno's serving Alabama, Mississippi, Georgia and Florida.  Prior to 2001, BI-LO and Bruno's had been separate entities with no corporate affiliation.

Also on December 22, 2004, BI-LO entered into the initial C&S Supply Agreement (which was subsequently amended and restated) providing for C&S to supply grocery merchandise to both BI-LO and Bruno's.

Following Lone Star's acquisition of BI-LO and Bruno's, BI-LO Holding entered into an Asset Advisory Agreement with Hudson Advisors, L.L.C. ("Hudson"), an affiliate of Lone Star, pursuant to which Hudson acted as manager of Lone Star's interests in BI-LO Holding.

Also following the acquisition, BI-LO undertook a series of store sales, sale-leasebacks and closures of stores, including, among other things (a) the sale or closure of certain BI-LO stores in certain geographic markets, (b) the sale of BI-LO's warehouse and distribution assets to C&S and entry into a new supply agreement with C&S, (c) the closure (which had begun under Ahold's ownership) of Bruno's corporate offices and commencement of efforts to consolidate Bruno's corporate functions into BI-LO's corporate offices in Greenville, South Carolina and (d) the sale on April 22, 2005 of 109 stores – some Bruno's and some BI-LO – to various affiliates of C&S (collectively, the "SFM Buyer").  C&S guaranteed all obligations of the SFM Buyer under the purchase agreement and certain lease obligations with respect to the transferred stores.  Subject to certain conditions and adjustments, C&S's lease payment guaranty is capped at $26.5 million.

In addition, on June 30, 2005, BI-LO and Bruno's entered into a sale-leaseback transaction with Cardinal Capital Partners, Inc. ("Cardinal") whereby BI-LO sold six of its stores and Bruno's sold twelve of its stores to Cardinal (the "Cardinal Stores"), and Cardinal leased the Cardinal Stores back to BI-LO, although the Bruno's Cardinal Stores were always operated as Bruno's stores and never as BI-LO stores.

By January of 2006, BI-LO operated 230 stores, and Bruno's operated 90 stores.

I.      **BI-LO's Spin-Off of Bruno's Supermarkets**

On March 25, 2007, BI-LO sold all of its membership interests in Bruno's to LSF5 Bruno's Investments, LLC, a sister portfolio company within Lone Star (the "Spin-Off").  On the same date, BI-LO entered into various agreements including a Transition Services Agreement and an Employee Leasing

---

[1]      The dates listed in this chronology refer to the date of signing definitive agreements effectuating the relevant events.  The closing date of each of these events occurred after the date of signing in most cases.

Agreement in connection with the Spin-Off to assist Bruno's in its newly-separated operations. As part of the Spin-Off, BI-LO assigned its interest as lessee under the leases for the Bruno's Cardinal Stores to Bruno's.

In addition, the C&S Supply Agreement with C&S was bifurcated on March 23, 2007, with BI-LO and Bruno's each entering into separate supply agreements with C&S, and with BI-LO entering into a guaranty pursuant to that certain *Amended and Restated Guaranty* by and between BI-LO Holding, BI-LO and C&S dated March 23, 2007 (the "C&S Guaranty") of Bruno's obligations under its separate supply agreement with C&S.

BI-LO also provided working capital to Bruno's using funds drawn from BI-LO's own credit facilities. There is currently a dispute between the Debtors and the Term Lenders regarding BI-LO's right under the Term Credit Agreement to advance more than $10 million in loans to Bruno's. The Term Lenders assert that the $10 million cap applies to all advances made, in the aggregate amount of all such advances. The Debtors assert that the cap was meant to apply to advances outstanding at any given time. If the Term Lenders are correct, prepetition interest would have accrued at the default rate from the date the total aggregate amount of the advances exceeded $10 million. If the Debtors are correct, prepetition interest would not have accrued at the default rate.

Bruno's filed a voluntary chapter 11 case in Birmingham, Alabama on February 5, 2009 styled and numbered *In re Bruno's Supermarkets, LLC*, Case No. 09-00634, Bankr. N.D. Ala (the "Bruno's Chapter 11 Case"). Efforts to sell the Bruno's business resulted in only one bid from Southern Family Markets Acquisition II LLC, an affiliate of C&S, who ultimately acquired thirty-one (31) of Bruno's grocery stores and liquidated the remaining stores for the benefit of Bruno's. The purchase price was $6.4 million, plus certain costs relating to inventory and outstanding administrative expenses, and the assumption of certain liabilities.

**J.       Events That Lead to the Commencement of the Debtors' Chapter 11 Cases**

Following the Bruno's Spin-Off in 2007, Lone Star began efforts to sell BI-LO, and entered into the ABL Credit Agreement and the Term Loan to refinance BI-LO's existing indebtedness.

As discussed above, BI-LO operates in a supermarket industry that is generally characterized by intense competition and narrow profit margins. During the period when Lone Star was seeking a sale, BI-LO's financial performance deteriorated significantly. BI-LO reported EBITDA (fully loaded for rent expense under both operating and capital leases) of $114 million in 2006; $96 million in 2007; and $76 million in 2008. This decline was traceable to, among other things, changes in senior management, declines in same store sales, a contraction in margin rates from mounting competition, increases in product and supply costs and operating expenses from increased energy prices and burdensome obligations relating to its dark and underperforming store locations, and a supply agreement with C&S that was designed for a larger store footprint, saddling BI-LO with certain fixed minimum charges regardless of declines in actual volume. As BI-LO's performance declined, the costs of servicing its debt obligations became more burdensome as well, although BI-LO never missed a scheduled payment prior to the Petition Date. Beginning in November 2008, according to the Debtors, BI-LO initiated a series of actions designed to enhance its competitive position by appointing new merchandising leadership, including the appointment of Mike Byars, as Chief Executive Officer in February 2009, focusing sales efforts to offset negative trends, and identifying underperforming stores and negotiating with landlords in an effort to improve store performance. In addition, BI-LO implemented a series of general and administrative cost reductions over the last two years, which, in the aggregate, have yielded savings of approximately $22.0 million on an annual basis.

However, when the financing provided by the Term Lenders approached maturity on March 27, 2009, BI-LO was unable to refinance that indebtedness or obtain an acceptable agreement from the Term Lenders to extend the maturity date.  In preparation for the commencement of these Chapter 11 Cases, BI-LO entered into an amendment to the C&S Supply Agreement (the "C&S Amendment") that, among other things, eliminated or deferred until December 1, 2009 certain surcharges, and obligated C&S to continue performance under the C&S Supply Agreement pending assumption or rejection of the C&S Agreement under § 365 of the Bankruptcy Code.  The Debtors believe that the C&S Amendment helped BI-LO improve its operating cash flow and simplified the administration of the Chapter 11 Cases.

## III.
## THE DEBTORS' CHAPTER 11 CASES

On the Petition Date, the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to conduct their businesses and manage their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

**A.      Overview of the Chapter 11 Process**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11, a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."  The commencement of a chapter 11 case creates a bankruptcy "estate" that consists of all of a debtor's legal and equitable interests as of the filing date.

Chapter 11 provides a debtor with a variety of legal tools to rehabilitate its business, including the ability to "reject" (*i.e.*, terminate) burdensome contracts or leases, sell unprofitable or non-core assets, identify the universe of all potential liabilities or claims against the debtor, and restructure those claims through a collective process rather than through time-consuming individual negotiations with each creditor.

This restructuring of claims is done through a chapter 11 plan.  The plan can be proposed by a debtor or any other party in interest after an initial period of the case when the debtor has the exclusive right to propose a plan.  That right is colloquially referred to as the debtor's "exclusivity."  The plan process is supervised by the Bankruptcy Court, which must approve all materials sent to solicit their votes on a plan and then must determine if the legal requirements for court approval ("confirmation") of the plan have been satisfied.  Subject to certain limited exceptions, and other than as provided in the plan itself or the Bankruptcy Court's order confirming the plan (the "confirmation order"), the order discharges the debtor from any obligations that arose prior to the confirmation date and imposes on the debtor and parties in interest the obligations specified in the confirmed chapter 11 plan.

For purposes of a chapter 11 plan, the Bankruptcy Code requires that prepetition claims against a debtor be segregated into separate "classes" so that legally dissimilar claims are not in the same class.  For instance, secured claims are put in a separate class ("classified") from unsecured claims, and secured claims themselves can be put into separate classes if they do not share the same collateral.  Each creditor holding a claim in a given class will receive the same treatment as every other creditor in that class unless the creditor specifically agrees to less favorable treatment.

Creditors in classes that are receiving payment in full under a chapter 11 plan (*i.e.*, are "unimpaired" by the plan), are not entitled to vote on the plan; they are deemed to have accepted it.  If a class of creditors or equity holders is slated to receive nothing under a chapter 11 plan, that class is also not entitled to vote on the plan; it is deemed to have rejected the plan.

Classification is also relevant to voting to accept a chapter 11 plan. As discussed more fully in Section IV of this Disclosure Statement, if the requisite percentages of creditors in a class vote to "accept" a plan (*i.e.*, the plan is approved by more than half of those voting who hold at least two-thirds of all claims voted) and the plan is confirmed, the plan is binding on all creditors in that class even if they did not vote to accept it.

**B.    Early Stages of the Debtors' Chapter 11 Cases**

*1.    First Day Orders*

On the first day of the Chapter 11 Cases, the Debtors filed several applications and motions seeking relief by virtue of so-called "first day orders." First day orders are intended to facilitate the transition between a debtor's prepetition and postpetition business operations by approving certain regular business practices that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior approval by the bankruptcy court. The first day orders obtained in the Chapter 11 Cases, which are typical of orders entered in business reorganization cases across the country, authorized, among other things:

- joint administration of the Debtors' cases;

- specific notice procedures;

- extension of the deadline for filing schedules and statements;

- appointment of Kurtzman Carson Consultants LLC as claims, noticing and balloting agent;

- continued use of the existing cash management system and bank accounts and continued use of current investment and deposit policy;

- payment of certain prepetition employee compensation, payroll taxes, benefits, and related obligations, payment of expenses related to independent contractors, and continuation of employee programs on a postpetition basis;

- payment of prepetition claims arising under the Perishable Agricultural Commodities Act and other related statutes;

- payment of certain prepetition taxes and other ordinary course governmental obligations;

- payment of prepetition obligations to certain vendors of alcoholic beverages and lottery agencies and to honor lottery tickets presented by the Debtors' customers;

- honoring of certain prepetition customer obligations and continuation of customer programs and practices;

- turn over of certain funds held in trust and honoring of obligations under consignment arrangements;

- deeming utilities adequately assured of payment, prohibiting utilities from altering, refusing, or discontinuing services and establishment of procedures for resolving requests for adequate assurance;

- establishment of procedures for the interim compensation and reimbursement of expenses for retained professionals;

- establishment of procedures for the retention and payment of ordinary course professionals; and

- continued payment of prepetition insurance and workers' compensation programs and payment of prepetition premiums, related obligations and premium financing payments.

*2.*    *Debtor in Possession Financing, Cash Collateral, Adequate Protection and DIP Amendment Motion*

*a.*    *Debtor in Possession Financing*

To address their immediate liquidity issues and ensure a seamless transition into chapter 11, the Debtors negotiated term sheets and commitment letters for a $125 million debtor-in-possession secured, superpriority revolving credit facility (as amended, the "DIP Facility") from General Electric Capital Corporation ("GE"), as administrative agent for itself and the other financial institutions from time to time parties to the DIP Facility credit agreement. The obligations under the DIP Facility are guaranteed by all of the Debtors and are secured by a lien on substantially all of the Debtors' assets (with certain limitations), which lien has senior priority with respect to substantially all such assets (other than the Term Lenders' collateral) and by a superpriority administrative expense claim.  The Debtors have estimated that as of the date of this Disclosure Statement, approximately $45.0 million was outstanding on the DIP Facility, including outstanding letters of credit of $25.0 million.

On the Petition Date, the Debtors sought authority to enter into the DIP Facility.  Certain parties objected, and certain other parties, including Ahold and Bayside Capital (an affiliate of one of the Term Lenders) made proposals to provide debtor-in-possession financing to the Debtors.  After a competitive process and a series of contested hearings on the proposed DIP Facility, the Bankruptcy Court authorized the Debtors' entry into the DIP Facility on an interim basis on April 3, 2009 and on a final basis on April 16, 2009.

*b.*    *Cash Collateral and Adequate Protection*

In addition, on the Petition Date the Debtors sought to satisfy their obligation to provide "adequate protection" to the ABL Lenders and the Term Lenders.  Adequate protection is a term of art under the Bankruptcy Code that refers to a debtor's obligation to protect prepetition secured lenders from any diminution in value of their interests in their collateral.  The Debtors' adequate protection proposal was contested by the Term Lenders, and there were a series of hearings on the dispute.  While the parties were negotiating a resolution, they agreed to interim use of cash collateral, and the Bankruptcy Court approved those interim agreements on March 24, 2009, March 27, 2009, April 3, 2009 and April 8, 2009.  On May 1, 2009, the disputes were resolved and the Bankruptcy Court entered an order to reflect the settlement (the "Adequate Protection Consent Order").

Among other things, the Adequate Protection Consent Order authorized the Debtors to make an initial cash payment to the Term Lenders of $2.45 million and subsequent payments of $1.45 million per month.  The characterization of these payments (*i.e.*, whether they should be applied to reduce the Term Loan principal or be treated as payment of postpetition interest) was expressly left to further determination.  The Plan settles any disputes over the value of the Term Lenders' collateral and provides that these payments will be retained by the Term Lenders.  It is estimated that these payments will total $18.4 million by the time a plan is confirmed, assuming a May 1, 2010 emergence.

c.      *DIP Amendment Motion*

On January 29, 2010, the Debtors filed a motion seeking approval of an amendment to their DIP Facility, approval of a standby liquidator agreement, and to pay related fees [Docket No. 2554]. By the Motion, the Debtors first sought approval of certain changes to the DIP Facility, chief among them, to extend the maturity of the DIP Facility from April 8, 2010[2] until May 31, 2010 and to pay an extension fee in connection therewith. The Court granted this relief in its order dated February 25, 2010 [Docket No. 2675]. Second, in an effort to retain store inventory for a certain extended period of time in the borrowing base under the DIP Facility, the Debtors also requested to engage Gordon Brothers Retail Partners, LLC to serve as a standby liquidator. The Debtors' sought approval of this engagement to satisfy the requirement in § 1 of the DIP Facility relating to the inventory exclusion deadline. In the order, the Bankruptcy Court continued the DIP Amendment Motion's request to engage Gordon Brothers until the omnibus hearing scheduled for March 16, 2010.

3.      *Retention of the Debtors' Professional Advisors*

The Debtors are represented in their Chapter 11 Cases by Vinson & Elkins L.L.P. and Nelson Mullins Riley & Scarborough, LLP as co-bankruptcy counsel, and Womble Carlyle Sandridge & Rice, PLLC as special corporate and litigation counsel.

The Debtors obtained the financial and operational restructuring consulting services of AP Services, LLC, and the auditing, accounting and tax advisory services of Deloitte & Touche LLP. In addition, the Debtors retained the special real estate consulting services of DJM Asset Management, LLC. Michael Feder of AlixPartners, serves as Chief Restructuring Officer. The Debtors also retained William Blair & Company, LLC for financial advisory and investment banking services.

4.      *Appointment of Official Committee of Unsecured Creditors*

On March 30, 2009, the Office of the United States Trustee (the "U.S. Trustee") appointed, pursuant to §§ 1102(a) and 1102(b) of the Bankruptcy Code, the following entities holding general unsecured claims to the Creditors' Committee: C&S Wholesaler Grocers, Inc.; Coca-Cola Bottling, Inc.; Kraft/Nabisco; Bottling Group, LLC; Kellogg Company; Flowers Baking Co. of Morristown, LLC; Sara Lee Corp.; Cardinal Health 110, Inc. ("Cardinal Health"); and Developers Diversified Realty Corp. At the invitation of the Creditors' Committee, American Greetings became an *ex officio* member. Bottling Group, LLC has since resigned from the Creditors' Committee.

---

[2]     The DIP Credit Agreement defines "Revolving Termination Date" as "the earliest of (a) April 8, 2010, (b) the date of termination of Lenders' obligations to make Revolving Loans, incur L/C Obligations or acceleration of maturity of all existing Loans pursuant to Section 9, (c) the date of indefeasible prepayment in full by Borrower of the Loans and the cancellation and return of all Letters of Credit or the cash collateralization of Letters of Credit in the manner specified in Section 3.2(c) and the permanent reduction of all Revolving Commitments to zero dollars ($0), (d) the date of entry of an order of the Bankruptcy Court confirming a plan of reorganization in any Chapter 11 Case that has not been consented to by the Required Lenders and fails to provide for the payment in full in cash of all Obligations under this Agreement and the other Loan Documents on the effective date of such plan, (e) the date of the closing of a sale of all or substantially all of Borrower's assets pursuant to Section 363 of the Bankruptcy Code, (f) a confirmed plan of reorganization or a liquidation pursuant to Chapter 7 of the Bankruptcy Code, and (g) if a plan of reorganization that has been consented to by the Required Lenders or that provides for payment in full in cash of all Obligations under this Agreement and the other Loan Documents has been confirmed by order of the Bankruptcy Court, the earlier of the effective date of such plan of reorganization or the sixtieth day after the date of entry of such confirmation order."

The Creditors' Committee is represented by the law firms of Otterbourg, Steindler, Houston & Rosen, P.C. and McCarthy Law Firm, LLC. The Creditors' Committee retained the financial advisory services of FTI Consulting, Inc. The expenses of members of this committee, and the fees and expenses of the professionals serving on their behalf, are entitled to be paid by the Debtors, subject to approval by the Bankruptcy Court.

As of the date hereof, no other official committees have been appointed in the Chapter 11 Cases.

### 5.    *The Ad Hoc Committee of Secured Term Lenders*

Jones Day and McNair Law Firm, P.A. served as counsel to the ad hoc committee of term lenders (the "Term Lender Committee"). The Term Lender Committee was also represented by the financial advisory firm of Houlihan Lokey. The Term Lender Committee dissolved upon the purchase of the Term Lender claims by Ahold described in further detail in Section III.M below.

### 6.    *Appointment of Consumer Privacy Ombudsman*

On May 28, 2009, the U.S. Trustee appointed Lucy L. Thomson as the Consumer Privacy Ombudsman pursuant to § 332 of the Bankruptcy Code to monitor ongoing sales of private/personally identifiable information.

## C.    Employee Matters.

Since the Petition Date, in addition to the first day motions filed by the Debtors, the Debtors have filed two significant motions relating to employee and compensation issues. First, on June 22, 2009, the Debtors filed a motion seeking authority to continue and make payments to certain of their employees under the three employee incentive bonus programs (the "Employee Bonus Programs") that the Debtors had in place prior to the Petition Date. Those programs were (a) the General Management Incentive Plan, a bonus program for approximately 250 of the Debtors' salaried and executive-level employees based on the achievement of certain pre-established performance metrics related to overall corporate sales and earnings before interest, taxes, depreciation and amortization ("EBITDA"); (b) the Store Management Incentive Program, a bonus program for approximately 1,700 employees consisting of eligible store directors, assistant store directors and key store department managers based on the achievement of certain pre-established performance metrics related to specific stores sales, overall corporate sales and EBITDA; and (c) the Pharmacy Incentive Plan, a bonus program for approximately 270 eligible pharmacy managers and staff pharmacists based on the achievement of certain pre-established performance metrics related to overall corporate sales and EBITDA. After negotiations with the U.S. Trustee and other parties in interest, the Bankruptcy Court approved the motion, as modified through the negotiations, on June 30, 2009. On February 26, 2010, the Debtors filed a motion for approval of substantially similar employee bonus programs for the 2010 calendar year. The motion was approved by order of the Bankruptcy Court on March 9, 2010.

In addition, on September 2, 2009, the Debtors filed a motion seeking authority to implement an executive management compensation program. This motion was filed after significant negotiations with the Creditors' Committee, the Term Lender Committee and the U.S. Trustee regarding the appropriate structure and contours of an executive incentive program. The motion sought approval of certain bonuses for the Debtors' CEO, CFO and Treasurer, based upon the achievement of certain targeted performance metrics. The motion was approved by the Bankruptcy Court on November 6, 2009.

Finally, by Order dated February 15, 2010 [Docket No. 2614], the Court approved a settlement between the Debtors and SHPS, Inc. relating to the settlement of certain prepetition benefit-related

expenses arising from SHPS's failure to establish BI-LO's Accidental Death and Dismemberment benefit program as an employee-paid benefit and to set up the aged band calculation for BI-LO's Supplemental Employee and Spouse Life benefit for calendar years 2008 and 2009. The SHPS settlement consisted of (a) SHPS making a payment of $187,014.66 to BI-LO to reimburse BI-LO for the errors; (b) a release of SHPS from BI-LO, subject to certain confidentiality provisions; and (c) partial early termination of a Services Agreement, dated January 1, 2007, between SHPS and BI-LO with respect to the enrollment and eligibility and carrier exchange services provided by SHPS effective December 31, 2009. Due to a dispute between GE and the Term Lender Committee with respect to conflicting security interests relating to the proceeds of the SHPS settlement, the Order approving the SHPS settlement provided for the proceeds to be placed in trust in a segregated account subject to the lien claims of GE and the Term Lenders, pending further order of the Court.

**D.      Vendor Matters**

   *1.      Designation of C&S as a Critical Vendor*

      As noted, on March 21, 2009, BI-LO entered into the C&S Amendment, which among other things, eliminated or deferred certain surcharges and obligated C&S to continue performance under the C&S Supply Agreement pending assumption or rejection of the C&S Agreement under § 365 of the Bankruptcy Code. The C&S Amendment required payment of all outstanding prepetition amounts to C&S as a critical vendor (in the approximate amount of $21 million) and the waiver of certain avoidance action claims by the Debtors' estates. On March 25, 2009, the Debtors filed a motion seeking to designate C&S as a critical vendor, and to take such other actions as were required by the C&S Amendment. The C&S Amendment provided significant relief to BI-LO, including the elimination of cost increases otherwise scheduled to take effect on April 1, 2009. The estimated value of the elimination of such cost increases will save BI-LO $3.0 million annually going forward. C&S also agreed to forebear on the collection of reduced volume surcharges until December 1, 2009, at which time such payments would be due, and would accrue at a rate of approximately $1 million a month thereafter. C&S agreed to continue to perform, subject to the conditions contained in the C&S Amendment, pending assumption or rejection of the C&S Agreement under § 365 of the Bankruptcy Code. The Bankruptcy Court approved the motion on May 28, 2009. On December 7, 2009, the Debtors paid C&S its $5.2 million administrative claim pursuant to the C&S Amendment.

   *2.      The 503(b)(9) Program*

      On May 22, 2009, the Debtors filed a motion requesting an order approving procedures for payment of certain claims asserted pursuant to § 503(b)(9) of the Bankruptcy Code. The Debtors' 503(b)(9) Motion sought authority to expedite payment of certain administrative expense claims pursuant to § 503(b)(9) of the Bankruptcy Code and the release of preference actions arising under § 547 of the Bankruptcy Code against certain vendors that agreed to provide normalized trade terms and promotional programs to the Debtors. The 503(b)(9) motion was initially approved in part and denied in part by the Bankruptcy Court. Thereafter, the Debtors refiled an amended 503(b)(9) motion that was supported by major parties in interest. On August 11, 2009, the Bankruptcy Court entered an order granting the Debtors' amended 503(b)(9) Motion.

      In the ordinary course of the Debtors' business, the Debtors purchase materials, supplies, goods, products and other related items from various vendors for use and sale in their stores. Prior to and after the Petition Date, the Debtors received demands from their vendors asserting a right to reclaim their goods under § 2-702(2) of the Uniform Commercial Code and § 546(c) of the Bankruptcy Code. The deadline to assert a reclamation demand was April 12, 2009. The 503(b)(9) order tolled the deadline for vendors participating in the 503(b)(9) Program to enforce their reclamation demands to October 1, 2009.

## E.      Asset Dispositions

One component of the Debtors' restructuring efforts has been to review and take steps to rationalize their portfolio of assets.  Since the Petition Date, the Debtors have sold or made arrangements to sell certain idle, non-core or other miscellaneous assets, including the following:

### 1.      Sale of Pharmacy Assets

On April 19, 2009, the Debtors sought Bankruptcy Court authority to sell certain pharmacy inventory and records related to a retail store in Charlotte, North Carolina, to CVS/pharmacy for $150,000.  BI-LO's lease of the store was scheduled to expire in May 2009 and BI-LO was required to remove all inventory and equipment before May 25, 2009.  The Debtors sought a prompt sale of the pharmacy assets and authority to apply the net proceeds of the sale to amounts outstanding under the DIP Facility.  The sale of the pharmacy assets was approved on April 23, 2009.

### 2.      Appointment of Grafe and Sale of Certain Equipment Assets

As discussed, the Debtors had certain dark stores on the Petition Date.  These stores contained various assets including packaging materials, raw materials, office furniture, supplies, computers, printers, other electronics, racking, shelving and machinery (collectively, the "Equipment") that were idle assets and, in the Debtors' business judgment, were not needed in the ongoing operation of the estates nor necessary for a successful reorganization.  Thus, on April 20, 2009, the Debtors filed a motion seeking authority to (i) employ and retain Grafe Auction Company to assist the Debtors with the sale of the Equipment; (ii) sell the Equipment free and clear of liens; and (iii) pay the net sale proceeds to the agent for the Term Lenders, subject to any later determination regarding the application of the payment to principal, interest, fees and/or charges.  The motion was approved on May 1, 2009.  Proceeds from the sale of the Equipment totaling approximately $320,000 were turned over to the agent for the Term Lenders.

### 3.      De Minimis Asset Sale Procedures

Prior to the Petition Date, the Debtors routinely and in the ordinary course of their business sold or disposed of non-core assets that had minimal value to their operations.  As part of this ongoing process, the Debtors determined that they had certain obsolete, excess or burdensome assets, including various outdated equipment parts, equipment in need of further repair, other products, fixtures and other items held by the Debtors but no longer used or necessary for the Debtors' operations.  Thus, on August 6, 2009, the Debtors filed a motion seeking authority to establish streamlined procedures for the sale, transfer or abandonment of these *de minimis* assets and authority to pay the necessary fees and expenses incurred in the sale or abandonment of the assets, including, but not limited to, commission fees to agents, brokers, auctioneers and liquidators.  Further, if an asset sold was encumbered, the Debtors sought authority to pay the net proceeds of the sale over to the lienholder, or if such liens were held by the Term Lenders, to the agent for the Term Lenders, subject to any later determination regarding the application of the payment to principal, interest, fees and/or charges.  The motion was approved on August 20, 2009.

## F.      Executory Contract and Lease Matters

### 1.      Ahold

As noted, to the Petition Date, Ahold entered into guarantees related to a majority of the Debtors' Leases, dating from Ahold's ownership of BI-LO prior to its sale to Lone Star.  As described above, Ahold objected to the Debtors' motion to enter into the DIP Facility and offered to provide debtor-in-

possession financing for the Debtors. To facilitate the resolution of Ahold's DIP objection and to minimize administrative obligations of the Debtors' estates, on April 3, 2009, the Debtors sought entry of an order approving a cost sharing agreement (the "Cost Sharing Agreement") with Ahold. Under the Cost Sharing Agreement, Ahold agreed to, among other things, withdraw its objection to the DIP Motion. In addition, pursuant to the Cost Sharing Agreement, Ahold assumed certain lease obligations and related costs for leases that the Debtors determined were burdensome and would otherwise seek to reject under § 365 of the Bankruptcy Code. Ahold reimbursed the Debtors approximately $4.2 million through October 2009 for these lease costs.

The Cost-Sharing Agreement also required the Debtors to provide notice to Ahold of a potential rejection of a lease. If Ahold informed the Debtors that it did not want that lease rejected, Ahold would be responsible for all obligations arising under § 365(d)(3) of the Bankruptcy Code arising from and after April 1, 2009 until assumption or rejection of the lease. Ahold exercised its rights under the Cost Sharing Agreement to override rejection of the leases relating to BI-LO stores 78, 94, 258[3], 264, 356, 390, 404, 426, 520, 527, 551, and 636. Ahold has paid approximately $2 million through October 2009 on account of these § 365(d)(3) obligations.

Ahold also obtained the right, in its sole discretion, to have any lease designated for rejection by the Debtors to be assumed and assigned to Ahold, provided that Ahold pay any and all cure costs with respect to that assumption and assignment (excepting any obligations under § 365(d)(3) of the Bankruptcy Code arising before the date of Ahold's non-consent to rejection of the lease). Pursuant to this right, Ahold designated the leases associated with BI-LO stores 78, 94, 101, 103, 264, 266, 356, 426, 527 and 636. Stores 101, 103 and 266 were subleased by Ahold back to BI-LO. All ten leases (and associated subleases) were assumed and assigned to Ahold in accordance with the following orders of the Bankruptcy Court:

- Order Approving Assumption, Assignment, and Sublease of Certain Nonresidential Real Property Leases [Docket No. 1580] (Stores 78, 94, 264, 356, 426, 101, and 266)

- Certified Consent Order Approving Assumption and Assignment of Unexpired Lease of Nonresidential Real Property [Docket No. 1598] (Store 636)

- Certified Consent Order Approving Assumption, Assignment, and Sublease of a Certain Nonresidential Real Property Lease [Docket No. 1599] (Store 103)

- Order Approving Assumption and Assignment of a Certain Nonresidential Real Property Lease [Docket No. 1601] (Store 527)

### 2.    *Approval of Procedures for the Rejection of Unexpired Non-Residential Real Property Leases*

On the Petition Date, the Debtors sought approval of certain streamlined procedures for the rejection of Leases. The procedures were approved by order of the Bankruptcy Court dated April 13, 2009.

---

[3]    Store No 258 had previously been assigned to Ingles.

3.      *Extension of Time to Assume or Reject Unexpired Non-Residential Real Property Leases*

Section 365(d)(4) of the Bankruptcy Code allows a debtor an initial 60-day period for determining whether to assume or reject nonresidential real property leases, which period may be extended by order of the Bankruptcy Court. As of the Petition Date, the Debtors were parties to hundreds of Leases. A failure to assume or reject a non-residential real property lease during this period or to obtain an extension of the period results in a deemed rejection of that nonresidential real property lease.

Given the size and complexity of these Chapter 11 Cases and the need to delay decisions as to the leases until the structure of the Debtors' reorganization was determined, the Debtors sought, by motion dated April 30, 2009, to extend the assumption or rejection period through the earlier of (a) the Effective Date or (b) October 19, 2009. The motion was granted by order of the Bankruptcy Court dated May 21, 2009.

As a result of the 2005 amendments to the Bankruptcy Code, the Debtors were not permitted to seek further extensions of the § 365(d)(4) deadline beyond October 19, 2009 unless the Debtors obtained the consent of the relevant lessors. Thus, with the assistance of DJM, the Debtors sought specific consents for those leases they were not prepared to reject, to extend further the time within which the Debtors could assume or reject those leases. In accordance with Bankruptcy Code § 365(d)(4)(B)(ii), the Debtors obtained subsequent extensions of the 365(d)(4) deadline with respect to the majority of the Debtors' unexpired leases of nonresidential real property upon prior written consent of the Debtors' lessors.

- By order dated September 1, 2009 [Docket No. 1370], the Bankruptcy Court authorized the Debtors to enter into stipulations with their lessors agreeing to extend the 365(d)(4) deadline and to grant preference waivers to lessors who granted such extensions to no earlier than March 31, 2010. Two hundred and twelve (212) stipulations were approved extending the 365(d)(4) Deadline until March 31, 2010. The Debtors also entered into stipulations extending the time to assume or reject six (6) additional leases to dates prior to March 31, 2010.

- By order dated January 21, 2010 [Docket No. 2464], the Bankruptcy Court authorized the Debtors to enter into further stipulations with their lessors agreeing to extend the 365(d)(4) deadline through May 31, 2010. In exchange for the stipulations extending the 365(d)(4) deadline through May 31, 2010, and in some cases also in exchange for rent concessions with respect to certain leases, the Debtors agreed to pay prepetition amounts owing under the leases regarding which a stipulation was entered into with the relevant lessor and also agreed to conditionally assume such leases, contingent upon and effective only as of the date of confirmation of a plan of reorganization in the Chapter 11 Cases. As of February 8, 2010, the Debtors have entered into such stipulations extending the 365(d)(4) Deadline until May 31, 2010 with respect to unexpired leases of nonresidential real property for one hundred seventy-eight (178) of the Debtors' stores. (The Debtors have also entered into an additional three (3) such stipulations with respect to ancillary leases relating to certain of their store leases.) The deadline for filing such stipulations is February 18, 2010 pursuant to agreement between GE and the Debtors dated January 29, 2010, as referenced in a supplement to the motion underlying the May 31 order, which was filed by the Debtors on January 29, 2010 [Docket No. 2552].

4.      *Disposition of Executory Contracts and Unexpired Leases*

Pursuant to § 365 of the Bankruptcy Code, the Debtors may choose to (a) assume, (b) assume and assign, or (c) reject executory contracts and unexpired leases of personal property, subject to approval of

the Bankruptcy Court. As a condition to assumption, or assumption and assignment, unless otherwise agreed by the non-Debtor party, the Debtors must cure all existing defaults under the contract or lease, and must provide adequate assurance of future performance of the contract or lease. If the contract or lease is rejected, any resulting rejection damages are treated as a prepetition unsecured claim. Generally, and with certain exceptions, postpetition obligations arising under a contract or lease must be paid in full in the ordinary course of business during the chapter 11 case.

To date, the Debtors have assumed sixteen (16) unexpired leases of nonresidential real property, have assumed, assigned and subleased back three (3) unexpired leases of nonresidential real property, have conditionally assumed one hundred eight-one (181) unexpired leases of nonresidential real property, and have assumed and assigned seven (7) unexpired leases of nonresidential real property and four (4) unexpired subleases of nonresidential real property under which the Debtors were Sublessor.

In addition, as of the date of this Disclosure Statement, the Debtors had rejected approximately two (2) executory contracts and twenty-nine (29) Leases (including those for four Cardinal Stores). The Debtors may file additional motions seeking to assume or reject certain of the Debtors' remaining executory contracts and Leases prior to the Confirmation Date. The Plan will provide for the rejection or assumption of all remaining executory contracts and Leases.

### G.    Summary of Other Significant Motions

Set forth below is a brief summary of certain of the principal motions the Debtors have filed during the pendency of the Chapter 11 Cases.

#### 1.    *Blue Cross Assumption Motion*

As of the Petition Date, the Debtors maintained a group healthcare program that is administered pursuant to an Administrative Services Agreement, effective January 1, 2009, as amended by the Specific Stop Loss & Aggregate Insurance Protection addendum, dated February 20, 2009 but effective January 1, 2009 (the "BCBSSC Contract") between BI-LO as purchaser and Blue Cross and Blue Shield of South Carolina ("BCBSSC"). After the Petition Date, the Debtors and BCBSSC operated under the terms of the BCBSSC Contract, with certain post-petition modifications to payment terms requested by BCBSSC. The Debtors and BCBSSC negotiated the terms of an amendment to the BCBSSC Contract that provided the Debtors with certain financial benefits. On July 14, 2009, the Debtors filed a motion authorizing the Debtors to enter into the amendment and assume the amended contract pursuant to § 365 of the Bankruptcy Code. In addition, the Debtors sought authority to pay all valid employee medical benefit claims, regardless of amount. The motion was approved by the Bankruptcy Court on July 22, 2009.

#### 2.    *Motion for Approval of BI-LO's Agreement to Subordinate a Portion of its Claims Against Bruno's Estate*

On May 12, 2009, the Debtors filed a motion in these Chapter 11 Cases seeking authority to subordinate a portion of their claim in the Bruno's Chapter 11 Case based on an agreement the Debtors reached with the Bruno's creditors' committee. The motion was approved by the Bankruptcy Court on June 10, 2009. Thereafter, on June 16, 2009, the Debtors filed a proof of claim [Claim No. 793] in the Bruno's Chapter 11 Case in the amount of $9,806.529.44. As a result of the drawn down on the $6.5 million letter of credit provided to C&S for Bruno's (described in further detail below) and the subordination of BI-LO's claim, on October 26, 2009, the Debtors filed an amended proof of claim [Claim No. 986] in the Bruno's Chapter 11 Case in the amount of $14,716,719.44.

### 3.    ACE Insurance Motions

By Order entered on January 8, 2010 [Docket No. 2257], the Debtors received authority to enter into an agreement with ACE American Insurance Company and BFW Liquidation, LLC (the successor to Bruno's Supermarkets, LLC). This agreement avoided an immediate draw on an approximately $4.5 million letter of credit that BI-LO had posted to collateralize certain obligations related to Bruno's Workman's Compensation insurance program. In addition to avoiding the draw, the agreement resulted in the reduction of the letter of credit to $3.8 million, which created $656,908 in immediately available liquidity under the Debtors' postpetition financing facility. In exchange, BI-LO committed to pay up to that $656,908 amount in the event there are actual claims reimbursable to the insurer or administrator under the insurance polices.

In addition, on February 26, 2010, the Debtors sought authority to assume their prepetition worker's compensation, automobile and related insurance programs with ACE and authority to enter into a new insurance program with ACE due to the scheduled expiration of the prepetition program on March 12, 2010. In connection with the relief requested in the motion, the Debtors sought authority to, among other things, provide ACE with certain letters of credit and other collateral support required under the new insurance program. The motion was approved by order of the court entered on March [•], 2010.

### 4.    Looper Settlement

By Order dated January 8, 2010 [Docket No. 2306], the Court approved a settlement between the Debtors, GE, and the Term Lender Committee relating to the settlement of certain prepetition state court litigation instituted by BI-LO against Looper Limited Partnership and American Fire and Casualty Insurance Company ("AFC") regarding indemnification of BI-LO for its defense and settlement of a claim stemming from a criminal mugging at the Manning shopping center at which Looper was BI-LO's landlord, and AFC was Looper's general liability insurer. The settlement consisted of AFC making a payment of $550,000 to BI-LO in full satisfaction of its claims in the state court litigation, all parties executing mutual releases and dismissal of appeals by the defendants in the state court litigation. Due to a dispute between GE and the Term Lender Committee with respect to conflicting security interests relating to the proceeds of the settlement, the order approving the settlement provided for the those proceeds to be placed in trust in a segregated account subject to the lien claims of GE and the Term Lenders, pending further order of the Court.

## H.    The Debtors' Five Year Business Plan

In June of 2009, the Debtors, in consultation with their advisors, initiated a comprehensive review of their business and began to formulate a detailed five year business plan, which involved a number of detailed analyses and work streams, the purpose of which was to improve operations, increase profitability, and create a path to reorganize under and emerge from chapter 11. At the time, the Debtors did not have a meaningful forecast that extended past 2009. The Debtors completed their five year plan in August 2009 and thereafter presented the five year plan to the Creditors' Committee, the Term Lender Committee and other parties-in-interest.

## I.    Claims

In chapter 11 cases, claims against a debtor are established either as a result of being listed in the debtor's schedules of liabilities or through assertion by the creditor in a timely filed proof of claim form. Once established, the claims are either "allowed" or "disallowed." If allowed, the claim will be recognized and dealt with under the chapter 11 plan. If disallowed, the creditor will have no right to obtain any recovery on, or to otherwise enforce, its claim against the debtor.

1.    ***The Debtors' Schedules and Statements***

On May 1, 2009, the Debtors filed their schedules of assets and liabilities, schedules of executory contracts and unexpired leases and statements of financial affairs; these were updated in a filing on December 1, 2009[4] (collectively, as amended, the "Schedules"). The Schedules set forth, among other information, the claims of known creditors against each of the Debtors as of the Petition Date based upon the Debtors' books and records. The Debtors reserved the right to amend their Schedules during these Chapter 11 Cases as more information becomes known to them.

2.    ***Claims Bar Date***

By notice dated May 11, 2009, the Debtors established August 13, 2009 as the deadline (the "Bar Date") for filing proofs of claim against the Debtors by creditors (other than governmental units) who are required to do so, and established September 21, 2009 as the Bar Date applicable to governmental units. In compliance with procedures approved by the Bankruptcy Court, the Debtors, through Kurtzman Carson Consultants LLC, acting as the Debtors' claims agent, provided timely notice of the Bar Date by mail.

3.    ***Claims Objection Process***

Approximately 3,950 proofs of claim have been filed against the Debtors or are listed on the Schedules, totaling approximately $5.9 billion as filed or scheduled. As of the date hereof, the Debtors have filed four omnibus objections to claims and nearly $50 million in claims have been expunged from the claims register thus far. The Debtors and/or the Creditors' Trust expect to file additional objections seeking disallowance of certain asserted claims prior to the deadline established in the Plan (the "Claims Objection Deadline"). If the Debtors or other parties in interest do not object to a timely proof of claim by the Claims Objection Deadline in the Plan, that claim will be considered "allowed" under the Plan.

4.    ***Claims Summary***

The Debtors estimate that at the conclusion of the claims objection, reconciliation and resolution process, there will be approximately $75 million in general unsecured claims, which will consist of approximately $18.0 million in trade vendor claims, $41 million in executory contract rejection claims, $12 million in Ahold guarantee claims, $2.3 million in tort litigation and other claims and $2 million in current and former employee claims. These estimates are based on a number of assumptions, and thus there is no guarantee that the ultimate amount of allowed claims in each category will conform to the Debtors' estimates. The above analysis excludes certain material filed or asserted claims to which the Debtor has objected. Specifically, the Bruno's UFCW Union claim could be determined to be between $0 and $66 million and the Bruno's Estate Claim could be between $0 and $33 million. Negotiations are ongoing between all parties to resolve these specific claims.

5.    ***Claims Filed on Behalf of the Bruno's Bankruptcy Estate***

Both Bruno's and the Bruno's creditors' committee filed proofs of claim against the Debtors on behalf of the Bruno's estate, with both asserting essentially the same claims, all related to the Spin-Off. Because these claims have been asserted in such large amounts, the claims are described below. Also summarized are some of the principal defenses that the Debtors have to the claims. Nothing in the

---

[4]    The Debtors retain the right to further update the Schedules.

summary is intended to be or is to be construed as a waiver of any defenses, claims, counterclaims or other rights on the part of the Debtors or their estates.

        a.        The Lease Assignment.

    The Bruno's creditors' committee's first basis for alleging fraudulent transfers is the allegation that Bruno's was harmed by the assignment of twelve (12) store leases from BI-LO to Bruno's pursuant to that certain Assignment and Assumption of Leases dated March 23, 2007 (the "Lease Assignment"). They argued that these leases were losing money and transferred by BI-LO to Bruno's in 2007 so as to mitigate BI-LO's losses on them.  They asserted a $13 million claim related to this lease assignment, based on an alleged total of rental payments made by Bruno's under those leases in the two years following the Lease Assignment.

    Importantly, however, these leases, on which BI-LO was a tenant in name only, were leases for stores operated by Bruno's, and were never BI-LO stores.  Accordingly it was logical to assign them to Bruno's in connection with the Spin-Off.  Furthermore, the assignment did not release BI-LO from liability on those leases by the landlords following the Spin-Off.

    The Debtors contend that it is not accurate to characterize the assignment of the leases to Bruno's as a fraudulent transfer because they were Bruno's stores.  Bruno's paid the rent, possessed and operated the stores, and enjoyed all revenues from their operation both before and after the assignment.  Therefore, the Debtors believe that the $13 million claimed by the Bruno's creditors' committee should be denied in full.  For the same reasons, the Debtors contend that a claim for the alleged operating losses associated with those twelve (12) stores after the Spin-Off (in an amount claimed to exceed $15 million) should also be denied in full.  Moreover, the $15 million dollar claim is duplicative of the $13 million dollar claim and is also invalid on that basis.  The Debtors contend that any gains or losses on those stores, which were always Bruno's stores, are not the result of the Spin-Off or the assignment of those leases.

        b.        The C&S Supply Agreements

    The Bruno's creditors' committee has also alleged that the fact of Bruno's entering into the Bruno's–C&S Supply Agreement with C&S in 2007 constituted a fraudulent transfer to the extent BI-LO received benefits from Bruno's entering into this contract because Bruno's allegedly did not receive reasonably equivalent value for it and was insolvent at the time or was rendered insolvent by the transaction.  Prior to the Bruno's–C&S Supply Agreement, Bruno's had obtained groceries and goods under the 2005 supply agreement between BI-LO and C&S.

    The Debtors believe that this claim is also without merit.  First, Bruno's transferred nothing to BI-LO.  The obligations Bruno's incurred under the Bruno's–C&S Supply Agreement were to C&S, and not to BI-LO, and Bruno's transferred nothing to BI-LO in that connection or otherwise in the Spin-Off.  Bruno's waived all claims against C&S in connection with Bruno's sale of all its stores to C&S's affiliate, Southern Family Markets Acquisition II.  Furthermore, prior to entering into the Bruno's–C&S Supply Agreement, Bruno's was already obligated to pay for its supply under the prior supply agreement.  The Debtors believe that the allegation of fraudulent transfer is therefore without merit on its face.

    Moreover, the Debtors note that BI-LO Holding and BI-LO executed the C&S Guaranty in favor of C&S with respect to purchases of groceries and merchandise by Bruno's under the Bruno's–C&S Supply Agreement.  Thus, BI-LO was not fully relieved of its prior obligation to stand good for grocery purchases from C&S by Bruno's.  Indeed, as noted, BI-LO paid approximately $5.98 million to C&S in March 2009 on behalf of Bruno's when C&S demanded payment from BI-LO under its C&S Guaranty.  In addition, as required by the Bruno's–C&S Supply Agreement, BI-LO procured an Irrevocable Standby

Letter of Credit (No. SM233389W) dated December 2, 2008 and amended on December 5, 2008, December 10, 2008, and February 9, 2009, issued by Wachovia Bank, N.A. for the account of BI-LO to C&S for the benefit of Bruno's in the amount of $6.5 million. In June of 2009, C&S drew the full amount of that letter of credit. Contrary to the arguments made by the Bruno's creditors' committee, the Debtors believe that BI-LO has not avoided liability to C&S, but rather has financially supported Bruno's in having its own independent Bruno's–C&S Supply Agreement since March 2007.

c.    Preferential and/or Other Fraudulent Transfers

The Bruno's creditors' committee asserts that payments to BI-LO of "at least $198,719,195" in the year prior to Bruno's filing its bankruptcy petition are "preferential transfers" that can be recovered under § 547 of the Bankruptcy Code, or are recoverable fraudulent transfers.

BI-LO has acknowledged that, indeed, based on the Bruno's creditors' committee documents, there were transfers from Bruno's to BI-LO totaling $198,719,193[5] during that period. However, the Debtors note that the Bruno's creditors' committee has ignored the decisive fact that BI-LO transferred amounts totaling $203,356,673 to Bruno's during that same span of time. This was an intercompany account by which BI-LO loaned funds to Bruno's and Bruno's repaid BI-LO in the ordinary course of business on a routine basis every week from the time of the Spin-Off until Bruno's obtained its asset-based loan from Regions Bank in the summer of 2008. After netting payments to and from Bruno's during the one year prior to Bruno's bankruptcy petition, the Debtors believe that BI-LO was a net payor to Bruno's of approximately $4.6 million. Thus, the Debtors contend that not only should the Bruno's creditors' committee's claim with respect to the $198,719,193 be disallowed in its entirety, but, under the Bruno's creditors' committee's own analysis and argument, it is BI-LO which is owed money from Bruno's.

Furthermore, the Debtors believe that the payments from Bruno's to BI-LO are not avoidable as preferences because they fall under the exceptions set forth in Bankruptcy Code § 547(c)(2)(A) as being made in the ordinary course of business or financial affairs of the debtor and § 547(c)(4) as payments made for new value extended on an ongoing basis by BI-LO to Bruno's. The Debtors also believe that Bruno's was not insolvent during the relevant time period because after the Spin-Off, Bruno's had no bank debt whatsoever, and the Spin-Off gave Bruno's a good start in its separate existence, with net assets of over $57 million at that time.

Finally, the Debtors contend that Bruno's cannot properly claim it received "less than reasonably equivalent value" (one of the tests for a fraudulent conveyance) in exchange for any of the transactions with BI-LO following the Spin-Off. BI-LO provided substantial transition services and other beneficial acts for Bruno's, and it expected to be fairly compensated for them. Accordingly, BI-LO has filed its amended proof of claim in an amount in excess of $14.7 million (the first $2.25 million of which has been subordinated to all other creditors in the Bruno's chapter 11 case as discussed above).

To the extent that the Bruno's Committee also urges other unspecified preference and fraudulent transfer claims, BI-LO denies the same. The Debtors believe that the dealings between BI-LO and Bruno's simply do not form a basis for preference and fraudulent transfer claims.

---

5    BI-LO's calculation yielded a total that is $2 less than the Bruno's creditors' committee's calculations.

> d.    Unjust Enrichment/ Money Had and Received/ Additional Preferences
> and Fraudulent Transfers.

The Bruno's creditors' committee has also asserted that Bruno's has unspecified claims against BI-LO for improper distributions, unjust enrichment and/or money had and received, and for potential additional preference and fraudulent transfer claims based upon the cash management arrangement between BI-LO and Bruno's being commingled prior to the Spin-Off.  BI-LO denies all these unspecified claims.

On August 31, 2009 the Debtors filed objections to the Bruno's and Bruno's creditors' committee proofs of claim.  No hearings on the objections are presently scheduled, and the Debtors' objections remain pending at this time.

6.    **The Bruno's Pension Fund Claims**

On August 11, 2009, the United Food and Commercial Workers Unions and Employers Pension Fund (the "<u>Pension Fund</u>") filed claims against each of the Debtors, alleging that the Debtors are members of the "controlled group" of organizations of Bruno's and, accordingly, are allegedly jointly and severally liable for "withdrawal liability" in the amount of $63,806,631.00 (the "<u>Pension Fund Claims</u>") that the Union Pension Fund asserts arise pursuant to the provisions of the Employee Retirement Income Security Act of 1974 ("<u>ERISA</u>"), 29 U.S.C. §§ 1001, *et seq*., in connection with Bruno's liquidation sale in its bankruptcy case.

On August 31, 2009, the Debtors filed an objection to the Pension Fund Claims [Docket No.1367].  On September 14, 2009, the Debtors filed their First Supplement to their objections (together with the Original Objection (collectively, the "<u>Pension Fund Claims Objection</u>") [Docket No. 1415].  In the Pension Funds Claims Objection, the Debtors assert that they are not a member of the "controlled group" of organizations of Bruno's, and thus are not liable for any of the asserted withdrawal liability.

On September 30, 2009, the Union Pension Fund filed its response to the Debtors' Pension Fund Claims Objection [Docket No. 1484].  On September 30, 2009, the Union Pension Fund also filed a motion to compel arbitration of the Pension Fund Claims, or alternatively, for relief from the automatic stay to allow them to pursue arbitration (the "<u>Union Pension Fund Motion</u>") [Docket No. 1489].

On October 10, 2009, the Debtors timely filed their objection to the Union Pension Fund Motion and argued, among other things, that (a) arbitration is neither required, given that the dispute concerns an issue that falls within the "core" jurisdiction of the Bankruptcy Court, nor prudent, given the nature of the dispute and the size of the claims; and (b) sufficient cause does not exist to lift the automatic stay.  No hearing on the Union Pension Fund Motion is currently scheduled, and the Debtors' objection remains pending at this time.  In addition the Union Pension Fund also filed a motion to compel arbitration of their claims or alternatively, for relief from the automatic stay to allow them to pursue arbitration in the Bruno's chapter 11 case.  That motion and the Bruno's creditors' committee's objection thereto are also still pending.

7.    **Litigation Claims**

The nature of the Debtors' businesses is such that they are from time to time named as defendants in litigation, particularly resulting from "slip and fall" and other similar incidents occurring in their operating locations.  As a result of the commencement of the Chapter 11 Cases, all litigation pending against the Debtors was automatically stayed pursuant to § 362 of the Bankruptcy Code.  As of the date of this Disclosure Statement, four requests have been made for relief from the automatic stay.  The Debtors

estimate that, as of the date of this Disclosure Statement, approximately 200 prepetition litigation claimants asserting claims in the aggregate amount of approximately $19.3 million have not yet settled or liquidated their claims.

The Debtors anticipate that, ultimately, liability on these claims in the aggregate will be significantly less than the amounts asserted by the plaintiffs.

**J.**    **Causes of Action Created by the Bankruptcy Code Belonging to the Debtors' Estates**

In addition to rights to sue third parties (generally referred to as "causes of action") that the Debtors' estates may have under other state and federal laws, the Bankruptcy Code creates certain causes of action that allow the Debtors to recover certain transfers (*i.e.*, those determined to be "preferences" and "fraudulent conveyances") they made prior to the Petition Date, as described below.

*1.    Preferences*

A debtor may recover a transfer of property it made prior to its bankruptcy filing if that transfer was: (a) in payment of a pre-existing debt; (2) allowed the transferee to receive more than it would have received had the transfer not been made and the debtor had been liquidated under chapter 7 of the Bankruptcy Code; and (c) made during the 90 days immediately prior to its bankruptcy filing (or, if the transferee was an insider, during the one year immediately prior to the bankruptcy filing).

There are certain statutory defenses to preference actions.  A transfer made in the ordinary course of the debtor's and transferee's business and according to ordinary business terms may not be recoverable.  Furthermore, if the transferee gave, subsequent to the transfer, new value to the debtor (for which the transferee was not paid), the new value constitutes an offset against the amount of any recovery.  If a transfer is recovered by the debtor, the transferee has a general unsecured claim against the debtor to the extent of the recovery.

*2.    Fraudulent Transfers*

Under the Bankruptcy Code and under various state laws, a debtor may recover a transfer of property it made while insolvent or that rendered it insolvent if and to the extent the debtor received less than reasonably equivalent value for such property.  Transfers made up to six years prior to the bankruptcy filing may be recovered under some state statutes.

*3.    Transfers By the Debtors*

The Debtors' Schedules are required to include a listing of payments the Debtors made in the 90 days immediately preceding the Petition Date as well as a listing of all payments to insiders.  The Debtors have conducted an analysis of potential preferences paid to their vendors in connection with approval of the 503(b)(9) Program, and to their landlords in connection with the preference waiver granted to landlords in exchange for extensions of time period to assume or reject leases pursuant to § 365(d)(4) of the Bankruptcy Code.  Other than these analyses, no analysis of the other payments has been made at this time.

Accordingly, the Debtors cannot estimate potential recoveries, if any, from possible litigation surrounding such payments, if any.  Under the Plan, certain causes of action related to preferences and fraudulent conveyances will be transferred to the Creditors' Trust, unless those causes of action are released or otherwise resolved before the Effective Date or under the Plan.

## K.      Exclusivity and Plan Negotiations

As noted, the Bankruptcy Code provides for an initial period of 120 days after the commencement of a chapter 11 case during which a debtor in possession has the exclusive right to propose a chapter 11 plan.  In addition, the Bankruptcy Code provides that if a debtor proposes a plan within its exclusive period, it has the remaining balance of 180 days after the commencement of a chapter 11 case to solicit acceptances of such plan.  During these exclusive periods, plans may not be proposed by any party in interest other than the debtor.  Under § 1121(d) of the Bankruptcy Code, these exclusive periods may be extended if the Bankruptcy Court determines there is good cause to do so.

On June 17, 2009, the Debtors filed a motion seeking to extend their exclusive periods. Thereafter, the Debtors, the Creditors' Committee, and the Term Lender Committee agreed to a consent order entered by the Bankruptcy Court on June 30, 2009, which extended the Debtors' exclusive period to propose a plan through September 21, 2009 and their exclusive period to solicit acceptances through November 21, 2009.

As those deadlines approached, the Debtors, the Creditors' Committee and the Term Lender Committee sought to address the committees' request to have the same right as the Debtors to file their own plan and solicit acceptances to it, *i.e.*, the committees sought "co-exclusivity."  In order to allow the parties further time to negotiate, on September 16, 2009, the Bankruptcy Court extended the Debtors' exclusive period for filing a plan through October 7, 2009 and their exclusive period for soliciting acceptances through December 8, 2009.

The negotiations among the Debtors, the Creditors' Committee, and the Term Lender Committee were ultimately unsuccessful, and significant litigation ensued, culminating in a hearing before the Bankruptcy Court on October 5-6, 2009.  On October 7, 2009, the Bankruptcy Court entered an order granting the requested "co-exclusivity" through November 20, 2009 for filing their respective plans, and through January 19, 2009 for soliciting acceptances to their plans.  On November 20, 2009, each of the Debtors and the Creditors' Committee/Term Lender Committee (together, the "Creditor Proponents") filed a proposed plan of reorganization with the Bankruptcy Court.  The Debtors' originally filed plan provided for the continuation of the business, with Lone Star as plan investor.  Under the Debtors' originally filed plan, unsecured creditors would be provided with a trust holding $30 million in cash plus the assignment of certain alleged causes of action.  The Creditor Proponent's plan (the "Creditors' Plan") contemplated the continuation of BI-LO's business as a going concern, however, with a potentially fewer number of stores, with Wellspring, an affiliate of one of the Term Lenders, serving as a plan investor.  Wellspring agreed to fund the Creditors' Plan pursuant to the terms of that certain Investment Agreement, dated September 11, 2009, by and among WCM-BL Holding, LLC, BILO Recovery, LLC, the Term Lenders party thereto, and the Creditors' Committee (the "Investment Agreement").  The Creditors' Plan provided for a trust for the benefit of general unsecured creditors (including the claims of the Bruno's estate and the Pension Fund), and also included a $30 million cash contribution to the trust and certain potential causes of action.

On December 18, 2009, the Debtors filed their first amended plan of reorganization, along with an amended disclosure statement that was intended to be a joint disclosure statement for both the Debtors' and the Creditor Proponents' plans.  The Debtors' amended plan incorporated a settlement with C&S but otherwise did not materially change from the previous version.  Likewise, the Creditor Proponents filed an amended plan on December 21, 2009, which did not materially alter the previously filed version of their plan. As described in further detail below, the Creditors' Plan was withdrawn by the Creditor Proponents on February 9, 2010.  The Debtors exclusivity period has most recently been extended through [ ], 2010.

*Please Note:  Sections L and M below have been provided to the Debtors by Lone Star and Ahold.  The facts contained therein have not been independently verified by the Debtors and represent Lone Star's and Ahold's recitation of the relevant facts.*

**L.      Settlement Agreement Between Lone Star and Ahold**

In connection with Lone Star's acquisition of BI-LO Holding from Ahold in December 2004, Lone Star U.S. Acquisitions, LLC, a Lone Star affiliate ("Lone Star Acquisitions"), agreed to indemnify and hold harmless Ahold U.S.A., Inc. (f/k/a Ahold U.S.A. Holdings, Inc.), a wholly-owned subsidiary of Ahold ("Ahold USA"), and each of its affiliates for any and all losses incurred by them with respect to certain real property lease guarantees made by affiliates of Ahold USA (the "Parent Guarantees") that remained in place after the closing of the sale of BI-LO Holding to Lone Star.  Pursuant to an Assignment and Assumption of Purchase Agreement dated January 21, 2005, LSF5 BI-LO Investments, LLC, a Lone Star affiliate ("LSF5 BI-LO"), assumed all of the duties and obligations of Lone Star Acquisitions with respect to the acquisition of BI-LO Holding from Ahold, including the obligation to indemnify and hold harmless Ahold USA and each of its affiliates for any losses incurred with respect to the Parent Guarantees.

On December 18, 2009, Ahold Acquisition Management LLC, a wholly-owned subsidiary of Ahold USA ("Ahold Management"), Ahold USA, Lone Star Fund V, Lone Star Acquisitions, LSF5 BI-LO and certain other Lone Star entities, entered into that certain *Settlement and Term Loan Acquisition Agreement* (the "Settlement Agreement").  The Settlement Agreement represented a final compromise, release and global settlement of all claims held by either Ahold USA, Lone Star Acquisitions or LSF5 BI-LO related to or otherwise arising from the sale of BI-LO Holding to LSF5 BI-LO by Ahold, including the indemnification obligations related to the Parent Guarantees.  A motion to file the Settlement Agreement under seal has been, or will be, filed with the Bankruptcy Court.

In consideration for the mutual release of claims related to or arising from the sale of BI-LO Holding to LSF5 BI-LO, the parties to the Settlement Agreement, among other things, agreed that:

> -- Lone Star would make a term loan in a maximum principal amount of up to $130 million (the "Lone Star Loan") to an affiliate of Ahold Management ("Buyer").

> -- in accordance with the Settlement Agreement, Buyer would use the proceeds of the Lone Star Loan and other affiliates of Ahold Management would use their own funds to purchase Term Loans in the aggregate principal amount of up to $260 million (but not less than $189,750,000).

> -- the Term Loans purchased by Buyer and other affiliates of Ahold Management could not be subject to the Investment Agreement, and the selling Term Lenders would be required to terminate the Investment Agreement prior to any purchase of the Term Loans by Ahold Management (or its designated affiliate(s)).

> -- the Term Loans purchased by Buyer with proceeds from the Lone Star Loan would serve as collateral for the outstanding balance of the Lone Star Loan; provided that no action could be taken against such collateral until Ahold had received a cash amount equal to the aggregate principal amount of Term Loans purchased by Buyer and other affiliates of Ahold management less the principal amount of the Lone Star Loan.

> -- Lone Star would enter into a guarantee, for the benefit of Buyer and its affiliates, with respect to all amounts funded by Ahold (other than amounts funded with the proceeds of

the Lone Star Loan) and used to purchase Term Loans (the "Acquired Term Loan Guaranty"). In the event of a payment by Lone Star to Ahold pursuant to the Acquired Term Loan Guaranty, Ahold will assign all of its rights under the Term Loans to Lone Star.

-- Lone Star would grant Buyer and its affiliates a security interest in certain of Lone Star's assets, as well as cash collateral equal to the unused portion of the Lone Star Loan (capped at $50,750,000) in order to secure the Acquired Term Loan Guaranty.

-- Lone Star would enter into a guarantee, for the benefit of Ahold and/or certain of its affiliates, with respect to the guaranty of those certain leases of the Debtors guaranteed by Ahold and its affiliates and those certain leases with respect to which Ahold or its affiliate is the lessor (the "Lease Guaranty").

-- Ahold Management and its affiliates would use their reasonable best efforts to assist and cooperate with the Debtors, Lone Star and their respective affiliates in doing all things necessary, proper or advisable to obtain confirmation of the Debtors' Plan.

-- Lone Star would indemnify Ahold Management and its affiliates (and their respective equityholders, directors, officers, members, employees, agents, successors and assigns and the respective affiliates thereof) (collectively, the "Indemnified Parties") for certain losses arising from or related to actions, law suits or legal proceedings related to or arising from the offer to purchase the Term Loans, the purchase of the Term Loans and/or the other transactions contemplated by the Settlement Agreement.

-- Lone Star would reimburse the Indemnified Parties for all costs and expenses (including reasonable attorney's fees and expenses) incurred in connection with the proposal to acquire the Term Loans and the transactions contemplated thereby and the Settlement Agreement.

-- Upon resolution of the Bankruptcy Case, Lone Star would pay Ahold a cash amount equal to the amount by which $15 million exceeds the aggregate amount of the distributions received by Ahold and its affiliates in the Bankruptcy Case with respect to unsecured claims of Ahold and its affiliates against the Debtors.

**M.    Ahold's Purchase of the Term Loans**

In accordance with the Settlement Agreement, on January 18, 2010, Ahold USA and certain of its affiliates made an offer to the existing Term Lenders to purchase (at their stated par value) Term Loans in the aggregate principal amount of up to $260 million (but not less than $189,750,000). The offer was made by Ahold to the existing Term Lenders pursuant to a *Purchase and Sale Agre*ement (the "Term Loan Purchase Agreement") that was executed by Ahold USA and certain of its affiliates and delivered to counsel for the Term Lender Committee.

Pursuant to the Term Loan Purchase Agreement, Ahold USA and its affiliates agreed to purchase Term Loans only if (a) the Term Loans to be purchased were no longer subject to the Investment Agreement, (b) the existing Term Lenders had taken all steps required under the Investment Agreement to terminate the Investment Agreement, (c) the Investment Agreement had been terminated and (d) the Term Lenders accepting the offer held Term Loans in an aggregate principal amount of not less than $189,750,000.

On February 2, 2010, Term Lenders holding Term Loans in the aggregate principal amount of $215,750,000 accepted Ahold USA's offer set forth in the Term Loan Purchase Agreement. On February 3, 2010, the accepting Term Lenders provided written certifications and other documents establishing that the Investment Agreement had been terminated in accordance with its terms, including the consent of Wellspring. On February 4, 2010, Lone Star funded the Lone Star Loan to Ahold Loan Acquisition I, LLC, an affiliate of Ahold USA ("Ahold Loan"), and Ahold Loan used $70,250,000 of the proceeds from the Lone Star Loan to purchase Term Loans in an aggregate principal amount of $70,250,000. Certain other affiliates of Ahold USA purchased the remaining $145,500,000 of Term Loans with their own funds.

On February 9, 2010, Ahold USA extended until February 22, 2010 its offer to purchase Term Loans held by Grace Bay Holdings II, LLC ("Bayside") in accordance with the Term Loan Purchase Agreement. Pursuant to an agreement between Lone Star and Ahold USA, the balance of the Loan Star Loan proceeds ($59,750,000) was held in escrow pending Bayside's acceptance of such offer. On February 22, 2010, Bayside accepted Ahold USA's offer and Ahold Loan used $44,250,000 of the proceeds of the Lone Star Loan to purchase Bayside's Term Loans in accordance with the Term Loan Purchase Agreement. At the same time, Ahold Loan used the remaining $15,500,000 of the Lone Star Loan proceeds to purchase Term Loans in the aggregate principal amount of $15,500,000 from an Ahold affiliate holding such Term Loans.

By accepting the Term Loan Purchase Agreement (with respect to the Term Lenders who sold their Term Loans to Ahold Loan and affiliates of Ahold USA) , each of the holders of the Term Loans as of the Petition Date has agreed that it will not participate, or authorize or permit its representatives, directly or indirectly through another person, to participate on its behalf in the Debtors' Chapter 11 Cases in any way except to pursue any claims for substantial contribution, to defend any actions brought against it or to enforce its rights under the Term Loan Purchase Agreement .

As a result of the purchase of the Term Loans by Ahold and the termination of the Investment Agreement, on February 9, 2010, the Creditor Proponents withdrew their plan of reorganization from consideration by the Bankruptcy Court.

For the avoidance of doubt, nothing in the Settlement Agreement or the Term Loan Purchase Agreement affects or in any way impairs Ahold's guarantee obligations under a majority of the Debtors' leases. Such guarantee obligations remain fully enforceable and valid obligations of Ahold.

## IV.
## LEGAL REQUIREMENTS FOR CONFIRMATION OF A PLAN

*Nothing in the following discussion is intended to convey legal advice, or provide a comprehensive explanation of the applicable statutes, rules, or case law. It is provided solely for the purpose of explaining why the Debtors believe the Plan can be confirmed. You are urged to consult with your own lawyer for any advice or explanation of this area of law which is highly specialized and complex.*

**A.      Section 1129 of the Bankruptcy Code**

At the hearing to begin on [•], 2010 to consider confirmation of the Plan, the Bankruptcy Court will determine whether the requirements for confirmation contained in § 1129 of the Bankruptcy Code have been satisfied. The legal requirements relevant in the Debtors' cases for confirmation are summarized as follows:

1.      *The Plan must comply with the applicable provisions of the Bankruptcy Code.*

2.      *The proponents of the Plan must comply with the applicable provisions of the Bankruptcy Code.*

3.      *The Plan must be proposed in good faith and not by any means forbidden by law.*

4.      *Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, must be disclosed to the Bankruptcy Court, and any such payment must be approved by the Bankruptcy Court as reasonable.*

5.      *Each holder of an impaired claim or equity interest must accept the plan, or receive a recovery under the plan that is at least equal to the amount that the holder would receive if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code. This test is known as the "best interests" test.*

6.      *Each class of claims or equity interests that is entitled to vote on the Plan has either accepted the Plan or is not impaired under the Plan, or the Plan can be confirmed without the approval of each class pursuant to the "cram down" provisions of § 1129(b) of the Bankruptcy Code requiring that (a) at least one impaired class of creditors has voted to accept the Plan, (b) the Plan "does not discriminate unfairly," and (c) the Plan is "fair and equitable" to non-accepting classes. These two terms are discussed in greater detail below as they relate to creditors. The Debtors may seek confirmation of the Plan under these cram down provisions.*

7.      *Except to the extent that the holder of a claim will agree to a different treatment, the Plan must provide for the full payment of administrative and priority claims in full on the Effective Date, or as soon thereafter as practicable.*

8.      *At least one class of impaired claims must vote to accept the Plan, without counting the votes of insiders holding claims in that class.*

9.      *The Plan must be feasible, meaning that after the Plan is confirmed, it is not likely to be followed by a liquidation, or the need for further reorganization.*

10.     *All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, must be paid as of the Effective Date.*

The Debtors believe that the Plan will satisfy these requirements for confirmation.

**B.     Best Interests Test/Best Interests Analysis**

The first step in meeting the best interests test is to determine the proceeds that the hypothetical liquidation of a debtor's assets and properties would generate in the context of a chapter 7 liquidation. The gross amount available would be the sum of the proceeds from liquidating the debtor's assets plus the cash held by the debtor at the time the hypothetical chapter 7 case is commenced.  The amount of any claims secured by these assets, the costs and expenses of the liquidation, and any additional administrative expenses and priority claims that may result from the termination of the debtor's businesses and the use of chapter 7 for the purposes of a hypothetical liquidation would reduce the amount of these proceeds.  Any remaining net cash would be allocated to creditors and equity interest holders in strict priority in accordance with § 726 of the Bankruptcy Code.

The Debtors' management, with the assistance of AlixPartners, has prepared a best interests analysis, which is attached as **Exhibit F** to the Plan (the "Best Interests Analysis").  The Best Interests Analysis is based upon projected assets and liabilities of the Debtors as of the Effective Date (assumed to be May 1, 2010).  It incorporates estimates and assumptions developed by the Debtors, which are subject to potentially material changes with respect to economic business conditions as well as uncertainties not within the Debtors' control.

**C.     The "No Unfair Discrimination" and "Fair and Equitable" Requirements for Cram Down**

In general, a plan does not discriminate unfairly if it treats a class substantially equivalent to how other classes that have equal legal rights are treated.  Courts will take into account a number of factors in determining whether a plan discriminates unfairly, including the effect of applicable subordination agreements between parties.   Accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

Generally speaking, the requirement that a plan be "fair and equitable" to a non-accepting class of secured claims means that the secured creditor must receive the full value of its collateral under a plan, either through cash payment, the sale of the collateral, or receipt of the "indubitable equivalent" of its collateral (this usually means giving the collateral to the creditor).

The requirement that a plan be "fair and equitable" with respect to a non-accepting class of unsecured creditors means that those creditors must be paid in full if any junior creditor or equity interest holder is to receive a distribution under the terms of the plan.

# V.
## OVERVIEW OF THE PLAN

*This description of the Plan is intended to guide creditors in reviewing the Plan. Therefore, this description summarizes only the key features of the Plan and does not include important details that are contained in the Plan itself, a copy of which is attached to this Disclosure Statement as Exhibit A. Creditors are urged to read carefully the full Plan and all related exhibits before casting their ballots.*

*Unless otherwise defined in this section, capitalized words used in this section of the Disclosure Statement are defined in the Plan. In the event of any inconsistency between a description of the Plan contained in this summary and the actual terms of the Plan, the Plan is the governing document.*

From the outset of the Debtors' Chapter 11 Cases, the Debtors' objective for their chapter 11 plan of reorganization was twofold: to maximize distributions to creditors and to create the most viable and stable post-emergence company as possible. In furtherance of these objectives, the Debtors have considered a number of different plan structures, including the sale of some or all of the company's assets and operations; an equity investment by one or more third parties unrelated to BI-LO; and an equity investment by Lone Star. After significant analysis and consideration, the Debtors have opted to file a plan sponsored by Lone Star because the Debtors believe that Plan best satisfies the Debtors' twin objectives. As set forth in further detail herein, the Plan is supported by and incorporates settlements by and among the Debtors, the Creditors' Committee, the Ahold Entities, C&S and the Lone Star Entities.

Under the Plan, the Debtors will reorganize and continue as an ongoing business with the bulk of their store base and operations intact, consistent with the Debtors' five year business plan. The Plan contemplates the assumption of an amended C&S Agreement that provides for, among other things: (a) elimination of C&S's exclusive first right to negotiate for the acquisition of BI-LO stores; (b) waiver of inflation-related adjustments to certain charges, rebates and surcharges; (c) BI-LO sublease savings of $52,524 per week; (d) a cash payment of $15 million by BI-LO to C&S in full satisfaction of any obligations of BI-LO and BI-LO Holding under the existing supply agreement; (e) a release of C&S's general unsecured claim in the Bruno's bankruptcy case; and (f) mutual releases between the Debtors and C&S for claims arising prior to the Debtors' emergence from chapter 11. The reorganized Debtors will be capitalized by the issuance of new equity interests to the Investor, or one or more of its affiliates, for $150 million, a $200 million new secured term loan (the "New Term Credit Facility") and a new secured working capital revolving credit facility (the "New ABL Facility"). The equity investment and the new credit facilities will close on the Effective Date and their proceeds will be used to fund distributions to holders of claims under the Plan and to fund the ongoing operations of the company as discussed in more detail below. The terms of the equity investment are determined and set forth in the "Equity Purchase Agreement" entered into between the Debtors and the Investor as of February 22, 2010 (as may be amended from time to time), a copy of which is attached as **Exhibit B** to the Plan.

The Plan also provides for meaningful recoveries to unsecured creditors. The Creditors' Trust will be created to hold assets for distribution to unsecured creditors in Class 4. Class 6 creditors will also be paid out of the Creditors' Trust, but will only be entitled to distributions equal to 60% of their allowed claims, payable from the cash contributed to the Creditors' Trust. The proposed Trustee shall be selected by Ahold and the Creditors' Committee, and shall be identified by no later than 10 days prior to the Voting Deadline. The trust will be governed by an advisory board consisting of parties with significant knowledge and history with the Debtors and/or parties holding significant unsecured claims. Those parties are: (a) an Ahold Entity representative; (b) a Kraft Food, Inc. representative (Ms. Sandra Schirmang); and (c) an American Greetings Service Corp. representative (Mr. Arthur P. Tuttle). The trust assets will include $40 million in cash (or $44 million if a majority of the Reorganized Debtors' assets are

sold within 180 days of the Effective Date and the Investor receives in cash or other consideration a net return of at least $175 million, subject to certain deductions) as well as certain Causes of Action with respect to Class 4 and Class 6 Claims (the "Trust Causes of Action").  A detailed description of the Creditors' Trust, its assets, and its functioning is contained in Section X of this Disclosure Statement. The provisions governing the Trust are designed to maximize fairness and recoveries to creditors and are discussed in more detail in Section X below.

Creditors holding allowed claims in Class 5 shall receive from the Investor (or its designee) a distribution in cash equal to the same percentage recovery provided to holders of claims in Class 4.

Unsecured creditors holding claims of $5,000 or less, and creditors willing to reduce their claims to $5,000, will be separately treated as "convenience claims" and will receive a fixed recovery of 60% in cash for their claims.  The Debtors estimate that the vast majority of the Convenience Claims filed in these cases (i.e., 2,012 out of 3,009 claims as of December 18, 2009) are claims for a specified amount (referred to under the Bankruptcy Code as "liquidated" claims because the amount is known, as contrasted to "unliquidated" claims where the actual amount of the claim has not yet been determined). Creditors holding allowed Convenience Claims will receive their cash as soon as possible after the Effective Date.

The Debtors estimate that the cost to the Creditors' Trust of paying these Convenience Claims will be approximately $720,000 to $1,500,000, excluding any estimate of claimants who choose to reduce the amount of their claims in order to qualify such claim for convenience treatment.  The balance of general unsecured claims that have been filed in a liquidated amount—not more than 997 claims—will, on the other hand, receive a smaller initial distribution shortly after the Effective Date from the cash contributed to the Creditors' Trust and await a final distribution based on the resolution of disputed general unsecured claims.

The recoveries by holders of Term Lender Claims under the Plan on account of $260 million in principal amount of secured prepetition debt, plus certain interest and fees arising under the Term Loan Credit Agreement will primarily consist of $260 million in cash.  In addition, the Term Lenders will retain all "adequate protection" payments made by the Debtors during the Chapter 11 Cases and the net sale proceeds from the sale of certain equipment assets during the Chapter 11 Cases, each as described in further detail in Sections III.B.2 and III.E.2 of this Disclosure Statement.

Other secured creditors (which are expected to be minimal) will receive a 100% recovery on their claims, either through reinstatement of such claims or as otherwise agreed by a secured creditor and the Debtors or reorganized Debtors, as applicable.

The Plan has been designed to foster the successful operation of BI-LO upon its exit from bankruptcy, for the ultimate benefit of its customers, employees, suppliers, landlords, and the communities in which it operates.

## VI.
## TREATMENT OF CLAIMS AND EQUITY INTERESTS

### A.    Substantive Consolidation

Like many plans of reorganization, the Plan provides for a limited form of "substantive consolidation" in order to simplify the administration of the plan of reorganization.  This limited substantive consolidation involves the theoretical pooling and merging of the assets and liabilities of all the Debtors so that they are treated as if they were a single corporate and economic entity, solely for

purposes of voting and distributions under the Plan. Consequently, each creditor's claim is treated under the Plan as an obligation of the consolidated group of affiliated debtors rather than a claim against a particular debtor. As part of the process of confirming the Plan, the Bankruptcy Court must decide whether the legal prerequisites for this limited substantive consolidation have been satisfied, *i.e.*, that creditors are not prejudiced by this mechanism simply to foster efficiency. The Debtors believe the prerequisites have been satisfied, and that the Bankruptcy Court will authorize this limited substantive consolidation.

**B.    Administrative and Priority Tax Claims**

*1.    Administrative Claims*

Generally speaking, an administrative claim is a claim against a debtor or its estate that first arose "postpetition," which means after the filing of the bankruptcy petition that commences a bankruptcy case, as compared to "prepetition," a term that refers to all periods before the commencement of the case. An administrative claim must also arise from an actual and necessary cost of preserving the value of the debtor's estate during the bankruptcy process. Typical administrative claims include claims for postpetition wages of the debtor, goods sold postpetition to the debtor, and services or other value provided to the debtor during its bankruptcy case. Under the Bankruptcy Code, administrative claims are given a priority over all prepetition claims and must be paid in full or otherwise satisfied before the debtor can emerge from bankruptcy. These provisions of the Bankruptcy Code were designed to encourage employees, vendors, service providers and other parties to continue to do business with a debtor despite the fact that it is in bankruptcy.

The one exception to the prepetition/postpetition distinction for administrative claims that is relevant in the Chapter 11 Cases is that vendors who delivered goods in the ordinary course of the Debtors' business prepetition in the 20 days prior to the commencement of the Chapter 11 Cases, and have not been paid, will have administrative claims pursuant to § 503(b)(9) of the Bankruptcy Code. To date, many of the administrative claims under § 503(b)(9) of the Bankruptcy Code have already been paid pursuant to the Bankruptcy Court order dated August 11, 2009 [Docket No. 1252] authorizing such payments.

Administrative claims can also have different priorities with respect to each other. The claims of a postpetition lender for repayment of amounts lent to finance the debtor's bankruptcy case (such financing is referred to as "debtor in possession" financing, or "DIP" financing) are given "superpriority" under the Bankruptcy Code, which means that they are entitled to be paid ahead of administrative claims that do not have such priority.

Under the Plan, all administrative claims—regardless of their priority—that have been "allowed" (*i.e.*, approved as legitimate claims) will be paid in full, including DIP Facility Claims and Professional Claims, as described more fully in the following paragraphs.

a.    DIP Facility Claims

On the Effective Date, all allowed "DIP Facility Claims" will be paid in full in cash, and all letters of credit issued and outstanding under the DIP Credit Agreement will either be returned to the issuer undrawn and marked cancelled, or will be collateralized either in cash or through a new back-to-back letter of credit, in an amount equal to 100% of the face amount of the old letter of credit.

b.    Professional Claims

As described in more detail in Article II.3 of the Plan, "Professional Claims" are claims against the Debtors by advisors who were retained pursuant to a Bankruptcy Court order to provide services to the Debtors or to the Creditors' Committee during the Chapter 11 Cases.  Under the Bankruptcy Code, these are payable by the Debtors.

In order to be paid, all Professional Claims must also be approved by the Bankruptcy Court.  Any entity seeking such approval must prepare its final application for Professional Claims incurred through the Effective Date and file and serve the application on the attorneys for the Debtors (whose names and addresses are listed on the front of the Disclosure Statement) no later than 45 days after the Effective Date.  Any objection to the allowance of a Professional Claim must be filed and served on the Professional Claim applicant, as well as on the attorneys for the Debtors, within 20 days after the application was served.  As soon as practicable (but no later than 5 business days) after the Bankruptcy Court has entered a Final Order allowing a Professional Claim, such claim will be paid in full in cash or, in the case of claims of any Creditors' Committee Professional, be immediately paid from the Professional Fee Escrow Amount.

On the Effective Date, the Reorganized Debtors will create a segregated bank account (the "Creditors' Committee Professional Fee Account") and fund such account with cash equal to the aggregate Creditors' Committee Professional Fee Reserve Amount described below.  The Creditors' Committee Professional Fee Account shall be maintained in trust for the Creditors' Committee professionals whose fees and expenses have been held back pursuant to the Interim Compensation Order.  Such funds shall not be considered property of the Reorganized Debtors.  The remaining amount of Creditors' Committee Professional Claims shall be paid in cash by the Reorganized Debtors from the Creditors' Committee Professional Fee Account, without interest or other earnings therefrom, when such claims are allowed by a Bankruptcy Court order.  When all such claims have been paid in full, any amounts remaining in the account shall be paid or transferred to the Reorganized Debtors.

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Creditors' Committee Professionals shall estimate their Professional Claim prior to and as of the Effective Date and shall deliver such estimate to the Debtors on or before the Effective Date.  If a Creditors' Committee Professional does not provide such estimate, the Reorganized Debtors may do the estimate; provided, however, that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Professional.  The total estimated amount as of the Effective Date shall comprise the "Creditors' Committee Professional Fee Reserve Amount."

c.    Reimbursement of Financing and Other Costs and Expenses

On or about the Effective Date, the Reorganized Debtors shall reimburse the Investor and its Affiliates for all commitment and other fees and expenses (including legal fees and expenses) incurred by the Investor or its affiliates in connection with, relating to or arising under New ABL Facility or the New Term Credit Facility.

d.    All Other Administrative Claims

All other allowed administrative claims will be paid in full in cash.  Except for administrative claims that relate to the ordinary course of the Debtors' business, creditors seeking to be paid administrative claims must first file with the Bankruptcy Court an application for allowance of an administrative claim and explain the particularities of the claim.  This application must be filed with the Bankruptcy Court and served on the attorneys for the Debtors no later than 45 days after the Effective Date.

For creditors who hold administrative claims that relate to the ordinary course of business, or to an express contract, an application for approval need not be filed, and that claim will be paid according to the trade terms or contract provisions which govern that particular relationship.

Holders of administrative claims will not be entitled to vote on the Plan.

e.    Priority Tax Claims

Priority tax claims are certain tax-related claims of a governmental unit against a debtor or its estate that are given priority pursuant to § 507(a)(8) of the Bankruptcy Code. Allowed priority tax claims will receive the following distribution under the Plan, at the option of the Reorganized Debtors: (a) the amount of such holder's allowed priority tax claim, at the rate applicable under non-bankruptcy law, in quarterly cash installment payments over a period ending not later than five years after the commencement of the case (provided that the Reorganized Debtors may prepay the balance of any such allowed priority tax claim at any time without premium or penalty); (b) cash on the Distribution Date in the amount equal to the allowed priority tax claim; or (c) such other treatment as may be agreed upon in writing between the holder and the Debtors, subject to approval of the Bankruptcy Court, or, after the Effective Date, between the holder and the Reorganized Debtors. Penalties related to priority tax claims will not be allowed and will be discharged under the Plan.

Holders of priority tax claims will not be entitled to vote on the Plan.

## C.    Classification and Treatment of All Other Claims and Equity Interests

The Bankruptcy Code requires that prepetition claims against a debtor be segregated into separate "classes" so that legally dissimilar claims are not in the same class. For instance, secured claims are put in a separate class ("classified") from unsecured claims, and secured claims themselves can be put into separate classes if they don't share the same collateral. Each creditor holding a claim in a given class will receive the same treatment as every other creditor in that class unless it specifically agrees otherwise.

Classification is also relevant to voting to accept a plan of reorganization. As discussed more fully elsewhere in this Disclosure Statement, if the requisite percentages of creditors in a class vote to "accept" a plan (i.e., the plan is approved by more than half in number and more than two-thirds in dollar amount of all claim votes), and the plan is confirmed, the plan is binding on all creditors in that class, even if they did not vote to accept it.

Creditors in classes that are receiving payment in full under a chapter 11 plan (i.e., are "unimpaired" by the plan), are not entitled to vote on the plan; they are deemed to have accepted it. If a class of creditors or equity holders is slated to receive nothing under a chapter 11 plan, that class is also not entitled to vote on the plan; it is deemed to have rejected the plan. Classes 3, 4, 5 and 6 will be entitled to vote on the Plan.

The Plan provides the treatment for each class of claims and equity interests as set forth in the following chart. The chart also provides the Debtors' estimates of what this treatment will mean in terms of actual recoveries to creditors, using certain assumptions about the amount of claims in a given class, and certain assumptions about the value of the non-cash property that is being distributed for the benefit of the class members. Some of these assumptions are described after the chart. The Debtors believe these are reasonable assumptions given all available information. Importantly, however, the actual recoveries to creditors could vary significantly from the estimates set forth in the chart, depending on the amount of claims in a given class that are eventually allowed, and the actual value of non-cash property (such as the Trust Causes of Action) once it is eventually converted to cash.

| Class | Treatment Under the Plan | Estimate of Total Allowed Claims | Estimated % Recovery |
|---|---|---|---|
| **Class 1 - Priority Non-Tax Claims** | Priority non-tax claims will be paid in full on the Distribution Date or receive such other treatment as may be agreed in writing by such holder and Debtors or, after the Effective Date, by the Reorganized Debtors. | $25,000 | 100% |
| **Class 2 - Secured Claims** | At the option of the Reorganized Debtors, all allowed secured claims in this class will either (a) have such claim reinstated on its existing terms; or (b) receive such other treatment as may be agreed in writing by such holder and Debtors or, after the Effective Date, by the Reorganized Debtors. | $2 million | 100% |
| **Class 3 - Term Lender Claims** | Each holder of a Term Lender Claim will receive its proportionate share of $260,000,000.00 in Cash minus (a) the aggregate principal amount of the Term Loans, if any, contributed by the Investor (and cancelled) and (b) the net proceeds from the sale of collateral paid to the Term Lenders during the cases.<br><br>The Term Lenders will also be entitled to retain (a) all "adequate protection" payments made by the Debtors during the Chapter 11 Cases and (b) the net sale proceeds from the sale of certain equipment assets during the Chapter 11 Cases (together, estimated to be $18.7 million).<br><br>The Plan will serve as a motion seeking approval under Bankruptcy Rule 9019(a) of a compromise with respect to the priority, secured status and treatment of the Class 3 Term Lender claims in accordance with the Plan. | $260 million in principal plus certain interest and fees arising under the Term Loan Credit Agreement | 94.5% |
| **Class 4 - General Unsecured Claims (other than Class 5 or Class 6 Claims)** | Each holder of an allowed general unsecured claim in Class 4 will receive its proportionate share of Trust Assets, less any amounts necessary to satisfy or reserve for Convenience Claims. Distributions to holders of allowed general unsecured claims in Class 4 will be paid from Trust Recoveries. Trust Recoveries consist of $40 million in cash (or $44 million if a majority of the Reorganized Debtors' assets are sold within 180 days of the Effective Date and the Investor receives in cash or other consideration a net return of at least $175 million, subject to certain deductions), minus trust expenses, taxes and amounts necessary to satisfy or reserve for the Convenience Claims Class (estimated to be between $0.7 and $1.5 million). | $65 – 85 million | 43.5% - 57.8% |
| **Class 5 - Bruno's/Pension Fund Claims** | Each holder of an allowed Class 5 Claim shall be entitled to receive from the Investor (or its designee) payments in cash equal to the percentage paid to holders of allowed Class 4 Claims. Lone Star Fund V (U.S.) LP shall guarantee the Class 5 payments to be made pursuant to the Plan. | $0 – 100 million | 43.5% - 57.8% |
| **Class 6 - Convenience** | Each holder of an allowed Class 6 Convenience Claim (*i.e.*, one that is no greater than $5,000, or one that the creditor has agreed to reduce to | $1.2 - $2.5 million | 60% |

| Class | Treatment Under the Plan | Estimate of Total Allowed Claims | Estimated % Recovery |
|---|---|---|---|
| Claims | $5,000) will be entitled to receive a one-time cash payment from Trust Assets equal to 60% of the allowed claim.  Other than such one-time cash payment, Class 6 claimants shall not receive any distribution from Trust Assets. | | |
| *Class 7 - Old Equity Interests* | No property will be distributed to or retained by Lone Star and any other preferred or common holder of the Old Equity Interests of BI-LO Holding on account of those interests, and all such interests will be cancelled and extinguished. | $0 | 0% |

The amounts under "Estimated Percentage Recovery" in the chart above were derived by dividing the assumed value of the consideration available to be distributed to all holders of allowed claims in a given class by the estimated amount of all allowed claims in that class.

The actual value of the Trust Causes of Action is impossible to determine at this stage, so the assumed value is zero for purposes of calculating recoveries to holders of Class 4 Claims.  Holders of Class 4 Claims should not presume recoveries on Trust Causes of Action.

The estimates of total allowed claims in a given class are based on a preliminary review of the Debtors' claims register, the Debtors' schedules of assets and liabilities that have been filed with the Bankruptcy Court and other information received from the Debtors.  The estimates of allowed claims in Classes 4, 5 and 6 have been developed by the Debtors with the assistance of the Debtors' professionals.  The eventual amount of allowed general unsecured claims could be significantly different from these estimates and could result in significantly lower or higher recoveries for holders of claims in Classes 4 and 5.

The range of estimates for the recoveries on account of the Term Lender Claims is based upon the range of claims that may be asserted by the holders of the Term Lender Claims.  The Term Lenders Claims may include (to the extent not otherwise limited by the Bankruptcy Code) prepetition and postpetition interest at the default rate, and prepetition and postpetition fees and expenses (including fees and expenses of counsel or other professionals).  The recovery analysis assumes that (a) the adequate protection payments (estimated at $18.4 million made by the Debtors during the Chapter 11 Cases) and (b) the net sale proceeds from the sale of certain equipment assets during the Chapter 11 Cases are included in the calculation of the recovery to holders of the Term Lender Claims.

The recoveries under the Plan are in full and complete settlement, satisfaction and discharge of all claims against and equity interests in the Debtors.

# VII.
## TREATMENT OF EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES

**A.     Assumption of Certain Executory Contracts and Unexpired Leases Under the Plan**

Any executory contract or unexpired lease that is listed on the Contract Assumption Schedule will be assumed under the Plan on the Effective Date.  Each such executory contract and unexpired lease

assumed pursuant to the Plan but not assigned to a third party prior to the Effective Date will become a binding obligation of the Reorganized Debtors. If a non-debtor counterparty to an executory contract or unexpired lease agrees to modifications of the contract or lease prior to the Effective Date, that contract or lease will be deemed to be assumed as modified on the Effective Date. The Debtors or Reorganized Debtors, as applicable, reserve the right to alter, amend, modify or supplement the schedules of executory contracts or unexpired leases (other than a Conditionally Assumed Lease, provided that such Conditionally Assumed Lease has not been explicitly excluded from the Contract Assumption Schedule by no later than 10 days prior to the Voting Deadline) identified on the Contract Assumption Schedule at any time through and including 15 days after the Effective Date. Any non-debtor party may object to being removed from the Contract Assumption Schedule by filing an objection with the Bankruptcy Court and serving such objection on the Creditors' Committee, the Debtors, and, after the Effective Date, the Reorganized Debtors and the Trustee, ten (10) days after service of notice of removal from the Contract Assumption Schedule.

### 1.    *Cure Amount Schedule and Determination of Cure Amounts*

Upon the assumption of an executory contract or unexpired lease on the Effective Date, the Reorganized Debtors will pay in cash in full any amounts that are in arrears or otherwise in default under the agreement on the Effective Date (the "Cure Amounts"), unless the non-debtor counterparty agrees to a waiver of the Cure Amount.

The Debtors' Contract Assumption Schedule will include what the Debtors believe are the Cure Amounts related to each contract or lease to be assumed. The assumption of such executory contract or unexpired lease (other than a Conditionally Assumed Lease, provided that such Conditionally Assumed Lease has not been explicitly excluded from the Contract Assumption Schedule by no later than 10 days prior to the Voting Deadline) may be conditioned upon the disposition of all issues with respect to the Cure Amount. To the extent that a non-debtor counterparty to an executory contract or unexpired lease disagrees with a Cure Amount contained in the Contract Assumption Schedule, the non-debtor counterparty must file a request for payment of a different Cure Amount with the Solicitation Agent on or before the Cure Bar Date unless the Debtors and the counterparty have stipulated in writing to payment of the different Cure Amount. If the Debtors or the Reorganized Debtors, as applicable, object to any Cure Amount or any other matter related to assumption, the Bankruptcy Court shall determine the allowed amount of such Cure Amount and any related issues. If there is a dispute regarding a Cure Amount, the ability of the Reorganized Debtors to provide "adequate assurance of future performance" or any other matter pertaining to assumption, then the Cure Amount shall be paid as soon as reasonably practicable after entry of a final order resolving such dispute, approving the assumption and, if applicable, the assignment, or as agreed by the Debtors, in consultation with the Investor or the Reorganized Debtors, as applicable, and the counterparty. Any counterparty that does not object timely to the proposed assumption of any executory contract or unexpired lease will be deemed to have consented to such assumption.

The Debtors or the Reorganized Debtors, as applicable, reserve the right either to reject or nullify the assumption of any executory contract or unexpired lease (other than a Conditionally Assumed Lease, provided that such Conditionally Assumed Lease has not been explicitly excluded from the Contract Assumption Schedule by no later than 10 days prior to the Voting Deadline) no later than 30 days after a final order determining the Cure Amount or any request for adequate assurance of future performance.

*There are other important details in Article IV of the Plan concerning the assumption of executory contracts and unexpired leases and the determination of cure amounts, and non-debtor counterparties are urged to read them carefully.*

2.        *Effect of Assumption*

Executory contracts and unexpired leases slated for assumption under the Plan will be deemed to be assumed on the Effective Date and become binding obligations of the relevant Reorganized Debtor and non-debtor counterparty without the need to obtain any party's consent to the assumption.

B.        **Rejection of Certain Executory Contracts and Unexpired Leases Under the Plan**

1.        *Contracts to be Rejected*

If an executory contract or unexpired lease is not listed on the Contract Assumption Schedule and has not previously been assumed or rejected, that contract or lease will be rejected under the Plan. Each executory contract or unexpired lease that is rejected will include all modifications, amendments, supplement, restatements or other agreements that in any manner affect such executory contract or unexpired lease, and all related executory contracts and unexpired leases, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interest, except as rejected or repudiated previously or under the Plan.

*There are other important details in Article IV of the Plan concerning the rejection of executory contracts and unexpired leases, and non-debtor counterparties are urged to read them carefully.*

2.        *Contract Rejection Damage Claims*

Contracts and leases that are rejected as described above are essentially being terminated, and the Debtors (and the Reorganized Debtors) will be discharged from any further obligations under those agreements. A non-debtor counterparty to a rejected agreement is entitled to file a claim for any damages it incurred from the rejection, and the Debtors' estates or the Creditors' Trust are entitled to assert defenses to the claims. All claims for rejection damages are considered prepetition claims under the Bankruptcy Code, even though the agreement was rejected postpetition. Rejection damage claims are treated as general unsecured claims under the Plan unless the non-debtor counterparty holds a valid interest in collateral or a permissible right of setoff, in which case the non-debtor counterparty's damage claim is treated as a Class 2 secured claim to the extent of the value of that collateral or setoff.

3.        *Bar Date for Filing Contract Rejection Damage Claims*

In order to assert a contract rejection damage claim under the Plan, the non-debtor counterparty must file a proof of claim in accordance with the procedures that will be set forth in the Confirmation Order no later than the latest of: (a) 30 days after the Effective Date, (b) the date that is 30 days after service of a notice that an executory contract or unexpired lease has been removed from the Contract Assumption Schedule, (c) if any objection to removal of an executory contract or unexpired lease from the Contract Assumption Schedule is timely filed, the date that is 30 days after the withdrawal of, or overruling of, such objection, (d) such later date as may be agreed by the Debtors prior to the Effective Date or the Trustee after the Effective Date or (e) such other date as may be fixed by the Bankruptcy Court. The appropriate form for this proof of claim is available upon request to the Kurtzman Carson Consultants LLC, whose contact information is listed in the initial section of this Disclosure Statement.

The Debtors intend to attempt to send notice to all non-debtor counterparties whose executory contracts or unexpired leases are not listed on the Contract Assumption Schedule or have not otherwise been assumed that their contracts are scheduled to be rejected under the Plan. As a precautionary measure, however, persons with agreements with the Debtors should check the court's docket after the

Contract Assumption Schedule has been filed to determine if their agreements are being rejected under the Plan in order to timely file a proof of claim.

*If a proof of claim for the rejection of an executory contract or unexpired lease is not timely filed, the non-debtor counterparty will receive no recovery under the Plan on account of that claim, and the claim will be permanently barred and discharged.*

## C.    Contracts and Leases Entered into Postpetition

None of the Reorganized Debtors shall be a party to or shall be obligated to perform under (a) any contracts or leases entered into after the Petition Date by any Debtor, including any Management Agreements, or (b) any executory contracts or unexpired leases assumed by any Debtor prior to Confirmation, unless, in each case, such contract or lease constitutes a Reorganized Asset or is set forth on the Contract Assumption Schedule. Any contract or lease entered into or assumed by any Debtor after the Petition Date that does not constitute a Reorganized Asset or is not set forth on the Contract Assumption Schedule shall be deemed an Excluded Asset, subject to the Reorganized Debtors' rights under this Plan to revise the Contract Assumption Schedule to add such contract or lease within 15 days of the Effective Date, in which case, such contract or lease shall be deemed a Reorganized Asset.

## D.    Employee and Retiree Compensation and Benefits

Generally, on the Effective Date, the Reorganized Debtors shall only assume (and otherwise be liable or responsible for) those certain prepetition compensation and benefit plans, policies, and programs of the Debtors applicable to their officers and employees that constitute Reorganized Assets and/or Assumed Obligations under the Equity Purchase Agreement or as listed on the Contract Assumption Schedule, including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, life, accidental death and dismemberment and workers' compensation insurance plans and contracts which have not been previously rejected, terminated or modified. Any such prepetition plan, policy or program that is not included in the Reorganized Assets or is not listed on the Contract Assumption Schedule, or that is not otherwise assumed by the Reorganized Debtors pursuant to the Plan shall be deemed rejected as of the Effective Date.

In addition, as detailed in Article IV.7(b) of the Plan, the Plan will serve as a motion seeking approval under Bankruptcy Rule 9019(a) of a compromise with respect to the executory severance agreements of two former executives of the Debtors, Tye Anthony and John Symons. Messrs. Anthony and Symons served as Executive Vice President of Marketing and Merchandising and Executive Vice President of Store Operations, respectively, and terminated their employments with the Debtors as of December 31, 2008 and June 28, 2008, (the "Termination Dates") respectively. By mutual agreement, BI-LO agreed to pay and Messrs. Anthony and Symons agreed to accept a monthly payout of severance, and each agreed not to solicit the Debtors' employees or to disclose any information acquired in the course of their employment for a 15 month and 12 month period, respectively, following each of their Termination Dates. Messrs. Anthony and Symons filed proofs of claim for the amounts of $ 334,030 and $ 282,405, respectively. The Debtors have negotiated with Messrs. Anthony and Symons extensively throughout the course of the Case and have reached a settlement as follows: the terms of Messrs. Anthony's and Symons' non-disclosure and non-solicitation obligations shall be extended for the period of 18 months after the Effective Date and their entitlements to severance and any other payments from the Debtors and Reorganized Debtors shall be reduced by about 40 percent in aggregate amount and paid, satisfied and discharged in full by two installments: the first in the amount of $75,000 to Mr. Anthony and $75,000 to Mr. Symons on the Effective Date, and the second in the amount of $125,418 to Mr. Anthony and $94,443 to Mr. Symons on the 120th day after the Effective Date. No further documentation of the

settlement shall be necessary, and Messrs. Anthony and Symons will withdraw their proofs of claim upon receipt of such payments.  This settlement is fair and equitable and in the best interest of the estates.

## VIII.
## RELEASES OF THIRD PARTIES UNDER THE PLAN

### A.      Background

        Plans of reorganization customarily contain certain releases of claims held by the debtors against third parties as part of either a settlement of disputes with those parties or in consideration for a contribution the party makes to the reorganization process.  Granting such releases does not mean that the debtor necessarily has any valid claims against the party being released, but rather parties seek releases for purposes of finality so that they can know that their relationship with the debtor has been fully resolved, just as the consummation of the plan of reorganization gives the debtor finality with respect to the issues and events that preceded its bankruptcy case.

        Similarly, it is also customary to provide "exculpation" to key parties who participated in the debtor's chapter 11 case so long as they have not acted with gross negligence or willful misconduct. Exculpation is a legal term meaning that a party will have no liability for its actions.  This is a slightly different legal concept compared to a release, which releases liability that theoretically may have existed based on actions or conduct not related to the debtor's chapter 11 case.

        These releases and exculpations must be approved by the Bankruptcy Court as part of confirmation of the plan of reorganization, and must satisfy certain legal standards for approval.

### B.      Releases By the Debtors and Exculpation Under the Plan

        The Plan contains releases by the Debtors of claims the Debtors may theoretically have against various parties.  Under the Plan, the "Released Parties" include the DIP Agent, the DIP Lenders, the New ABL Agent, the New ABL Lenders, the New Term Credit Agent, the Creditors' Committee, any Person that sold Term Loans to any of Ahold USA, Inc. and its affiliates (the "Ahold Entities") after the Petition Date but prior to Confirmation, the Ahold Entities, Lone Star Fund V (U.S.), L.P., LSF5 BI-LO Investments, LLC, LSF V International Finance, L.P., LSF5 BI-LO Holding, LLC, Lone Star U.S. Acquisitions, LLC, LSF5 Grocery Holdings, LLC, Hudson Advisors, LLC and any affiliates (other than the Debtors) of one or more of the foregoing (collectively, the "Lone Star Entities") and each of their respective officers, managers, directors, principals, members, partners, stockholders, employees, agents, advisors and attorneys, acting in such capacities and all of the successors and assigns of the foregoing, and each of the Debtors' Effective Date and prior officers, managers, directors, principals, members, partners, employees, agents, advisors and attorneys, acting in such capacities, and all of the successors and assigns of the foregoing.

        During these bankruptcy cases, the Creditors' Committee initiated an investigation to determine whether the Debtors' estates may have certain valid claims and causes of action against the Released Parties and in particular, against the Ahold Entities and the Lone Star Entities and certain of the Debtors' current and former officers and directors.  A description of the potential claims and causes of action that could have potentially resulted from such investigation was included in the *Joint Disclosure Statement for the Alternative Plans of Reorganization Filed by (I) Debtors and (II) the Creditors: Part B Disclosure Concerning the Creditors' Plan* (the "Creditors' Disclosure Statement") filed by the Creditors' Committee on December 21, 2009 [Docket No. 2050].  The investigation was preliminary and, in light of the settlement reflected by the Plan, was not concluded.  While the Creditors' Committee believes that the Debtors' estates may have suffered material economic harm as a result of certain acts and omissions

occurring prior to these bankruptcy cases, at the time it ceased its investigation (pending confirmation of the Plan), it had not yet made any determination as to whether estate claims exist and, if so, their viability and value. Creditors wishing to understand the Creditors' Committee's investigation of potential causes of action are encouraged to review the Creditors' Disclosure Statement carefully, though the Debtors specifically disclaim authorship of the contents of the Creditors' Disclosure Statement and take no position as to the truth or untruth of any statement contained therein or with respect to the possible existence of any estate claims and causes of action, as the Debtors have not conducted an independent investigation. Moreover, the Released Parties, in particular the Lone Star Entities and the Ahold Entities, have vehemently denied that any estate claims or causes of action exist against them. Finally, the Plan provides exculpation to the Debtors, the Reorganized Debtors, the DIP Lenders, the DIP Agent, the Investor, the Creditors' Committee, the Creditors' Trust, the Trustee, the Trust Advisory Board, the Term Lenders, the Prepetition Lenders and the Prepetition Agents, any Person that sold Term Loans to any of the Ahold Entities after the Petition Date but prior to Confirmation, the Ahold Entities and the Lone Star Entities and their respective members, officers, directors, employees, advisors, professionals, attorneys or agents. These exculpated parties will be deemed to be free of any liability for their conduct during the Chapter 11 Cases, including the development and implementation of the Plan, unless they are found to have acted with gross negligence or willful misconduct. Given that the Bankruptcy Court has supervised the conduct of the Chapter 11 Cases, as well as the general transparency of the process, the Debtors do not believe the Exculpated Parties otherwise have engaged in any conduct that would result in liability to others for their conduct in the cases. In addition, the Debtors, the Reorganized Debtors, the Creditors' Committee, the Lone Star Entities and the Ahold Entities (and their affiliates, directors, officers, employees and other agents) will be deemed to have participated in good faith in compliance with the applicable provisions of the Bankruptcy Code with regard to the distribution of the securities pursuant to the Plan, and therefore will not be liable for the solicitation of acceptances or rejection of the Plan or the distributions of securities made pursuant to the Plan.

## C.    Approval by the Bankruptcy Court

The Debtors will present evidence at the Confirmation Hearing to demonstrate that they have met the legal requirements for the releases and exculpations contained in the Plan, and the Bankruptcy Court will determine if they are appropriate.

*Parties are urged to carefully review Article IX.8 of the Plan for a complete description of the Plan's releases and exculpations.*

# IX.
## PROCEDURES FOR DISTRIBUTIONS TO CREDITORS
## AND RESOLUTION OF DISPUTED CLAIMS

## A.    General

To receive a distribution under a plan of reorganization, a creditor must have an "allowed" claim, *i.e.*, one that has either been agreed to by the debtor or its representatives or one that has been validated by the Bankruptcy Court. Although most claims are readily resolved through a consensual reconciliation process, some remain disputed and require further negotiations or litigation to determine whether, and in what amount, the claims will be allowed.

On the date that a chapter 11 plan becomes effective, there are usually numerous claims that have not been agreed to or litigated to a resolution, and the "claims reconciliation" process (generally begun during the chapter 11 case) continues so that the full universe of parties entitled to a recovery can be determined. Where creditors in a given class will share in a single pool of assets for their recoveries,

reserves are established both to permit distributions to holders of allowed claims and to assure that there will be sufficient assets remaining for creditors with unreconciled claims to receive that same percentage recovery, if their claims are eventually allowed.

Plans of reorganization contain detailed procedures for the reconciliation of claims and distributions to creditors. These generally involve appointing one or more "disbursing agents" to handle the administrative paperwork involved in tracking creditors' claims and insuring that creditors receive all amounts they are entitled to receive under the plan. These disbursing agents are customarily exculpated from liability for their activities unless they act with gross negligence or willful misconduct.

Plans of reorganization also specify who will be authorized to conduct the claims reconciliation process—*i.e.*, to settle or litigate disputed claims. In many instances, it is the debtor or the reorganized debtor. In cases where a creditors' trust is established under a plan, containing cash or assets that are to eventually be converted to cash for distribution to creditors, it is customary for the creditors' trust to handle the claims reconciliation process for that class of claims.

In order to expedite distributions to creditors holding allowed claims to be satisfied from a creditor's trust, plans of reorganization can provide for partial interim distributions from the trust, provided that like amounts have been reserved for the payment of disputed claims that may eventually be allowed.

## B.    Procedures for Distributions to Creditors

### 1.    The Claims Reconciliation Process and the Disbursing Agents

The Plan contains claims reconciliation procedures that are typical for plans of this type. The Creditors' Trust (or its designee) will serve as disbursing agent for holders of Class 4 (general unsecured claims) and Class 6 (convenience claims) claims. The Reorganized Debtors (or their designee) will serve as disbursing agent for distributions to all other classes of creditors or equity holders under the plan.

On and after the Effective Date, the Reorganized Debtors or their designee (and/or the Investor with respect to Class 5 claims) shall have the exclusive right and authority to file, withdraw or litigate to judgment objections to claims or interest other than claims in Classes 4 and 6 and to settle, resolve or compromise any disputed claim (other than claims in Classes 4 and 6) without any further notice or action, order or approval by the Bankruptcy Court.

On and after the Effective Date, the Creditors' Trust shall have the right and authority to file, withdraw or litigate to judgment, objections to claims in Classes 4 and 6 and to settle, resolve or compromise any disputed claim in Classes 4 and 6; provided, however, that Bankruptcy Court approval, after notice and a hearing, shall be required before the Creditors' Trust may settle or compromise any disputed claim in excess of $250,000 if the settlement has not been approved by a unanimous vote of the Trust Advisory Board.

The Creditors' Trust and the Reorganized Debtors will also have the ability to ask the Bankruptcy Court to estimate the amount of a disputed claim pursuant to § 502(c) of the Bankruptcy Code.

### 2.    Distributions Made Only to Those Who Are Creditors as of the Record Date

In certain instances, creditors may sell or assign their claims to other parties. Under Bankruptcy Rule 3001, notices of such transfers may be required to be filed with the Bankruptcy Court, which allows the Debtors to keep an accurate "claims register" listing all parties holding claims. On the Effective Date,

the claims register will be "closed" and any subsequent transfers by creditors will not be recognized by the disbursing agents. The disbursing agents will be authorized to deal only with those creditors listed in the claims register as of the date the Bankruptcy Court dockets an order confirming the Plan (the "Record Date"), and the disbursing agents will not be obligated to recognize any claim transfers after that date or provide distributions to any party not listed as a creditor as of the Record Date.

3.      *Establishment of Reserves for Disputed General Unsecured Claims and Trust Costs*

For purposes of calculating the initial distribution and interim distributions from the Creditors' Trust to holders of allowed Class 4 general unsecured claims (and the necessary reserves that must be established for the eventual payment of disputed claims in that class) disputed claims will be assumed to be worth the "Maximum Allowable Amount" of such claims, which is defined in detail in Article I.1(a)(75) of the Plan.

Generally speaking, the Maximum Allowable Amount of a disputed claim that is "liquidated" (*i.e.*, an actual dollar amount has been placed on it by the claimant, as opposed to an "unliquidated" claim where the claimant has not yet determined the dollar value of its claim) will be the lower of (a) the amount asserted by the creditor in its proof of claim, (b) the amount agreed to by the creditor and the Debtors or the Creditors' Trust as the Maximum Allowable Amount, or (c) the amount ordered by the Bankruptcy Court as the Maximum Allowable Amount. The Maximum Allowable Amount of a disputed claim that is unliquidated or contingent (for example a litigation claim) will be the lower of (a) the estimated amount of the claim as determined by the Bankruptcy Court, or (b) the amount agreed to by the creditor and the Debtors or the Creditors' Trust.

4.      *Timing of Distributions*

Article VII of the Plan contains important details concerning the timing of distributions to creditors. Class 4 claims and Class 6 claims that have been allowed as of the Effective Date will be paid on a date determined by the Trustee after sufficient reserves have been established.. The initial distributions to holders of allowed Class 4 claims will represent such creditor's proportionate share of the cash proceeds held by the Creditors' Trust, net of taxes, fees, costs and expenses and the amount necessary to provide recoveries to holders of allowed Convenience Claims in Class 6 and the Maximum Allowable Amount of disputed claims in Class 4 and Class 6. Thereafter, as disputed claims are "disallowed" or allowed in lesser amounts than the Maximum Allowable Amount, additional funds will be distributed to creditors with allowed claims. If a Class 4 general unsecured claim becomes allowed after the Effective Date, it will be eligible for its relevant distribution on the next distribution date, as determined by the Trustee. Payments to Class 5 claimants will be made on the same schedule as payments to Class 4 claimants.

Claims in all other classes that have been allowed as of the Effective Date will be paid as soon as practicable after the Effective Date. If they become allowed after the Effective Date, they will be paid on the next distribution date.

5.      *Cash*

The disbursing agents will have the option to distribute cash to creditors by a check drawn on a domestic bank or by wire transfer, except that (a) the payment of cash to the holders of allowed DIP Financing claims will be made by wire transfer of immediately available funds as directed by the DIP Agent and (b) the payment of cash to any holders of Term Lender Claims will be made by wire transfer of immediately available funds.

If a creditor receives a check on account of its distributions under the Plan and fails to cash that check within 6 months after distribution, the check will be voided and be of no value and shall revest in the Reorganized Debtors, the Investor or the Creditors' Trust, as applicable, and no further distributions will be made on account of such claims.

No distribution of cash less than $25 will be made by a disbursing agent unless it is a payment on account of Class 6 Convenience Claim or the creditor makes a written request for such a payment to the disbursing agent within 30 days after the Effective Date. The Creditors' Trust will not be required to make any interim or final distributions on such *de minimis* claims. In the event there are funds remaining after final distributions, the trustee of the Creditors' Trust is authorized to donate any such remaining funds to the BI-LO Charities, Inc. (sponsor of the BI-LO Classic) or its successor charity, or if no such charity exists, or if the Trust Advisory Board determines otherwise, to a recognized tax-exempt charity, as determined by the Trust Advisory Board.

6.      *Addresses for Delivery of Distributions to Creditors; Unclaimed Distributions*

Unless the Debtors (or, after the Effective Date, Reorganized BI-LO Holding, the Solicitation Agent or the Creditors' Trust) have been notified in writing of an address change, all distributions to creditors will be sent to the creditor's address listed on the creditor's proof of claim if one was timely filed or, if none was timely filed, the Debtor's Schedules that are in effect on the Record Date. These Schedules are filed with the Bankruptcy Court and are available upon request to Kurtzman Carson Consultants LLC, whose contact information is listed in the initial section of this Disclosure Statement.

If a distribution to a holder of an allowed claim is unclaimed six months after it is distributed or if a check is returned as undeliverable mail and the disbursing agent is not notified in writing of the then-current address of such holder within six months of distribution, then the funds will be deemed unclaimed property under § 347(b) of the Bankruptcy Code, and the funds will revert to the Reorganized Debtors or the Creditors' Trust, as applicable, and the creditor for whom those funds were intended will have no right to any distributions.

It is important that creditors ensure that they have provided the Debtors with their correct mailing address.

7.      *Surrender of Notes and Other Instruments; Payment of Taxes*

As set forth in greater detail in the Plan, the disbursing agents may require, as a condition to giving a distribution to a particular creditor, that the creditor turn over to the disbursing agent any note or other written evidence of the claim that is to be paid. If a creditor refuses to do so or otherwise fails to reach an agreement acceptable to the disbursing agent, that creditor may forfeit its rights to receive any distribution under the Plan. Regardless of whether the document is turned over to the disbursing agent, it will be deemed cancelled and discharged.

The disbursing agents are required to comply with all applicable tax and similar laws that impose withholding or reporting requirements, but each creditor is responsible for the payment of any tax or similar obligation imposed by law on the creditor.

### C.      Procedures for Resolution of Disputed Claims

#### 1.      *Objections to Claims*

As noted above, on and after the Effective Date, the Reorganized Debtors or their designee (and/or the Investor with respect to Class 5 claims) shall have the exclusive right and authority to file, withdraw or litigate to judgment objections to claims or interest other than claims in Classes 4 and 6 and to settle, resolve or compromise any disputed claim (other than claims in Classes 4 and 6) without any further notice or action, order or approval by the Bankruptcy Court.

On and after the Effective Date, the Creditors' Trust shall have the right and authority to file, withdraw or litigate to judgment, objections to claims in Classes 4 and 6 and to settle, resolve or compromise any disputed claim in Classes 4 and 6; provided, however, that Bankruptcy Court approval, after notice and a hearing, shall be required before the Creditors' Trust may settle or compromise any disputed claim in excess of $250,000 if the settlement is not approved by a unanimous vote of the Trust Advisory Board.

Unless otherwise ordered by the Bankruptcy Court, all objections to proofs of claim or requests for payment that have been filed with the Bankruptcy Court (other than applications for allowance of Professional Claims) must be filed and served upon the claimant/applicant by the applicable Claims Objection Deadline.  For administrative claims, the deadline for objecting is 90 days after the proof of claim or request for payment was filed.  For all other claims, the deadline to object is 180 days after the Effective Date.  The Bankruptcy Court may also extend these deadlines.  If no objection to a claim is filed by the applicable deadline, the claim is deemed to be allowed.

No creditor with a disputed claim will be entitled to a distribution until all disputes related to that claim have been resolved.  In addition, if a creditor holds both a disputed claim and an allowed claim, no distributions will be made to it until the disputed claim has been resolved.

#### 2.      *Recoveries from the Debtors' Insurance Coverage*

Any "Litigation Claim" (*i.e.*, one that relates to personal injury, property damage, products liability, unlawful discrimination, employment practices, or other torts or one that is currently being litigated) will be deemed to be an allowed claim only to the extent the claimant cannot recover from third parties through the Debtors' insurance coverage, unless that coverage is the Debtors' self-insurance.

#### 3.      *Nonpayment of Claims of Parties Holding Recoverable Property; Setoff*

Except as otherwise set forth in the Plan, and as described in greater detail in the Plan, if a creditor holds property (including money) that is recoverable, or is alleged to be recoverable, by the Reorganized Debtors or the Creditors' Trust, as applicable, under §§ 542, 543, 550, or 553 of the Bankruptcy Code, or if that creditor is alleged to be a transferee of a transfer avoidable under §§ 544, 545, 547, 548, or 549 of the Bankruptcy Code, that creditor will not be entitled to receive a distribution on an allowed claim.  The distribution will be made only after the creditor has turned over the property or the Bankruptcy Court has determined that the creditor is not required to turn over the property.

Except as otherwise set forth in the Plan, and as described in greater detail in the Plan, if the Reorganized Debtors or the Creditors' Trust are owed money by a creditor, the Reorganized Debtors or the Creditors' Trust, as applicable, are entitled to setoff any amounts owed to that creditor against amounts the creditor owes the Reorganized Debtors or the Creditors' Trust, as applicable.  Neither the failure to setoff nor the allowance of any claim will constitute a waiver or release by a Debtor or

Reorganized Debtor or the Creditors' Trust of any Cause of Action that it has against the holder of the claim.

# X.
## THE CREDITORS' TRUST

**A.      The Administration of the Creditors' Trust**

As noted, the Creditors' Trust will be established on the Effective Date.  The Creditors' Trust will hold the Trust Assets, which consist of $40 million in cash (or $44 million if a Qualifying Transaction occurs) and the Trust Causes of Action, which are described in the Plan.

The interests of general unsecured creditors in Classes 4 and 6 in the Creditors' Trust will be uncertificated and will be non-transferable except upon death of the creditor or by operation of law.  The Debtors believe that the distribution of beneficial interests in the Creditors' Trust (to the extent such interests are deemed to constitute "securities") to general unsecured creditors in Classes 4 and 6 under the Plan satisfy the requirements of § 1145(a)(1) of the Bankruptcy Code and are, therefore, exempt from registration under the Securities Act and state securities laws.

Article V of the Plan contains important details about the Creditors' Trust, and a copy of the actual Trust Agreement governing the trust will be separately filed with the Bankruptcy Court.  These documents provide for the appointment of a trustee (the "Trustee") that will be selected by Ahold and the Creditors' Committee and will be announced prior to the Voting Deadline for the Plan.  The Trustee will be "disinterested" as defined in § 101(14) of the Bankruptcy Code.  A person is disinterested if he or she (a) is not a creditor, equity holder or an insider, (b) is not currently and has not within the last 2 years been a director, officer or employee of the debtors, and (c) does not have a materially adverse interest to the estate or any class of creditors or equity holders.

In addition, a trust advisory board (the "Trust Advisory Board") will be created under the Trust Agreement, consisting of three voting members as follows: (a) an Ahold Entity representative, (b) a Kraft Food, Inc. representative (Ms. Sandra Schirmang) and (c) an American Greetings Service Corp. representative (Mr. Arthur P. Tuttle).  The Trustee will consult regularly with the Trust Advisory Board and take direction from the Trust Advisory Board as described in the Trust Agreement.

The Trustee's job will be to oversee the administration of the trust, including resolving disputed claims and making distributions to unsecured creditors in Classes 4 and 6, objecting to disputed claims in Class 4 and Class 6 (and prosecuting, settling, compromising, withdrawing or resolving such objections) and establishing and administering any necessary reserves.

The Trust Advisory Board, by a majority vote, must approve all settlements of claim objections or reconciliations, authorize the Trustee to invest the trust's cash in certain investments and may remove the Trustee for any reason.  Neither the Trust Advisory Board members nor their representatives will have any liability except for their gross negligence or willful misconduct, and they will not be liable for any act or omission done in accordance with the guidance of their professional advisors.

The Creditors' Trust will have a term of five years from the Effective Date.  With limited exceptions, the term can be extended by the Trust Advisory Board if approved by the Bankruptcy Court.

### B.      Tax Matters

The Creditors' Trust is intended to be treated for federal U.S. income tax purposes as a liquidating trust within the meaning of Treasury Regulations § 301.7701-4(d) provided that the Trustee will to the extent permitted by applicable law elect to treat any Trust Assets allocable to, or retained on account of, disputed claims as a "disputed ownership fund" governed by Treasury Regulation § 1.468B-9.  Other important information concerning tax matters related to the Creditors' Trust is contained in Article V of the Plan and below.

## XI.
## CONFIRMATION AND IMPLEMENTATION
## OF THE PLAN

### A.      General

As discussed in greater detail elsewhere in this Disclosure Statement, in order for a chapter 11 plan to be confirmed, a creditor vote is held followed by a hearing before the Bankruptcy Court to determine whether all the other legal requirements under the Bankruptcy Code for confirmation have been satisfied.

In addition, most chapter 11 plans contain certain additional conditions to confirmation, and these conditions are contained in the plan itself.  After these conditions have been met, and the plan has been confirmed, it does not become effective until further conditions (also contained in the plan itself) are satisfied.  Once these conditions are satisfied (the "effective date" of a plan), the plan becomes binding on all persons according to its terms.  The debtor's business is considered to have emerged from bankruptcy and is no longer subject to the rules and constraints of chapter 11 or the supervision of the Bankruptcy Court.

### B.      Confirmation

Section IV of this Disclosure Statement contains a more detailed discussion of the legal requirements for confirmation of a chapter 11 plan.  The Debtors believe that the Plan will satisfy these requirements.

As described in Section IV, one of these requirements is that the plan provide a recovery to every creditor or equity holder that is at least equal to what that party would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code, a test known as the "best interests" test.  The Debtors have undertaken a "best interests" analysis of the likely recoveries to creditors if they were liquidated under chapter 7.  A summary of this analysis is attached to the Plan as **Exhibit G**.  The Debtors believe that they will be able to demonstrate at the Confirmation Hearing that the Plan provides recoveries that are greater than what would be received if the Debtors were liquidated, and so satisfies this requirement.

Another requirement is applicable if a plan proponent seeks to confirm a plan that has not been accepted by all classes, but has been accepted by at least one class that does not receive a full recovery under the plan.  Known colloquially as a "cram down" plan, the Bankruptcy Code requires that such a plan (i) not discriminate unfairly in its relative treatment of claims and equity interests, and (ii) be "fair and equitable" in respecting the relative legal priorities of holders of claims and equity interests.  The Debtors believe that they will be able to demonstrate at the Confirmation Hearing that the Plan does not discriminate unfairly, and is fair and equitable.

Assuming the Plan meets the statutory requirements for confirmation under the Bankruptcy Code, it cannot be considered confirmed unless the Bankruptcy Court's order confirming the plan (usually a lengthy and detailed document) as well as all other Plan Documents, are in a form that is satisfactory to the Debtors and to Lone Star, and reasonably satisfactory to the Creditors' Committee.  In addition, the Trust Agreement must be in form and substance reasonably acceptable to the Creditors' Committee. Finally, in order to be confirmed, the Contract Assumption Schedule shall not exclude any (i) commercial non-real estate executory contract, (ii) real estate/unexpired lease or (iii) employee/employee benefit/indemnification obligation listed on the preliminary Contract Assumption Schedule (attached as Exhibit A-1 to the Plan) whose exclusion or exclusions will, in the good faith belief of the Debtors and Committee, result in an aggregate net increase of more than $4 million to the aggregate amount of Allowed Claims in Class 4 and Class 6, unless the Creditors' Committee has otherwise consented.

As set forth in detail in Article IX.1 of the Plan, the Bankruptcy Court order confirming the Plan will, as of the Effective Date, discharge all prepetition claims and liabilities of the Debtors and terminate all prepetition equity interests.  This order will operate as an injunction (*i.e.*, a prohibition) against all entities from suing or otherwise seeking to collect on the Debtors' prepetition claims, liabilities, or equity interests, or from prosecuting actions against any party released or exculpated under the Plan.

**C.      Conditions to Consummation**

The Plan will become effective when each of the following conditions have been satisfied (or waived as provided in Article VIII of the Plan):

- The Contract Assumption Schedule shall not exclude any (i) commercial non-real estate executory contract, (ii) real estate/unexpired lease or (iii) employee/employee benefit/indemnification obligation listed on the preliminary Contract Assumption Schedule (attached as Exhibit A-1 to the Plan) whose exclusion or exclusions will, in the good faith belief of the Debtors and Committee, result in an aggregate net increase of more than $4 million to the aggregate amount of Allowed Claims in Class 4 and Class 6, unless the Creditors' Committee has otherwise consented.

- The Confirmation Order has become a final order, meaning it cannot be appealed, and there is no judicial order stopping the Plan from becoming effective.

- All conditions to the Investor's obligation to make the $150 million equity investment in Reorganized BI-LO Holding have been satisfied.  These conditions are contained in Article VII of the Equity Purchase Agreement, a copy of which is attached as **Exhibit B** to the Plan.

- All conditions to the Debtors' closing under the Equity Purchase Agreement have been satisfied.  These conditions are contained in Article VII of the Equity Purchase Agreement.

- The Bankruptcy Court has authorized the assumption and rejection of executory contracts and unexpired leases as contemplated by the Plan.

- The New Term Credit Facility and the New ABL Facility have both been entered into.

- All other actions, documents and agreements that the Debtors and the Investors determine are necessary to effectuate the Plan, and are reasonably acceptable to the Creditors' Committee, have been taken and executed, in form and substance acceptable to the Debtors and the Investor.

- All authorizations, consents, regulatory and other approvals that the Debtors determine are necessary to effectuate the Plan have been received.

- The Plan has not been materially amended, altered or modified from the version confirmed by the Confirmation Order, without the consent of the Investor.

- The Bankruptcy Court enters the Confirmation Order on its docket.

These conditions to effectiveness can be waived by the Debtors, with the consent of the Investor, other than the conditions in the Equity Purchase Agreement to the Investor's obligation to make the $150 million investment.  Those latter conditions can be waived if each of the Debtors and the Investor agree to do so.

The Plan also provides that if these conditions to effectiveness have not been satisfied or waived by August 17, 2010, then the Debtors can withdraw the plan and the confirmation order will be "vacated" (cancelled).

As of the date of this Disclosure Statement, the Debtors believe that the conditions to effectiveness can and will be satisfied.

## D.    Implementation of the Plan

A number of actions will be taken on the Effective Date to implement the Plan, including the following:

- Execution of various corporate and loan documents, including the Reorganized Debtor LLC Agreements, the New Term Credit Agreement governing the New Term Notes, the New ABL Credit Agreement and the Trust Agreement.

- Transfer of the Trust Assets to the Creditors' Trust.

- Issuance of the New Common Units.

- Issuance of the New Term Notes.

- Installation of the initial managers and directors and election of the initial officers of the Reorganized Debtors, the execution of any indemnification agreements and the procurement of manager, director and officer insurance, and the execution of the Management Agreements.

- Implementation of the Restructuring Transactions (as defined in Article I.1(a)(113) of the Plan).

- Subject to allowance by the Bankruptcy Court after the Effective Date, and, once allowed, payment of the Professional Claims of the legal and financial advisors to the Debtors and the Creditors' Committee in connection with their services rendered during the Chapter 11 Cases.

- Dissolution of the Creditors' Committee and release of its members from all of their duties in connection with the Chapter 11 Cases, other than to be involved in the process of determining allowed Professional Claims and any challenges to the Plan or appeals of the Confirmation Order.

E.    Section 1145 Exemption

The offering, issuance and distribution under the Plan of the New Common Units and any beneficial interests in the Creditors' Trust, to the extent they are securities, shall be exempt from the registration requirements of § 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution or sale of such securities, pursuant to §1145 of the Bankruptcy Code to the extent that such securities are issued under the Plan in exchange for a claim against or interest in the Debtors or principally in such exchange and partly for cash or property.  The Debtors believe that the offering, issuance and distribution under the Plan of the New Term Notes and the New Common Units (to the extent the New Common Units are not issued under the Plan in exchange for a claim against or interest in the Debtors or principally in such exchange and partly for cash or property) shall be exempt from the registration requirements of §5 of the Securities Act and other applicable law requiring registration pursuant to the exemptions provided for under such laws, provided however that the Securities and Exchange Commission makes no determination regarding the availability of any such exemptions.

F.    **C&S Settlement**

As part of the global settlements contained in the Plan, on the Effective Date, pursuant to the Plan, a settlement with C&S shall be implemented.  Under the settlement, the Reorganized Debtors shall assume the New C&S Agreement that provides for, among other things: (a) elimination of C&S's exclusive first right to negotiate for the acquisition of BI-LO stores; (b) waiver of inflation-related adjustments to certain charges, rebates and surcharges; and (c) BI-LO sublease savings of $52,524 per week.  In addition, in full and final satisfaction of any obligations of BI-LO and BI-LO Holdings, LLC to C&S and any related parties in connection with the Existing Supply Agreement (except for Outstanding Accounts Receivable (as defined below)), the Bruno's supply agreement or the Bruno's estate, on the Effective Date, the Reorganized Debtors shall provide C&S a cash payment in the amount of fifteen million ($15 million) dollars (the "C&S Settlement Amount").  Upon the payment of the C&S Settlement Amount, and for other consideration contained in the Plan, C&S and the Debtors, and their respective related parties including, without limitation, any entity or person claiming by or through any of the Debtors or their respective estates, Lone Star and its affiliates shall release one another from any and all claims and causes of action of any description, kind or nature, in law or equity or otherwise, whether known or unknown, regardless of whether any such claims and causes of action exist, have arisen, arise or are actionable prior to, as of or after the Effective Date, but excluding any claims or causes of action arising out of or under the new Supply Agreement or any outstanding accounts receivable, as of the Effective Date, owed, irrespective of the scheduled payment date, by BI-LO to C&S for the shipment of merchandise in the ordinary course of business under the C&S Supply Agreement, which shall include any and all Reduced Volume Surcharges (as defined in the C&S Supply Agreement) and Lost Profit Surcharges (as defined in the C&S Supply Agreement) accrued, but not paid, irrespective of the scheduled payment date, through the Effective Date (collectively, the "Outstanding Accounts Receivable").  The various forms of value and consideration being provided by C&S, the Reorganized Debtors and the Debtors in connection with the settlement are mutually dependent upon one another and therefore are not severable from one another.  Absent any portion of the consideration described herein, one or more of the parties to the settlement would not have consented to the settlement.  C&S will also release its general unsecured claim pending in the Bruno's Chapter 11 Cases.  To the extent necessary, the Plan will serve as a motion seeking approval under Bankruptcy Rule 9019(a) of a compromise with respect to any claims by and among the Debtors and C&S as set forth above.

G.    Ahold/SFM Claims Settlement

In 2005, shortly after the acquisition by certain of the Lone Star Entities of the membership interests of BI-LO Holding from certain the Ahold Entities, BI-LO divested and assigned certain leases of unexpired non-residential real property to SFM for the operation of supermarkets.    BI-LO remains obligated under these leases.    In addition, prior to the 2005 acquisition by the Lone Star Entities and subsequent divestiture by BI-LO, certain of the Ahold Entities had entered into guarantees related to many of these leases.    Certain of the supermarkets covered by these leases guaranteed by the applicable Ahold Entities have closed, or may close, resulting in potential claims against those Ahold Entities that the Ahold Entities assert will be in excess of $60 million, which is reflected in proofs of claim filed by the Ahold Entities in the Chapter 11 Cases.    The Ahold Entities assert that the statutory cap on damages related to unexpired leases under § 502(b)(6) of the Bankruptcy Code does not apply to the calculation of the Ahold Entities' damages as a guarantor in respect of the SFM leases.    After engaging in arm's length negotiation with the Debtors, the Creditors' Committee and the Lone Star Entities, the Ahold Entities, in the interest of ensuring the confirmation of the Plan, have agreed to compromise and settle the Ahold/SFM Lease Claims under Bankruptcy Rule 9019 in an allowed amount of $7 million (as discussed below), which reflects the amount of the claim if calculated under § 502(b)(6).

As part of the overall compromise and settlement by and between the Debtors, the Creditors' Committee, the Ahold Entities and the Lone Star Entities that is contained in the Plan, the applicable Ahold Entities (in the aggregate) shall have an Allowed Class 4 Claim relating to the Ahold/SFM Lease Claims in the amount of $7 million.    Confirmation of the Plan by the Bankruptcy Court constitutes approval and allowance of the Ahold/SFM Lease Claims in this amount; provided, however, that to the extent any Proofs of Claim filed by a landlord against the Debtors' Estates in respect of non-residential real property leases covered by the Ahold/SFM Lease Claims which are subject to a guaranty entered into by an Ahold Entity, including Proofs of Claim Nos. 1454, 1659 and 1660 for SFM store numbers 434, 518, 528 and 733 (the "SFM Landlord Claims"), becomes an Allowed Claim (subject to the Ahold Entities' right to take assignment of any SFM Landlord Claims and be heard in connection with any objection to or resolution of any SFM Landlord Claims by the Trustee of the Creditors' Trust), the Ahold/SFM Lease Claims related to such Allowed SFM Landlord Claim shall either (i), upon payment by an Ahold Entity of an Allowed SFM Landlord Claim, be subrogated to such Allowed SFM Landlord Claim (only to the extent of such Allowed SFM Landlord Claim), with such Allowed SFM Landlord Claim to be (a) deemed subsumed and included entirely within the Ahold/SFM Lease Claims, and (b) then expunged; provided, however, that such inclusion shall not increase or impact, in any manner whatsoever, the Allowed amount of the Ahold/SFM Lease Claims or (ii) be reduced in an amount equal to such Allowed SFM Landlord Claim if a distribution under the Plan is made to the holder of such Allowed SFM Landlord Claim; provided further, however, such approval does not affect or operate as a limit or a cap on any other General Unsecured Claim submitted by any Ahold Entity (which does not include any Class 3 Claims) which shall be treated as Class 4 Claims.    Notwithstanding anything in this Plan or the Equity Purchase Agreement to the contrary, the Trustee of the Creditors' Trust shall have the right to assert any Claims, Causes of Action, rights of set-off or other rights or defenses relating to any Class 4 Claim of an Ahold Entity (other than Claims, Causes of Action or rights of set-off arising under §§ 502(d) or 544-550 of the Bankruptcy Code) with respect to any dispute, objection, or other matters exclusively related to reconciliation of any Ahold Entities' Class 4 Claim.

## XII.
## THE REORGANIZED DEBTORS

**A.     Business**

Following the implementation of the Plan, the Reorganized Debtors will operate in excess of approximately 200 supermarkets in the southeastern United States largely in accordance with the Debtors' five year business plan.  They will continue to operate with their vendors and landlords in the ordinary course of business in substantially the same manner as they did prior to their chapter 11 filings.  The Reorganized Debtors, however, will emerge from chapter 11 with significantly reduced leverage and enhanced liquidity as a result of the investment of significant new equity capital in connection with the Plan.  The Plan contemplates the assumption of the supply agreement with C&S, as amended.  The amendment provides for, among other things: (a) elimination of C&S's exclusive first right to negotiate for the acquisition of BI-LO stores; (b) waiver of inflation-related adjustments to certain charges, rebates and surcharges; (c) BI-LO sublease savings of $52,524 per week; and (d) a cash payment of $15 million by BI-LO to C&S in full satisfaction of any obligations of BI-LO and BI-LO Holding under the existing supply agreement and guaranty.

**B.     Financial Projections**

Attached as **Exhibit G** to the Plan are certain financial projections for the Reorganized Debtors after their emergence from bankruptcy that were prepared by the Debtors and their professionals.  These projections are dependent on the validity of the assumptions underlying the financial projections, but the Debtors believe the assumptions are reasonable as of the date of this Disclosure Statement.

**C.     Liquidity and Capital Structure**

The Reorganized Debtors will have access to up to $150 million under the New ABL Facility, which is anticipated to be substantially undrawn upon exiting bankruptcy, thus providing significant liquidity for the company's operations.  The Debtors anticipate that this new credit facility will be secured by the same type of collateral as the prepetition working capital facility.

Other than trade debt and small amounts of miscellaneous secured debt, the Reorganized Debtors' total debt as of the Effective Date is anticipated to be only the drawn portion of the New ABL Facility, and borrowings outstanding on the Term Loans**.**

**D.     Ownership**

On the Effective Date, the Reorganized Debtors will be 100% owned by the Investor.

**E.     Governance**

On the Effective Date, the initial board of managers of Reorganized BI-LO Holding will be determined as set forth in the Equity Purchase Agreement.  The identities and affiliations of all board members on the Effective Date will be disclosed in a filing with the Bankruptcy Court at or prior to the Confirmation Hearing.  To the extent any person proposed to serve as a board member or an officer of Reorganized BI-LO Holding is an insider, the Debtors will disclose the nature of any compensation for such person at or before the Confirmation Hearing.

Each individual serving as an officer of BI-LO Holding immediately prior to the Effective Date will hold the same office with Reorganized BI-LO Holding on and after the Effective Date, unless changes are made by the board of managers of Reorganized BI-LO Holding on or after the Effective Date.

On the Effective Date, the initial board of managers of Reorganized BI-LO Holding will appoint the managers of the initial board of managers of each of the other Reorganized Debtors. Thereafter, the method of selection of managers for the boards of each of the Reorganized Debtors will be as provided in their organizational documents.

Each individual serving as an officer of a Debtor other than BI-LO Holding immediately prior to the Effective Date will hold the same office with the applicable Reorganized Debtor on and after the Effective Date, unless changed by the Reorganized Debtor's board of mangers after the Effective Date.

# XIII.

## CERTAIN MISCELLANEOUS PROVISIONS OF THE PLAN

**A.**    Payment of Statutory Fees

All fees payable pursuant to § 1930(a) of title 28 of the United States Code, as determined by the Bankruptcy Court at a hearing pursuant to § 1128 of the Bankruptcy Code, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.

**B.**    Dissolution of Creditors' Committee

On the Effective Date, the Creditors' Committee shall cease operating and dissolve and other than with respect to its duty to maintain the confidentiality of protected, confidential or commercially sensitive information in accordance with any applicable agreements, orders of the Bankruptcy Court or the Creditors' Committee by-laws (which duty shall continue) the Creditors' Committee members shall have no further duties, responsibilities and obligations in connection with the Chapter 11 Cases; provided, however, that the Creditors' Committee shall exist and its Professionals shall be retained and their Professional Fees shall be paid with respect to (a) the preparation of their applications for Professional Claims, (b) responding to any objections to such applications, whether formal or informal, and attendance at any hearings with respect to such applications, (c) reviewing, and if required, preparing and prosecuting objections to Professional Claims of other Professionals, whether formal or informal and attendance at any hearings with respect to such objections, (d) defending against or otherwise participating in any challenge to the provisions of the Plan or the Confirmation Order, including appeals and (e) reviewing post-Effective Date changes, if any, to the Contract Assumption Schedule, consistent with the limitations contained in Section 8.1(b)(1) of the Plan. Other than as set forth herein, on the Effective Date, the retention and employment of the Committee's Professionals shall terminate without further order of the Bankruptcy Court.

**C.**    Nonseverability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, (a) the remainder of the terms and provisions of the Plan will remain in full force and

effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation and (b) no re-solicitation of any acceptance or rejection of the Plan shall be required.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) nonseverable and mutually dependent.

**D.**    Notices

To be effective, all notices, requests and demands to or upon the following parties shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

To the Debtors:

> BI-LO, LLC
> 208 BI-LO Blvd.
> Greenville, South Carolina 29607
> Facsimile: (864) 234-6999
> Attn: Brian P. Carney

To counsel for the Debtors:

> VINSON & ELKINS L.L.P.
> 3700 Trammell Crow Center
> 2001 Ross Avenue
> Dallas, Texas 75201-2975
> Facsimile: (214) 220-7718
> Attn:  Josiah M. Daniel, III
>
> -and-
>
> NELSON MULLINS RILEY & SCARBOROUGH, L.L.P.
> 1320 Main Street, 17th Floor
> Post Office Box 11070 (29211)
> Columbia, SC 29201
> Facsimile:    (803) 256-7500
> Attn:  George B. Cauthen

To counsel for the Creditors' Committee:

> OTTERBOURG STEINDLER HOUSTON & ROSEN, P.C.
> 230 Park Avenue
> New York, New York 10016
> Facsimile: (212) 682-6104
> Attn: Scott L. Hazan and Enid Nagler Stuart
>
> -and-
> McCARTHY LAW FIRM, LLC
> 1715 Pickens Street (29201)

Columbia, South Carolina 29211-1332
Facsimile: (803) 779-0267
Attn: G. William McCarthy, Jr. and Daniel J. Reynolds

To counsel for Lone Star:

KING AND SPALDING, PC
1100 Louisiana Street
Houston, Texas 77002
Facsimile: (713) 751-3290
Attn: Edward L. Ripley

-and-

LEVY LAW FIRM, PC
2300 Wayne Street
Columbia, South Carolina 29201
Facsimile: (803) 799-5245
Attn: R. Geoffrey Levy

To counsel for Ahold:

WHITE & CASE, LLP
200 South Biscayne Boulevard, 49th Floor
Miami, Florida 33131
Attn: John K. Cunningham, Esq. and Frank L. Eaton, Esq.

-and-

MOORE & VAN ALLEN PLLC
40 Calhoun Street, Suite 300
Post Office Box 22828
Charleston, South Carolina 29413-2828
Attn: David B. Wheeler, Esq.

**E.**  **Terms of Injunctions or Stays**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to §§ 105 or 362 of the Bankruptcy Code or any Final Order, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**F.**  **Closing of Chapter 11 Cases**

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

G.    Governing Law

Except to the extent the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, the rights and obligations arising under the Plan and any agreements, documents and instruments executed in connection with the Plan or the Chapter 11 Cases, including the Plan Documents, shall be governed by, and construed and enforced in accordance with, the laws of the State of South Carolina (without giving effect to the principles of conflicts of law of such jurisdiction), except as may be otherwise specifically provided in such agreements, documents and instruments.

**XIV.**
**CERTAIN FEDERAL INCOME TAX ISSUES**
**RELATED TO THE PLAN**

A.    **General**

The following discussion is a summary of certain U.S. federal income tax consequences of the Plan to the Debtors and to holders of claims.  This discussion is based on the Internal Revenue Code of 1986, as amended (the "IRC"), Treasury Regulations promulgated and proposed thereunder, judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service ("IRS") as in effect on the date hereof.  Due to the complexity of certain aspects of the Plan, the lack of applicable legal precedent, the possibility of changes in the law, the differences in the nature of the claims (including claims within the same class), the holders' status and method of accounting (including holders within the same class) and the potential for disputes as to legal and factual matters with the IRS, the tax consequences described herein are subject to significant uncertainties.  No legal opinions have been requested from counsel with respect to any of the tax aspects of the Plan and no rulings have been or will be requested from the IRS with respect to the any of the issues discussed below.  Furthermore, legislative, judicial or administrative changes may occur, perhaps with retroactive effect, which could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to the Debtors and the holders of claims.

This summary does not apply to (i) holders of claims that are not United States persons (as defined in the IRC) or that are otherwise subject to special treatment under U.S. federal income tax law (including, for example, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, regulated investment companies, investors that hold the instruments as part of a straddle or hedging, constructive sale, integrated or conversion transactions for U.S. federal income tax purposes or investors whose functional currency is not the U.S. dollar) or (ii) holders of claims or equity interests that are not entitled to vote on the Plan, including holders whose claims or equity interests are entitled to reinstatement or payment in full in cash under the Plan or holders whose claims or interests are to be extinguished without any distribution.  The following discussion assumes that holders of claims hold their instruments as "capital assets" within the meaning of IRC § 1221 and that holders of claims hold only claims in a single class.  Holders of multiples classes of claims should consult their own tax advisors as to the effect such ownership may have on the federal income tax consequences described below.  Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to Debtors and holders of claims based upon their particular circumstances.  Additionally, this summary does not discuss any tax consequences that may arise under state, local, or foreign tax law.

If a partnership holds claims, the tax treatment of a partner will generally depend upon the status of the partner and the activities of the partnership.  Partners in partnerships that hold claims should consult their tax advisors.

THE FOLLOWING SUMMARY IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE PERSONAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM.  EACH HOLDER OF A CLAIM IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## B.     Consequences to the Debtors

Each of the Debtors is classified, for U.S. federal income tax purposes, as an entity whose existence is disregarded as separate from that of the Investor, a non-Debtor.  Consequently, the Plan should not result in any U.S. federal income tax consequences to the Debtors.  Rather, the U.S. federal income tax consequences of the Plan to the Debtors will occur at the level of the non-Debtor parent, the Investor.

## C.     Federal Income Tax Treatment of the Creditors' Trust

### 1.     Classification of the Creditors' Trust

Pursuant to the Plan, the Debtors will transfer certain assets to the Creditors' Trust, which will become obligated to make distributions in accordance with the Plan.  The Plan provides, and this discussion assumes, that the Creditors' Trust will be treated for federal income tax purposes as a "liquidating trust," as defined in Treasury Regulation § 301.7701-4(d), and will therefore be taxed as a grantor trust, of which the beneficiaries will be treated as the owners and grantors thereof.  Accordingly, because a grantor trust is treated as a pass-through entity for federal income tax purposes, no tax should be imposed on the Creditors' Trust itself or on the income earned or gain recognized by the Creditors' Trust.  Instead, the beneficiaries (*i.e.*, holders of allowed claims in Class 4) will be taxed on their allocable shares of such net income or gain in each taxable year (determined in accordance with the Trust Agreement), whether or not they receive any distributions from the Creditors' Trust in such taxable year.

Although the Creditors' Trust has been structured with the intention of complying with guidelines established by the IRS in Rev. Proc. 94-45, 1994-2 C.B. 684, for the formation of liquidating trusts, it is possible that the IRS could require a different characterization of the Creditors' Trust, which could result in different and possibly greater tax liability to the Creditors' Trust and/or the holders of allowed claims.  No ruling has been or will be requested from the IRS concerning the tax status of the Creditors' Trust, and there can be no assurance the IRS will not require an alternative characterization of the Creditors' Trust.  If the Creditors' Trust were determined by the IRS to be taxable not as a liquidating trust, as described in Treasury Regulation § 301.7701-4(d), the taxation of the Creditors' Trust and the transfer of assets by the Debtors to the Creditors' Trust could be materially different than is described herein and could have a material adverse effect on the holders of allowed claims.

### 2.     Tax Reporting

The Trustee will file tax returns with the IRS for the Creditors' Trust as a grantor trust in accordance with Treasury Regulation § 1.671-4(a).  The Trustee will also send to each beneficiary of the Creditors' Trust a separate statement setting forth the beneficiary's allocable share of items of income, gain, loss, deduction or credit and will instruct the beneficiary to report such items on such beneficiary's federal income tax return.

3.      *Reserve for Disputed Claims*

The Trustee may establish a reserve on account of any distributable amounts required to be set aside on account of disputed claims. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Trustee will, to the extent permitted by applicable law, (A) elect to treat any Trust Assets allocable to, or retained on account of, disputed claims (the "Trust Claims Reserve") as a "disputed ownership fund" governed by Treasury Regulation § 1.468B-9, and (B) report consistently with the foregoing for state and local income tax purposes. Accordingly, the Trust Claims Reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to the Trust Assets in such reserves, and all distributions from such reserves will be treated as received by holders in respect of their claims as if distributed by the Debtors. All parties (including, without limitation, the Debtors, the Trustee and the Trust beneficiaries) will be required to report for tax purposes consistently with the foregoing.

## D.    Consequences to Holders of Claims

The federal income tax consequences of the Plan to a holder of a claim will depend upon several factors, including but not limited to: (i) the origin of the holder's claim, (ii) whether the holder is a resident of the United States for tax purposes (or falls into any of the special classes of taxpayers excluded from this discussion as noted above), (iii) whether the holder reports income on the accrual or cash basis method, (iv) whether the holder has taken a bad debt deduction or worthless security deduction with respect to its claim and (v) whether the holder receives distributions under the Plan in more than one taxable year. HOLDERS ARE STRONGLY ADVISED TO CONSULT THEIR TAX ADVISORS WITH RESPECT TO THE TAX TREATMENT UNDER THE PLAN OF THEIR PARTICULAR CLAIMS.

1.      *Gain or Loss Recognized by Holders of Claims*

Generally, a holder of an allowed claim will recognize gain or loss equal to the difference between the "amount realized" by such holder and such holder's adjusted tax basis in the allowed claim. The "amount realized" is equal to the sum of the cash and the fair market value of any other consideration received under the Plan in respect of a holder's claim, including, to the extent such holder is a beneficiary of the Creditors' Trust, the fair market value of each such holder's proportionate share of the assets transferred to the Creditors' Trust on behalf of and for the benefit of such holder (to the extent that such cash or other property is not allocable to any portion of the allowed claim representing accrued but unpaid interest (as discussed below)).

The transfer of the Trust Assets (other than any assets allocated to the Trust Claims Reserve, discussed above) to the Creditors' Trust by the Debtors should be treated for federal income tax purposes as a transfer of such Trust Assets directly to the holders of allowed claims to the extent they are beneficiaries of the Creditors' Trust, followed by a deemed transfer of such Trust Assets by such beneficiaries to the Creditors' Trust. As a result of such treatment, such holders of allowed claims will be required to take into account the fair market value of their pro rata share, if any, of the proceeds of the Trust Assets transferred on their behalf to the Creditors' Trust in determining the amount of gain realized and required to be recognized upon consummation of the Plan on the Effective Date. In addition, since a holder's share of the assets held in the Creditors' Trust may change depending upon the resolution of disputed claims, the holder may be prevented from recognizing any loss in connection with consummation of the Plan until all such disputed claims have been resolved. The Trustee will provide the holders of allowed claims with valuations of the assets transferred to the Creditors' Trust on behalf of and for the benefit of such holders and such valuations should be used consistently by the Creditors' Trust and such holders for all federal income tax purposes. HOLDERS SHOULD CONSULT THEIR OWN TAX

71

ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR ALLOWED CLAIMS.

### 2.   *Distributions in Discharge of Accrued but Unpaid Interest*

Pursuant to the Plan, distributions received in respect of allowed claims will be allocated first to the principal amount of such allowed claims, with any excess allocated to any allowed accrued but unpaid interest. However, there is no assurance that the IRS will respect such allocation for federal income tax purposes. Holders of allowed claims not previously required to include in their taxable income any accrued but unpaid interest on an allowed claim may be treated as receiving taxable interest to the extent the consideration they receive under the Plan is allocable to accrued but unpaid interest. Holders previously required to include in their taxable income any accrued but unpaid interest on an allowed claim may be entitled to recognize a deductible loss, to the extent that such accrued but unpaid interest is not satisfied under the Plan. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR ALLOWED CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.

### 3.   *Character of Gain or Loss; Tax Basis; Holding Period*

The character of any gain or loss as capital or ordinary and, in the case of capital gain or loss, as long-term or short-term, recognized by a holder of allowed claims under the Plan will be determined by a number of factors, including, but not limited to, the status of the holder, the nature of the allowed claim in such holder's hands, the purpose and circumstances of its acquisition, the holder's holding period of the allowed claim, the extent to which the holder previously claimed a deduction for the worthlessness of all or a portion of the allowed claim and the extent to which the holder acquired the allowed claim at a market discount. The holder's aggregate tax basis for any consideration received under the Plan will generally equal the amount realized in the exchange (less any amount allocable to interest as described in the preceding paragraph). The holding period for any consideration received under the Plan will generally begin on the day following the receipt of such consideration.

### E.   **Backup Withholding**

Under the backup withholding rules, a holder of claims may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless that holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax but merely an advance payment that may be refunded to the extent it results in an overpayment of tax.

The Debtors will withhold all amounts required by law to be withheld from payments of interest. The Debtors will comply with all applicable reporting requirements of the IRC.

AS INDICATED ABOVE, THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. ACCORDINGLY, EACH HOLDER OF A CLAIM IS URGED TO CONSULT SUCH HOLDER'S TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, HOLDERS OF CLAIMS ARE HEREBY NOTIFIED THAT: (1) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER OF A CLAIM FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS OF CLAIMS UNDER THE TAX CODE, (2) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE CONFIRMATION OF THE PLAN TO WHICH THE TRANSACTIONS DESCRIBED IN THIS DISCLOSURE STATEMENT ARE ANCILLARY AND (3) HOLDERS OF CLAIMS SHOULD SEEK ADVICE BASED UPON THEIR PARTICULAR CIRCUMSTANCES FROM THEIR OWN TAX ADVISOR.

## XV.
## CERTAIN RISKS TO BE CONSIDERED IN
## CONNECTION WITH THE DEBTOR'S PLAN

The Plan sets forth the means for satisfying the claims against the Debtors. Certain claims and equity interests receive no distributions pursuant to the Plan. Prior to voting to accept or reject the Plan, holders of claims should read carefully the following discussion of some of the risks set forth below, as well as the other information set forth in the Disclosure Statement and the Plan (and the documents delivered together with, or incorporated by reference, either in the Plan, or the Disclosure Statement, including Plan Documents) prior to voting to accept or reject the Plan. These risks should not be considered to be or regarded as constituting the only risks involved in connection with the Plan and its implementation, or alternatives to the Plan.

**A.    Business Risks**

*1.    Competition*

The food retailing business is highly competitive. Supermarket chains generally compete on the basis of location, quality of products, service, price, product variety and store condition. The Debtors compete with several national, regional and local supermarket chains, including Wal-Mart, as well as similar supercenters and other non-traditional grocery retailers such as dollar-discount stores, drug stores, convenience stores, warehouse club stores and conventional department stores.

Heightened competition could include the intensification of price competition, the entry of new competitors and the expansion, renovation and opening of new stores by new and existing competitors. If the Debtors or Reorganized Debtors fail to successfully respond to competitive pressures in this industry or to effectively implement their strategies to respond to these pressures their operating results may be negatively affected.

Some of the Debtors' principal competitors have greater financial resources than the Debtors and either have or may in the future use those resources to take steps which may have an adverse effect on the Debtors' competitive position and financial performance.

*2.    Geographic Concentration*

The Debtors operate in the southeastern United States. The Debtors may be adversely affected by a decline in economic conditions or a natural or other catastrophic event that impacts this region.

*3.     C&S Supply Relationship; Dependency on Suppliers*

C&S supplies approximately 70% of the Debtors' merchandise.  Any material change in C&S's method of operation or a termination or material modification of the Debtors' contractual relationships with C&S could have an adverse impact on the Debtors' supply chain, sales and earnings.  If the supply contract with C&S is terminated, the Debtors may be unable to locate alternative, comparable sources from which to purchase its retail merchandise, which could increase their costs and adversely affect their operations.  Moreover, if there is a comparable replacement for C&S, a change in suppliers could cause a delay in distribution and a possible loss of sales, which would affect operating results adversely.

Cardinal provides the Debtors with its prescription and over-the-counter drugs, comprising approximately 10% of the Company's merchandise.  In addition to C&S and Cardinal, approximately 500 other vendors and third party food manufacturers deliver the remaining 20% of the Debtors' merchandise directly to their stores.  Any interruption in the ability of the Debtors to obtain merchandise and secure the delivery of such merchandise to their stores could materially and negatively impact the results of their operations.  Any adverse change to the terms on which the Debtors obtain merchandise and the delivery thereof could also materially and negatively impact the results of their operations.

*4.     Extended Time in Chapter 11 Could Be Damaging*

Continuing the Chapter 11 Cases, if no plan is confirmed in the time frame currently contemplated, could further adversely affect the Debtors' relationship with their customers, suppliers and employees.

*5.     Dependencies on Leasehold Properties*

The Debtors lease substantially all of their stores.  Loss of leases or the inability to renew leases at reasonable rental rates could have a material adverse affect on the Debtors' business.  Furthermore, after emergence from chapter 11, the Debtors' leases will typically provide for multiple year durations, which decreases the Debtors' flexibility in closing any stores that may subsequently become under-performing.

*6.     The Financial Forecast Is Fundamentally Uncertain*

A financial forecast that assumes the Plan is confirmed is attached to the Plan as **Exhibit G**.  The forecast is dependent upon the validity of the assumptions underlying the projections.  The forecast is intended to illustrate the estimated effects of the Plan and the related transactions on the results of operations, cash flow and financial position of the Reorganized Debtors for the periods indicated.  The Reorganized Debtors' future operating results are subject to and likely to be affected by a number of factors, including significant business, economic, regulatory and competitive uncertainties, many of which are beyond the control of the Debtors.  Accordingly, actual results may vary materially from those shown in the forecast.

The financial forecast was not prepared with a view toward public disclosure other than in this Disclosure Statement or with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information.  The Debtors do not intend to update or otherwise revise their financial forecast to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events.  The Debtors believe that their financial forecast was prepared on a reasonable basis and represents a reasonable view of the expected future financial performance of the Reorganized Debtors after the Effective Date.  Nevertheless, the financial forecast should not be regarded as a representation or

assurance by anyone that the forecast will be achieved.  Parties in interest are therefore cautioned not to place undue reliance on them.

> 7. *Historical Financial Information Will Not Be Comparable*

As a result of the consummation of the Plan, the Reorganized Debtors will operate under a new capital structure.  In addition, the Reorganized Debtors will be subject to the fresh start accounting rules. Accordingly, the financial condition and results of the Reorganized Debtors' operations from and after the Effective Date will not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

## B.    Certain Bankruptcy Considerations

> 1. *Objections to the Debtors' Classification of Claims*

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of claims and interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

> 2. *Consummation of the Equity Investment, New Term Credit Facility and New ABL Facility*

The Plan is based upon the issuance of the New Common Units to the Investor for $150 million and the entry into by the Reorganized Debtors of the New Term Credit Facility and New ABL Facility. The closing of the equity investment and the two new loan facilities are subject to certain conditions that will need to be satisfied.  If the equity investment and the two new loan facilities cannot be closed and the Debtors do not waive this condition to consummation of the Plan, the Plan as structured cannot be consummated.  The Debtors believe the equity investment and the two new loan facilities will be consummated but cannot give an absolute assurance that they will be.

> 3. *Securing Confirmation of the Plan*

There can be no assurance that the Debtors will receive the requisite acceptances to confirm the Plan.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting creditor or equity holder of the Debtors might challenge the adequacy of this Disclosure Statement or contend that the balloting procedures and results are not in compliance with the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the Plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes, and the value of distributions to non-accepting holders of claims and equity interests within a particular class under the Plan will not be less than the value of distributions such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  While there can be no assurance that these requirements will be met, the Debtors believe that the Plan does satisfy these tests.

4.        *Conditions to Confirmation of the Plan*

While the Debtors believe that those conditions will be met, they cannot give absolute assurance. If the conditions are not met, a waiver of the conditions by the Debtors and the Investor would be required in order to confirm the Plan.  If the Plan is not confirmed, it is unclear whether another restructuring of the Debtors could be implemented and what distributions holders of claims or equity interests ultimately would receive with respect to their claims or equity interests.  If an alternative reorganization plan could not be agreed to, it is possible that the Debtors would have to convert their cases to chapter 7, in which case it is likely that holders of claims and equity interests would receive substantially less favorable treatment than they would receive under the Plan.

5.        *Debtors' Objections to Classification of Claims*

The Reorganized Debtors and the Creditors' Trust (with respect to Class 4 and Class 6 claims) reserve the right to object to the amount or classification of any claim or equity interest.  The estimates set forth in this Disclosure Statement cannot be relied on by any creditor or equity holder whose claim or equity interest is subject to an objection.  Any such claim or equity interest holder may not receive its specified share of the estimated distributions described in this Disclosure Statement.

6.        *Additional Bankruptcy-Specific Risk Factors*

In addition to the foregoing, the following risk factors are some, but not all, of the variables that may have an impact on the Plan, or the information contained in this Disclosure Statement, and exhibits thereto: adverse affect on public perception of the company as a result of the bankruptcy filing; possibility that an insufficient number of holders of claims will vote in favor of the Plan; and possibility the Plan will be confirmed over the objection and non-acceptance by certain classes.

C.        **Risks to Beneficiaries of the Creditors' Trust**

1.        *Risk Factors Relating to Securities Laws*

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan from registration under the Securities Act and state securities laws if three principal requirements are satisfied:  (i) the securities must be offered and sold under a plan and must be securities of the debtor, an affiliate participating in a joint plan with the debtor or a successor to the debtor under the plan; (ii) the recipients of the securities must hold a prepetition or administrative expense claim against the debtor or an interest in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor or principally in such exchange and partly for cash or property.  To the extent that the rights to distributions from the Creditors' Trust are deemed to constitute securities issued in accordance with the Plan, the Debtors believe that such interests satisfy the requirements of § 1145(a)(1) of the Bankruptcy Code and, therefore, such interests are exempt from registration under the Securities Act and applicable state securities laws.

2.        *Non-Transferability of Interests*

Holders of claims in Class 4 should be aware that their rights to distribution from the Creditors' Trust are not transferable.  Therefore, there will not be any trading market for such rights, nor will those rights be listed on any public exchange or other market.  The lack of liquidity of the rights to distributions from the Creditors' Trust may have a negative impact on their value.

3.       *Expenses of the Creditors' Trust*

The ultimate amount of cash available for distribution to beneficiaries of the Creditors' Trust depends, in part, on the manner in which the Trustee, in consultation with the Trust Advisory Board, operates the Creditors' Trust and the expenses the Trustee incurs.  Expenses of the Creditors' Trust, the Trustee (including its professionals) and the Trust Advisory Board will be given priority over distributions to holders of claims in Class 4.  As a result, the amount of professional or other expenses incurred by the Creditors' Trust, the Trustee and the Trust Advisory Board will impact the amount of cash remaining to satisfy allowed claims in such class.

4.       *Uncertainty of Allowed Amounts of General Unsecured Claims*

This Disclosure Statement has been prepared based on preliminary information concerning filed claims and the Debtors' publicly filed schedules of assets and liabilities.  Upon completion of more detailed analyses of filed claims, the actual amount of allowed claims may differ materially from the Debtors' current estimates.

Approximately 1,400 general unsecured claims were filed against the Debtors, totaling in excess of $453 million, plus contingent and other unliquidated amounts.  The Debtors believe that there may be valid objections to certain of the claims that have been filed, and that the ultimate allowed amounts of those claims will be significantly less than the asserted amount of such claims.  The amount of disputed claims in these cases is expected to be material.  These disputed claims, include, among other things, litigation claims and lease or contract rejection claims, including rejection claims filed by landlords in excess of the applicable statutory limitations upon such claims.

The Debtors' estimates of the recoveries set forth in this description of the Plan are predicated on an estimate by the Debtors of approximately $65 - 85 million of total Class 4 and 6 general unsecured claims being eventually allowed and the treatment of Class 5 creditors being parallel and equal to Class 4.  There can be no assurance that this estimated amount of general unsecured claims is correct.  The actual allowed amount of claims will likely differ in some respect from the estimates, and that difference could be material.  The estimated amounts are subject to certain risks, uncertainties and assumptions.  Should one or more of these risks or uncertainties materialize, or should the underlying assumptions prove incorrect, the actual allowed amount of general unsecured claims may vary materially from these estimates.

Holders of allowed general unsecured claims in Class 4 will receive a recovery from a finite amount of assets.  While that amount is not presently known (as a result of, among other things, uncertainty about the value, if any, of the Trust Causes of Action, and the amount of the expenses of the Creditors' Trust), if individual Class 4 general unsecured claims are allowed in amounts in excess of estimates, the recovery to creditors in this class could be substantially diluted.

5.       *Changes in Rules and Regulations*

In addition, the value of such rights, and the amount of distribution to the beneficiaries of the Creditors' Trust will depend on the effects of any changes in tax and other government rules and regulations applicable to the Creditors' Trust.

THESE RISK FACTORS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE

CONTROL OF DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, THE PRICES AT WHICH DEBTORS CAN SELL THEIR GOODS AND SERVICES, CURRENCY EXCHANGE RATE FLUCTUATIONS, NATURAL DISASTERS AND UNUSUAL WEATHER CONDITIONS, TERRORIST ACTIONS OR ACTS OF WAR, OPERATING EFFICIENCIES, LABOR RELATIONS, ACTIONS OF GOVERNMENTAL BODIES, AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

# XVI.
## RECOMMENDATION

The Debtors recommend the Plan because it provides for greater distributions to the holders of claims than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code and is, in the Debtors' business judgment, the best alternative available to the Debtors, their estates and creditors. **Accordingly, the Debtors recommend that holders of claims entitled to vote on the Plan support confirmation and vote to accept the Plan.**

Dated:  March 15, 2010                    Respectfully submitted,


                                          By: */s/ Brian P. Carney*_____
                                          Executive Vice President and
                                          Chief Financial Officer
                                          BI-LO, LLC

## EXHIBIT A

**Plan of Reorganization**

**<u>EXHIBIT B</u>**

**Order Approving Disclosure Statement**