## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

**Case No. 09-02140-hb**

### ORDER APPROVING FINAL FEE APPLICATIONS OF PROFESSIONAL PERSONS
### EMPLOYED BY OR AT THE EXPENSE OF THE ESTATES

The relief set forth on the following pages for a total of __ pages, including this page, is hereby **ORDERED**.

**FILED BY THE COURT**
**08/05/2010**



_____
US Bankruptcy Judge
District of South Carolina

Entered: 08/05/2010

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| In re: | § | **Case No. 09-02140 (HB)** |
| | § | |
| **BI-LO, LLC** *et al.*, | § | **Chapter 11** |
| | § | |
| Debtors.[1] | § | **(Joint Administration)** |
| | § | |

## ORDER APPROVING FINAL FEE APPLICATIONS OF PROFESSIONAL PERSONS EMPLOYED BY OR AT THE EXPENSE OF THE ESTATES

---

This matter comes before the Court upon the final fee and expense reimbursement applications (the "Final Fee Applications") filed by the following professional persons who were employed by or are to be paid at the expense of the estates of the above-captioned Debtors (in alphabetical order):

- AP Services, LLC ("APS")
- Deloitte & Touche LLP ("Deloitte")
- DJM Asset Management, LLC ("DJM")
- FTI Consulting, Inc. ("FTI")
- McCarthy Law Firm, LLC ("McCarthy")
- Nelson Mullins Riley & Scarborough ("NMRS")
- Official Committee of Unsecured Creditors (the "Committee") (expenses only)
- Otterbourg Steindler Houston & Rosen, P.C ("Otterbourg")
- Parker Poe Adams & Bernstein LLP ("Parker Poe")
- Vinson & Elkins, LLP ("V&E")
- William Blair & Company, LLC ("Blair")
- Womble Carlyle Sandridge & Rice, PLLC ("Womble")

For the reasons set forth herein, the Court approves the fees and expenses requested in the Final Fee Applications as presented at the Hearing (hereinafter defined).

---

[1]    The Debtors and the last four digits of their respective tax identification numbers are: BI-LO, LLC (0130); BI-LO Holding, LLC (5011); BG Cards, LLC (4159); ARP Ballentine LLC (6936); ARP James Island LLC (9163); ARP Moonville LLC (0930); ARP Chickamauga LLC (9515); ARP Morganton LLC (4010); ARP Hartsville LLC (7906); and ARP Winston Salem LLC (2540).

<u>Jurisdiction and Venue</u>

1.      The Court has subject matter jurisdiction over these matters pursuant to 28 U.S.C.

§ 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper pursuant

to 28 U.S.C. §§ 1408 and 1409.  The hearing on the Fee Applications was held on July 27, 2010

in the Donald Stuart Russell Federal Courthouse in Spartanburg, South Carolina (the "<u>Hearing</u>").

Notice of the Hearing was proper pursuant to the Federal Rules of Bankruptcy Procedure (the

"<u>Bankruptcy Rules</u>") and the *Order Establishing Certain Notice, Case Management and*

*Administrative Procedures* [Docket No. 115], approved by this Court on March 27, 2009; and no

other or further notice is necessary.

2.      The Bankruptcy Code provides that it is the duty of the Court to approve both the

employment and the compensation of professional persons who are employed by the debtors in

possession pursuant to Bankruptcy Code §§ 1107 and 327 and by committees under §§ 1103 and

327.  Section 331 of the Bankruptcy Code provides that professionals' fees may be approved on

an interim basis, as many of the fees were during these cases, pursuant to the *Corrected Order*

*Establishing Procedures for Interim Compensation and Reimbursement of Expenses for*

*Professionals and Official Committee Members* [Docket No. 119]; however, such interim

allowances were only provisional, and all fees must be approved on a final basis.  Employment

of professionals may be under arrangements that are, if so ordered by the Court, under § 328 or

§ 330 of the Bankruptcy Code.[2]  It is also one of the duties of the United States Trustee, in

supervising the administration of chapter 11 cases, to review and object, if necessary, to fee

requests of employed professionals.  The final fee applications that are the subject of this Order

came before the Court pursuant to these Bankruptcy Code-required processes.

---

[2]      As more fully addressed below, APS was employed in these cases under § 363 of the Bankruptcy Code.  While
technically not a "professional," subject to the same fee application requirements of the Bankruptcy Code, APS
is included in the consideration of allowances of the professionals in this Order.

## Brief History of the Debtors and of the Initiation of the Cases

3.       Originally organized in 1961, the Debtors operate as a regional retail supermarket chain under the "BI-LO" and "Super BI-LO" banners with stores in South Carolina, North Carolina, Tennessee, and Georgia and with headquarters in Greenville, South Carolina.

4.       With declining financial performance and substantial loans quickly approaching maturity, each of the Debtors filed a voluntary petition for relief under the Bankruptcy Code on March 23, 2009 (the "Petition Date"), thereby commencing the above-captioned chapter 11 cases (the "Chapter 11 Cases") in this judicial district.  The Court notes that the Debtors had a choice of filing the Chapter 11 Cases in this District of South Carolina or in the District of Delaware.

5.       On March 24, 2009, the Court entered its *Order Directing Joint Administration of the Debtors' Related Chapter 11 Cases* consolidating the Chapter 11 Cases under Case No. 09-02140 for procedural purposes.

6.       The Chapter 11 Cases have had a successful outcome.  On April 30, 2010, the Court entered its *Order Confirming Debtors' Fourth Amended Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 3225] (the "Confirmation Order") confirming the *Fourth Amended Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 3122] (the "Plan"), which had been proposed by the Debtors and was supported by the Committee.  Pursuant to the Plan, the Debtors emerged as a reorganized limited liability company operating 207 full-service grocery stores.

## Assets and Debts at the Time of Filing

7.       On the Petition Date, the Debtors' assets consisted of:

- 254 retail grocery stores  –  all but one of which were leased, and 39 of which were "dark" or closed stores;

- Two leased warehouse distribution centers: one in Mauldin, SC, which was operating, and the other in Chattanooga, TN, which was closed;

- The equipment necessary to operate the Debtors' stores and headquarters offices;

- The inventory of goods in the stores;

- Numerous executory contracts and unexpired leases;

- The goodwill associated with the brand name and intellectual property, including numerous trademarks; and

- Other assets.

8.      As of the Petition Date, the principal debts were approximately $65.7 million (including $29.6 million in letters of credit) owed under a $100 million revolving credit asset-based loan provided by GE Business Financial Services, Inc., $260 million in term loans agented by The Bank of New York Mellon, and unsecured claims of various sorts ranging from balances due on a normal basis to vendors and landlords to sundry disputed claims.

9.      As of the Petition Date, the Debtors reported sales for the year ending January 3, 2009 of $2.6 billion.

Major Parties in the Case

10.     BI-LO continues to be one of the largest food retailers in the southeastern United States, currently operating 207 stores in South Carolina, North Carolina, Georgia and Tennessee, with the majority of stores located in South Carolina.  BI-LO's corporate headquarters are located in Greenville, South Carolina, and it currently employs approximately 20,000 full and part-time employees.  Throughout the Chapter 11 Cases, the Debtors remained in possession of their assets and business operations as debtors in possession.

11.     On March 30, 2009, the United States Trustee (the "U.S. Trustee") appointed the Committee [Docket No. 159].  Nine members were originally appointed to the Committee; however, effective March 8, 2010, Bottling Group, LLC ("Pepsi") resigned as a member of the Committee.  The remaining members of the Committee are (1) Kraft/Nabisco; (2) Cardinal Health 110, Inc.; (3) Kellogg Company; (4) C&S Wholesale Grocers, Inc. ("C&S"); (5) Sara Lee Corp.; (6) Developers Diversified Realty Corp.; (7) Coca-Cola Bottling, Inc.; and (8) Flowers Baking Co. of Morristown, LLC.

12.     The ad hoc committee of term lenders (the "Term Lenders") consisted of six entities who were, until their term loans were purchased by Ahold (defined herein) late in the Chapter 11 Cases, holders, managers, or investment advisors with respect to the debt obligations under the Debtors' $260,000,000 term credit agreement.  The Term Lenders were: (1) Ares Management, LLC, on behalf of funds managed by Ares Management LLC or a wholly-owned subsidiary of Ares Management LLC; (2) Kohlberg Kravis Roberts & Co. (Fixed Income) LLC; (3) Canyon Capital Advisors LLC; (4) Grace Bay Holdings II, LLC ("Bayside"); (5) C. Saunders, LLP; and (6) Merrill Lynch Credit Products.[3]

13.     GE Business Financial Services, Inc. served as administrative agent for the Debtors' prepetition $100,000,000 revolving asset-based loan facility.

14.     After a competitive process and a series of contested hearings, General Electric Capital Corporation was approved as administrative agent for itself and the other financial institutions from time to time parties to the Debtors' $125,000,000 debtor-in-possession financing facility credit agreement ("DIP Financing Facility").

---

[3]     Based upon the *Verified Statement of Jones Day and McNair Law Firm, P.A. Pursuant to Bankruptcy Rule 2019* [Docket No. 356].

15.     Koninklijke Ahold, N.V. (together with its affiliates, "Ahold") owned the Debtors until December of 2004[4] and is a guarantor on the majority of the Debtors' nonresidential real property leases, and various Ahold affiliates are landlords on a number of the Debtors' nonresidential real property leases.  Ahold also ultimately purchased the term loans from the Term Lenders during the late stages of the Chapter 11 Cases.

16.     In December 2004, Lone Star U.S. Acquisitions, LLC agreed to purchase BI-LO Holding, LLC from Ahold.  As of the Petition Date, substantially all of the equity interests in BI-LO Holding, LLC and BI-LO were indirectly owned by Lone Star Fund V (U.S.), L.P., LSF V International Finance, L.P. (Bermuda), or their affiliates ("Lone Star").

17.     The supplier of approximately 70% of the merchandise sold in BI-LO stores is C&S.

18.     The Debtors have hundreds of landlords and executory contract counterparties and other creditors and claimants.

Summary of Professional Appointments and
Role of Other Counsel in the Cases

19.     The Debtors employed V&E as lead bankruptcy counsel.  As South Carolina co-counsel, the Debtors called upon one of their long-time outside counsel firms, NMRS.  The Debtors also continued to employ NMRS as an ordinary course professional with respect to the same types of matters for which they had been retained prepetition.

20.     The Debtors employed APS to provide interim management and restructuring services, and APS Managing Director Michael Feder was appointed by the Debtors to serve during the Chapter 11 Cases as Chief Restructuring Officer.

---

[4]     December 22, 2004 was the date of signing of the relevant definitive agreements; however, the closing date of the transaction occurred at the beginning of 2005.

21.    The Debtors employed Blair as financial advisors to the Debtors, with Blair Principal, Tim Carroll, as lead advisor.[5]

22.    The Debtors employed DJM as lease mitigation consultant and appraiser.

23.    The Debtors employed Deloitte as auditors.

24.    The Debtors employed Parker Poe as ordinary course professional attorneys, providing legal services including those relating to environmental and pharmacy matters.

25.    The Debtors employed Womble as special counsel with respect to various matters including contracts, leases, and intellectual property.

26.    The Committee employed Otterbourg as counsel to the Committee and McCarthy as South Carolina co-counsel.

27.    The Committee employed FTI, and FTI Senior Managing Director, Steven Simms, as financial advisors to the Committee.

28.    The record of the proceedings reflects a substantial number of South Carolina attorneys who served as lead or local counsel to creditors, landlords, and other parties and the involvement of numerous regional, national, and international law firms in the Chapter 11 Cases. King & Spalding, LLP and the Levy Law Firm, LLC served as counsel to Lone Star; White & Case, LLP and Moore & Van Allen PLLC served as counsel to Ahold; Jones Day and the McNair Law Firm, P.A. served as counsel to the Term Lenders; and Latham & Watkins LLP and Nexsen Pruet Jacobs & Pollard, LLP served as counsel to the DIP Lender (hereinafter defined).

29.    The Court observes that the requirement of local counsel may have increased the legal costs overall, but the involvement of South Carolina lawyers was helpful to the Court and

---

[5]    The Blair retention was the subject of many months of negotiations among the Committee, Blair, the Debtors, and others.

to the successful outcome of the Chapter 11 Cases.[6]  The Court also notes that if the Chapter 11

Cases had been filed in the alternative venue available to the Debtors, the District of Delaware,

the cases would likely have involved most of the out-of-state attorneys involved here, and fees

and expenses would likely have been comparable to or higher than those experienced in this

district.

Summary of Final Fee Applications with Negotiated Reductions

30.    Section 2.3(a) of the Plan provides that the deadline for filing final fee

applications by the professionals employed pursuant to approval of the Court was June 26, 2010

(45 days after the Effective Date).   All of the Final Fee Applications were timely filed.

31.    The following charts summarize the amounts requested in the Final Fee

Applications, with any voluntary or negotiated reductions, and the remaining unpaid amounts

owed to each professional:

---

[6]    South Carolina Local Bankruptcy Rule 2090-1 sets forth the requirements for admission to practice before this Court.  It provides that "[a]n attorney who is admitted to practice in the United States District Court for the District of South Carolina" is admitted and that "[a]n attorney, not otherwise admitted to practice in this Court, may move for admission to practice in this Court *pro hac vice* as provided in the Local Rules of the United States District Court for the District of South Carolina" (the "District Court").  SC LBR 2090-1.  Rule 83.I.04 of the local rules of the District Court requires, among other things, that litigants "must be represented by at least one member of the Bar of this Court who shall sign each pleading, motion, discovery procedure, or other document served or filed in this Court."  Local Civil Rule 83.I.04 DSC.  Rule 83.I.05 of the local rules of the District Court allows for admission for attorneys not admitted in South Carolina "[u]pon motion of an attorney admitted to practice before this Court" in order to allow the attorney not admitted to practice in South Carolina "to appear in a particular matter in association with a member of the Bar of this Court," and further specifies requirements for such an application and the court's jurisdiction over such attorney's behavior relating to the "action for which the appearance is allowed."  Local Civil Rule 83.I.05 DSC.  Rule 83.I.06 of the local rules of the District Court requires that "[p]leadings and other documents filed in a case where an attorney appears who is not admitted to the Bar of this Court shall contain the individual name, firm name, address, and phone number of both the attorney making a special appearance under this Local Civil Rule and the associated local counsel" and also requires that "[u]nless excused by the Court, the associated local counsel shall be present at all pretrial conferences, hearings and trials and may attend discovery pleadings.  Local counsel is expected to be prepared to actively participate if necessary."  Local Civil Rule 83.I.06 DSC.

| PROFESS-IONAL | FEES REQUESTED | SUCCESS or COMPLETION FEES REQUESTED | EXPENSES REQUESTED | TOTAL FEES AND EXPENSES REQUESTED | TOTAL FEES AND EXPENSES REQUESTED AFTER NEGOTIATIONS AND/OR VOLUNTARY REDUCTIONS[7] |
|---|---|---|---|---|---|
| APS | $8,140,585.00 | $1,750,000.00 | $589,817.38 | $10,480,402.38 | $9,480,402.38 (reduced success fee by $1,000,000.00) |
| Deloitte | $1,170,890.89 | $0.00 | $502.75 | $1,171,393.64 | $1,171,393.64 |
| DJM | $1,017,499.64 | $200,000.00 | $38,326.51 | $1,255,826.15 | $1,255,826.15 |
| FTI | $2,392,741.94 | $1,250,000.00 | $41,869.55 | $3,684,611.49 | $3,009,611.49 (reduced total by $675,000.00, i.e., monthly fee applications for March, April, and May 2010 reduced by $175,000.00 aggregate, and completion fee reduced by $500,000.00) |
| McCarthy | $722,850.00 | n/a | $36,286.08 | $759,136.08 | $759,136.08 |
| NMRS – Local Counsel | $2,479,857.80 | n/a | $124,711.62 | $2,604,569.42 | $2,604,569.42 |
| NMRS - OCP | $70,412.50 | n/a | $1,845.69 | $72,258.19 | $72,258.19 |
| Otterbourg | $6,846,885.00 | n/a | $256,554.06 | $7,103,439.06 | $7,097,439.06 (reduced fee request by $6,000.00) |
| Parker Poe | $128,032.58[8] | n/a | $1,014.01[9] | $129,046.59 | $129,046.59 |
| UCC | $0.00 | n/a | $42,108.19 | $42,108.19 | $29,308.76 (reduced expenses request by $12,799.43) |

---

[7] These amounts reflect fees and expenses incurred through the Effective Date of the Plan and do not include post-Effective Date fees and expenses.

[8] This fee amount is $225.05 less than originally requested in Parker Poe's Final Fee Application due to an error that was discovered by Parker Poe. Parker Poe voluntarily reduced this amount.

[9] This expense amount is $10.00 less than originally requested in Parker Poe's Final Fee Application due to an error that was discovered by Parker Poe. Parker Poe voluntarily reduced this amount.

ORDER APPROVING FINAL FEE APPLICATIONS OF PROFESSIONAL
PERSONS EMPLOYED BY OR AT THE EXPENSE OF THE ESTATES                    Page 10 of 32

US 487487v.8

| V&E | $9,730,025.00 | n/a | $404,923.87 | $10,134,948.87 | $10,133,432.32 (reduced total expenses request by $1,516.55, although V&E already credited BI-LO for this amount on its Second Monthly Fee Application) |
| Blair | $6,000,000.00 | (included in fee request) | $158,901.42 | $6,158,901.42 | $5,858,901.42 (reduced fee request by $300,000.00) |
| Womble | $558,208.50 | n/a | $12,387.50 | $570,596.00 | $1,143,483.70 (increased fee request by $564,948.00 and expenses request by $7,939.70 for a total increase of $572,887.70 (accounting for 1st through 4th fee applications, which were not listed in final fee application)) |

| PROFESSIONAL | TOTAL FEES REMAINING UNPAID TO DATE (AFTER NEGOTIATIONS) | TOTAL EXPENSES REMAINING UNPAID TO DATE | TOTAL FEES AND EXPENSES REMAINING UNPAID TO DATE |
|---|---|---|---|
| APS | $750,000.00 | $0.00 | $750,000.00 |
| Deloitte | $153,199.20 | $0.00 | $153,199.20 |
| DJM | $324,389.93 | $0.00 | $324,389.93 |
| FTI | $763,548.39 | $0.00 | $763,548.39 |
| McCarthy | $48,649.50 | $0.00 | $48,649.50 |
| NMRS – Local Counsel | $172,050.50 | $0.00 | $172,050.50 |
| NMRS - OCP | $0.00 | $0.00 | $0.00 |
| Otterbourg | $545,295.90 | $0.00 | $545,295.90 |
| Parker Poe | $65,939.00 | $133.47 | $66,072.47 |
| UCC | $0.00 | $0.00 | $0.00 |
| V&E | $704,783.70 | $0.00 | $704,783.70 |
| Blair | $2,960,000.00 | $11,750.89 | $2,971,750.89 |
| Womble | $91,080.50 | | $91,080.50 |

Fees and Expenses Subject to this Order

32.    All of the fees and expenses set forth in the above charts are subject to this Order.

<u>Applicable Legal Standards for Approval of Fees</u>

33.     The statutory standard applicable to the approval of the Final Fee Applications of

the Committee, Deloitte, McCarthy, NMRS, Otterbourg, Parker Poe, V&E, and Womble is set

forth in § 330(a) of the Bankruptcy Code:

> (1) After notice to the parties in interest and the United States
> Trustee and a hearing, and subject to sections 326, 328, and 329,
> the court may award to a trustee, a consumer privacy ombudsman
> appointed under section 332, an examiner, an ombudsman
> appointed under section 333, or a professional person employed
> under section 327 or 1103—
>
>> (A) reasonable compensation for actual, necessary services
>> rendered by the . . . professional person, or attorney and by
>> any paraprofessional person employed by any such person;
>> and
>>
>> (B) reimbursement for actual, necessary expenses.
>
> (2) The court may, on its own motion or on the motion of the
> United States Trustee, the United States Trustee for the District or
> Region, the trustee for the estate, or any other party in interest,
> award compensation that is less than the amount of compensation
> that is requested.
>
> (3) In determining the amount of reasonable compensation to be
> awarded to . . . [a] professional person, the court shall consider the
> nature, the extent, and the value of such services, taking into
> account all relevant factors, including –
>
>> (A)   the time spent on such services;
>>
>> (B)   the rates charged for such services;
>>
>> (C)   whether the services were necessary to the
>> administration of, or beneficial at the time at which the
>> service was rendered toward the completion of, a case
>> under this title;
>>
>> (D)   whether the services were performed within a
>> reasonable amount of time commensurate with the
>> complexity, importance, and nature of the problem, issue,
>> or task addressed;
>>
>> (E)   with respect to a professional person, whether the
>> person is board certified or otherwise has demonstrated
>> skill and experience in the bankruptcy field;
>>
>> (F)   whether the compensation is reasonable based on the

customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

(4)(A) Except as provided in subparagraph (B) [not applicable here], the court shall not allow compensation for –

(i) unnecessary duplication of services; or

(ii) services that were not –

(I) reasonably likely to benefit the debtor's estate; or

(II) necessary to the administration of the case.

11 U.S.C. § 330(a).

34.     The statutory standard applicable for approval of the Final Fee Applications of

DJM, FTI, and Blair is set forth in Bankruptcy Code § 328(a):

> The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis. Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

11 U.S.C. § 328(a).

35.     In each of the orders approving the employment of DJM, FTI, and Blair, the

Court and the U.S. Trustee reserved and retained the right to review such fees under a

reasonableness standard, in addition to the standard set forth in Bankruptcy Code § 328(a).

36.     APS was retained by the Debtors pursuant to § 363 of the Bankruptcy Code, in

accordance with the "Jay Alix Protocol" negotiated with the U.S. Trustee.  As set forth in the

APS Final Fee Application, the reasonableness standard set forth in Bankruptcy Code § 330, set

forth above, applies to its requested success fee.

**ORDER APPROVING FINAL FEE APPLICATIONS OF PROFESSIONAL
PERSONS EMPLOYED BY OR AT THE EXPENSE OF THE ESTATES**        **Page 13 of 32**

US 487487v.8

37.     The expenses of the Committee are permitted to be paid pursuant to Bankruptcy Code § 503(b)(3)(F).

<u>Major Events of the Chapter 11 Cases</u>

38.     The Court entered a number of first day orders in the Chapter 11 Cases including the joint administration of the Debtors' cases; the establishment of certain notice procedures; the appointment of Kurtzman Carson Consultants, LLC as claims, noticing, and balloting agent; the authorization of continued use of the Debtors' existing cash management system; the payment of certain prepetition employee related obligations; the payment of prepetition claims arising under the Perishable Agricultural Commodities Act and related statutes; the payment of certain prepetition governmental obligations including taxes; the payment of prepetition obligations relating to alcoholic beverages and lotteries; the honoring of certain prepetition customer obligations and programs; the turnover of certain funds held in trust; the establishment of procedures for resolving adequate assurance issues regarding utilities; the establishment of procedures for interim compensation and reimbursement of expenses for retained professionals; and the continued payment of prepetition insurance and workers' compensation programs.

39.     After a competitive process and a series of contested hearings during which Ahold and one of the Term Lenders presented competing debtor in possession financing proposals, on April 16, 2009, the Court approved General Electric Capital Corporation as administrative agent for itself and the other financial institutions (the "<u>DIP Lender</u>") from time to time parties to the Debtors' $125 million DIP Financing Facility, which was used in part to refinance the $65.7 million owed under the prepetition revolving credit facility.

40.     On April 16, 2009, the Court entered an order approving a cost sharing agreement between the Debtors and Ahold (the "<u>Cost Sharing Agreement</u>").  The Cost Sharing Agreement

provided for the payment of certain of the Debtors' lease obligations by Ahold and granted Ahold the right with respect to leases that had been designated for rejection by the Debtors, to direct the Debtors not to reject such leases, with Ahold reimbursing the Debtors for the § 365(d)(3) obligations relating to such leases, until such time as Ahold (a) determined to direct the Debtors to assume and assign those leases to Ahold or its designee, with cure costs relating to such assumptions to be paid by Ahold, or (b) consented to the Debtors' rejection.  Ahold reimbursed the Debtors approximately $4.2 million during the course of the Chapter 11 Cases for certain lease obligations and paid at least $2 million in § 365(d)(3) obligations.  In exchange for the Debtors entering into the Cost Sharing Agreement, Ahold withdrew its objection to the Debtors' DIP Financing Facility.

41.    In May 2009, the Court approved the Debtors' first day motion designating C&S as a critical vendor and authorized the Debtors to take certain other actions as required by the March 21, 2009 "C&S Amendment," an amendment to the Debtors' supply agreement with C&S, which, among other things, eliminated or deferred certain surcharges, required payment in excess of $17 million in outstanding prepetition amounts to C&S as a "critical vendor," provided releases to C&S of estate claims, and obligated C&S to continue performance under the C&S Supply Agreement pending assumption or rejection thereof under § 365 of the Bankruptcy Code.

42.    In June 2009, the Debtors, in consultation with their advisors, initiated a comprehensive review of their business and began formulating a detailed five year business plan (the "Five Year Plan"), which was completed and presented to the Committee, the Term Lenders, and other parties in interest in August 2009.

43.    In August 2009, the Court approved a program, suggested by the Committee and proposed by the Debtors, setting forth procedures for expedited payment of certain

**ORDER APPROVING FINAL FEE APPLICATIONS OF PROFESSIONAL
PERSONS EMPLOYED BY OR AT THE EXPENSE OF THE ESTATES**                    **Page 15 of 32**

US 487487v.8

administrative expense claims of vendors asserted pursuant to § 503(b)(9) of the Bankruptcy Code and the release of preference actions under § 547 of the Bankruptcy Code against certain vendors that agreed to provide normalized trade terms and promotional programs to the Debtors (the "503(b)(9) Program").

44.     Over the course of the Chapter 11 Cases, the Court approved three rounds of stipulations between the Debtors and most of their landlords extending the Debtors' time to assume or reject almost 200 leases of nonresidential real property pursuant to § 365(d)(4) of the Bankruptcy Code in order to preserve the Debtors' availability under their DIP Financing Facility.

45.     Over the course of the Chapter 11 Cases, the Court approved sales of certain of the Debtors' assets including: (1) the sale of certain pharmacy inventory and records from a Charlotte, North Carolina store to a CVS/pharmacy; (2) the sale of certain equipment in auctions conducted by Grafe Auction Company; (3) the sale of certain *de minimis* assets pursuant to established streamlined procedures approved by the Court in August 2009; and (4) the sale of certain assets at their stores in Lake City, South Carolina and Mullins, South Carolina.

<u>Plan Negotiation and the Confirmation Process</u>

46.     The Debtors' original exclusive periods under § 1121(d) of the Bankruptcy Code were July 21, 2009 to propose a plan and September 21, 2009 to solicit acceptances thereof. The Debtors obtained two extensions of exclusivity through October 7, 2009 to propose a plan and through December 8, 2009 to solicit acceptances thereof. The Debtors filed a further request to extend exclusivity, to which the Committee filed an objection and a request for "co-exclusivity," which was accompanied by a term sheet (the "<u>Term Sheet</u>") for a plan of reorganization. The Term Sheet contemplated a reorganized BI-LO, a conversion of the Term Lender debt to equity

and new term debt, and an investment of new equity by one or more of the Term Lenders.  On

October 7, after extensive document production, discovery-related motions, multi-state

depositions, and a two-day hearing on the Debtors' request for an extension of exclusivity to

pursue a number of plan options then available to them after the completion of their Five Year

Plan and the Committee's request for "co-exclusivity" based on their Term Sheet with the Term

Lenders, the Court granted "co-exclusivity."  The "co-exclusivity" was granted to the Debtors

and the Committee through November 20, 2009 for filing their respective plans and through

January 19, 2010 for soliciting acceptances thereof.

47.    The "co-exclusivity" led to the filing of two competing plans and accompanying

disclosure statements on November 20, 2009.  One plan was filed by the Debtors and the other

by the Committee, which filed its plan jointly with the Term Lenders (the "Creditors' Plan" filed

by the "Creditor Proponents").  Both plans provided for the continuation of the Debtors' business

and a trust containing $30 million in cash and certain potential causes of action for the benefit of

general unsecured creditors, including Bruno's Supermarkets, LLC ("Bruno's")[10] and the United

Food and Commercial Workers Unions and Employers Pension Fund (the "Union Pension

Fund").  The Debtors' plan contemplated Lone Star as the Plan investor, and the Creditors' Plan

contemplated an affiliate of one of the Term Lenders serving as the plan sponsor pursuant to a

certain investment agreement (the "Investment Agreement").  Both parties filed amended plans,

which did not materially alter the previously filed versions of their plans.

48.    In December 2009, Ahold and Lone Star entered into that certain *Settlement and

Term Loan Acquisition Agreement* (the "Settlement Agreement"), which was a final

compromise, release and global settlement of all claims held by Ahold or Lone Star entities

---

[10]    The Bruno's claims are now being pursued by William Kaye, the Liquidating Trustee of BFW Liquidation,
LLC f/k/a Bruno's Supermarkets, LLC.

related to or arising from the sale of BI-LO to Lone Star from Ahold, including certain obligations of Lone Star to indemnify Ahold on its guarantees of most of BI-LO's nonresidential real property leases.  In consideration for the release of these claims, among other things, (a) Lone Star agreed to make a term loan of up to $130 million to an affiliate of Ahold; (b) that Ahold affiliate would use those loan proceeds, and other Ahold affiliates would use their own funds, to purchase loans of the Term Lenders in the aggregate principal amount of up to $260 million (but not less than $189,750,000); and (c) the selling Term Lenders would be required to terminate the Investment Agreement prior to the purchase of the term loans.  In accordance with the terms of the Settlement Agreement, Ahold made an offer to the Term Lenders to purchase the term loans, and on February 2, 2010, Term Lenders holding term loans in the aggregate principal amount of $215,750,000 accepted Ahold's offer.  The Investment Agreement was terminated on February 3, 2010.  On February 4, 2010, Lone Star funded its loan to Ahold, and Ahold used $70,250,000 of the proceeds of that loan and $145,500,000 of its own funds to purchase the term loans.  On February 22, 2010, Bayside also accepted Ahold's offer, and Ahold used $44,250,000 of the funds loaned by Lone Star to purchase Bayside's term loans.  Ahold used the remaining $15,500,000 of the Lone Star loan proceeds to purchase term loans in the aggregate principal amount of $15,500,000 from an Ahold affiliate holding such term loans.

49.     As a result of the purchase of the loans from the Term Lenders by Ahold and the termination of the Investment Agreement, on February 9, 2010, the Creditor Proponents withdrew their plan of reorganization from consideration by the Bankruptcy Court.  Thereafter, the Committee, the Debtors, and Lone Star engaged in extensive negotiations with respect to the Plan proposed by the Debtors, which ultimately resulted in an amended Plan that provided for improvements with respect to the treatment of unsecured creditors including, among other things,

an increased cash contribution of $40 million to the trust for unsecured creditors and the separate classification of the Bruno's and the Union Pension Fund's claims from the claims of other unsecured creditors, with a distribution on any of those two claims, if allowed, to be paid by the Plan investor in the same percentage as other unsecured creditors (exclusive of the convenience class).

50.    On March 22, 2010, the Court entered an order approving the Debtors' disclosure statement and setting the confirmation hearing for April 29, 2010 [Docket No. 2837] (the "Confirmation Hearing").

51.    Prior to the Confirmation Hearing, the Debtors, in conjunction with the Committee, resolved substantially all of the objections to the Debtors' Plan.  After a full evidentiary hearing, the Court overruled any remaining objections to the Plan and entered its Confirmation Order confirming the Debtors' Plan on April 30, 2010 [Docket No. 3225].

52.    On May 12, 2010, the Debtors filed their *Notice of Occurrence of Effective Date of the Debtors' Fourth Amended Plan of Reorganization* [Docket No. 3250].

53.    The Union Pension Fund has filed claims against each of the Debtors alleging that the Debtors are joint and severally liable for Bruno's "withdrawal liability" under the Employee Retirement Income Security Act ("ERISA") based on Bruno's withdrawal from its pension plan in connection with Bruno's liquidation sale in its bankruptcy case.  Such withdrawal liability is alleged to be $63,806,631.00.  The Debtors have objected to the Union Pension Fund's claims, and additional responsive pleadings have been filed.  The Union Pension Fund has also filed a motion seeking to compel arbitration of its claims, to which the Debtors' and other parties in interest objected, and which was heard by the Court on June 29, 2010.  The parties currently

have until August 12, 2010 to submit proposed findings of fact and conclusions of law to the Court on this matter.

54.    Through William Kaye, the Bruno's Liquidating Trustee, Bruno's has filed claims against the Debtors asserting at least $40,000,000 in liability based upon allegations of fraudulent and preferential transfers and unjust enrichment.   The Debtors have objected to Bruno's claims.   Bruno's has also filed a motion to lift BI-LO's automatic stay to allow the Bruno's claims against BI-LO to be resolved in the Bruno's bankruptcy court along with the claims BI-LO filed against Bruno's in that court.   The Debtors objected to that motion.   A hearing was held on June 29, 2010 on the motion to lift stay, and the parties submitted proposed findings of fact and conclusions of law to the Court on this matter on July 19, 2010.   The Court has not yet ruled on the motion to lift stay.

55.    Pursuant to the Plan, the claims of both the Union Pension Fund and Bruno's are "Class 5 Claims" and, if they are ultimately allowed, the holders of Class 5 Claims will receive a "Class 5 Payment" from the Plan investor, LSF5 Grocery Holdings, LLC, which is supported by a guarantee by Lone Star Fund V (U.S.) LP.

Role of Each Professional in the Case and<br>the Contributions of Each to a Favorable Result

56.    APS provided critical interim management, strategic, and operational services to the Debtors through the office of Chief Restructuring Officer.   APS also (1) seamlessly integrated into the Debtors' operations and became a "go-to" resource, which allowed BI-LO's management to focus on and achieve the favorable operating results reported throughout the Chapter 11 Cases; (2) played a key role in vendor negotiations and ensuring continuous supply of product; (3) provided due diligence support to major constituents during the Chapter 11 Cases; (4) managed the Debtors' contract evaluation process and led and assisted the Debtors in the

negotiation of contract modifications, which generated future savings for the Debtors; (5) was primarily responsible for generating the monthly operating reporting data for the U.S. Trustee; (6) reviewed and analyzed claims asserted against the Debtors; (7) served, at the Debtors' request, as the interim vice president of Center Store Merchandising; (8) provided interim treasury support of the Debtors' 13-week cash flow forecasting and management process; and (9) provided leadership and expertise during periods of discord between the Committee and the Debtors, which helped to support continued smooth business operations.

57.     Deloitte performed important auditing services for the Debtors, which enabled the Debtors to continue to have, and to satisfy a requirement of the DIP credit agreement as well as to be able to make available to the key constituencies, audited consolidated financial statements.

58.     DJM performed critical services to the Debtors by successfully obtaining three rounds of stipulations extending the Debtors' time to assume or reject nonresidential real property leases pursuant to § 365(d)(4) of the Bankruptcy Code (with a 94% success rate in the first round and 98% success rate in both the second and third rounds).  These stipulations were critical to the Debtors' ability to preserve necessary liquidity under their DIP Financing Facility and to prevent the premature assumption of leases in view of the timing requirements of § 365(d) of the Bankruptcy Code.  DJM also negotiated and obtained over $8 million in rent concessions from many of the Debtors' landlords.

59.     FTI provided financial advisory services to the Committee.  FTI analyzed various issues to aid the Committee in the exercise of its fiduciary duties to the Debtors' estates including analysis of (1) current operating results and events; (2) the Debtors' five year business plan; (3) valuation and related matters; (4) employee compensation programs; (5) claims and liabilities subject to compromise; (6) restructuring alternatives and plan proposals available to

the Debtors; (7) on a weekly basis, the Debtors' cash and liquidity position; (8) issues relating to financing, including the DIP Financing Facility and exit financing; (9) issues relating to the Debtors' 503(b)(9) Program; (10) various real estate related issues; (11) the sale of certain assets from the Debtors' estates; (12) tax issues; (13) various motions, including the Debtors' motion to employ Blair; and (14) potential causes of action against various parties.  FTI also had ongoing communications and meetings with the Committee, the Debtors and the Debtors' professionals, and other parties-in-interest.  Additionally, FTI prepared for and attended certain court hearings, including preparation for and providing testimony in support of the Committee's motion requesting co-exclusivity.

60.    McCarthy served as South Carolina co-counsel to the Committee, providing comprehensive legal services, in conjunction with Otterbourg as co-counsel, to assist the Committee in the exercise of its fiduciary duties to the Debtors' estates, including negotiating with respect to the consensual Plan confirmed by the Court.

61.    NMRS served as South Carolina co-counsel to the Debtors, providing comprehensive bankruptcy-related legal services, working closely and in conjunction with V&E as co-counsel, to serve and advise the Debtors on all bankruptcy-related matters throughout the Chapter 11 Cases, including all major orders entered and the formulation of the Debtors' consensual Plan, which was confirmed by the Court.

62.    NMRS also served as counsel to the Debtors as an ordinary course professional in the Chapter 11 Cases, providing legal services to the Debtors relating to general matters, employee benefits and labor, and litigation matters.

63.    Otterbourg served as lead counsel to the Committee, providing comprehensive legal services, working closely and in conjunction with McCarthy as co-counsel, to assist the

Committee in the exercise of its fiduciary duties to the Debtors' estates, including involvement

with all major orders entered and negotiating with respect to the consensual Plan confirmed by

the Court.

64.     Parker Poe served as counsel to the Debtors as an ordinary course professional in

the Chapter 11 Cases, providing legal services to the Debtors including those relating to

environmental and pharmacy matters.

65.     V&E served as lead counsel to the Debtors providing comprehensive bankruptcy-

related legal services, working closely and in conjunction with NMRS as co-counsel, to serve

and advise the Debtors on all bankruptcy-related matters throughout the Chapter 11 Cases,

including preparation and submission of all major motions and orders entered and the

formulation and confirmation of the Debtors' consensual Plan, which was confirmed by the

Court.

66.     Blair provided services through principals, including Tim Carroll, vice presidents,

associates, and analysts on whose experience and expertise the Debtors relied heavily.

Specifically, Blair provided services relating to (1) the preparation and review of various court

filings and other documents regarding certain financial aspects, including depositions and

document gathering relating to a number of court filings; (2) attendance at a number of court

hearings and providing testimony regarding many issues including: first day motions, the DIP

Financing Facility and an extension thereof, retention of professionals, exclusivity and co-

exclusivity, competing plans of reorganization, extensions of the Debtors' § 365(d)(4) deadline,

and plan confirmation; (3) preparation for and participation in meetings with various creditor

constituents regarding financial and investment banking matters and strategic bankruptcy issues;

(4) review and analysis of the Debtors' business, operations, and financial projections; (5)

preparation of the Debtors' Five Year Plan; (6) negotiations with C&S; (7) financial analysis regarding various reorganization scenarios available to the Debtors; (8) assistance with due diligence requests; (9) negotiations and preparations relating to the Plan and assisting the Debtors in preparing for lender meetings and rating agency presentations; (10) taking an active role in the Debtors' obtaining exit financing including solicitation of exit financing offers, diligence relating thereto, hosting meetings, and negotiating on behalf of the Debtors; (11) obtaining debtor in possession financing and actively working to achieve an extension of the Debtors' DIP Financing Facility and related negotiations with Gordon Brothers Retail Partners, LLC pursuant to the DIP credit agreement requirements; (12) coordinating the marketing process of attempting to sell assets relating to underperforming stores; and (13) participating actively in discussions with several potential strategic and financial buyers regarding interest in the Debtors' assets.

67.    Womble served as special counsel to the Debtors in the Chapter 11 Cases, providing legal services to the Debtors including those relating to contract, lease, and intellectual property related matters.

Plan Funding and Substantial Consummation

68.    On May 12, 2010, the Debtors filed their *Notice of the Debtors' Funding of the Creditors' Committee Professional Fee Account* [Docket Nos. 3251] in the amount of $3,630,393.38 to cover the Estimated Professional Claim, as that term is used in § 2.3(d) of the Confirmation Order.

69.    On May 14, 2010, the Trustee of the Creditors' Trust filed the *Notice of the Debtors' Funding of the Unsecured Creditors' Fund* [Docket No. 3262] in the amount of

$40,000,000.00 pursuant to § 5.2(b) of the Plan, which amount represents the funding of the Unsecured Creditors' Fund, as that term is defined in § 1.1(a)(149) of the Plan.

70.    On July 13, 2010, the Debtors filed their *Debtors' Report of Substantial Consummation and Motion (I) For Extension of Time to File Application for Final Decree and (II) to be Relieved from Filing Further Monthly Operating Reports* [Docket No. 3411] (the "Report of Substantial Consummation"), reporting that, in addition to funding the Creditors' Committee Professional Fee Account and the Unsecured Creditors' Fund (which will be used to pay claimants in Classes[11] 4 and 6), as a consequence of the occurrence of the Effective Date of the Plan on May 12, 2010, the Debtors also paid certain required administrative claims, including the DIP Facility Claims, in full and made the required Plan payments to Classes 1, 2, and 3 under the Plan.  The Debtors were not required to make any payments to Class 5 claimants because any distributions to those claimants will be funded by the Investor under the Plan after any allowance of such claims.  The Debtors have also completed all of the Restructuring Transactions pursuant to the Plan; the Equity Investment Agreement, New Term Credit Facility, and New ABL Facility have all closed; and all conditions to consummation as set forth in § 8.1(b) of the Plan have been satisfied.

Debts Not Yet Paid or Funded Post-
Confirmation and Debtors' Responsibility

71.    The only Plan-related payment obligations owed but not yet paid by the Debtors to creditors or claimants are the balances due to professionals pursuant to their Final Fee Applications, as set forth in this Order, certain cure amounts on contracts and leases regarding which there is a dispute, and reconciliations following payment of estimated cure amounts regarding a number of the Debtors' leases pursuant to the procedures set forth in the Plan.

---

[11]    Capitalized terms utilized but not otherwise defined herein retain the meanings ascribed to them in the Plan.

### General Financial State of the Reorganized Debtors

72.     The Chief Financial Officer of the Reorganized Debtors has informed the Court

that the Reorganized Debtors are currently operating according to plan, the current general

financial state of the Reorganized Debtors is good, and the Reorganized Debtors are meeting all

debt obligations and their projections for financial performance.

### Care Used in Preparing the Final Fee Applications

73.     At the Hearing, each professional that appeared in support of the Final Fee

Applications responded to questions from the Court and assured the Court that due care, so as to

avoid unnecessary fees and expenses and to avoid errors, was employed in preparing each of the

Final Fee Applications.

### Payors of Approved Final Fees

74.     There are two sources of payment of the fees and expenses sought to be approved

in the Final Fee Applications.

75.     First, with respect to the Debtors' professionals (APS, Deloitte, DJM, NMRS,

Parker Poe, V&E, Blair, and Womble), the Reorganized Debtors are responsible for paying

outstanding amounts determined to be owed to them on a final basis.  The Chief Financial

Officer of the Reorganized Debtors assured the Court that the Reorganized Debtors have the

financial ability to pay these obligations after approval by the Court.

76.     Second, as to the professionals hired by the Committee (FTI, McCarthy, and

Otterbourg) as well as the expenses accrued by members of the Committee (collectively, the

"Committee Professionals"), those fees and expenses that are approved on a final basis are to be

paid out of the Creditors' Committee Professional Fee Account, which the Debtors funded in the

amount of $3,630,393.38, in accordance with the "Estimated Professional Claim" (as that term is

used in § 2.3(d) of the Confirmation Order), which estimated amount was provided to the

Debtors by counsel to the Committee.  The fees and expenses yet unpaid to the Committee

Professionals totals $1,357,493.79.  The amount owed to the Committee Professionals is less

than the amount reserved for such payment in the Creditors' Committee Professional Fee

Account.  The balance remaining in the Creditors' Committee Professional Fee Account after

payment of final fees and expenses to the Committee Professionals shall be returned to the

Reorganized Debtors by the Creditors' Trust pursuant to §2.3(c) of the Plan within fifteen (15)

days of the entry of this Order.

Debtors' Beliefs Regarding Reasonableness of Fees in
the Unusual Circumstances of These Cases

77.    The Debtors' Chief Financial Officer, Brian Carney, advised the Court that the

Debtors are pleased with all of the efforts and hard work of the various professionals throughout

the Chapter 11 Cases on behalf of the Debtors and their creditors.  The zealous work of regional

and national professionals, in protecting and pursuing the often competing interests of the

Debtors and their creditors in the Chapter 11 Cases, produced fees that may appear high

compared to those typically awarded in the District of South Carolina.   However, these Chapter

11 Cases were large, complex, and contentious, at times, and the Debtors take comfort in the fact

that, ultimately, the Chapter 11 Cases concluded with a consensual outcome that preserved the

Debtors' autonomy and secured substantial recoveries for the various creditor classes.  In light of

the size and complexity of the Chapter 11 Cases and the positive outcome achieved, the Debtors

believe that the fees and expenses of the professionals, including the various adjustments and

reductions made and reflected at the Hearing, are reasonable, and the Debtors have the

wherewithal and the ability to make the final fee and expense payments required to be paid by

the Debtors pursuant to the Plan on a timely basis upon entry of this Order.

78.    The Court finds that the Debtors, as the ultimate party responsible for paying the professionals' fees and expenses,[12] are satisfied with the professional services that have been provided in the context of these Chapter 11 Cases.

### Involvement of the U.S. Trustee, the Committee, the Debtors, and the Debtors' General Counsel

79.    John T. Stack attended the Hearing on behalf of the U.S. Trustee and reported that he has reviewed the Final Fee Applications, has negotiated certain reductions, and has reported to the Court his conclusion that the fees and expenses presented to the Court at the Hearing are reasonable, necessary, and beneficial, and he has recommended them for approval in the amounts presented in the Hearing.  This conclusion was based upon an extensive review of all of the applications, utilization of spreadsheet analysis, and the nationwide resources of the U.S. Trustee.

80.    The Committee utilized a fee review subcommittee, which has reviewed the Final Fee Applications and has approved or has no objections to the requests as presented at the Hearing.

81.    The Debtors have reviewed the Final Fee Applications and have approved or have no objections to the requests as presented at the Hearing.

82.    The Debtors' General Counsel or his designee has previewed each invoice of the Debtors' professionals and has reviewed the Final Fee Applications and has approved or has no objections to the requests as presented at the Hearing.

---

[12]    As discussed above, the fees and expenses of the Committee Professionals will be paid from the Creditors' Committee Professional Fee Account, which was previously funded by the Debtors.

**ORDER APPROVING FINAL FEE APPLICATIONS OF PROFESSIONAL
PERSONS EMPLOYED BY OR AT THE EXPENSE OF THE ESTATES**                **Page 28 of 32**

US 487487v.8

<u>Approval of Fees and Expenses of Each Professional</u>

83.    Appropriate representatives of each professional person were present at the Hearing to respond to questions of the Court with the exception of DJM and Deloitte, whom the Court had excused and whose applications were presented by counsel for the Debtors, and the consumer privacy ombudsman, whose fees were previously approved by order entered on July 19, 2010 [Docket No. 3433].   The Court is satisfied that the amounts of fees and expense reimbursements requested, as set forth in the Final Fee Applications, and any supplements or amendments thereto, and as presented at the Hearing and provided herein, are reasonable, necessary, beneficial, and proper, and such fees and expenses are hereby approved on a final basis, and without objection.

IT IS, THEREFORE, ORDERED THAT:

1.    APS's Final Fee Application, as modified, is approved in the amount of $8,890,585.00 in fees and $589,817.38 in expenses, for a total of $9,480,402.38.   The balance currently unpaid and authorized to be paid at this time is $750,000.00 in fees and $0.00 in expenses, for a total payment of $750,000.00.

2.    Deloitte's Final Fee Application is approved in the amount of $1,170,890.89 in fees and $502.75 in expenses, for a total of $1,171,393.64.   The balance currently unpaid and authorized to be paid at this time is $153,199.20 in fees and $0.00 in expenses, for a total payment of $153,199.20.

3.    DJM's Final Fee Application is approved in the amount of $1,217,499.64 in fees and $38,326.51 in expenses, for a total of $1,255,826.15.   The balance currently unpaid and authorized to be paid at this time is $324,389.93 in fees and $0.00 in expenses, for a total payment of $324,389.93.

4.      FTI's Final Fee Application, as modified, is approved in the amount of $2,967,741.94 in fees and $41,869.55 in expenses, for a total of $3,009,611.49.  The balance currently unpaid and authorized to be paid at this time is $763,548.39 in fees and $0.00 in expenses, for a total payment of $763,548.39.

5.      McCarthy's Final Fee Application is approved in the amount of $722,850.00 in fees and $36,286.08 in expenses, for a total of $759,136.08.  The balance currently unpaid and authorized to be paid at this time is $48,649.50 in fees and $0.00 in expenses, for a total payment of $48,649.50.

6.      NMRS's Final Fee Application, for its services as local bankruptcy counsel to the Debtors, is approved in the amount of $2,479,857.80 in fees and $124,711.62 in expenses, for a total of $2,604,569.42.  The balance currently unpaid and authorized to be paid at this time is $172,050.50 in fees and $0.00 in expenses, for a total payment of $172,050.50.

7.      NMRS's Final Fee Application, for its services as an ordinary course professional, is approved in the amount of $70,412.50 in fees and $1,845.69 in expenses, for a total of $72,258.19.  The balance currently unpaid and authorized to be paid at this time is $0.00 in fees and $0.00 in expenses, for a total payment of $0.00.

8.      Otterbourg's Final Fee Application, as modified, is approved in the amount of $6,840,885.00 in fees and $256,554.06 in expenses, for a total of $7,097,439.06.  The balance currently unpaid and authorized to be paid at this time is $545,295.90 in fees and $0.00 in expenses, for a total payment of $545,295.90.

9.      Parker Poe's Final Fee Application, as modified, is approved in the amount of $128,032.58 in fees and $1,014.01 in expenses, for a total of $129,046.59.  The balance currently

unpaid and authorized to be paid at this time is $65,939.00 in fees and $133.47 in expenses, for a total payment of $66,072.47.

10.     The Committee's Final Expense Application, as modified, is approved in the total amount of $29,308.76 in expenses.  The balance currently unpaid and authorized to be paid at this time totals $0.00 in expenses.

11.     V&E's Final Fee Application, as modified, is approved in the amount of $9,730,025.00 in fees and $403,407.32 in expenses, for a total of $10,133,432.32.  The balance currently unpaid and authorized to be paid at this time is $704,783.70 in fees and $0.00 in expenses, for a total payment of $704,783.70.

12.     Blair's Final Fee Application, as modified, is approved in the amount of $5,700,000.00 in fees and $158,901.42 in expenses, for a total of $5,858,901.42.  The balance currently unpaid and authorized to be paid at this time is $2,960,000.00 in fees and $11,750.89 in expenses, for a total payment of $2,971,750.89.

13.     Womble's Final Fee Application, as modified, is approved in the amount of $1,123,156.50 in fees and $20,327.20 in expenses, for a total of $1,143,483.70.  The balance currently unpaid and authorized to be paid at this time is $91,080.50 in fees and $0.00 in expenses, for a total payment of $91,080.50.

14.     The Reorganized Debtors and the Creditors' Trust, as applicable, are hereby authorized and directed to remit the balances due to the pertinent professionals and otherwise to take all actions necessary to implement the relief granted in this Order.

15.     Any amounts of fees and expenses requested, or that could have been requested, but not approved by this Order are hereby disallowed.

16.     The approval of fees and expenses herein is specific to and based upon the unique facts and circumstances of these Chapter 11 Cases.  No party or professional should regard this order as precedential in any other case in this Court or any other court at any other time.

17.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order including, among other things, jurisdiction to interpret, implement, and enforce the terms and provisions of this Order.

**AND IT IS SO ORDERED.**