# U.S. BANKRUPTCY COURT
## District of South Carolina

Case Number: **09-02140-hb**

# ORDER ON MOTION FOR PAYMENT OF ADDITIONAL CURE AMOUNT PURSUANT TO
```
ASSUMED LEASE
```

The relief set forth on the following pages, for a total of 16 pages including this page, is hereby ORDERED.

**FILED BY THE COURT**
**03/01/2011**



US Bankruptcy Judge
District of South Carolina

Entered: 03/02/2011

**UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| IN RE: | C/A No. 09-02140-HB |
| | Chapter 11 |
| BI-LO, LLC *et al.* | |
| | **ORDER ON MOTION FOR PAYMENT OF ADDITIONAL CURE AMOUNT PURSUANT TO ASSUMED LEASE** |
| Reorganized Debtors.[1] | |
| Debtor(s). | |

This matter came before the Court for hearing on February 8, 2011 ("Hearing"), pursuant to the *Motion for Payment of Additional Cure Amount Pursuant to Assumed Lease* (Doc. 3743) ("Motion") filed by Friarsgate Investment Group, LLC ("Friarsgate" or "Lessor") on January 26, 2011. Friarsgate contends that, pursuant to the lease between the parties, BI-LO, LLC ("BI-LO") owes Friarsgate for Common Area Maintenance ("CAM") fees at the Friarsgate Plaza Shopping Center, where BI-LO store # 526 is located. In response, BI-LO and its affiliates (collectively with BI-LO, the "Debtors") filed the *Debtors' Objection to Friarsgate Investment Group, LLC's Motion for Payment of Additional Cure Amount Pursuant to Assumed Lease* ("Objection") on February 4, 2011. (Docket No. 3758). Debtors assert that Friarsgate's Motion is not timely and dispute the amount of the CAM charges.

After reviewing the record and supporting documents and considering the arguments of counsel at the Hearing, the Court concludes that Friarsgate's Motion is not time barred. The Court further finds that the disputed charges do not constitute CAM

---

[1] The Reorganized Debtors and the last four digits of their respective tax identification numbers are: BI-LO, LLC (0130); BI-LO Holding, LLC (5011); BG Cards, LLC (4159); ARP Ballentine LLC (6936); ARP James Island LLC (9163); ARP Moonville LLC (0930); ARP Chickamauga LLC (9515); ARP Morganton LLC (4010); ARP Hartsville LLC (7906); and ARP Winston Salem LLC (2540).

1

fees, as defined by the Lease; thus, they are the responsibility of Friarsgate. In support of these holdings, the Court makes the following findings of fact and conclusions of law.[2]

## FINDINGS OF FACT

1. On March 23, 2009 ("Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned bankruptcy cases ("Chapter 11 Cases"). On March 23, 2009, the Court entered an order designating the Chapter 11 Cases as Complex Chapter 11 Cases pursuant to SC LBR 2081-2. On March 24, 2009, the Chapter 11 Cases were administratively consolidated under Case No. 09-02140-hb. On March 30, 2009, the Office of the United States Trustee for the District of South Carolina ("U.S. Trustee") appointed the official committee of unsecured creditors ("Committee"). No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases.

2. On April 13, 2010, Debtors filed the *Fourth Amended Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* ("Plan"). (Docket No. 3122). On April 30, 2010, the Bankruptcy Court entered its *Order Confirming the Debtors' Fourth Amended Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* ("Confirmation Order"). (Docket No. 3225). The Effective Date occurred on May 12, 2010, as set forth in the *Notice of Occurrence of Effective Date of the Debtors' Fourth Amended Plan of Reorganization*. (Docket No. 3250). From the Petition Date to the Effective Date of the Plan, the Debtors operated their business and

---

[2] To the extent that any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and *vice versa*.

2

managed their properties as debtors in possession pursuant to 11 U.S.C. §§ 1107 and 1108.[3]

3. BI-LO and Friarsgate are parties to a certain lease ("Lease") of nonresidential property dated October 23, 1980, between BI-LO, LLC, successor to BI-LO, Inc. and Friarsgate Investment Group, LLC, as successor in interest to Edens & McTeer, Inc., Center Associates, Edens & Avant Financing Limited Partnership, Friarsgate Plaza Limited Partnership and Friarsgate Plaza, LLC.

4. The Lease relates to BI-LO Store # 526 located at Friarsgate Plaza Shopping Center, 7949 Broad River Road, Irmo, South Carolina ("Premises").

5. On May 22, 2009, the Court entered an order extending the Debtors' time to assume or reject unexpired leases of nonresidential real property ("§ 365(d)(4) Period"), pursuant to § 365(d)(4), through and including October 19, 2009, without prejudice to the Debtors' right to seek further extensions of time to assume or reject some or all of their unexpired leases with the consent of any landlord as provided in § 365(d)(4)(B)(ii). (Docket No. 658).

6. Subsequently, BI-LO and Friarsgate entered into three stipulations extending the § 365(d)(4) Period for the Lease. Pursuant to the authority approved by the Court by Order dated January 21, 2010 (Docket No. 2464), the parties entered into a *Second Stipulation Further Extending the Time to Assume or Reject Unexpired Lease of Nonresidential Real Property Pursuant to § 365(d)(4) of the Bankruptcy Code* ("Second Stipulation") which extended the § 365(d)(4) Period through and including May 31, 2010. (Docket No. 2633).

---

[3] Further reference to the Bankruptcy Code, 11 U.S.C. § 101 *et. seq.*, will be by section number only.

3

7. Following the language provided by the January 21, 2010 Order (Docket No. 2464 ¶ 3), the Second Stipulation instructs the parties to do the following in the event a dispute over cure amounts arises:

> . . . If the Debtors and the Lessor are not able to reconcile the cure amounts within sixty (60) days of the entry of the order approving the Second Stipulation, either party may request a hearing on the disputed portion of the cure amount at the next omnibus hearing date on not less than ten (10) days notice.

(Second Stipulation, Docket No. 2633 ¶ 2).[4]

8. BI-LO and Friarsgate thereafter entered into a *Third Stipulation Further Extending the Time to Assume or Reject Unexpired Lease of Nonresidential Real Property Pursuant to § 365(d)(4) of the Bankruptcy Code* ("Third Stipulation"), which extended the § 365(d)(4) Period through July 31, 2010, but did not affect or negate the January 21, 2010, Order in any way. (Docket No. 3026).

9. On April 30, 2010, the Court entered an order confirming the Debtors' chapter 11 Plan which provided for assumption of the Lease. (Docket No. 3225). The terms of the Plan provided that Debtors would pay the estimated Cure Amount[5] for any Conditionally Assumed Lease[6], such as the Lease involved in the instant action. In

---

[4] The *Order Establishing Certain Notice, Case Management and Administrative Procedures* ("Case Management Order") (Docket No. 115), establishes procedures for setting Omnibus Hearing dates. Pursuant to the Case Management Order, the Court periodically enters orders providing available dates for any matters that may arise in this case and allows parties to self-schedule or request certain hearings on those dates.

[5] *See* Plan, Docket No. 3122 at ¶ 1.1(47):
> "Cure Amount" means the dollar amount required to be paid under § 365 of the Bankruptcy Code at the time an executory contract or unexpired lease is assumed by that Debtor to cure Debtor's defaults under such contract or lease, and if applicable, to compensate the non-debtor party or parties to such contract or lease for any actual pecuniary loss to such party resulting from such default. For purposes of Conditionally Assumed Leases, the prepetition portion of the Cure Amount shall be reconciled, determined and paid pursuant to the Conditional Assumption Order.

(emphasis in original).

[6] *See id.* at ¶ 1.1(33):

4

addition, almost identical to the language set forth in the Second Stipulation, the Plan stated that "[i]f the Cure Amount of any Conditionally Assumed Lease is not reconciled within sixty (60) days of the Effective Date either party may request a hearing on the disputed portion at the next omnibus hearing date on not less than ten (10) days notice." (Docket No. 3122 at ¶ 4.1(c)).[7] The reconciliation and payment of the Cure Amount under these provisions constitutes "a full and complete release, satisfaction and discharge of all monetary obligations under the Conditionally Assumed Lease," with the exception of certain charges which were not yet payable or known. *Id.*

    10.    Friarsgate notified BI-LO of the outstanding reconciled 2009 CAM charges due in the amount of $29,200.20. Pursuant to the parties' Lease, the "Lessor's Duty to Maintain Premises," are as follows[8]:

> Lessor covenants and agrees to keep in good order and repair the *parking and allied areas* and the demised building's *structural elements* (structural elements shall include said elements of building's load bearing

---

    "Conditionally Assumed Lease" means an unexpired lease of non-residential real property that has been conditionally assumed by the Debtors pursuant to the Conditional Assumption Order and for which a "Second Stipulation" has been filed as listed on the *Third Supplement to the Motion of the Debtors for Entry of an Order Authorizing the Debtors to Enter into Second Stipulations with Landlords Extending the Time to Assume or Reject Unexpired Leases of Nonresidential Real Property Pursuant to 11 U.S.C. § 365(d)(4) and to Pay Cure Costs and Conditionally Assume Leases in Connection Therewith*, filed by the Debtors on February 19, 2010 [Docket No. 2641].
(emphasis in original).

[7] The Effective Date of the Plan was May 12, 2010; therefore, sixty (60) days from the Effective Date was July 12, 2010.

[8] Other provisions of the Lease describe in detail the duties of the Lessor to maintain the premises. For example, Paragraph 1D for "Parking" states the following:
> In said center Lessor shall at Lessor's expense provide and maintain in good order and repair . . . the customer parking areas (and also properly keep painted and maintained in good order and repair thereon vehicular parking spaces and traffic direction signs so as to provide effective and orderly parking and traffic control) . . . Lessor shall, at Lessor's expense, install in said parking areas new and modern metal poles and electric light fixtures for the sufficient and adequate lighting of a modern shopping center . . . Lessor shall pay for the electricity necessary for lighting said parking areas during the night hours Lessee operates its business in the demised building, but no later than one hour after closing. Lessor shall at Lessor's expense maintain said poles and electric light fixtures in good order and repair, and make any needed replacements thereof . . .

(Debtors' Exhibit A, Lease Agreement ¶ 1D).

5

walls, roof, marquis, floor (excluding floor coverings) and foundation), the roof and *exterior walls* (exclusive of all glass including plate glass). Lessor shall further be responsible for any and all *unexposed and exterior utility and service pipes*, lines and conduits, which includes the required replacement of fixtures and lines pertaining to the *water, sewer, electrical and sprinkler systems* resulting from normal wear, tear and use or to damage other than that due to the willful or negligent act or omission of Lessee . . .

(Debtors' Exhibit A, Lease Agreement ¶ 9A) (emphasis added).

11. The Lease allows the Lessor to charge BI-LO for the following expenses, in addition to the standard rental rate:

For each calendar month during the term of this Lease, Lessee shall pay to Lessor as additional rent at the end of each month, upon notice, its pro rata share of the cost of the *common area maintenance* of the Shopping Center for the preceding month. Lessee's pro rata share shall be measured by the amount of square footage of floor space occupied by Lessee in relationship to the total amount of rentable square footage of floor space in the Shopping Center. The common area maintenance *shall include, but no be limited to, items* such as cleaning and sweeping, snow and ice removal, lighting, policing and repainting or striping of the *parking area*, and watering and maintenance of *landscaped areas* . . .

*Id.* at ¶ 9B (emphasis added).

12. Although the Lease does not define "common areas" of the Premises, they are discussed under the "Use of Common Areas" provision, which states that:

Lessee shall have a non-exclusive right of use of all *streets, driveways* and *alleys* adjoining said premises. *Customer parking areas* provided by Lessor on or about the Shopping Center are acknowledged by Lessor and Lessee to be for use by customers of all tenants of the Shopping Center. Lessee shall instruct its employees not to use said *parking areas, the streets, alleys,* or *vacant lands* in said Shopping Center for parking or storage of any automobiles, trucks or vehicles owned or used by them except as may be approved by Lessor. Free parking areas for use of Lessee's employees shall be provided by Lessor as shown on Exhibit A.

*Id.* at ¶ 16 (emphasis added).

13. Pursuant to the Lease, BI-LO's responsibilities under "Lessee's Duty to Maintain Premises" specifically include[9]:

> Lessee shall, *at its own expense*, keep and maintain the said premises and appurtenances and every part thereof, in good order and repair except that portion of the premises to be maintained and repaired by Lessor as herein provided. Lessee agrees also to keep all fixtures and exposed interior lines pertaining to heating, air conditioning, water, sewer, electrical and sprinkler systems in good order and repair . . . Lessee shall make good any damage to plate glass in the demised premises unless such damage results from the willful or negligent act or omission of Lessor, or from structural defects in or settling of the building . . .

*Id.* at ¶ 10.

14. Friarsgate invoices and sends BI-LO a notice of outstanding CAM charges during the first quarter of the following year. For example, the invoice for the 2001 CAM charges is dated February 12, 2002, and the invoice for the 2007 CAM charges is dated January 30, 2008. However, testimony is unclear as to when the invoice for the 2009 CAM charges was sent to BI-LO.

15. The testimony indicated that it has been the practice of the parties to participate in reconciliation discussions after Friarsgate sends the invoice to BI-LO. During this time, BI-LO and Friarsgate negotiate which CAM charges will be honored.

16. Testimony and evidence presented at the Hearing established that sometime after the confirmation of the Plan, Friarsgate sent BI-LO an invoice for the 2009 CAM charges due in the amount of $29,200.20. The testimony of Ms. Octavia

---

[9] In addition to "Lessee's Duty to Maintain Premises," Lessee has the right to undergo the following actions on the Premises:
> Lessee shall have the right and privilege to make such alterations, improvements, additions and changes, structural and otherwise . . . at its own cost and expense, in and do the demised premises in such manner as it may deem necessary or convenient to promote the interest of its business; provided, however, that major changes to the structural portions of the buildings must first be submitted to Lessor for its written approval, which approval shall not be unreasonably withheld.

*Id.* at ¶ 7C.

7

Andrews indicated that the bill for the 2009 CAM charges included $21,082.00 for exterior painting of the walls of the Premises as well as $145.00 for plumbing repairs.

17. By letter dated October 6, 2010, BI-LO disputed the 2009 CAM charges. BI-LO asserted that the charges for exterior painting and plumbing repairs were not within the scope of CAM charges billable to this tenant under the terms of the Lease and thus, were Friarsgate's responsibility under the Lease. BI-LO tendered a payment to Friarsgate in a lesser amount, representing what it believed to be both the pre- and post-petition cure amounts for 2009 taxes and CAM. (Movant's Exhibit 1, Friarsgate Inventory Statements).

18. Testimony and evidence presented at the Hearing revealed that some charges relating to exterior painting and plumbing have been billed by Friarsgate and paid for by BI-LO as part of CAM reconciliation in prior years. In 2001 and 2002, Friarsgate charged painting of a rear wall and plumbing repairs as CAM. *Id.*

19. Testimony and evidence presented at the Hearing also established that in prior years BI-LO has tendered payments to Friarsgate for less than the invoiced CAM amount and Friarsgate has accepted these reduced payments. For example, in 2007 BI-LO disputed CAM charges for plumbing and exterior line repairs. BI-LO tendered payment only for $10,660.97, despite being billed $14,321.97 for CAM, and Friarsgate accepted this amount. In addition, BI-LO was billed $7,303.18 for CAM in 2001; however, BI-LO tendered payment only for $7,139.18, which was also accepted by Friarsgate. *Id.*

20. The parties' Lease contains a "No Waiver" clause which states that:

No failure of either party hereto to exercise any power given unto such party hereunder or to insist upon strict compliance by the other party with

8

>any obligation of the other party hereunder, and no custom or practice of either party at variance with the terms hereof shall constitute a waiver of the other party's right to demand exact compliance with the terms hereof.

(Lease Agreement ¶ 34).

## CONCLUSIONS OF LAW

### Jurisdiction

The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334 and Local Civil Rule 83.XI.01, DSC. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (B). Venue of this proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

### Timeliness of Motion

BI-LO asserts that Friarsgate's Motion is not timely because it was filed after deadlines established by the Second Stipulation and the Plan. However, after reviewing the language of the Second Stipulation and the Plan, the Court cannot conclude that either document contains absolute deadlines for Friarsgate to file its Motion or any consequences for failing to file a Motion asking this Court to determine the amount in controversy.

BI-LO contends that the Second Stipulation required motions for additional Cure Amounts to be filed within sixty days of the January 21, 2010 Order approving the Stipulations. Therefore, any motion for additional Cure Amounts not filed by March 22, 2010, would be time barred. In addition, BI-LO asserts that the Plan provided a similar deadline to file motions for addition Cure Amounts, which was no later than sixty days after the May 12, 2010 Effective Date of the Plan. Thus, motions filed after July 13, 2010, would be time barred as well. However, both the Second Stipulation and the Plan

9

state that if the parties cannot reconcile the cure amount "within sixty (60) days of the entry of the order approving the Second Stipulation [or Effective Date], either party *may* request a hearing on the disputed portion at the next omnibus hearing date on not less than ten (10) days notice." (Docket Nos. 2633 ¶ 2 & 3225 at ¶ 4.1(c)) (emphasis added). The Court finds that the use of the term "may" implies that it is optional for Friarsgate to file the motion to set the hearing on the next omnibus hearing date. The language does not establish that it is strictly required that the Motion be filed in time for a hearing to be scheduled on the next omnibus hearing date, it only requires that the parties wait sixty days before making such a request. Further, there are no consequences stated for any failure to make such a request. If BI-LO intended to establish an absolute deadline for bringing forth motions to determine Cure Amounts it should have included definitive language such as "must," "shall" or "is required to." Absent such absolute or direct terms, the Court cannot conclude that the Second Stipulation or the Plan imposes a strict deadline for Friarsgate to file its Motion for an additional Cure Amount.

In addition, the provisions state that "*either party* may request a hearing . . ." Although Friarsgate may be the party seeking a determination of the CAM charges in order to receive a higher payment from BI-LO, the terms the provisions do not place the duty solely on Friarsgate to file such motions. The Second Stipulation and Plan direct *either party* to request a hearing to determine the disputed amount. Therefore, both Friarsgate and BI-LO may be responsible for coming forward and requesting a hearing.

Overall, the Second Stipulation and Plan set forth the manner in which these two parties may resolve any disputes over the Cure Amount. The Court, therefore, finds that the language of the Second Stipulation and Plan is too vague to establish a strict deadline

10

to file motions to request a hearing to determine the Cure Amount and a waiver or bar thereof if the request is not filed by Friarsgate, as asserted by BI-LO.

Meaning of Common Area Maintenance under the Lease

Friarsgate contends that BI-LO is required to pay the full invoiced CAM amount of $29,200.20 because, pursuant to the Lease, CAM charges include those incurred for exterior painting and plumbing. Friarsgate relies on language included in Paragraph 9B of the Lease that states "[t]he common area maintenance shall include, *but not be limited to*, items such as . . ." (Lease Agreement ¶ 9B) (emphasis added). It is Friarsgate's contention that the "but not be limited to" language indicates that the areas and specific services listed in Paragraph 9B are merely illustrative and do not constitute an exclusive list of what services and repairs constitute CAM or where they may be conducted.

On the other hand, BI-LO asserts that the terms of the Lease do not include exterior painting and plumbing as CAM. BI-LO contends that, pursuant to Paragraph 9B, CAM only pertains to repairs involving the parking and landscaped areas. *See id.* In addition, BI-LO claims that exterior painting and plumbing are specifically enumerated as Friarsgate's responsibility under Paragraph 9A, "Lessor's Duty to Maintain Premises." *Id.* at ¶ 9A ("Lessor covenants and agrees to keep in good order and repair . . . the demised building's structural elements . . . the roof and *exterior walls* . . . Lessor shall further be responsible for any and all *unexposed and exterior utility and service pipes*, lines and conduits . . .) (emphasis added)).

"Lease provisions are construed under rules of contract interpretation." *South Carolina Dep't of Transp. v. M & T Enter. of Mt. Pleasant, LLC*, 379 S.C. 645, 654, 667 S.E.2d 7, 12 (Ct. App. 2008) (citations omitted).

11

> The cardinal rule of contract interpretation is to ascertain and give effect to the intention of the parties. In determining the intention of the parties, the court first looks to the language of the contract. If the language is clear and unambiguous, the language alone determines the contract's force and effect.

*United Dominion Realty Trust, Inc. v. Wal-Mart Stores, Inc.*, 307 S.C. 102, 105, 413 S.E.2d 866, 868 (Ct. App. 1992) (internal citations omitted). "In arriving at the intention of the parties, the lease must be construed as a whole and different provisions dealing with the same subject matter are to be read together." *Skull Creek Club Ltd. P'ship v. Cook & Book, Inc.*, 313 S.C. 283, 286, 437 S.E.2d 163, 165 (Ct. App. 1993).

"Whether the language of a [lease] is ambiguous is a question of law to be determined by the court from the terms of the [lease] as a whole." *State Accident Fund v. South Carolina Second Injury Fund*, 388 S.C. 67, 75, 693 S.E.2d 441, 445 (Ct. App. 2010). The lease must be "read as a whole document so that one may not create an ambiguity by pointing out a single sentence or clause." *Alexander's Land Co., L.L.C. v. M & M & K Corp., et al.*, 703 S.E.2d 207, 215 (S.C. 2010) (citations omitted); *see also United Dominion Realty Trust, Inc.*, 307 S.C. at 105, 413 S.E.2d at 868 ("[T]he purport of a written agreement is to be gleaned from the contents of the whole instrument." (citations omitted)). Looking at the Lease as a whole, the Court finds it apparent that the parties intended for those duties listed in 9A to be at the expense of the Lessor unless specifically indicated otherwise elsewhere in the Lease.

The fact that Paragraph 9A does not include the words "at the expense of the Lessor" does not mean the Lessee must pay for the Lessor's duties listed therein. Construing the language of the Lease in such a manner is not a reasonable interpretation considering other provisions of the Lease. For example, paragraph 1D describes the

12

parking areas of the premises and lists specific duties that the Lessor must perform and pay for within that area. *See* Lease Agreement ¶ 1D. Because the Lease elsewhere states that the Lessor is required to maintain the parking areas at its own expense, it is not necessary for this to be reiterated in 9A. It would be redundant to include such language in 9A when other provisions of the Lease already establish the Lessor's obligation to fund such services and repairs.

Furthermore, the parties would have included exclusionary language in the Lease when they intended to except the duties of Paragraph 9A from being at the Lessor's expense. For instance, Paragraph 9A excludes floor coverings and plate glass from the Lessor's duties. *See id.* at ¶ 9A. Paragraph 10 supplements this by specifically stating that the Lessee must repair and pay for any damage to plate glass "unless such damage results from the willful or negligent act or omission of Lessor, or from structural defects in or settling of the building." *See id.* at ¶ 10. Thus, if the parties intended for Lessee to pay for those duties enumerated in Paragraph 9A, the Lease would have clearly stated this elsewhere.

Other provisions of the Lease imply that the responsibilities of Paragraph 9A are at the expense of the Lessor. Paragraph 7C states that "Lessee shall have the right and privilege to make such alterations, improvements, additions and changes, structural and otherwise . . . at its own cost and expense . . ." *Id.* at ¶ 7C. When read with Paragraph 9A, this provision implies that the structural elements of the Premises are to be maintained and funded by the Lessor and only improvements or alterations to such areas are at the expense of the Lessee. Therefore, despite the fact that Paragraph 9A does not specifically state "at the expense of Lessor," the Lease as a whole implies that the duties listed in 9A

13

are at the expense of the Lessor unless otherwise specifically provided in the Lease. The Court also finds that the term "but not limited to" in Paragraph 9B refers to the *services, repairs or types of maintenance* conducted on or within the parking and landscaped areas that may constitute CAM.[10]

At the Hearing, Friarsgate argued that the exterior painting qualifies as CAM because it improved the Premises' appearance which "benefitted all the tenants." (Docket No. 3769). However, the Court can find no language in the Lease defining CAM as maintenance or repairs undergone that "benefit all the tenants."

Because no other provision of the Lease implies that exterior walls and plumbing may constitute "common areas" to conduct CAM, the Court does not find Friarsgate's interpretation of Paragraph 9B to be reasonable. Therefore, the Court adopts BI-LO's interpretation of Paragraph 9B[11] and BI-LO is not required to pay the $21,082.00 for exterior painting of the walls and the $145.00 for plumbing billed in the 2009 CAM invoice.

## Parties' Prior Dealings

Both parties contend that their course of dealings demonstrates that exterior painting and plumbing do or do not constitute CAM. Friarsgate asserts that BI-LO's payment for such repairs in the past evidences that they constitute CAM charges. However, BI-LO argues that because it has objected to and not paid for such charges in the past, the parties' prior dealings establish that exterior painting and plumbing are not repairs within the meaning of CAM.

---

[10] See also, paragraph 16, "Use of Common Areas," describes what the "common areas" are, which gives credence to the Court's interpretation of what CAM includes. *See id.* at ¶ 16.

[11] *See* Movant's Exhibit 2, Letter of Octavia Andrews (stating that "based on the verbiage, 'but not limited to' would imply expenses that are not specifically stated but those that would only relate to the common area parking and landscaped areas.").

14

Despite the fact that "[i]f a contract is unambiguous, extrinsic evidence cannot be used to give the contract a meaning different from that indicated by its plain terms," *United Dominion Realty Trust, Inc.*, 307 S.C. at 105, 413 S.E.2d at 868, this Court believes the parties' prior dealings are worth addressing. The fact that Friarsgate has charged and received payment for such repairs as CAM in prior years and BI-LO has refuted such charges in the past has no bearing on the Court's interpretation of the Lease. The Lease contains a "No Waiver" clause which states that "no custom or practice of either party at variance with the terms hereof shall constitute a waiver of the other party's right to demand exact compliance with the terms hereof." (Lease Agreement ¶ 34). Therefore, this provision prevents the parties' actions from overruling or changing the terms of the Lease. In addition, because such prior dealings fall in favor of and against both parties, the Court concludes that the parties' prior course of conduct does not carry any persuasive weight.

The Court therefore holds that:

1. Friarsgate's Motion was timely and is not barred by provisions in the Second Stipulation or the Plan; and
2. The disputed 2009 CAM charges for exterior painting and plumbing do not constitute CAM, as defined by the Lease, and are, thus, the responsibility of and to be paid for by Friarsgate.

**AND IT IS SO ORDERED.**